IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO - CLEVELAND DIVISION

_____

DEMETRIUS KERN,

      Plaintiff,

    v.                        Case No.

NAFTALI WOLF, et al.,        1:23-CV-1327

      Defendants.

_____

VIDEOTAPED DEPOSITION OF

CARLY LEWIS

DATE:         Thursday, June 13, 2024

TIME:         9:04 a.m.

LOCATION:    Baker Dublikar Beck Wiley & Mathews

             400 South Main Street

             North Canton, OH 44720

REPORTED BY:  David Ross

JOB NO.:     6742301

```
 1                   A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF DEMETRIUS KERN:

 3        CHRISTOPHER WIEST, ESQUIRE

 4        Chris Wiest, Atty at Law, PLLC

 5        50 East Rivercenter Boulevard, Suite 1280

 6        Covington, KY 41011

 7        chris@cwiestlaw.com

 8        (513) 257-1895

 9

10        THOMAS B. BRUNS, ESQUIRE

11        Bruns, Connell, Volmar & Armstrong, LLC

12        4555 Lake Forest Drive, Suite 330

13        Cincinnati, OH 45242

14        tbruns@bcvalaw.com

15        (513) 312-9890

16

17   ON BEHALF OF DEFENDANT NAFTALI WOLF:

18        TOMMY H. KACZKOWSKI, ESQUIRE

19        Reminger Co., LPA

20        200 Civic Center Drive, Suite 800

21        Columbus, OH 43215

22        tkaczkowski@reminger.com

23        (614) 232-2443

24

25
```

1          A P P E A R A N C E S (Cont'd)

2   ON BEHALF OF DEFENDANT CLEVELAND HEIGHTS AND CARLY

3   LEWIS:

4        GREGORY A. BECK, ESQUIRE

5        Baker Dublikar Beck Wiley & Mathews

6        400 South Main Street

7        North Canton, OH 44720

8        beck@bakerfirm.com

9        (330) 499-6000

10

11   ALSO PRESENT:

12        Ivan Bercian, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   I N D E X

 2   EXAMINATION:                              PAGE

 3        By Mr. Wiest                           7

 4

 5                E X H I B I T S

 6   NO.            DESCRIPTION                 PAGE

 7   Exhibit 1      Policy and Procedure Manual   80

 8   Exhibit 8      Certification List            21

 9   Exhibit 9      Final Evaluation              52

10   Exhibit 10     Police Report                101

11   Exhibit 10a    CW Version of Road - By Hand  120

12   Exhibit 11     Body Cam Footage - Video     207

13   Exhibit 16     Radio Traffic - Audio        204

14   Exhibit 17     First Video                  194

15   Exhibit 17a    Second Interview - 10/20 Video 202

16   Exhibit 21     Obstructing Code 525.07      186

17   Exhibit 24     Charges Filed                247

18   Exhibit 25     Judgment Entry               193

19   Exhibit 36     Anonymous Email              255

20   Exhibit 40a    Interrogatory Responses      252

21

22          QUESTIONS INSTRUCTED NOT TO ANSWER

23                    PAGE      LINE

24                    256        3

25                    258        4
```

1                   P R O C E E D I N G S

2              THE REPORTER:  Good morning.  My name

3    is David Ross; I am the reporter assigned by Barlow Reporting

4    to take the record of this proceeding.  We are now on

5    the record at 9:04 a.m.

6                   This is the deposition of Carly Lewis

7    taken in the matter of Demetrius Kern vs. Naftali

8    Wolf, et al. on Thursday, June 13, 2024, in North

9    Canton Ohio, Stark County.

10                  I am a notary authorized to take

11   acknowledgments and administer oaths in Ohio.  Parties

12   agree that I will -- oh, nope.

13                  Additionally, absent an objection on

14   the record before the witness is sworn, all parties

15   and the witness understand and agree that any

16   certified transcript produced from the recording of

17   this proceeding:

18              - is intended for all uses permitted

19                  under applicable procedural and

20                  evidentiary rules and laws in the

21                  same manner as a deposition recorded

22                  by stenographic means; and

23              - shall constitute written stipulation

24                  of such.

25                  This proceeding will be recorded via

Page 6

1  video technology by Ivan Bercian from Barlow Reporting

2  & Video Services.

3                    At this time will everyone in

4  attendance please identify yourself for the record,

5  beginning with you, Mr. Wiest.

6                    MR. WIEST:  Chris Wiest and my

7  colleague Tom Bruns are here for the plaintiff,

8  Demetrius Kern.

9                    MR. BECK:  I'm Greg Beck.  I'm here on

10  behalf of Cleveland Heights and Officer Carly Lewis.

11                    MR. KACZKOWSKI:  Tommy Kaczkowski, on

12  behalf of Defendant Naftali Wolf.

13                    THE REPORTER:  Thank you.

14                    Hearing no objections, I will now swear

15  in the witness.

16                    Ms. Lewis, please raise your right

17  hand.

18  WHEREUPON,

19                         CARLY LEWIS,

20  called as a witness and having been first duly sworn

21  to tell the truth, the whole truth, and nothing but

22  the truth, was examined and testified as follows:

23                    THE REPORTER:  Thank you.

24                    We may proceed.

25  //

1                      EXAMINATION

2   BY MR. WIEST:

3        Q    Let me just get a preliminary from you.  Can

4   you state your name for the record?

5        A    Carly Lewis.

6        Q    I have a couple of ground rules today, and I

7   am assuming that you have testified before in court

8   proceedings.

9        A    Yes, sir.

10        Q    This is just like a court proceeding in the

11   sense that there's a reporter, it's under oath, but

12   it's a little bit different because there's no judge

13   here to adjudicate objections and that kind of thing.

14        I am likely today to ask a bad question that you

15   may not understand.  And if I do that, if you let me

16   know, I will fix it.  And if you answer it, I'm going

17   to assume you understand; fair?

18        A    Fair.

19        Q    If you need a break at any time today, let

20   us know.  This is not a marathon.  We've got a fair

21   amount to go over, and we'd be happy to take a break.

22             The only ground rule that I've got on that

23   is if I've got a question pending, I'm going to ask

24   you to answer it, and then we'll adjourn and take as

25   many breaks as you need; okay?

1      A    Yes, sir.

2      Q    And I know you know this because you've

3  given testimony before, I need answers to be verbal.

4  No head nods even though we've got a video and things

5  like that; okay?

6      A    Yes, sir.

7      Q    And one final ground rule and then we'll get

8  into the substance of this.  If -- well, maybe that's

9  it.  I think that's probably it.  I may have another

10  ground rule as we go.  Yeah, that was what it was.  If

11  you can avoid talking over me, I will do my best to

12  avoid talking over you so that they can get a clear

13  transcript.

14      A    Yes, sir.

15      Q    Okay.  Can you tell me a little bit about

16  your educational background?  Do you have any -- where

17  did you go to high school?

18      A    I went to high school at Garfield Heights

19  High School in Garfield Heights, Ohio.

20      Q    And you graduated?

21      A    Yes, sir.

22      Q    Do you have any education beyond that?

23      A    Yes, sir.

24      Q    Where?

25      A    I went to community college while active

1    duty at Mississippi Gulf Coast Community College.

2    Once I got out of the military, I completed my

3    bachelor's degree in Florida at Florida Atlantic

4    University.

5          Q     What was that degree in?

6          A     Public Safety Administration.

7          Q     What year did you get that?

8          A     2015 going into 2016.

9          Q     Is that a Bachelor of Arts, Bachelor of

10   Science?

11         A     It's a Bachelor of Public Safety

12   Administration.

13         Q     Okay.  You said you were in the military?

14         A     Yes, sir.

15         Q     What branch?

16         A     United States Navy.

17         Q     From what years?

18         A     2008 to 2013.

19         Q     Honorable discharge?

20         A     Yes, sir.

21         Q     Did you have any reserve commitment after

22   that?

23         A     No, sir.

24         Q     Did you go into the Navy right out of high

25   school?

1      A    No, sir.

2      Q    Okay.  What did you do right after high

3  school?

4      A    I actually sold cars for a few years.

5      Q    Okay.  Where did you do that at?

6      A    In Bedford, Ohio at Mazda, Saab and Lotus.

7  And then also in Cleveland at Westside Automotive

8  Group.  And that was Mazda Land Rovers and Jaguars.

9      Q    What year did you graduate high school?

10     A    2006.

11     Q    Okay.  So you sold cars for about two years

12  and then you went into the Navy.

13     A    And clerical things in between.

14     Q    Were any of those clerical things in between

15  in either the legal business, law enforcement, courts,

16  anything involving that?

17     A    No, sir, automotive industry.

18     Q    Okay.  What was your specialty in the Navy?

19     A    I was an equipment operator.

20     Q    Okay.  I wasn't sure if it was military

21  police or anything like that.  That's why I asked.

22     A    I did do background investigations for the

23  last two years of my service.

24     Q    Did you do that through NCIS or did you do

25  that --

1      A     It was through Office of Personnel

2   Management.

3      Q     Okay.  OPM.  All right.  Did you have any

4   other law enforcement type roles while you were in the

5   Navy?

6      A     No, sir.

7      Q     Okay.  2013, you're discharged from the

8   Navy.  What happened?  What did you do next by way of

9   work?

10     A     I was working back in the automotive

11  industry.  For a few months I was doing service

12  appointments and cashier.  And then I got into

13  collision while I was going to school at night.

14     Q     When you say you got into collision, like

15  repair work?

16     A     No, administrative.  So customer service and

17  accounting.

18     Q     Okay.  How long did you do that for?

19     A     Probably about two years or so.

20     Q     2015?

21     A     Maybe like -- yeah, "ish."

22     Q     Okay.  And then what did you do after that?

23     A     The job became very demanding and I took a

24  position with an insurance underwriting company for a

25  few months, almost a year.  And then once I graduated

Page 12

1    college, I moved back to Ohio.

2         Q    So were you doing the 2013 to 2015

3    automotive work, what state were you doing that in?

4         A    In Florida.

5         Q    Okay.  Where in Florida?

6         A    Fort Lauderdale.  And then also I would work

7    at our office in Hallandale Beach.

8         Q    Was it used or new automobiles?

9         A    That was collision.

10        Q    Okay.  So that was pretty much repair work?

11        A    Insurance claims, yes.

12        Q    Okay.  You said you then took a position in

13   underwriting for which insurance company?

14        A    It wasn't an insurance company specifically.

15   It was -- I didn't do underwriting.  I was just a

16   customer service.  So I would kind of just -- it was

17   for trucking.

18        Q    Okay.

19        A    And I still don't understand insurance

20   underwriting, but I think it was for multiple

21   different companies.  I wasn't sure quite what the

22   underwriters did, per se.

23        Q    Were you involved in helping to procure

24   policies for customers?

25        A    No, sir.

1      Q    Okay.  What sorts of things were you doing

2  in the insurance underwriting context?

3      A    Just basically answering phone calls,

4  directing clients to the appropriate underwriter or

5  their assistant, and then pulling safer reports for

6  trucking companies, and preparing that for the

7  underwriter.

8      Q    So you were kind of an administrative

9  assistant?

10     A    Correct.

11     Q    Okay.  2015, you graduated and you got your

12  bachelor's degree in public safety administration.

13  What did you do then?

14     A    I continued working in the insurance

15  underwriting, and then February of 2016, I relocated

16  back home to Ohio.

17     Q    Okay.  When you relocated, did you have a

18  job lined up?

19     A    No, sir.

20     Q    Okay.  Why did you choose to relocate?

21     A    Say again.

22     Q    Why did you choose to relocate back to Ohio?

23     A    I wasn't really finding a job in Florida to

24  support the cost of living.  And my family is here.

25     Q    That begets another question.  I'm going to

Page 14

1    tell you why I'm asking.  This case, there's been a

2    jury demand, and we are pooling jurors from Cuyahoga

3    County and some of the surrounding counties.  Is all

4    of your family in Cuyahoga County and the surrounding

5    families, is their last name Lewis?

6         A    Yes.

7         Q    Is anybody's last name not Lewis?

8         A    My mother's.

9         Q    And what is that last name?

10        A    Raulston, R-A-U-L-S-T-O-N.

11        Q    And does that cover all of the family and

12   extended family, in the Cleveland area?  From a last

13   name perspective?

14        A    My siblings are married.

15        Q    What is their last name?

16        A    Maksym, M-A-K-S-Y-M.

17        Q    Okay.  Any other last names from a family

18   perspective?

19        A    My brother's wife, my sister-in-law, her

20   last name was Hyde.  H-Y-D-E.

21        Q    Okay.  Any other last names?

22        A    No, sir.

23        Q    Okay.

24        A    Wilken, sorry.

25        Q    W-I-L-K-I-N?

1        A     K-E-N.

2        Q     K-E-N, okay.

3        A     My aunt and uncle.

4        Q     Okay.  All right.  By the way, are you

5   married?

6        A     No.

7        Q     Okay.  So you moved back to Ohio.  Did you

8   move in back in with your parents?

9        A     I did.

10       Q     And what happened then from a work

11  perspective?

12       A     I started working at a company called No

13  Shock in Berea, doing administrative assistant work.

14       Q     Okay.  How long did you do that for?

15       A     Oh, only a couple months.

16       Q     Okay.  And then what?

17       A     They were moving me into a sales position

18  role.  During that role I realized I did not like it,

19  and then I was also bartending part-time in addition

20  to that job.

21       Q     Okay.

22       A     And I kind of bounced around, trying a few

23  different jobs out.  I worked for a recruiting office

24  for a legal group for only a few months.

25       Q     Was that like the placement of attorneys or

1    administrative assistants or paralegals?

2        A    No, it was sort of like one of the customer

3    service -- when you -- When people have, like, job --

4    I don't know how to explain it.  Basically, like, if

5    your job offered legal assistance, you would call a

6    hotline number, and it was kind of like a prompted

7    script, like, "Who are you covered through," type

8    of -- kind of like a customer service job on that

9    level.

10       Q    Is that like the legal insurance some people

11   procure where it covers -- it provides attorneys for

12   common claims?

13       A    No, it's more of like, "Does my company

14   provide me with a written will?"

15       Q    Okay.

16       A    Is that covered on that level, or do I have

17   resources to -- like legal assistance.

18       Q    Did any aspect of that job touch on law

19   enforcement or the legal aspects that are involved in

20   any law enforcement activity?

21       A    No, sir.

22       Q    Did you get into any of that in your

23   bachelor's degree?  In other words, law enforcement,

24   the laws that surround it, constitutional rights,

25   anything like that?

1     A    I can't recall.

2     Q    Okay.  It may have, but you don't remember

3 it.

4     A    Correct.

5     Q    What did you do next?

6     A    I took a semester for paralegal while

7 bartending.  And while bartending, I just kind of quit

8 all the office jobs.  I was making more money

9 bartending in less time.

10    Q    Where did you take a semester of paralegal

11 courses at?

12    A    Tri-C.

13    Q    I think we're familiar with Tri-C.  And how

14 long was that whole course?

15    A    I only took a semester.  I was determining

16 if I wanted to go to law school or to the police

17 academy.

18    Q    Okay.  If you would have completed the

19 course, how long would it have been?

20    A    I'm not sure.  Maybe two years.

21    Q    Okay.

22    A    Maybe -- yeah, like a year or two.

23    Q    Okay.  Did any of the paralegal classes that

24 you take touch on law enforcement law, constitutional

25 rights, anything like that?

1       A     No, not that I recall.

2       Q     And so did you then go to the Police

3    Academy?

4       A     I went to the Police Academy in 2017 into

5    2018.

6       Q     Okay.  Was that sponsored by Cleveland

7    Heights?

8       A     No, sir.

9       Q     Okay.  Which police academy did you go to?

10      A     To the Cleveland Heights Police Academy.

11      Q     Did that mean if you graduated that you

12   would be hired by Cleveland Heights?

13      A     No, sir.

14      Q     Okay.

15      A     I was an open enrollment student.

16      Q     And you were bartending at the time, or did

17   you stop bartending while you were at the academy?

18      A     I continued to bartend.

19      Q     Okay.  All of that employment that we went

20   over, was any of it ended involuntarily?  In other

21   words, you know, basically you were fired from any of

22   those jobs?

23      A     My first job out of high school in 2006 at

24   Mazda Bedford.

25      Q     Okay.  Why were you fired?

1       A     I was contemplating going into the military

2    and the sales manager was like, "Well, if this isn't

3    your career, then you could just leave."

4       Q     Okay.

5       A     So I left.

6       Q     You said open enrollment for the police

7    academy.  What were the other options?

8       A     Wherever I wanted to apply.  So open

9    enrollment is somebody who's -- I'm paying for myself

10   to go through the police academy.  I'm putting myself

11   through.  So it wasn't -- it would be basically any

12   agency that was hiring I could apply within.

13      Q     As opposed to being sponsored by a

14   department where then you would have to go to work for

15   that department.

16      A     Correct, correct.

17      Q     And as a consequence of that you were paying

18   the tuition for the Academy versus the sponsoring

19   department paying the tuition.

20      A     I was utilizing my G.I. Bill.

21      Q     Okay.  How long was the police academy?

22      A     Approximately seven to eight months long.

23      Q     Did you have any courses in the course and

24   scope of the police academy that dealt with any

25   aspects of Ohio statutory law?

1          A     I believe so yes.

2          Q     What about the specifics and the

3    requirements of obstruction charges under Ohio law?

4    Was that covered?

5          A     Not that I recall.

6          Q     What about the specifics of constitutional

7    rights?  Did you have any courses on that?

8          A     I'm sure.

9          Q     Do you recall any?

10         A     I can't recall.

11         Q     Let me get into some more specifics on that.

12   Anything that talked about First Amendment rights, the

13   right to protest or complain about government

14   activity.  Did you have any courses on that?

15         A     I believe so.

16         Q     Okay.  What do you recall from that?

17         A     I don't recall specifics.

18         Q     How about Fourth Amendment, probable cause

19   for arrest, use of force.  Did you have any courses on

20   that?

21         A     I believe so.

22         Q     Okay.  What do you recall about that?

23         A     I just -- I don't recall specifics.  I just

24   recall probably going over it.

25         Q     Okay.  And my understanding is, and we're

1  going to look at some records in a minute, you

2  graduated the police academy or at least received your

3  certification on or about July 2, 2018?

4      A    Yes, sir.

5      Q    Okay.  I've got your certifications.  We're

6  going to go look at them.  I've marked it already as

7  Exhibit 8.

8              (Exhibit 8 was marked for

9              identification.)

10             I wanted to start, the first page of this

11  Exhibit 8.  And, ma'am, I will represent to you, I

12  pulled all of your certificates that were produced to

13  us, I think via an open records request prior to the

14  filing of this lawsuit.  And I looked for ones that

15  might have some relevance to the claims or defenses in

16  this case.  You agree the first page is your

17  certificate; right?

18     A    Yes, sir.

19     Q    And did you go to work for Cleveland Heights

20  right after you graduated the academy?

21     A    Yes, sir.

22     Q    Tell me about that.  Did you apply while you

23  were in the academy?

24     A    I did, yes, sir.

25     Q    How long prior to graduation did you apply?

Page 22

1      A     A few months prior.  I don't recall the

2  exact month or date.

3      Q     Like did they come in because they were

4  running the police academy and try and recruit members

5  of the class because they had openings?  Is that how

6  that worked?

7      A     No.

8      Q     Okay.  How did you come to apply for

9  Cleveland Heights?

10     A     In the police academy at Cleveland Heights,

11  we have a job board and the academy commander would

12  list -- he would post on the board all of the hiring

13  agencies.  In addition to Facebook had a page, they

14  would post hiring agencies.

15     Q     Okay.  And so did you begin work right on

16  July 2nd or was there like a little bit of a lapse

17  before you started?

18     A     I started -- I think it was the 3rd.

19     Q     So literally a day later?

20     A     Correct.  Yes, sir.  I believe that was my

21  hire date.

22     Q     Okay.  And I know we're going to look at

23  some other records later today, but my understanding

24  is when you began with the police department they put

25  you into the field training program?

1          A     Orientation and then field training.

2          Q     Okay.  Tell me about orientation.  How long

3     was that?

4          A     I think mine was approximately a week.

5          Q     What did you cover in orientation that you

6     recall, if anything?

7          A     Just getting into your uniforms,

8     familiarization with the department, just preparing to

9     go to the shift.

10          Q     Did you go over the department's policy and

11     procedure manual at that point?

12          A     Yeah, it was assigned to us.

13          Q     Like, did they go through it in a class or

14     did they just assign it to you and say read it?

15          A     Correct.

16          Q     Okay.  I asked -- yeah, let's clarify that.

17     I told you I was going to maybe ask --

18          A     Yes, sir.

19          Q     -- a bad question.  Did they assign it and

20     have you read it or did they like, in a classroom

21     setting, walk you through all of it?

22          A     No, it was assigned to me, and I was advised

23     to read it.

24          Q     Did they have you sign off on anything that

25     indicated that you had read it?

1       A     I don't recall that.

2       Q     Did you read it?

3       A     I did, yes, sir.

4       Q     Did you read all of it?

5       A     To the best of my ability.

6       Q     Did you have questions about it?

7       A     No.

8       Q     Was there anything in it that you didn't

9  understand?

10      A     Majority of it.

11      Q     Okay.  The majority of it you did not

12 understand?

13      A     At that moment, correct.  As a new person.

14      Q     Absolutely.  Did the department ever sit you

15 down and ask if you had any questions or if there's

16 anything you didn't understand?

17      A     No.

18      Q     How long was the FTO program?

19      A     Approximately six months.

20      Q     Okay.  We're going to look at some of your

21 FTO paperwork later today.  Tell me about how that

22 worked.

23      A     We -- in the program, I'm assigned to a

24 field training officer who I'm riding with for my

25 entire shift, whether it be an 8-hour shift or a 12-

1    hour shift.

2        Q    And as you're doing that -- by the way, was

3    there only one FTO that you were assigned?

4        A    I was assigned to -- I was assigned to two.

5    When they were not available, I rode with two others.

6        Q    And rode with, were they driving or were you

7    driving?

8        A    It would vary.  Sometimes they would drive,

9    sometimes I would drive.

10       Q    Was there a syllabus that had to be checked

11   off in terms of things that they were supposed to go

12   over in the course of the FTO program with you or was

13   it more you're on the job, you're taking calls and

14   they're reviewing calls with you after the fact or

15   maybe both?

16       A    Both.  We did have a syllabus to guide

17   through each phase of the FTO program.

18       Q    You said each phase.  Tell me about the

19   phases of the FTO program.

20       A    I think during my time there were four

21   phases.

22       Q    And what were they?

23       A    I don't recall exactly what phase.  And with

24   that being said, in a field training program, it's

25   hard to say on this day and at this time we're going

Page 26

1  to do domestic violence because you can't plan for

2  that.  You have to learn as it comes.

3      Q    Sure, so you would, for instance, maybe have

4  to check off a domestic violence box, and then when

5  you would respond to a call for domestic violence, you

6  would be able to do that; is that fair?

7      A    No.  We would have to go through it first.

8      Q    What do you mean by that?

9      A    We would -- so there's -- I couldn't check

10  off something I didn't learn.  So they could go over

11  the domestic violence policies or procedures with me,

12  but they don't like to check it off until the officer

13  actually takes a report for domestic violence.

14      Q    Okay.  So the way that it would work is

15  there may be a syllabus block for domestic violence in

16  the FTO program, and they would review the policies

17  and procedures and how to handle a call with you;

18  right?

19      A    If we didn't -- eventually we would get to a

20  domestic violence.

21      Q    Right, and then eventually there would be a

22  call for it --

23      A    Correct.

24      Q    -- for service related to that.

25      A    Yes.

1     Q     And then you would respond and they would

2  assess?

3     A     Correct.

4     Q     Okay.  Did any of the FTO program cover

5  First Amendment rights?

6     A     We didn't actually sit down and say, this is

7  this amendment or that amendment.  So I guess I would

8  answer no.

9     Q     Okay.  How about more generally the right of

10 citizens that's protected in the Constitution to make

11 complaints?  Did any of the FTO program cover that?

12    A     Not that I recall.

13    Q     Did any of the FTO program cover probable

14 cause for arrest?

15    A     Yes.

16    Q     What did you learn in the FTO program about

17 what was required to make an arrest.

18    A     Probable cause of a crime.

19    Q     Which means what?

20    A     Are you asking for the definition or --

21    Q     I'm asking, yeah, what you learned, what

22 probable cause was when it was present.

23    A     So probable cause of a crime, if there's a

24 commission of a crime that's probable cause or traffic

25 violations, the probable cause to stop a vehicle.

1    Q    Without using the words probable cause, in a

2  layperson's perspective, can you tell us what that is

3  and when it's present?

4                 MR. BECK:  Objection.

5                 Go ahead.  You can answer.

6                 THE WITNESS:  Can you repeat the

7  question?

8  BY MR. WIEST:

9    Q    Using a layperson's perspective, an average

10  juror off the street, explain what probable cause is

11  and when it's present, without using the words

12  probable cause.

13                 MR. BECK:  Objection.

14                 You can answer.

15                 THE WITNESS:  Okay.  My reason for

16  stopping a vehicle, a violation.

17  BY MR. WIEST:

18    Q    Okay.  Is it based on suspicion alone?

19                 MR. BECK:  Objection.

20                 Go ahead.

21                 THE WITNESS:  No, there's facts that go

22  with it.

23  BY MR. WIEST:

24    Q    Do you have to believe that it's more likely

25  than not that somebody has committed a crime?

1              MR. BECK:  Objection.

2              You can answer.

3              THE WITNESS:  I -- can you repeat the

4    question?

5    BY MR. WIEST:

6        Q    Do you have to believe that it's more likely

7    than not that someone has committed a crime?

8              MR. BECK:  Objection.

9              Go ahead.

10             THE WITNESS:  It's not always just a

11   crime for the reason to stop and speak with a person.

12   BY MR. WIEST:

13       Q    What about for an arrest?

14       A    What is the reason for somebody to be

15   arrested?

16       Q    Right.

17       A    If they're in violation for some reason,

18   maybe a warrant they have, which is confirmed through

19   leads.  If there's witnesses stating they observed

20   somebody committing a crime, if I observe the

21   commission of a crime.

22       Q    What if somebody simply says, "I want to be

23   arrested"; is that sufficient?

24             MR. BECK:  Objection.

25             Go ahead.

 1                THE WITNESS:  No.

 2   BY MR. WIEST:

 3        Q    Okay.  If you don't have a warrant and you

 4   don't have witness statements that a crime was

 5   committed, otherwise, you've got to observe a

 6   violation of the law; fair? For an arrest?

 7                MR. BECK:  Objection.

 8                Go ahead.

 9                THE WITNESS:  Yes.

10   BY MR. WIEST:

11        Q    Did any of your field training curricula

12   cover the elements or what was required for an

13   obstruction charge under Ohio law?

14        A    I don't recall.

15        Q    When did you finish -- and I know we've got

16   the records, and you can give me an approximate, we'll

17   look at the records later.  When did you finish your

18   field training?

19        A    Maybe in the fall, approximately.  I don't

20   recall the date or month.

21        Q    Because if you started July 3rd and it was

22   six months, I'm thinking, would it have been maybe

23   December or January?

24        A    It was -- I don't remember the exact month.

25   But it was -- I don't recall snow.  I don't recall it

1    snowing.  I think it was fall going into the cooler

2    weather.

3        Q    I think we've got an evaluation -- by the

4    way, was Lewis Alvis your FTO?

5        A    He was one of them.  He was my final

6    training officer.

7        Q    Okay.  And if he's got a report from

8    November of 2018, would that surprise you?

9        A    No.

10        Q    Okay.  Looks like, I'm just doing the math

11    here, July to November -- four months?

12        A    Approximately.

13        Q    Okay.

14        A    December 5, maybe.

15        Q    Okay.  We'll look at the report later this

16    morning.

17        A    Yes, sir.

18        Q    I want to talk about some other courses that

19    you've done.  The second page back is a cultural

20    diversity and sensitivity training that it looks like

21    you completed on December 4, 2019, through North Coast

22    Polytechnic Institute; do you see that?

23        A    Yes, sir.

24        Q    Was that an online class?

25        A    No, sir.

1      Q      So where did you go to complete that?

2      A      I think I joined in a class -- it was at

3  another police department. I believe that was in Solon

4  Police Department -- or, I believe it was I went to

5  Solon Police Department.

6      Q      What lessons, if any, you recall that you

7  walked away from, from cultural diversity and

8  sensitivity training?

9      A      Probably I believe it was like de-escalation

10  sort of class.

11      Q      Do you know whether or not there was any

12  training in the course of that class on trying to see

13  issues or situations from the perspective of

14  minorities?

15      A      I don't recall.

16      Q      Is one of the lessons that was covered in

17  that class not making split-second judgments based on

18  the color of someone's skin?

19      A      I don't recall that.

20      Q      Did they go over in that class any sort of

21  history issues in this country of minorities being

22  treated differently under the law because of the color

23  of their skin?

24      A      I don't recall.

25      Q      All right.  Let's go back another one.  This

1  was a certification it looks like you took or a course

2  you completed on building mutual respect and community

3  trust training on November 10, 2020, through Cleveland

4  State, the Division of Diversity, Inclusion, and

5  University Engagement.  Do you see that?

6        A    Yes, sir.

7        Q    First of all, you agree you did complete

8  that course; right?

9        A    Yes.

10        Q    What do you recall from that course and that

11  course covering?

12        A    I don't recall this course at all.

13        Q    Okay.  Let's go back one more.  By the way,

14  do you know on that Building Mutual Respect and

15  Community Trust training -- I know you don't recall

16  it, maybe at all, the content of it.  Do you know

17  whether that was in person or online?

18        A    I don't recall.

19        Q    Okay.  Fair enough.

20        A    2020, it most likely was online, but again,

21  I don't recall.

22        Q    Okay.  And you say that because it was

23  COVID?

24        A    Yes, sir.

25        Q    Okay.  One back, it looks like the Ohio

1   Attorney General and OPOTA -- actually eOPOTA -- put

2   on a use of force liability and standards class?

3       A    Yes, sir.

4       Q    Do you recall anything from that class?

5       A    I do.

6       Q    What?

7       A    This was a requirement for our department

8   online training class.  It kind of just went over use

9   of force and de-escalation.

10      Q    Okay.

11      A    Did you learn that no force whatsoever could

12  be used to effect an illegal arrest?  In other words,

13  if you're going to use force to affect an arrest, it

14  had to a lawful arrest to begin with.

15              MR. BECK:  Objection.

16              Go ahead.

17              THE WITNESS:  Can you repeat that?

18  BY MR. WIEST:

19      Q    Did you learn in the course of this program

20  that no force could be used to affect an illegal

21  arrest?  In other words, to use force in the course of

22  an arrest, it had to be a lawful arrest.

23              MR. BECK:  Objection.

24              Go ahead.

25              THE WITNESS:  I don't recall.

Page 35

1  BY MR. WIEST:

2      Q    Did you have An understanding, prior to

3  September of 2022, that no -- well, more specifically

4  September 22nd of 2022, that no force could be used to

5  effect a unlawful or illegal arrest?

6                  MR. BECK:  Objection.

7                  Go ahead.

8                  THE WITNESS:  I don't know.

9  BY MR. WIEST:

10     Q    Okay.  Do you recall any training that the

11  city of Cleveland Heights put on about the amount of

12  force that can be used to effect an illegal or

13  unlawful arrest?

14                  MR. BECK:  Objection.

15                  Go ahead.

16                  THE WITNESS:  No.

17  BY MR. WIEST:

18     Q    Okay.  Did you learn, in the course of this

19  use of force, liability, and standards, anything about

20  probable cause needing to be required for an arrest?

21     A    No.

22     Q    What do you recall, if anything, from this

23  course specifically?

24     A    Basically, if I recall correctly, it would

25  be the levels of force leading up to deadly force.

Page 36

1      Q    Okay.  And did they go over when you could
2   use those different levels of force?
3      A    I believe so, yes.
4      Q    Okay.  Did they get into -- because there's
5   this liability and standards that's mentioned,
6   anything about the duty to intervene under federal
7   constitutional law?  Was that covered at all in the
8   course?
9      A    I don't recall.
10      Q    Okay.  All right.  Is there anything else
11   that you recall about this course that we haven't
12   already talked about?
13      A    No, sir.
14      Q    Let's go back another one.  This was an
15   ethics and professionalism course that it looks like
16   you took through eOPOTA on or about December 22, 2020.
17   Do you recall that course?
18      A    Yes, sir.
19      Q    What do you recall about the ethics and
20   professionalism course?
21      A    My, again, recall was this was a required
22   training through the department online for OPOTA.
23      Q    Okay.  And do you recall anything specific
24   about the content of that course?
25      A    I do not.

1       Q     Okay.  Let's go back another one.  Do you

2   recall -- let me begin with just some background.  Was

3   this that we're looking at, the Certificate of

4   Achievement for De-escalation and Officer Wellness

5   Training, was this something that was administered

6   through Cleveland Heights?

7       A     This -- I believe so.  I believe this one

8   was in person.  There were two different type of de-

9   escalation courses.  I believe this one was in person

10  with an outside agency.

11      Q     When you say outside agency, did the police

12  department contract with the instructor that came in?

13  Is that what you're saying?

14      A     I think that they had -- I don't recall.  I

15  think it might have been from Cleveland State.  I

16  could be mixing up that other one we had discussed

17  prior.

18      Q     Okay.

19      A     But I do recall the de-escalation course.

20      Q     What does de-escalation mean?

21      A     De-escalation means trying to -- I'm bad

22  about not using the same word in the definition.

23  Calming a situation down.

24      Q     Rather than pouring gas on the fire so to

25  speak?

1      A    Correct.

2      Q    Did you learn in the course of that

3  instruction that threatening someone with an arrest

4  who did not commit a crime would escalate rather than

5  de-escalate a situation?

6               MR. BECK:  Objection.

7               Go ahead.

8               THE WITNESS:  No, sir.  That was not an

9  example provided.

10 BY MR. WIEST:

11     Q    Okay.  Do you think that threatening someone

12 with an arrest who did not commit a crime would

13 escalate or de-escalate a situation?

14               MR. BECK:  Objection.

15               Go ahead.

16               THE WITNESS:  I do.

17 BY MR. WIEST:

18     Q    You do what?

19     A    I do believe that would escalate a

20 situation.

21     Q    Did you learn in the course of that

22 instruction -- and by the way, it looks like that was

23 for eight hours; right?

24     A    Yes, sir.

25     Q    DID you learn that not answering a

1   reasonable question from a member of the public would

2   escalate rather than deescalate a situation?

3                   MR. BECK:  Objection.

4                   Go ahead.

5                   THE WITNESS:  I did not learn that.

6   BY MR. WIEST:

7       Q    Okay.  Do you think that not answering a

8   reasonable question from a member of the public would

9   escalate rather than de-escalate a situation?

10                  MR. BECK:  Objection.

11                  You can answer.

12                  THE WITNESS:  I do.

13  BY MR. WIEST:

14      Q    You think it would escalate?

15      A    I do.  Yes, sir.

16      Q    Because it could be perceived as ignoring

17  that person?

18                  MR. BECK:  Objection.

19      A    Agree.

20      Q    Next one back.  This looks like -- not looks

21  like.  It looks like it was a October 19, 2021 course

22  that you took through North Coast Polytechnic

23  Institute for legal updates.

24      A    Yes, sir.

25      Q    Let me ask, was this in person or online?

1      A    I don't recall.  I believe that this was in

2  person.  I do believe it was.  I do think it was in

3  person.

4      Q    Why do you believe it was in person?

5      A    I recall going to OPOTA's Richfield location

6  where we did a legal update.

7      Q    And that's what you think this was probably?

8      A    I believe so.

9      Q    Okay.  Did anything -- let me ask what do

10  you recall about the legal update?

11      A    If I'm thinking of the correct one, there

12  was a female, I think she was a chief, an assistant

13  chief.  She gave the update, and if I'm thinking

14  correctly, that one was sort of just updates -- what

15  was it?  I can't recall exactly.  It was sort of an

16  open discussion update.

17      Q    About cases that were handed down or --

18      A    No, it was -- I want to say it was ORC and

19  case law, but I don't recall exactly the context of

20  the course.  It was more of an open discussion.

21      Q    When you say assistant chief, do you know

22  what department she was with?

23      A    It was an out-of-state agency, I think a

24  Chicago suburb.

25      Q    Okay.  Why was an assistant chief from a

Page 41

1    Chicago suburb going over Ohio's statutory law?

2              MR. BECK:  Objection.

3              Go ahead.

4              THE WITNESS:  I do not have an answer

5    for that.

6    BY MR. WIEST:

7        Q    Okay.  Do you know whether or not the

8    elements of an obstruction charge were covered in this

9    legal update?

10       A    No, I don't recall.

11       Q    Okay.  By the way, would it be your

12   practice, if you were looking to charge someone with

13   an offense, and you didn't know the elements, to go

14   look them up prior to conducting or completing a

15   criminal charge?

16       A    Can you say that again?

17       Q    Yeah.  If you don't know the elements of an

18   offense prior to charging somebody with an offense,

19   would it be your practice to go look up the statute

20   before you file a charge on someone?

21       A    If I didn't understand the statute, I would

22   confirm that the elements fit the charge.

23       Q    Right.  In that instance, you would look up

24   the statute?

25       A    Yes, sir.

Page 42

1     Q    Okay.  Do you recall any of the cases that
2  they went over, the case law?

3     A    I do not.

4     Q    Okay.  All right.  There's another course on
5  October 1, 2022, that you took for ethics and
6  professionalism through the Office of the Attorney
7  General.  Do you recall anything about that course?

8     A    I do not.

9     Q    Okay.  Next one back.  It was a course you
10  took on October 1, 2022, through the Office of the
11  Attorney General and OPOTA, the Ohio Peace Officer
12  Training Commission, for community diversity and
13  procedural justice.  Do you recall anything about that
14  course?

15     A    I do.  These, again, were our yearly online
16  training courses.  This one was added in, I believe.
17  And if I recall correctly, this one was touching on
18  understanding the different cultures within your
19  community and understanding how to I guess respond or
20  understand that culture, so to say.

21     Q    Does the city of Cleveland Heights, is that
22  a diverse community?

23     A    It is.

24     Q    And so you've got, for instance, areas of
25  the city where it's predominantly black.  Do you

Page 43

1    agree?

2        A    There are, yes.

3        Q    Was that discussed at all in dealing with

4    any aspects of dealing with the black community in

5    this program?

6        A    I don't recall specifically it being

7    tailored toward African Americans.

8        Q    Okay.  Who was it tailored toward?

9        A    I think it was tailored toward everybody.

10       Q    What is procedural justice?

11       A    I don't know.

12       Q    Okay.  What, if anything, did you learn

13   about dealing with diverse communities in this course?

14   Do you recall walking away from the course with?

15       A    If I recall correctly, it was understanding

16   like -- oh, what do I remember?  I don't know.

17       Q    Okay.  Next one back.  This is August 2,

18   2022.  It looks like you took a course on hate crimes.

19       A    Yes, sir.

20       Q    Do you recall that course?

21       A    I do.

22       Q    Again, it was another one that was an online

23   requirement.  Did you learn anything in that course

24   about civil rights violations?

25       A    I don't recall.

1      Q    Okay.  Is there anything that you do recall

2  other than what we've already spoken about, about the

3  hate crimes course?

4      A    No, sir.

5      Q    Next one back.  On August 30, 2022, it looks

6  like you took a course on qualified immunity.

7      A    Yes, sir.

8      Q    Do you recall anything about that course?

9      A    This one just basically touched on police

10  kind of being protected by our agencies.

11      Q    Okay.  Did they talk about when qualified

12  immunity would be overcome?

13      A    I don't recall.

14      Q    What does qualified immunity mean to you?

15      A    What does --

16           MR. BECK:  Objection.

17           Go ahead.

18  BY MR. WIEST:

19      Q    Yeah, what was your understanding of

20  qualified immunity coming out of this course?

21      A    Qualified immunity protects me to some

22  degree when acting in my present role.

23      Q    Did you learn that if you violated clearly

24  established rights that you would not have qualified

25  immunity?

Page 45

1              MR. BECK:  Objection.

2              Go ahead.

3              THE WITNESS:  I don't recall.

4   BY MR. WIEST:

5      Q    Did you learn that people have a clearly

6   established First Amendment right to make complaints

7   about the police?

8              MR. BECK:  Objection.

9              Go ahead.

10             THE WITNESS:  I don't recall that.

11  BY MR. WIEST:

12     Q    Did you learn that people have a clearly

13  established right not to be retaliated against by the

14  police by making a complaint against the police?

15             MR. BECK:  Objection.

16             Go ahead.

17             THE WITNESS:  In this course, I don't

18  recall that.

19  BY MR. WIEST:

20     Q    Okay.  Did you learn that people have a

21  clearly established right not to be arrested without

22  probable cause?

23     A    In this course, no.

24     Q    Okay.  Did you learn that there's clearly

25  established law in this course from the United States

Page 46

1    Court of Appeals from the Sixth Circuit that an

2    obstruction charge under Ohio law cannot be based on a

3    failure to identify?

4                    MR. BECK:  Objection.

5                    Go ahead.

6                    THE WITNESS:  No, sir.

7    BY MR. WIEST:

8        Q    did you learn that there's clearly

9    established law that a police officer who is present

10   at a scene where a civil rights violation is occurring

11   and has an opportunity to intervene has a duty to do

12   so?

13                   MR. BECK:  Objection.

14                   Go ahead.

15                   THE WITNESS:  No, sir.

16   BY MR. WIEST:

17       Q    Okay.  Did you ever learn that prior to

18   August 30, 2022?  On any of those things that we just

19   talked about, did you ever learn any of those things

20   prior to August 30, 2022?

21                   MR. BECK:  Objection.

22                   Go ahead.

23                   THE WITNESS:  In -- No, I don't recall.

24   BY MR. WIEST:

25       Q    Did the city of Cleveland Heights ever offer

Page 47

1    training on any of those issues prior to August 30,

2    2022?

3                    MR. BECK:  Objection.

4                    Go ahead.

5                    THE WITNESS:  Not that I recall, no.

6    BY MR. WIEST:

7        Q    Did you learn any of the things that we just

8    talked about in the period between August 30, 2022,

9    and September 22, 2022?

10                   MR. BECK:  I'm sorry.  You're talking

11   about all those questions you just asked her?

12                   MR. WIEST:  Yes, on the clearly

13   established rights.

14                   MR. BECK:  Objection.

15                   Go ahead.  You can answer.

16                   THE WITNESS:  Prior to this training?

17   BY MR. WIEST:

18       Q    Or actually, between the period of this

19   training and September 22, 2022.

20       A    Could you repeat each question so I can

21   answer accordingly?

22       Q    Did you learn or did the city of Cleveland

23   Heights offer any training about people having a

24   clearly established right, first amendment right, to

25   make complaints about the police between August 30,

Page 48

1    2022, and September 22 2022?

2                   MR. BECK:  Objection.

3                   Go ahead.

4                   THE WITNESS:  Yeah, I don't recall

5    that.

6    BY MR. WIEST:

7        Q    Okay.  Did you learn or did the city of

8    Cleveland Heights offer training that people had a

9    clearly established right to not be retaliated against

10   by the police for making a complaint between August

11   30, 2022 and September 22, 2022?

12                  MR. BECK:  Objection.

13                  Go ahead.

14                  THE WITNESS:  Did I learn or did I --

15   did Cleveland Heights provide training?

16   BY MR. WIEST:

17       Q    Correct.

18       A    No.

19       Q    Did you learn or did Cleveland Heights

20   provide training that people had a clearly established

21   right not to be arrested without probable cause

22   between August 30, 2022, and September 22, 2022?

23                  MR. BECK:  Objection.

24                  Go ahead.

25                  THE WITNESS:  Yes.

Page 49

1    BY MR. WIEST:

2        Q     Where did you learn that at?

3        A     On the job training.

4        Q     When?

5        A     Throughout my entire career.

6        Q     Okay.  Did you learn or did Cleveland

7    Heights provide training that there is a -- between

8    August 30, 2022, and September 22, 2022, that there's

9    a clearly established law that an obstruction charge

10   cannot be based on a failure to identify.

11                  MR. BECK:  Objection.

12                  Go ahead.

13                  THE WITNESS:  No.

14   BY MR. WIEST:

15       Q     Did you learn that or did Cleveland Heights

16   provide training between August 30, 2022, and

17   September 22, 2022, that a police officer who's

18   present at a scene where a civil rights violation is

19   occurring and has an opportunity to intervene has a

20   duty to do so?

21                  MR. BECK:  Objection.

22                  Go ahead.

23                  THE WITNESS:  No.

24   BY MR. WIEST:

25       Q     Okay.  All right.  Next course -- or next,

Page 50

1    yeah, next training.  On August 30, 2022, you took a

2    course on objective reasonableness.  What did you

3    learn?

4         A    I don't recall.

5         Q    Do you know if that was dealing with the use

6    of force and the Graham factors?

7         A    I don't recall the course.

8         Q    Okay.  All right.  Next course back.  It

9    looks like on August 30, 2022, you took a use of

10   restraints course.

11        A    Yes, sir.

12        Q    Do you recall anything about that?

13        A    I do not.

14        Q    Did you ever learn that when you could use

15   restraints against someone who was not under arrest?

16        A    When you use the term restraint, give me an

17   example of what you mean.

18        Q    Yeah, handcuffs are an example.  I mean, you

19   know, it could be more restraints than that.  It could

20   be leg shackles, perhaps.  I mean, you know, it could

21   be not standard handcuffs, but zip ties sometimes.  I

22   know police departments use those.  Those are all

23   examples of restraints.

24        A    Okay.  So you're referring to handcuffs when

25   you ask the question.  Could you repeat the question?

1      Q     Do you recall when restraints could be used

2  on somebody who is not under arrest?

3      A     When somebody is being detained.

4      Q     When can you do that?

5      A     In Cleveland Heights, we detain -- if we

6  detain somebody, say we're waiting for a warrant to be

7  confirmed.  Or if we're issuing them a citation for a

8  criminal violation, we detain them.  That's all I can

9  recall.  Can you use restraints anytime somebody is

10 being detained for questioning?

11                MR. BECK:  Objection.

12                Go ahead.

13                THE WITNESS:  I do not know.

14 BY MR. WIEST:

15     Q     The last course that I've got is, it looks

16 like you took an August 31, 2022, course on custodial

17 interrogation.

18     A     Yes, sir.

19     Q     Do you recall anything about that course?

20     A     I do not.

21     Q     Okay.  I want to get into the policy manual,

22 but I'm not ready for it yet.  Just stick that off to

23 the side.

24     A     Yes, sir.

25     Q     We've marked this as Exhibit 9.

1                    (Exhibit 9 was marked for

2                    identification.)

3        I will tell you that these are your evaluations,

4    including your field training evaluation at the front.

5        A    Yes, sir.

6        Q    Let me start with the field training

7    evaluation at Exhibit 9 at the very first two pages.

8    Have you seen this before?

9        A    No, sir.

10        Q    Have you ever had occasion to go in and

11    review your records?

12        A    Yes, sir.

13        Q    Okay.  I want to talk -- and by the way, you

14    indicated Lewis Alvis, and we see his signature on the

15    second page, he was your final FTO, I believe you told

16    me before?

17        A    Yes, sir.  Correct.

18        Q    He indicates that he conducted the final

19    evaluation of you regarding your FTO training.  Do you

20    agree with that?  Do you agree that he did that?

21        A    Yes, sir.

22        Q    He said that he was able to observe you in

23    the following areas: calls for service, driving, MBT

24    computer use, traffic stops, and report writing.  Do

25    you see that?  Do you agree that he was able to

Page 53

1   observe you doing those things?

2       A    Yes, sir.

3       Q    He indicates in the second full paragraph,

4   Officer Lewis sometimes struggled with what

5   information was necessary to document and sometimes

6   information she would obtain was irrelevant to the

7   actual complaint.  Do you see that?

8       A    Yes, sir.

9       Q    Do you agree that that was the case during

10  your field training?

11      A    I don't recall.

12      Q    Okay.  One way or the other you don't

13  recall?

14      A    No, sir.

15      Q    Okay.  He indicates a little bit below that

16  that "There were times where Officer Lewis ran into a

17  call for service that had circumstances she had not

18  yet encountered."  Do you agree that that was the

19  case?

20      A    Yes, sir.

21      Q    And he says, "Officer Lewis had the common

22  sense to check with her FTO to make sure she was

23  handling the situation correctly instead of guessing

24  and or giving the complainant the wrong information."

25  Right?  You agree that that was the case?

1        A    Yes, sir.

2        Q    He says a couple sentences later, "She did

3   have trouble trying to determine whether the call for

4   service required lights and sirens, but this can be

5   corrected with experience."  Do you agree that that

6   was the case?

7        A    I don't recall that.

8        Q    Okay.  If you had questions on an issue

9   after FTO, who would you check with?

10       A    Anybody who has more experience than me.

11   Well, I guess that wouldn't be true.  I would check

12   with my colleagues first prior to going to a

13   supervisor.  If we couldn't collectively come up with

14   an answer.

15       Q    Let me ask about that generally.  If we get

16   into 2022, and I know we're four years in advance of

17   this evaluation, what shifts was Cleveland Heights

18   running?

19       A    We've always run 12-hour shifts.

20       Q    How many 12-hour shifts would you be

21   scheduled for a week?

22       A    In a week?  It would depend on the week.  In

23   a pay period, which is two weeks, we get one eight-

24   hour day in that pay period.

25       Q    What does that mean?

 1      A    So to make it the 40 hours or the 80

 2  hours -- I'll give you the example of my schedule.  I

 3  would work, say, a Monday, Tuesday, be off a

 4  Wednesday, Thursday, and then work the whole weekend.

 5      And then the following week would be opposite.  I

 6  would be off Monday, Tuesday, work Wednesday,

 7  Thursday, and be off the weekend.  And all 12's except

 8  for there's one 8-hour day in that.  And the 8-hour

 9  day would be chosen based on seniority of the officer.

10      Q    Okay.  When were the shifts run?  Like when

11  was the shift change?

12      A    Sure.  The shifts would either run from 6

13  a.m. to 6 p.m. or vice versa.

14      Q    6P to 6A?

15      A    Correct.  And then there were -- usually, I

16  shouldn't say always, two officers who would be the 5

17  to 5.  So that way there'd at least be officers on the

18  road during the shift change.

19      Q    Okay.  Was it the case that there were the

20  same supervisors that were on during it during the

21  same shifts?  In other words, would you be dealing

22  with the same supervisors generally?

23      A    Yes, sir.

24      Q    Okay.  How many sergeants would be on duty

25  during a shift?

1      A    I don't recall if in 2022 we had two.  We

2   have two now.

3      Q    Would it be at least one?

4      A    At least one sergeant if they were not off

5   for that vacation or what not.  And or one lieutenant.

6      Q    Was there always a lieutenant that was on

7   for the shift?

8      A    Unless if they were on vacation.

9      Q    Unless they were on vacation.

10     A    Yes, sir.

11     Q    Okay.  Was the lieutenant effectively the

12   shift commander?

13     A    He is, correct.

14     Q    I want to go on to the second page of this

15   FTO report.  Your FTO reports that Officer Lewis, and

16   this is on the first full paragraph down, "Officer

17   Lewis did struggle with the process of signing

18   criminal complaints and what paperwork might be needed

19   if a warrant were to be issued."  Do you agreed that

20   that was the case?

21     A    At that time during FTO, yes.

22     Q    Okay.  "Officer Lewis had limited experience

23   when it came to filing charges or issuing warrants."

24   Do you agree that that was the case?

25     A    Yes, sir.

1      Q     Did the city of Cleveland Heights provide

2  you any training on the process of signing criminal

3  complaints or the process of filing charges and

4  warrants?

5      A     Yes, sir.

6      Q     Was it adequate?

7      A     It was during the FTO period, and may I

8  reflect on what I believe he means?

9      Q     Yeah.

10     A     So the process of signing complaints and

11 what paperwork needed to be with it, so whether I

12 needed to have a warrantless affidavit to go with the

13 paperwork.  And being new, I wasn't sure like which --

14 what needed to go with what.

15          Felonies and misdemeanors are different.  They

16 get allocated to different departments.  Whether it

17 needed to be like at the detective bureau or just

18 straight to the court.  As well as juvenile paperwork

19 is different because it's a completely different court

20 system outside of our agency.

21     Q     Did they go over the elements of common

22 charges with you during the FTO process or training?

23     A     As far as -- can you explain?

24     Q     Yeah, like what -- let me give you an

25 example.  Did they go over what the elements of an

Page 58

1    obstruction charge were?

2        A    I don't recall that.

3        Q    Okay.  Let's go over a couple more common

4    ones, although I don't know that they're issues in

5    this case.  How about the elements of a disorderly

6    conduct charge?

7        A    Yes, sir.

8        Q    What else is common?  Elements of a speeding

9    charge.

10       A    Yes.

11       Q    Okay.  Right, I mean, there's got to be a

12   posted speed limit.

13       A    Correct.

14       Q    They've got to violate it.  All that; right?

15       A    Correct.

16       Q    Improper turn?

17       A    It's a probable cause for a traffic stop.

18       Q    Right.  And a ticket if you wanted to write

19   it?

20       A    Yes, sir.

21       Q    Improper lane change; they go over that with

22   you?

23       A    Yes, sir.

24       Q    Okay.  All right.  He makes another comment,

25   Officer Alvis says, "I would say Officer Lewis was

1    aggressive when it came to initiating traffic stops or

2    contact with suspicious persons."  Do you see that?

3    It's in the second paragraph, probably three sentences

4    or four sentences up.

5         A    Yes, sir.

6         Q    Was that true?

7         A    I was aggressive in the manner of I enjoyed

8    initiating traffic stops.  I was very proactive,

9    and -- well, up until this year, I still am.

10        Q    Okay.

11        A    I guess that sentence would, I'd have to ask

12   you how do you perceive that question of me being

13   aggressive?  As far as demeanor or as far as --

14        Q    I tell you how I read it.

15        A    Yes, sir.

16        Q    And I will tell you I deal with law

17   enforcement all the time.  There are some folks that

18   come on shift, and they sit back, and they don't

19   actively police, and there are other folks that go out

20   on patrol and look for activity, and this suggests to

21   me that you were the latter and not the former.

22        A    Yes, sir.

23        Q    Okay.  You said up to this year; did

24   something change in the way that you've engaged your

25   police work this year?

1              MR. BECK:  Objection.

2              Go ahead.  You can answer.

3              THE WITNESS:  I've sprained my ankle.

4              MR. WIEST:  Okay.

5              THE WITNESS:  So I'm not really getting

6    in and out too much.

7    BY MR. WIEST:

8        Q    Okay.  Is that -- when did you do that?

9        A    In June.

10       Q    Okay.  So that's recent.

11       A    Yes, sir.

12       Q    And I'm sure once that recovers in a few

13   weeks, you'll be back to normal?

14       A    A couple months, sir.

15       Q    A couple months?

16       A    I'll need surgery, yes, sir.

17       Q    Okay.  Okay.

18       A    I'll be back.

19       Q    If you look at the next page, this begins

20   your evaluations, your regular evaluations I think,

21   and some assessments.  And what I wanted to look at,

22   really, if you look at the second page, there's some

23   comments from you.  It looks like this was signed

24   2/10/19, and that is your signature; correct?

25       A    Yes, sir.

Page 61

1     Q    And it's the rating period, it looks like
2  June to December of 2019 is what the rating period
3  says, although this is a little strange to me.  It
4  also says February 10, 2019, at the top.  I think the
5  rating period might have been '18, but I'm not sure
6  about that.  That might be a typo.
7     A    I agree.  Yes, sir.
8     Q    You think it's a typo, too?
9     A    I do.
10    Q    Okay.  And you would agree it's your
11 handwriting that's in the employee comments portion of
12 that; right?
13    A    Yes, sir.
14    Q    You say, "Over the next six months, I hope
15 to learn and understand more policy and procedures as
16 well as city and state ordinance."  Do you see that?
17    A    Yes, sir.
18    Q    As you provided that comment, which you
19 agree, I think, it went up through your supervision.
20 If we look the next page, the lieutenant signed it.
21 The page after that, the captain and the police chief
22 signed it.
23        Did anyone provide you additional training in the
24 city of Cleveland Heights to address your request to
25 get more training for policies and procedures in city

Page 62

1  and state ordinance?

2      A    At that time, no.

3      Q    Okay.  How about any time after that?

4      A    Yes, sir.

5      Q    When?

6      A    We now utilize Lexipol.

7      Q    When did that come into effect?

8      A    Oh, I believe within the last two years, if

9  I can recall.

10      Q    So sometime in 2022?

11      A    Yeah, I believe so.

12      Q    Lexipol is a common -- I've seen it in -- a

13  ton of departments use Lexipol policies and

14  procedures; correct?

15      A    Yes, sir.

16      Q    Lexipol also puts out, I think, daily and

17  monthly bulletins?

18      A    Yes, sir.

19      Q    Does Cleveland Heights require the use of

20  the daily and monthly bulletins?

21      A    They do.

22      Q    Do you have to sign off on them?

23      A    We log into it, and then we complete however

24  many are given throughout the month with acknowledge

25  to update to policy and procedures.

Page 63

1       Q     Do you recall having ever been given

2    training prior to September 22 of 2022 on the elements

3    of an obstruction charge under Ohio law?

4       A     I do not recall.

5       Q     And I know we've talked about all of the

6    constitutional issues and clearly established rights a

7    couple of minutes ago.  Do you recall any Lexipol

8    training on those issues?

9       A     On constitutional rights?

10      Q     Constitutional rights, clearly establish law

11   under the First and Fourth Amendments.  We talked

12   about that before.

13      A     Correct.

14      Q     Do you recall any Lexipol training on any of

15   those issues?

16      A     Prior to what date?

17      Q     Prior to September 22 of 2022.

18      A     I don't recall if we had Lexipol at that

19   time.

20      Q     Okay.  You think Lexipol came in after

21   September of 2022?

22      A     I don't -- I don't know exactly when it was

23   implemented.

24      Q     When the department implemented it, I mean,

25   that's not a small manual.  We're going to go over

Page 64

1  some of those policies.  I mean, I think it was like

2  800 pages.  It might have been less.  I'm assuming the

3  expectation wasn't that all of that be memorized by

4  every officer overnight.

5        A    So no.

6        Q    Okay.  Was there some expectation to have

7  officers go through, you know, so much of it every

8  month, or how did that work?

9        A    Yes, sir.  So in our agency, we utilize the

10  Lexipol app.  And when we log into the Lexipol app, it

11  gives all of the DTBs, which is, I believe, Daily

12  Bulletin Training.

13        Q    Daily Training Bulletin?

14        A    DBT, DTBs, one of them, yes.  And they give

15  a kind of like a guided date in which you should read

16  each policy and then sign off.  Which basically when

17  you're not signing off, you're just completing the

18  policy, you read it, it'll give a scenario, and then

19  you take a small, like a multiple choice quiz at the

20  end of that bulletin.

21        Q    And if you get it wrong, what happens?

22        A    You should re-read the scenario to make sure

23  you understand it, and then it gives you enough time

24  to then choose the correct one.

25                MR. WIEST:  Okay.  All right.

Page 65

 1                    MR. BECK:  At some point you want to

 2      take a break.

 3                    MR. WIEST:  Let me get through this

 4      exhibit, Greg.  I'm probably -- I'm not that far from,

 5      I mean I'm probably 15 minutes from being done and

 6      then we can take a break.  Unless you -- unless she

 7      needs it.  If she needs it, I'm fine.

 8                    THE WITNESS:  I can go 15 minutes if

 9      you guys are good.

10                    MR. BECK:  Okay.  All right.

11                    THE WITNESS:  If everyone else is okay.

12      BY MR. WIEST:

13          Q    The next statement that you make that I

14      wanted to talk about is you say, "I need to get better

15      at speaking to people and learn to empathize when

16      needed."  Why did you make that comment?

17          A    I think in the beginning of the career,

18      you're kind of like -- you're textbook and not so

19      personal.  You're trying to navigate through hearing

20      out the facts of a situation as opposed to

21      understanding someone's actual, like, personal

22      feelings, regardless if that person is in commission

23      of a crime or not.

24          Q    Well, that was one of the questions I had

25      for you.  Do you agree that someone's constitutional

Page 66

1   rights don't depend, for instance, on their criminal

2   history?

3                   MR. BECK:  Objection.

4                   Go ahead.

5                   THE WITNESS:  I wouldn't know someone's

6   criminal history while speaking with them.

7   BY MR. WIEST:

8       Q    Right.  Or even whether or not somebody has

9   a constitutional First Amendment right to make a

10  complaint.  Do you think that would depend on their

11  history?

12      A    No.

13      Q    So you would agree it does not matter --

14  people don't lose their Fourth Amendment rights

15  because of, or First Amendment rights, because of, for

16  instance, the criminal history?

17      A    I wouldn't know someone's criminal history

18  at first encountering them.

19      Q    But even if you did know, would that allow

20  you, for instance, to arrest them without probable

21  cause?

22      A    No.

23      Q    Would it allow you to arrest them for

24  wanting to file a complaint?

25                  MR. BECK:  Objection.

Page 67

1          Go ahead.

2          THE WITNESS:  No.

3   BY MR. WIEST:

4     Q    Okay.  Let's go back.  The next comment,

5   this is your rating period.  You signed it on July 26,

6   2019.  It was for the January 1 to June 30, 2019

7   period.  Tell me when you're there.

8     A    I believe I am.  The last sentence is apply,

9   try out.

10    Q    Yes, ma'am.

11    A    Yes, sir.

12    Q    Yep.  You say "Continue to expand knowledge

13  of city and state laws/ordinances, continue learning

14  and implementing policies and procedures."  This was

15  on July 26th of 2019; correct?

16    A    Yes, sir.

17    Q    Did the city do anything in the months that

18  followed this to help you expand your knowledge of

19  city and state laws and ordinances?

20    A    I think -- unless if that was one of the

21  time periods I got to go to one of those courses,

22  other than our online training, I don't recall the

23  city specifically.

24    Q    Correcting that?

25    A    Correct.

1        Q    Okay.  The next one I've got back is your

2   comment on February -- and we talked about the courses

3   you took at the beginning of this session, and a lot

4   of them, other than what you told me, you don't have

5   memory of what you took away from those courses;

6   correct?

7        A    Specifically, per course, no.

8        Q    Okay.  This was in February of 2020.  It

9   says, again, you say, "Would like to continue

10  knowledge and education for the job by enrolling in

11  more OPOTA courses."  Right?

12       A    Yes.

13       Q    You still felt like you needed to gain more

14  knowledge and education for the job as of February

15  2020; correct?

16       A    Yes.

17       Q    Did the city do anything in response to that

18  to help you correct that?

19       A    Aside from online courses, no.

20       Q    Okay.

21       A    And when I -- may I --

22       Q    Yeah.

23       A    -- reiterate or like touch on that.

24  Policies and procedures and as we know laws are always

25  changing.  So I guess more so getting involved in

Page 69

1    legal update, and then to touch more on that, this is

2    during COVID as well.  So we really were not doing any

3    training.

4         Q    When did the training resume following

5    COVID?

6         A    I think we were allowed to start taking

7    courses again -- because OPOTA was shut down for a

8    while.  I can't recall a specific date.  At least a

9    year or more later.

10        Q    The thought occurred to me going through

11   your training records, and we did, there was this

12   entire chunk.  There's a bunch of courses in your

13   file, in the August of 2022 period.

14        A    Yes, sir.

15        Q    And one of the things that struck me, and

16   I'm asking you about it, was whether or not maybe that

17   was when it was lifted and you were playing catch up.

18        A    All the OPOTA courses were online.

19        Q    Okay.

20        A    Majority -- I've only been to OPOTA for a

21   course in person when that deputy chief was

22   instructing for legal update.  And I've gone for crime

23   scene photography and sexual assault.

24        Q    Okay.  The city of Cleveland Heights has a

25   municipal prosecutor that's in-house; correct?

1      A     Yes.

2      Q     Did they ever put on courses for the

3  department?

4      A     Recently.

5      Q     When you say recently, can you give me an

6  approximate date?

7      A     We just had jail training.  So I recall her

8  being there for our jail trainings.

9      Q     When you say jail training, the department

10  maintains a jail?

11      A     Yes, sir.

12      Q     It's a decently large enough department that

13  they've got their own jail; right?

14      A     Yes, sir.

15      Q     And would the law enforcement officers

16  within the City of Cleveland Heights Police Department

17  also man the jail?

18      A     We do, yes, sir.

19      Q     Okay.  Is that a separate shift or how does

20  that work?

21      A     So the way that works is the officer in

22  charge oversees the jail.  I believe that -- and I'm

23  not an officer in charge so I don't know exactly, but

24  they oversee -- and I do believe they have to go in at

25  least once or twice themselves through the shift to

1    check the inmates in person themselves.

2         Otherwise, they'll usually mandate either a desk

3    officer who will go back every hour for a check.  And

4    when court is in session, there's somebody constantly

5    back there to --

6         Q    Shuttle the prisoners in and out?

7         A    Correct.  To the court, as well as deliver

8    their meals for the day.  Checks to see if they need

9    any hygiene supplies or if people have medical

10   conditions.

11        Q    Have you ever done that duty?

12        A    Yes, sir.

13        Q    How many times?

14        A    More than I can count.

15        Q    Okay.  And so you would do that, I suppose,

16   instead of the road work?

17        A    Correct.

18        Q    Okay.  Like, do you know in advance whether

19   you're going to do that for a shift, or do you just

20   show up, and they say you're on jail duty today?

21        A    Yes, sir.  Correct.

22        Q    The latter?

23        A    Yes.

24        Q    Okay.  Other than legal updates concerning

25   the jail, have you had other legal updates from the

1   prosecutor's office?

2        A    Yes.

3        Q    Do you know when?

4        A    It's always during jail training.

5        Q    So when you say jail training, like they

6   might do training, is it training other than related

7   to jail?

8        A    Go ahead, I'm sorry.

9        Q    When you say jail training, is there

10  training that goes on beyond performance of jail

11  duties?

12       A    Yes.

13       Q    Okay.  And is it that the whole department's

14  there for that?

15       A    Correct.  It's broken down into separate

16  days based on the platoon.  It's given during a day

17  we're off work.  Okay.  And then she's allotted a

18  section of that training where she'll come in and

19  she'll touch on anything that's possibly changed or

20  updated.

21       Q    Do you recall anything in the course of that

22  prior to September 22 of '22 where they talk about

23  obstruction charges and elements?

24       A    No, sir.

25       Q    Do you recall anything prior to September 22

Page 73

1    of '22 dealing specifically with constitutional

2    rights?

3         A    No, sir.

4              MR. WIEST:  Okay.  All right.  I think

5    that's the last time that you've provided a comment.

6    All right.  That's all I've got on this exhibit.  I

7    think we're good for a break.

8              (Off the record.)

9              THE VIDEOGRAPHER:  Back on the record,

10   time 10:32 a.m.

11   BY MR. WIEST:

12        Q    Officer Lewis, I've got some follow-ups that

13   I wanted to cover before we get into the next topic.

14   I know we went through all of those coursework that

15   you did with those certificates.  Remember looking at

16   those with me?

17        A    Yes, sir.

18        Q    Did you get those certificates by merely

19   attending the course or was there testing that was

20   involved?

21        A    Some of them had testing at the end.

22        Q    Do you know which ones?

23        A    I do not.

24        Q    Who would have that, if anyone?  The course

25   provider?

1       A     Probably OPOTA.

2       Q     Okay.  Have you ever been convicted of a

3    crime other than a traffic violation?

4                MR. BECK:  Objection.

5                Go ahead.

6                THE WITNESS:  As a juvenile.

7    BY MR. WIEST:

8       Q     Okay.  What was that for?

9                MR. BECK:  Objection.

10               You can answer.

11               THE WITNESS:  I graffitied on a wall.

12   BY MR. WIEST:

13      Q     It wasn't a crime of dishonesty?

14      A     No.  No, sir.

15      Q     I don't care about it.  Have you ever been

16   involved in a lawsuit before today?

17      A     Yes, sir.

18      Q     When?

19      A     Last year it ended.  It was a car accident.

20      Q     When was the accident?

21      A     I believe it was in maybe 2020 or 2021.

22      Q     And that was in a police vehicle?

23      A     Yes, sir.

24      Q     Do you know who the plaintiff was in that

25   case?

1       A    I do not recall her name.

2       Q    There was a dispute in that case just like

3  there is in this case about whether or not your lights

4  and sirens were on; correct?

5       A    Yes --

6                 MR. BECK:  Objection.

7                 Go ahead.

8                 THE WITNESS:  Yes, sir.

9  BY MR. WIEST:

10      Q    Was that case settled?

11      A    Yes, sir.

12      Q    And I believe, as I understand that case,

13 the other party indicated that your lights and sirens

14 were not on, and you indicated that they were at the

15 time of the incident; correct?

16      A    Yes, sir.

17      Q    Did you get a deposition in that case?

18      A    I did, yes, sir.

19      Q    Do you know when that was?

20      A    It was last year.  I don't know the date.

21      Q    Who was the plaintiff in that case?

22      A    I don't recall her name.

23      Q    Okay.  What court was that in?

24      A    Where the deposition was or --

25      Q    Where the lawsuit was pending.

1        A    I don't recall that.

2        Q    Do you know if it was in the Cuyahoga County

3   Common Police Court?

4        A    I don't.  I don't know.

5        Q    Were you named as a party to the suit or

6   were you merely a witness?

7        A    I don't know the answer to that.

8        Q    Did anybody come and serve you with papers

9   related to that lawsuit?

10       A    No, sir, I don't believe so.

11       Q    Okay.  Did you review your deposition

12  transcript in that case?

13       A    I did not.

14       Q    Do you have a copy of your deposition

15  transcript?

16       A    No, sir.  I never received a copy.

17       Q    Okay.  Do you know who the attorney was for

18  the plaintiff in that case?

19       A    I do not.

20       Q    We talked about the probable cause issue a

21  little bit this morning as well.  Do you remember

22  that?

23       A    Yes, sir.

24       Q    Would you agree that to determine probable

25  cause, you would need to know, for a particular

1  offense, you would need to know the elements of the

2  offense?

3            MR. BECK:  Objection.

4            Go ahead.

5            THE WITNESS:  Can you repeat the

6  question?

7  BY MR. WIEST:

8     Q    To determine whether you have probable cause

9  that somebody committed a particular offense, you

10 would have to know the elements of that offense?

11           MR. BECK:  Objection.

12           Go ahead.

13           THE WITNESS:  Yes, sir.

14 BY MR. WIEST:

15    Q    Unless you had a third-party witness

16 providing you information, you would have to see all

17 of the elements of the offense for probable cause;

18 correct?

19           MR. BECK:  Objection.

20           Go ahead.

21           THE WITNESS:  Can you say that again?

22 BY MR. WIEST:

23    Q    To determine probable cause for a particular

24 offense, you would have to see or have other evidence

25 that all of the elements of the offense were met.

1              MR. BECK:  Objection.

2              Go ahead.

3              THE WITNESS:  Yes, sir.

4  BY MR. WIEST:

5      Q    Okay.  What did you do to prepare for today?

6  And I want to be careful about the way that I'm asking

7  this.  I do not want to talk about any communications

8  that you've had with Mr. Beck or anyone with his

9  office where you're speaking with them.

10             But I'm entitled to know anything that

11  you've reviewed and that kind of thing.  So don't tell

12  me about any conversations you have with Mr. Beck or

13  anybody in his office, but did you do anything else to

14  prepare for your deposition today?

15     A    I reviewed my statement, my police report

16  statement.

17     Q    Okay.

18     A    The body camera footage.

19     Q    Okay.  Anything else?

20     A    The policy and procedures.

21     Q    Anything else?

22     A    I was provided with a copy of the findings

23  from the internal affairs investigation.

24     Q    The ones against Sergeant Wolf?

25     A    It was involving everybody.  Myself,

Page 79

1    Sergeant Wolf, and Mr. Kern.

2         Q    Okay.  So you reviewed those findings.

3    Anything else?

4         A    I reviewed the citation that was issued to

5    Mr. Kern.

6         Q    Okay.  Anything else?

7         A    No, sir.

8         Q    When did you review all of that?

9         A    Between Monday and today.

10        Q    Okay.  So this week?

11        A    Yes, sir.

12        Q    Did you review your videotaped statement to

13   internal affairs?

14        A    No, sir.

15        Q    Okay.  We'll go over those.  They were not

16   very long, but we'll go over those.  We'll look at

17   those here in a little bit.

18        A    Can I ask regarding the -- Did I see the

19   video or do I have the paper copy?

20        Q    The video of -- where the detectives are

21   interviewing you.

22        A    No, I do not have that, no.  No, sir.

23        Q    All right.  I do want to go over the policy

24   and procedure manual, and I've got some questions for

25   you about that.  So let's go ahead and do that now.

Page 80

1   This I've marked as Exhibit 1.

2                    (Exhibit 1 was marked for

3                    identification.)

4            Give me a minute to hand this out.  It's not

5   a thin document.  And, ma'am, I will represent to you

6   that I did not pull the entire 800 some pages of this

7   manual.  What I attempted to do was to pull those

8   sections that may have some relevance to this case.

9        A    Yes, sir.

10       Q    Here's my first question.  I've handed you

11  what I've marked as Exhibit 1.  Do you know when this

12  Lexipol manual was first put in place by the City of

13  Cleveland Heights?

14       A    I don't know when it was.  If I can assume,

15  it would be 10/31/2022.

16       Q    Well, that was my first question to you

17  because what was produced to us in this case had a

18  copyright of October 31, 2022, on all of it.  And so

19  my question was, do you know if that was when the

20  Lexipol manual was first used by the City of Cleveland

21  Heights?

22       A    I don't know.

23       Q    Prior to the Lexipol manual, what policies

24  and procedures did the city have in place?  Do you

25  know?

Page 81

1     A     Everything from cruiser patrol vehicle

2  operation to handling -- well I don't even know, jail,

3  like -- jail policy and procedure.  Everything that --

4  in which Cleveland Heights would operate under.  And

5  it would have been in a large binder approximately the

6  size of that one.

7     Q     I'm going to ask you some questions about

8  this manual because this is the only thing that's been

9  produced to us in this case.

10    A     Yes, sir.

11    Q     And to the extent that you recall whether a

12 particular -- I'm going to ask you whether a

13 particular policy was in place prior to this Exhibit

14 1.  Maybe you know and maybe you don't.  I'm sure

15 we'll have more questions about this tomorrow for the

16 30(b)(6) witness.

17          I want to get into the second page of this

18 exhibit, 100.6 Constitutional Requirements.  And it

19 says, "All members shall observe and comply with every

20 person's clearly established rights under the United

21 States and Ohio Constitutions."  Do you see that?

22    A     Yes, sir.

23    Q     My first question is, was that present in

24 the prior version, prior to Lexipol, of the city's

25 policies and procedures?

1      A     I don't recall, but if I would assume, I

2  would say yes.

3      Q     But you don't know for sure one way or the

4  other?

5      A     No, sir.  No.

6      Q     Okay.  Was there any specific training that

7  was provided by the city of Cleveland Heights to

8  extrapolate or expand upon what clearly established

9  rights are?

10     A     I don't recall.

11     Q     Okay.  Turn the page 15.  There was a

12  section, this section 102 of the policy manual

13  requires the oath of office; correct?

14     A     Yes, sir.

15     Q     And it says, "I do solemnly swear or affirm

16  that I will support the Constitution and laws of the

17  United States of America, the Constitution and laws of

18  the state of Ohio, and the laws and ordinances of the

19  city of Cleveland Heights, and to the best of my

20  ability will discharge the duties of this office."  Do

21  you see that?

22     A     Yes, sir.

23     Q     Was that the oath that you took prior to

24  assuming the duties of a police officer in the city of

25  Cleveland Heights?

```
 1       A    Yes, sir.

 2       Q    Was it your understanding that you had to

 3  perform your duties in a manner that was consistent

 4  with the United States Constitution?

 5       A    Yes, sir.

 6       Q    And was that true for all of the officers?

 7  Do you know did every officer in the city of Cleveland

 8  Heights have to take the same oath?

 9       A    I don't know.

10       Q    Turn the page to 23.  200.3.4 required

11  members to respond to and make a good faith and

12  reasonable effort to comply with the lawful orders of

13  superior officers and other proper authorities;

14  correct?

15       A    Yes, sir.

16       Q    And then there's a section about unlawful

17  and conflicting orders at 200.3.5; correct?

18       A    Yes, sir.

19       Q    And it says no member is required to obey

20  any order that outwardly appears to be in direct

21  conflict with any federal law, state law, or local

22  ordinance; correct?

23       A    Yes, sir.

24       Q    Did you have an understanding about whether

25  or not that also applied to constitutional rights?
```

Page 84

         1                 MR. BECK:  Objection.

         2                 Go ahead.

         3                 THE WITNESS:  Yes, sir.

         4    BY MR. WIEST:

         5         Q    So if somebody gave you an order that would

         6    violate the United States Constitution, you would not

         7    be required to obey it; correct?

         8                 MR. BECK:  Objection.

         9                 Go ahead.

        10                 THE WITNESS:  Can you repeat?

        11    BY MR. WIEST:

        12         Q    If someone gave you an order that did not

        13    comply and in fact violated the United States

        14    Constitution, you would not be required to obey it;

        15    correct?

        16         A    No, sir.

        17         Q    Is that correct?  Would you or would you not

        18    have to obey an order that would cause you to violate

        19    the United States Constitution?

        20                 MR. BECK:  Objection.

        21                 Go ahead.

        22                 THE WITNESS:  I would not have to

        23    comply with that order.

        24    BY MR. WIEST:

        25         Q    And then the next sentence talks about what

Page 85

1    happens when you're not sure if it violates or

2    doesn't.  If the legality of an order is in doubt, the

3    affected member shall ask the issuing supervisor to

4    clarify the order or confer with a higher authority?

5        A    Yes, sir.

6        Q    Would you agree that if a supervisor gave

7    you an order that you thought might violate the United

8    States Constitution, for instance, that you had the

9    right and the ability to go up the chain of command to

10   the next highest level?

11                   MR. BECK:  Objection.

12                   Go ahead.

13                   THE WITNESS:  Yes, sir.

14   BY MR. WIEST:

15       Q    Okay.  Have you ever had occasion where

16   you've done that?

17       A    Up until September 22, 2022, no.

18       Q    Okay.  And we'll talk about that incident in

19   a couple minutes.  Okay.  203 is the training.  This

20   is a whole section about training policies and DTBs.

21       And I'm not going to get into a whole lot of the

22   section 203.  I think it's four pages, 26 to 29, of

23   the training manual -- or the policy manual rather.

24   Do you know what the training plan was for the city of

25   Cleveland Heights?

Page 86

1    A    I do not, no.

2    Q    And I know you did tell me that Cleveland

3  Heights, once they went into Lexipol, did have DTBs;

4  correct?

5    A    Yes, sir, every month.

6    Q    Okay.  All right.  Other than jail day

7  training by the department, was there other training

8  that the department put on, on a regular basis?

9    A    On a regular basis, no.

10    Q    Okay.  How often would jail training be?

11    A    Once a year.

12    Q    Okay.  And how long was the course?  Was it

13  one shift basically where they --

14    A    It's an eight-hour course.

15    Q    Okay.

16    A    I think that's required by the state.

17    Q    Okay.  300, it's page 37.  This is the use

18  of force policy under the Lexipol manual.  You would

19  agree that officers could use only the amount of force

20  that was reasonably necessary?

21    A    Yes, sir.

22    Q    Okay.  Let me ask, the oath requirement, was

23  that true with the policy manual that predated the

24  Lexipol policy?

25    A    I don't recall that.

 1      Q     Okay.  How about the unlawful or conflicting

 2  order policy?  Was that in place prior to the Lexipol

 3  policy?

 4      A     I don't recall.

 5      Q     Okay.  Was the training aspect of the policy

 6  or procedure manual in place prior to the Lexipol

 7  policy?

 8      A     I don't recall that.

 9      Q     Was there a use of force policy that was

10  similar to the Lexipol policy prior to the Lexipol

11  policy?

12      A     Yes.

13      Q     Okay.  302 is handcuffing and restraints.

14  It starts at 49.  First of all, it says only members

15  who have successfully completed Cleveland Heights

16  Police Department approved training on the use of

17  restraint devices described in this policy are

18  authorized to use these devices.  This is 302.3;

19  correct?

20      A     Yes, sir.

21      Q     You agree that this would include handcuffs;

22  right?

23      A     Yes, sir.

24      Q     302.1 specifically says handcuffs; right?

25      A     Yes.

1      Q    Let me ask, was there a similar policy that

2   was in place to this policy prior to the Lexipol?

3      A    I don't know.

4      Q    Okay.  And then 302.3.1 talks about the use

5   of restraints for people that are not under arrest;

6   correct?

7      A    Yes, sir.

8      Q    And it says when determining whether to

9   detain somebody who's not under arrest, you have to

10  consider officer safety interests on the one hand

11  against continuing intrusion or restraints of liberty

12  on the detainee; right?

13     A    Yes, sir.

14     Q    Okay.  Have you ever detained anyone who was

15  not under arrest?

16     A    Well, yes, while waiting to confirm a

17  warrant.

18     Q    Okay.

19     A    And or if people were having serious

20  psychiatric issues or under the influence of PCP.

21     Q    Okay.  All right.  319 starts on 154 of the

22  manual.  This is another lawful directive section,

23  319.3 and then unlawful orders and conflicting orders

24  at 319.3.1; right?

25     A    Yes, sir.

1      Q    And this is the standards of conduct portion

2   of the policy manual right?

3      A    Yes, sir.

4      Q    And do you know whether or not there was

5   anything similar to this 319.3.1 that was in place

6   prior to Lexipol?

7      A    No, sir, I don't.

8      Q    Okay.  And I think you told me you're not

9   sure if this manual was in place or not in September

10  of 2022 in light of the copyright at the bottom left

11  of the manual; right?

12     A    Correct.

13          MR. WIEST:  Okay.  Greg, I'm going to

14  have a follow-up for you on that on a break, if that's

15  okay.

16          MR. BECK:  Mm-hmm.

17          MR. WIEST:  I just want to remember

18  that, just so we can follow up.  Because I'm going to

19  want whatever was enforced at the time.

20  BY MR. WIEST:

21     Q    319.5.1 on page 155 --

22     A    Yes, sir.

23     Q    -- talked about the fact that it could be

24  disciplined for violating federal, state, local, or

25  administrative laws, rules, regulations.  Do you know

1   whether or not that extended to violating either the

2   federal or state constitutions?

3        A    Can you repeat the question?

4        Q    So 319.5.1 subsection C, you see that at the

5   bottom of page 155?

6        A    Yes, sir.

7        Q    It says that you could receive disciplinary

8   action for violating federal, state, local, or

9   administrative laws, rules, or regulations.

10       A    Yes, sir.

11       Q    My question is do you know whether that

12  provision extended to violating the Ohio or federal

13  constitutions?

14       A    I do not know.

15       Q    Okay.  Did the city ever clarify that with

16  you?

17       A    Not that I recall.

18       Q    319.5.3 prohibits discrimination.  Do you

19  see that?

20       A    Yes, sir.

21       Q    Do you know whether or not there was a

22  discrimination prohibition in the policy manual that

23  preceded the Lexipol manual?

24       A    No, sir.

25       Q    Okay.  Yeah --

1     A    I don't recall.

2     Q    You don't recall.

3     A    Sorry.

4     Q    That's fine.

5     A    I'm sorry.

6     Q    319.5.8 had a -- these are the performance

7  standards of conduct.  And it includes "Failure to

8  disclose or misrepresenting material facts or making

9  any false or misleading statement on any application,

10  examination form, or other official document, report,

11  or form during the course of any work-related

12  investigation."  Do see that?

13     A    Yes, sir.

14     Q    Do you know if that extended to police

15  reports?

16     A    I don't know.

17     Q    Okay.  Do you know if a police report was

18  considered an official document?

19     A    I do know yes that it is.

20     Q    It is?  Okay.  How about a criminal charge?

21  Is that an official document?

22     A    Yes, sir.

23     Q    Are both of those documents work-related

24  records?

25     A    I don't understand what you're asking.

Page 92

```
 1        Q    319.5.8 subsection B prohibits the
 2   falsification of any work-related record, making
 3   misleading entries or statements with the intent to
 4   deceive or the willful and unauthorized removal,
 5   alteration, destruction, and or mutilation of any
 6   department record, public record, book, paper, or
 7   document.  Do you see that?
 8        A    Yes, sir.
 9        Q    Do you know whether or not police reports
10   are considered work-related records?
11                  MR. BECK:  Objection.
12                  Go ahead.
13                  THE WITNESS:  Yes, they are.
14   BY MR. WIEST:
15        Q    Is that also true for criminal charges?
16        A    As far as -- as in if I write a citation for
17   them or if I'm being charged?
18        Q    Right, a citation for them.
19        A    Yes, it's on -- it's --
20        Q    319.5.8 is the failure to participate in or
21   giving false or misleading statements or
22   misrepresenting or omitting material information to a
23   supervisor or other person in a position of authority
24   in connection with any investigation or in the
25   reporting of any departmental related business.  Do
```

1  you see that?

2       A    Yes, sir.

3       Q    Would internal affairs or an internal

4  affairs investigation be within the ambit of reports

5  to people in positions of authority or in the

6  reporting of any department related business?

7                 MR. BECK:  Objection.

8                 Go ahead.

9                 THE WITNESS:  I don't understand the

10  question.

11  BY MR. WIEST:

12       Q    Yeah, do you know if 319.5.8c extends to

13  internal affairs investigations and statements that

14  you would make to internal affairs investigators?

15                 MR. BECK:  Objection.

16                 Go ahead.

17                 THE WITNESS:  Yes, sir.

18  BY MR. WIEST:

19       Q    It would?

20       A    It would, correct.

21       Q    All right.  319.5.9 is conduct.  I've got

22  questions about some of the prohibitions there.  B

23  prohibits unreasonable and unwarranted force to a

24  person encountered or a person under arrest; right?

25       A    Yes, sir.

1      Q     C is exceeding lawful police officer powers

2   by unreasonable, unlawful, or excessive conduct;

3   correct?

4      A     Yes, sir.

5      Q     And then obviously, F is discourteous,

6   disrespectful, or discriminatory treatment of a member

7   of the public; correct?

8      A     Yes, sir.

9      Q     Okay.  Do you recall any training on any of

10  this that we're going over?

11     A     I don't recall.  It would -- it would

12  probably fall under those OPOTA online courses.

13     Q     Okay.  But you don't have any specific

14  recollection of specific training on any of the policy

15  manual thus far that we've gone over?

16     A     Only going through Lexipol.

17     Q     Only reading it yourself?

18     A     Reading it and then doing -- they would

19  provide a scenario like I said and then we would

20  answer a multiple choice question.

21     Q     Okay.  321 is report preparation.  And it

22  talks about report preparation being a major part of

23  each employee's job.  The purpose of the reports is to

24  document sufficient information to refresh the

25  employee's memory and to provide sufficient

1    information for follow-up investigation and successful

2    prosecution.  Report writing is the subject of

3    substantial formal and on-the-job training.  Do you

4    see that?

5         A    Yes, sir.

6         Q    First of all, you've seen this before;

7    correct?

8         A    Yes, sir.

9         Q    Is this consistent with the practice of

10   Cleveland Heights prior to the Lexipol manual, making

11   sure reports are accurate?

12        A    Yes, sir.

13        Q    321.1.1 indicates that employees should

14   ensure that the reports are sufficiently detailed for

15   their purpose and reasonably free of errors prior to

16   submission.

17        A    Yes, sir.

18        Q    And then there's even more specifics at the

19   bottom of that 321.1.1 that says all reports shall

20   accurately reflect the identity of the persons

21   involved, witnesses, all pertinent information seen,

22   heard, or assimilated by any other sense in any

23   actions taken.

24        Employees shall not suppress, conceal, or distort

25   the facts of any reported incident, nor shall any

1    employee make a false report orally or in writing.

2    Generally the reporting employees opinion should not

3    be included in the reports unless specifically

4    identified as such; right?

5         A    Yes, sir.

6         Q    Was that the practice of Cleveland Heights

7    and your practice prior to and on September 22, 2022?

8         A    Yes, sir.

9         Q    Okay.  I'm going to talk about 336.  It

10   starts on page 215.  Do you know whether or not this

11   section of the policy manual applies to, for instance,

12   pole-mounted cameras or cameras that are out in public

13   on traffic lights?  Do you know?

14        A    I don't know.

15        Q    Okay.  It's my sense of reading this that

16   this is not dealing with body cameras or in-vehicle

17   cameras and there's other sections of the policy that

18   apply to that.  Is that your understanding?  Do you

19   know?

20        A    I don't know.

21        Q    Have you had any training on this section

22   336?

23        A    No, sir.

24        Q    Let's look at 401, bias-based policing.  Did

25   Cleveland Heights offer you any training on bias-based

1   policing?

2       A    I think this would fall under the OPOTA

3   training of the cultural diversity.  I don't know

4   specifically.

5       Q    And I asked you some questions about that

6   this morning and you didn't have specifics about that

7   training.

8       A    Correct.

9       Q    Okay.  Let me ask more generally, did you on

10  or prior to September 22, 2022, have any

11  understandings about dealing with minority communities

12  in terms of your training or experience?

13      A    Yes, sir.

14      Q    Did you learn or have any understandings

15  that you should try to see incidents also from the

16  perspective of minority members of the community?

17      A    Yes, sir.

18      Q    Did you learn or have an understanding that

19  you should not make split-second judgments based on

20  the color of someone's skin?

21      A    Yes, sir.

22      Q    Did you learn or have an understanding that

23  there was a history in this country of minorities

24  being treated differently because of the color of

25  their skin?

1      A     Yes, sir.

2      Q     Did you learn or have any understanding that

3  minorities may be likely to perceive unfair treatment

4  directed to them as being related to the color of

5  their skin?

6      A     Yes, sir.

7      Q     Did you learn or have any understanding

8  about how to disabuse minorities of bad understanding

9  if they encountered it?

10                    MR. BECK:  Objection.

11                    Go ahead.

12                    THE WITNESS:  Can you repeat the

13  question?

14  BY MR. WIEST:

15      Q     Did you learn or have any understanding

16  about how to disabuse minorities that felt like they

17  were being treated unfairly because of the color of

18  their skin from that, if that wasn't the case, how to

19  deal with that?

20                    MR. BECK:  Objection.

21      A     What do you mean by disabuse them?

22      Q     If somebody, if a member of a minority

23  believes that their interaction with law enforcement

24  is handled a certain way because of the color of their

25  skin, how to ensure or calm a situation in a way that

1    they would not believe that that's the case by the end

2    of an interaction.

3                    MR. BECK:  Objection.

4        A    Yes, sir.

5        Q    How would you do that?

6        A    An example I could think of is a traffic

7    stop.  If I'm running a radar, the radar calibrates

8    prior to me being able to see who's driving the

9    vehicle or how many occupants are in the vehicle.  I

10   would ensure that to the party that I pull over when

11   they assume I pulled them over based on their race.

12       Q    So yeah, "I didn't even see who was in the

13   car when I read the speed.  That's why I pulled you

14   over."

15       A    Correct.

16       Q    Okay.  All right.  I'm going to talk about

17   421.  It's Policy 421.  By the way, I think I skipped

18   one.  420, real quick, does talk about the fact that

19   there's a shift lieutenant; correct?

20       A    Yes, sir.

21       Q    And they make the ultimate call, if

22   necessary, about what happens on a shift?

23       A    Yes, sir.

24       Q    Okay.  Did anyone ever tell you in the

25   course of performance of your duties at Cleveland

1  Heights that it would be inappropriate if you believed

2  that a sergeant was acting contrary to law to take it

3  to a shift lieutenant?

4      A    Nobody has told me that.

5      Q    Okay.  Has anybody inferred it to you or

6  suggested to you that it would be inappropriate to

7  follow the chain of command and bring a concern about

8  a sergeant to a shift lieutenant?

9              MR. BECK:  Objection.

10             Go ahead.

11             THE WITNESS:  No.

12  BY MR. WIEST:

13     Q    Okay.  Do you think that that would be the

14  appropriate course of action if you thought a sergeant

15  was acting inappropriately?

16     A    Yes, sir.

17     Q    Okay.  We'll talk about 421.  This is mobile

18  video recording, and as I understand it, I think that

19  that's the dash cam system.

20     A    Yes, sir.

21     Q    Did your vehicle have a dash cam system on

22  September 22, 2022?

23     A    No, sir.  And if I could recall, I believe I

24  was operating patrol vehicle 1181.

25     Q    Okay.

1        A    It's in here, if you can look at it.

2        Q    Yeah, we've definitely got the report.

3        A    Yeah, if it was 1181, no, it did not have a

4    dash cam, and it should reflect in my report the very

5    last statement.

6        Q    I'll let you look at the report a little

7    earlier than I was going to.

8        A    Okay.

9        Q    Why don't we go ahead and do that now.

10       A    Sorry?

11       Q    No, no, no.  I think that -- Exhibit 10.

12                    (Exhibit 10 was marked for

13                     identification.)

14       A    Yes, sir.  I was operating marked patrol

15   vehicle 1181, which does not have a dash cam.

16       Q    Okay.

17       A    Sorry.

18       Q    Yeah, no worries.  I think my associate --

19   let me see that exhibit because I think he added -- if

20   you could just detach the last two pages and give

21   those back to me.  So you were operating 1181 that

22   day?

23       A    I was, yes, sir.

24       Q    And there was no MVR in that?

25       A    No, sir.

1    Q    Okay.  How many vehicles -- I'm assuming

2  there were some vehicles with MVRs?

3    A    At one point there was.  To my knowledge

4  they did not update the software program for those

5  vehicles.  So at the time of this incident I don't

6  know if any patrol vehicle was equipped with a

7  functioning MVR.

8    Q    Okay.

9    A    1181 definitely did not and still does not.

10   Q    I take it that the city of Cleveland Heights

11  did not have take-home cruisers and so you would come

12  into work and get assigned a particular car?

13   A    The city of Cleveland Heights has take-home

14  cruiser policy.  At that time, I had just moved to the

15  city of Cleveland Heights and I was not assigned a

16  take-home cruiser at that point.

17   Q    423 is back on page 316.  This is the policy

18  for portable audio/video recorders; correct?

19   A    Yes, sir.

20   Q    This is the body-worn camera; correct?

21   A    Yes, sir.

22   Q    Okay.  A couple of things.  You were

23  required to make sure that the body camera was

24  functioning at all times under 423.5; right?

25   A    Yes.

1      Q      Prior to going into service, each uniformed

2    member will be responsible for making sure that he

3    slash she is equipped with a portable recorder issued

4    by the department and that the recorder is in good

5    working order; right?

6      A      Yes, sir.

7      Q      423.6, members should activate the recorder

8    any time the member believes it would be appropriate

9    or valuable to record an incident; correct?

10     A      Yes, sir.

11     Q      The portable recorder should be activated in

12   any of the following situations: all enforcement and

13   investigative contacts, including stops and field

14   interview situations; correct?

15     A      Yes, sir.

16     Q      Traffic stops, including but not limited to

17   traffic violations, stranded motorist assistance, and

18   all crime interdiction stops; right?

19     A      Yes, sir.

20     Q      You would agree with me that to record a

21   traffic stop, it would be appropriate to begin the

22   recording at least at the time of, if not before, you

23   activate lights and sirens; correct?

24                 MR. BECK:  Objection.

25                 Go ahead.

1              THE WITNESS:  No, sir.

2    BY MR. WIEST:

3        Q    Okay.  Why would you not want to record

4    lights and sirens in the course of a traffic stop?

5        A    Sometimes I make split decision to initiate

6    a traffic stop.

7        Q    Tell me how, physically, the body camera

8    system works and how you would activate it.

9        A    You just press a button and it starts

10   recording.

11       Q    So there's a button on the camera which is

12   on your vest; correct?

13       A    So the button to the camera -- wherever the

14   employee -- I mount mine to my vest, yes.  And then I

15   press the button to press record.  And to touch on

16   that further, I was under the impression when we got

17   these body cameras that it was supposed to roll back a

18   certain amount of minutes or seconds, which is why I

19   never would activate mine before I turn on my lights

20   and sirens.

21       Q    Because you thought there was like a 30

22   second play back?

23       A    I was under the impression and I don't know

24   if that is the case.

25       Q    Who told you that?

1      A    When we first got them, everybody was very

2   weary of them because they were being used in

3   Cleveland, and I think at one point some officers have

4   been -- like if they're running traffic on their phone

5   and then while they're running radar, and if I recall,

6   I have never been talked to about that, but I think

7   that the officers could -- whatever the content of

8   their phone would be, would play back of them

9   initiating their traffic stop.  If that makes sense.

10      Q    Yeah, it was a department scuttlebutt thing.

11   It wasn't like formal training where somebody from the

12   city of Cleveland Heights officially said, "Hey,

13   there's rollback."

14      A    No.

15      Q    And I know -- what would be true would be a

16   scuttlebutt thing; right?

17      A    I don't know what that means.

18      Q    Scuttlebutt, you're hearing it from other

19   officers rather than --

20      A    Yeah, correct.

21      Q    Rather than you're sitting in some training

22   and the chief says, "Hey, there's 30 second rollback."

23   That never happened; right?

24      A    No, not that I recall.

25      Q    I know that that's the case with most MVR

1  systems where there's a 30 second rollback from when

2  you activate lights and sirens, it's all automatic and

3  integrated, but that is not the case with the portable

4  body camera; correct?

5       A    Okay.  I don't know if it is the case or

6  not.

7       Q    Okay.

8       A    I was under the impression that it was.

9       Q    When did you come to learn that it was not

10  in fact the case?

11      A    I still don't know that it is not in fact

12  the case.

13      Q    Okay.  You've, today you've never asked

14  anyone in authority, whether or not, there's a 30

15  second rollback?

16      A    In authority, no.  I did ask a detective.

17      Q    When did you do that?

18      A    Recently, probably like a couple weeks ago.

19      Q    Okay.  How would you record a stop, all of a

20  stop, without starting the camera prior to the

21  initiation of lights and sirens?

22      A    My procedure of my traffic stops -- or can

23  you repeat the question?

24      Q    Well I'm asking generally, how would you

25  record all of a traffic stop without starting the

1   camera prior to activating lights and sirens?

2                   MR. BECK:  Objection.

3                   Go ahead.

4                   THE WITNESS:  If the camera does not

5   factually go back 30 seconds to a minute, I would not

6   be able to obtain all of it.

7   BY MR. WIEST:

8       Q    Unless you started the camera prior to

9   activating lights and sirens?

10      A    Correct.

11      Q    Do you believe, reading the policy as you

12  understand it, that if the recorder should be

13  activated in any of the following situations, and it

14  says traffic stops, including but not limited to, and

15  there's this list, that that includes all the traffic

16  stop?

17                  MR. BECK:  Objection.

18                  Go ahead.

19                  THE WITNESS:  I don't know.

20  BY MR. WIEST:

21      Q    Did you ever ask anyone?

22      A    I have not.

23      Q    Okay.  You would agree that 423.6b does not

24  say part of a traffic stop; right?

25                  MR. BECK:  Objection.

1          Go ahead.

2          THE WITNESS:  It does not say that, no.

3    BY MR. WIEST:

4     Q    Okay.  Is there -- in terms of recording all

5    of a traffic stop, is there anything physically that

6    would keep you from hitting the record button prior to

7    activating lights and sirens?

8     A    Just observing my infraction.

9     Q    Okay.

10    A    But --

11    Q    Let me ask about lights and sirens.

12    A    Yes, sir.

13    Q    How is that activated in your cruiser?

14    A    The lights are activated by a switch and the

15   sirens are activated by a knob.

16    Q    And both of those would require the use of

17   your right hand?

18    A    Yes, sir.

19    Q    In the same way that you could activate your

20   body camera with your right hand; right?

21    A    Yes, sir.

22    Q    In all of those actions, you're having to

23   drive, if you're in the process of driving with your

24   left hand, I'm assuming.  And while that's going on;

25   right?

1       A    Yes, sir.

2       Q    Okay.  All right.  How long does it take you

3  to activate lights and sirens?

4       A    How long?

5       Q    Like --

6       A    Immediate.

7       Q    A second or two?  The time it would take to

8  reach and flip and turn?

9       A    Yes, sir.

10      Q    And how long does it take you to activate

11  your body camera?

12      A    Immediate.

13      Q    Okay.  Have you had any training on body

14  worn cameras?

15      A    Aside from the day they were assigned to us,

16  no formal training.

17      Q    Look at 320.  423.12 is the policy.  This

18  says, "Initially, at least annually or more frequently

19  upon any updates, sworn members of this department

20  shall certify in writing or acknowledge electronically

21  that they have received, read, and understand this

22  policy."  See that?

23      A    No, I'm sorry, I don't.

24      Q    423 -- right there.  423.12.

25      A    Yes, sir.

1      Q    Did that in fact happen?

2      A    Only via Lexipol training.

3      Q    Okay.  Not otherwise?

4      A    No, sir.

5      Q    It says, "All BWC operators and supervisors

6    will complete an annual review of this directive and

7    complete knowledge testing on the proper use of the

8    equipment.  Testing may include the following topics:"

9    and there's an A through H there; right?

10     A    Yes, sir.

11     Q    Do you know whether or not that has

12   occurred?

13     A    I don't recall that.

14     Q    Okay.  All right.  424, it's a policy on the

15   public recording of law enforcement activity in place

16   by the city of Cleveland Heights.  Do you see that?

17     A    Yes, sir.

18     Q    424.2 says, "The Cleveland Heights Police

19   Department recognizes the right of persons to lawfully

20   record members of this department who are performing

21   their official duties."

22     A    Yes, sir.

23     Q    And it says members of this department will

24   not prohibit or intentionally interfere with such

25   lawful recordings; correct?

1       A    Yes, sir.

2       Q    People are allowed during a traffic stop,

3   for instance, to activate their camera.  And as long

4   as they're not interfering with the stop, they're

5   allowed to record it; correct?

6       A    Absolutely.

7       Q    Okay.  All right.  Did you understand that

8   on or before September 22, 2022?

9       A    Oh, yes.

10      Q    You say, "Oh, yes."  Why do you say that?

11      A    During COVID, everybody would like to get

12  out of their car and record us.

13      Q    What do you mean by that?

14      A    Any traffic stop.  If I initiated five

15  traffic stops a day, at least two passersby would get

16  out of the car, unrelated, and record.

17      Q    Would they stop their vehicle to do that?

18      A    Yes, sir.

19      Q    Okay.  And you knew that they had the right

20  to do that?

21      A    As long as they're not interfering with the

22  stop, and they're parked in a legal manner, they have

23  the right to record us.  Absolutely.

24      Q    Okay.  429 is a policy on First Amendment

25  assemblies.  It starts on 337.  And I want to look at

1    429.3 with you real quick.  "Individuals or groups

2    present on the public way such as public facilities,

3    streets or walkways generally have the right to

4    assemble, rally, demonstrate, protest or otherwise

5    express their views and opinions through varying forms

6    of communication including the distribution of printed

7    matter."  Do you see that?

8         A    Yes, sir.

9         Q    Did you have an understanding that that was

10   the case prior to September 22, 2022?

11        A    Yes, sir.

12        Q    Okay.  Was there any specific training that

13   the city of Cleveland Heights provided on that to you?

14        A    Not that I can recall.

15        Q    Okay.  1004 is an anti-retaliation policy.

16   It starts on 499 and goes through 501.  1004.1

17   prohibits "retaliation against members who identify

18   workplace issues that include, for instance, the abuse

19   of authority."  Do you see that?

20        A    Yes, sir.

21        Q    Did you have an understanding that if you

22   were to turn in, for instance, a supervisor for

23   abusing his or her authority that you would be

24   protected under this 1000.4 retaliation policy.

25                   MR. BECK:  Objection.

1                   Go ahead.

2                   THE WITNESS:  Yes, sir.

3     BY MR. WIEST:

4          Q     Okay.  Did you have that understanding prior

5     to September 22, 2022.

6          A     Yes, sir.

7          Q     Okay.  All right.  I'm going to -- I'm not

8     taking this -- I would prefer that you not refer to it

9     unless you feel like you need to.  We're going to go

10    through the report here in a minute.

11         A     Yes, sir.

12                   MR. WIEST:  But I want to transition.

13                   Greg, let me see, because I don't want

14    to be -- I'm getting into another line of questioning.

15    Does anybody need a break?

16                   MR. BECK:  No, we can keep going until

17    noon, I think.

18                   MR. WIEST:  That's fine.  Do you want

19    to address that now?  Did you want to take a lunch

20    break today?

21                   MR. BECK:  Well, you have to tell me

22    how long you're going to go.  I just want to make sure

23    that she's not sitting here for another five hours

24    without eating or anything like that.

25                   MR. WIEST:  Yeah, we should probably

1    take a lunch break.  I'm probably thinking, I mean, we

2    probably have three more hours to go at this point.

3              MR. BECK:  So why don't we go to noon,

4    and we can take maybe half an hour, see if we can get

5    her something to eat or whatever, to relax, and then

6    we can come back and we can knock it out.

7              MR. WIEST:  Okay.

8    BY MR. WIEST:

9        Q    September 22, 2022, you had the interaction

10   with Mr. Goodman and Mr. Kern on Mayfield Road in

11   Cleveland Heights; correct?

12       A    Yes, sir.

13       Q    Had you met or had any interactions with

14   either of them prior to that traffic incident?

15       A    No, sir.

16       Q    Okay.  I want you to tell me what you recall

17   from that incident.  And obviously, we're going to

18   review a report, and we've got a decent amount of this

19   on video.  And if you feel like you need to refer to

20   the report, or you want to defer to the report, I

21   don't have a problem with that, but I'm trying to get

22   to what you remember first, and then we'll go through

23   the report.

24       A    Sure.

25       Q    So can you tell me what you remember about

1    that stop?

2                    MR. BECK:  Objection.

3                    Go ahead.

4                    THE WITNESS:  And what exactly would

5    you like -- where would you like me to start?

6    BY MR. WIEST:

7        Q    From the beginning of the interaction.

8        A    Okay.  With both the gentlemen?

9        Q    Yes.

10       A    Okay.  I was on patrol in the area of Noble

11   Road and Mayfield Road.  I observed a silver Infiniti

12   that matched a description of a suspect from an

13   altercation we had the day prior.  It was -- I don't

14   know if you need the details for that.

15       Q    Well, let me ask you this.  Was there a

16   silver Infiniti that was involved?  Was it the

17   particular silver Infiniti?  Was it the plates that

18   matched?

19       A    It was the silver Infiniti that fit the

20   vehicle description of the suspect's silver Infiniti.

21   It was a -- I believe, a silver sedan.  Infiniti,

22   definitely.

23       Q    Was it a particular model of the Infiniti?

24       A    I don't recall a model, no.

25       Q    Were you involved in that prior incident

1    yourself?

2         A    I was not.  I just had knowledge of the

3    suspect's vehicle and the area in which it occurred.

4         Q    Was that near where the stop was?

5         A    It was on Noble Road.

6         Q    Okay.  How did you obtain knowledge of it?

7    Was it like a shift change briefing?

8         A    This was an incident that was continuously

9    occurring.  So we -- throughout like that week or

10   weekend, so we are all aware of the suspect's vehicle.

11        Q    What was the incident?  Was it a domestic?

12        A    It was a felony domestic violence situation.

13        Q    Did you have any identity of the perpetrator

14   of that?

15        A    I did not.

16        Q    Was there a name that was involved at all or

17   no?

18        A    The officers who responded would have all

19   that.  I did not respond to that.  So I didn't know

20   anything other than the vehicle description.

21        Q    How about the race of the suspect?

22        A    I don't recall the race of the suspect.

23        Q    Did you know if you had it at the time?

24        A    I did not know the race of the suspect.

25        Q    Did they provide any descriptors about the

1   potential perpetrator of this domestic?

2        A    In the report, I'm sure it reflected it.  I

3   did not read the report.  I wouldn't have had reason

4   to read it.

5        Q    Okay.  How long had the period of time

6   passed between when the domestic incident happened and

7   the time of the stop on 9/22?

8        A    It was the day prior, so less than 24 hours.

9        Q    Other than the description of silver

10  Infiniti, did you have any other information

11  describing the vehicle?

12       A    Not at the time.

13       Q    So you see a silver Infiniti.  It's in the

14  general vicinity of where the domestic felony incident

15  occurred the day prior.

16       A    Yes, sir.

17       Q    Did you do anything prior to initiating the

18  stop, like running the license plates?

19       A    I did.  I ran the license plate.

20       Q    Okay.

21       A    It had the display of the previous year.  It

22  was an expired license plate sticker.

23       Q    Was that the basis of the stop?

24       A    That was my probable cause to stop the

25  vehicle.

1       Q    Okay.  So there's an expired license sticker

2  and --

3       A    In addition to the description of the

4  vehicle.

5       Q    Let me ask about where you were relative to

6  these vehicles, because as I understand it, these

7  vehicles were in the right-hand lane?

8       A    Yes, sir.

9       Q    And were you behind the Silver Infiniti, I

10  take it, so that you could actually see the license

11  plate?

12       A    I was in -- those vehicles were in the right

13  curb lane.  I was in the left lane on Mayfield Road.

14  It was -- I think it was around rush around timeframe

15  give or take and Mayfield Road is pretty heavy

16  traffic, unless it's after 10 o'clock at night.

17       Q    Is it a pretty big, pretty heavy traffic

18  thoroughfare for the city of Cleveland Heights?

19       A    It is.  It's one of the main ways to get

20  through Cleveland Heights.  I think it's a U.S.

21  Route.  It's a pretty heavy congested traffic area.

22       Q    How many lanes of traffic are in that road?

23       A    So there's two lanes eastbound, two lanes

24  westbound, and then every so often there's a turning

25  lane and or there's like a middle lane which is used

1    as a turning lane to get to like a side street.

2         Q    Okay.  So you see the Silver Infiniti.  Does

3    the department have license plate readers or did you

4    manually have to put in the license plate?

5         A    I manually entered the license plate

6    information into LEADS.

7         Q    Okay.  And I take it that came back in a

8    couple seconds like it normally would; right?

9         A    Yes, sir.

10        Q    And you saw that -- did it confirm that the

11   license plate was in fact expired?

12        A    Yes, sir.

13        Q    Okay.  And so tell me what happened next.

14        A    So I confirmed that it was expired.  I

15   waited for an opportunity to get into the right lane.

16   I activated my overhead lights and sirens, which the

17   vehicle, the driver of the Infiniti stopped.  And then

18   Mr. Kern was operating the Tesla.  He was also in the

19   right lane, and he did not yield to the lights and

20   sirens, and we almost got into a collision.

21        Q    Let me unpack that a little bit because I

22   want to understand where you were.

23        A    Yes, sir.

24        Q    Is it your testimony that you had gotten all

25   the way over into the right-hand lane before you

1    activated lights and sirens?

2         A    I activated my lights and sirens as I was

3    transitioning into the lane.

4         Q    Okay.  Did you activate a turn signal as you

5    made the lane change?

6         A    I wouldn't activate my turn signal if I'm

7    activating my overhead lights and sirens.

8         Q    Okay.  Here's what I think I'd like to do.

9    I'm going to hand you what I've marked as Exhibit 10a,

10   which is a -- version of a road.

11                   (Exhibit 10a was marked for

12                   identification.)

13              And I'd like you to depict on there at the

14   time of operating the lights and sirens, when you say

15   you activated them, the positioning of where your

16   vehicle was, the positioning of where Mr. Kern's

17   vehicle was, and the positioning of where Mr.

18   Goodman's vehicle was for me.

19        A    Okay.  This is the westbound lane.  Mr.

20   Goodman's vehicle is right here.  G for Goodman.  I'm

21   in this lane.  L for Lewis.  And Mr. Kern is behind

22   me.  I have enough -- I can see that I can get over.

23        Q    Okay.  So let me unpack that just a little.

24   You're saying there was at least a car length between

25   Goodman and Kern?

1        A       To my knowledge, yes.

2        Q       Okay.  Do you know how many car lengths or

3   what the distance was between their vehicles at the

4   time that you activated lights and sirens?

5        A       I don't know the distance.

6        Q       Was it --

7        A       At a minimum a car length.  Because I knew I

8   would be able to get over.

9        Q       Okay.  How long did it take you to operate

10  your vehicle and maneuver it into the turn lane?

11       A       Into the curb lane?

12       Q       Yes, ma'am.  Yeah, I'm sorry, into the curb

13  lane.

14       A       Seconds.

15       Q       Are you activating your lights and sirens

16  and immediately getting into the curb lane?

17       A       I activated my overhead lights and sirens

18  and began to get into the lane.

19       Q       How quickly between the time that you

20  activated your lights and sirens and when you began to

21  maneuver your vehicle into the curb lane?

22       A       Probably within a few seconds.  I had an

23  opening to go over.

24       Q       Okay.  Do you know if the opening was more

25  than a car length?

1      A     I don't know.

2      Q     The only person that would have been in a

3  position to have recorded that, that had the equipment

4  to record it, was you with your body-worn camera;

5  correct?

6      A     My body-worn camera wouldn't have captured

7  the space next to me.  It would have only captured my

8  steering wheel.

9      Q     Okay.  Unless you turned a little bit, like

10  you were looking; right?  Then it might have.

11      A     Well, I would have used my mirror.  Turning

12  in the police car I wouldn't be able to see through

13  the caged in rear seat or the rear pillar.

14      Q     Okay.  So you're looking -- I just want to

15  be clear, you're looking in your right hand mirror to

16  see where Mr. Kern's vehicle was?

17      A     When I change lanes, yes, I do use my

18  mirror.

19      Q     Okay.  And you're also keeping your eye on

20  Mr. Goodman who's in front of you; right?

21      A     Yes, sir.

22      Q     Okay.  Your body camera that had audio would

23  have picked up the sirens, though, at the time that

24  those were activated, fair?

25      A     If the body -- the body camera was not

 1  activated at the time I initiated lights and sirens.

 2      Q    Okay.  That came later; correct?

 3      A    The body camera?

 4      Q    Yes.

 5      A    I activated it as I exited my patrol

 6  vehicle.

 7      Q    If you had activated it in the patrol

 8  vehicle prior to lights and sirens, we would have seen

 9  the sequence of events in terms of timing between the

10  distance, or the time that it took from when the

11  sirens were activated to the time that you stopped the

12  vehicle and got out; correct?

13      A    I don't know how -- I don't know if it would

14  have captured -- so my -- I'm short, so my body cam

15  looks directly at my steering wheel.  I don't know how

16  far to the side it would have -- I assume, but I don't

17  know for a fact.  And I don't know -- getting back to

18  how we discussed like how quickly does it activate, I

19  don't know if the sound activates abruptly.

20      Q    Does the sound not activate -- you're saying

21  you don't know if the sound activates when you --

22      A    Immediately upon activating the body camera.

23      Q    Okay.  At what angle did your vehicle have

24  to angle to get into the curb lane?

25      A    I don't -- I --

1       Q    Like --

2       A    -- went to the right?

3       Q    Was it like that?  Or was it like that?  Or

4   more like that?  I mean, do you have a sense of what

5   the angle was?

6                    MR. BECK:  Objection.

7                    Go ahead.

8                    THE WITNESS:  I entered into the

9   turning lane.  I wasn't angled at him.  Sorry, the

10  curb lane.

11  BY MR. WIEST:

12      Q    Well, it obviously wasn't 90 degrees.  Do

13  you have any sense of what the degrees were to make

14  that turn?

15      A    I couldn't tell you a degree, no.

16      Q    And I think your testimony was Mr. Goodman

17  hit his brakes right away.

18      A    Correct.

19      Q    Did he create skid marks as he was operating

20  his brakes?

21      A    No, sir.

22      Q    Okay.  In entering the curb lane, do you

23  know if you cut Mr. Kern off?

24      A    I did not cut Mr. Kern off.

25      Q    How do you know that?

1      A    It was a very abrupt stop.  Mr. Kern was

2   still behind my patrol vehicle.

3      Q    As you were entering the curb lane -- I

4   mean, you would agree with me that you were already

5   fully in the curb lane prior to Mr. Goodman fully

6   stopping; right?

7      A    I was in the curb lane, yes.

8      Q    Okay.  Do you know if as you were entering

9   the curb lane, you cut Mr. Kern off causing him to jam

10  on his brakes?

11     A    Mr. Goodman stopped abruptly causing me to

12  stop abruptly, causing Mr. Kern to stop abruptly.

13     Q    Did Mr. Goodman stop prior to your vehicle,

14  or at least begin to stop, prior to your vehicle fully

15  being in the curb lane?

16     A    Not that I -- no.

17     Q    Okay.  So your vehicle gets over into the

18  curb lane fully and then Mr. Goodman stops his vehicle

19  and hits his brakes?

20     A    Yes.

21     Q    Okay.  How do you know that you didn't cut

22  Mr. Kern off as you were making the lane change?

23             MR. BECK:  Objection.  You already

24  asked that.

25             Go ahead.  You can answer that one more

 1    time.

 2                   THE WITNESS:  When I was making the

 3    lane change utilizing my mirror, I had an opening to

 4    enter the lane.

 5    BY MR. WIEST:

 6        Q    But you told me you didn't know if the

 7    opening was more than one car length; right?

 8        A    I cannot tell you how large the opening was.

 9    It was at least a car length.

10        Q    How far was Mr. Kern's vehicle from yours as

11    you're entering the lane?

12        A    We were very close to one another.  I don't

13    know the exact distance.  We almost were in the

14    collision.

15        Q    Okay.  You were very close to a collision.

16    How many -- obviously, I'm trying to figure out where

17    this collision occurred.  Were you already in the curb

18    lane prior to it occurring, or did it almost occur as

19    you were getting into the curb lane?

20        A    I was already in the curb lane.  It would

21    have been an assured clear distance accident.  Mr.

22    Kern would have rear-ended my patrol vehicle.

23        Q    Okay.  You say it would have been an assured

24    clear distance.  Are you aware that if you cut off

25    someone's stopping distance it's not an assured clear

1   distance?

2           MR. BECK:  No, no.  Objection.

3           I'll let you answer that one because

4   it's not accurate, but go ahead.

5           THE WITNESS:  Are you looking for a yes

6   or no answer?

7   BY MR. WIEST:

8       Q    Yeah.  Yeah, go ahead.

9       A    Repeat the question.

10      Q    Are you aware that if you get into someone's

11  lane of travel, suddenly forcing them to hit the

12  brakes, and they hit you, because you've gotten into

13  the lane of travel, are you aware of whether that is a

14  assured clear distance violation?

15          MR. BECK:  Objection.

16      A    No.

17      Q    You don't know?

18      A    I don't know.

19      Q    Do you believe Mr. Kern committed a traffic

20  offense?

21      A    I do.

22      Q    What traffic offense do you think he

23  committed?

24      A    Mr. Kern did not yield to the emergency

25  vehicle lights and sirens.

1     Q    How much time did he have to yield?

2     A    I don't know how much time he had, but in my

3  20 plus years of driving experience, as soon as you

4  hear or see emergency vehicle lights and sirens, you

5  just stop up immediately.

6     Q    I mean, you would agree that someone to be

7  able to yield would have to have sufficient time to

8  appreciate the fact that lights and sirens are on, and

9  then react to it correct?

10               MR. BECK:  Objection.

11               Go ahead.

12               THE WITNESS:  Yes, sir.

13               MR. WIEST:  Hold on, let's go off the

14  record.

15               (Off the record.)

16               THE VIDEOGRAPHER:  Back on the record.

17  The time is now 11:42.

18  BY MR. WIEST:

19     Q    I think we -- I just want to summarize where

20  we were with this traffic stop.  You are in the left

21  lane.  Goodman and Kern in the right lane, and you

22  said you activated lights and sirens but not a turn

23  signal for a second or two and then you moved into the

24  curb lane; correct?

25     A    I don't know how long they are activated,

1    but yes I activated my overhead lights and sirens and

2    moved into the curb lane.

3         Q    Okay.  Were the lights and sirens activated

4    prior to you beginning the turn into the curb lane?

5         A    Yes.

6         Q    Okay.  What are the elements of a failure to

7    yield?

8         A    The elements of a failure to yield?

9         Q    Uh-huh.

10        A    Not stop -- to an emergency vehicle?

11        Q    Yes.

12        A    Not stopping for an emergency vehicle with

13   lights and sirens activated.

14        Q    How long does someone have to stop for an

15   emergency vehicle with lights and sirens activated?

16        A    I don't know that there is a time frame, but

17   they should stop abruptly, immediately, upon seeing

18   the lights and hearing the sirens.

19        Q    So you agree they've got to be able to see

20   and hear the lights and sirens?

21        A    Yes, sir.

22        Q    Okay.  And there has to be some amount of

23   time for them to be able to do that; correct?

24        A    Yes, sir.

25        Q    Okay.  Do you know whether or not Mr. Kern

1  had sufficient time in light of this incident to --

2      A    Being that I was directly in front next to

3  him, I don't know how he would not see or hear the

4  lights and sirens.

5      Q    You told me it was a second or two before

6  you maneuvered into a lane; right?

7      A    He had, in my opinion, plenty of time to see

8  and hear the lights and sirens if he had been paying

9  attention.

10     Q    And he was supposed to, I suppose, slam on

11  his brakes to allow that maneuver to occur; correct?

12             MR. BECK:  Objection.

13             Go ahead.

14             THE WITNESS:  No.

15  BY MR. WIEST:

16     Q    What was he supposed to do?

17     A    He should have pulled over to the side and

18  stopped and yielded to the lights and sirens.

19     Q    You agree he did pull over and stop; right?

20     A    Yeah, he was already over.

21     Q    Okay.

22     A    Did he stop?  He did stop eventually.

23     Q    How much time did it take him to stop?

24     A    I don't know.  I wasn't focusing on his

25  vehicle behind me.  I was focusing on the vehicle in

1   front of me.

2       Q    And you told me that Mr. Goodman immediately

3   was on his brakes, forcing you to get on your brakes

4   to avoid a collision; correct?

5       A    Mr. Goodman, I don't think realized I was

6   initiating traffic with him.  He stopped very

7   abruptly, which caused me to stop abruptly, which

8   caused Mr. Kern to stop abruptly in result of him not

9   yielding to the vehicle lights and sirens, which did

10  almost cause a collision.

11      Q    Did Mr. Kern's vehicle strike your vehicle?

12      A    It did not, no, sir.

13      Q    Did your vehicle strike Mr. Goodman's

14  vehicle?

15      A    No, sir, it did not.

16      Q    At the time of the stop, when you had

17  completed the stop with Mr. Goodman, how far away was

18  Mr. Kern's vehicle from your vehicle?

19      A    Mr. Kern's vehicle was at least a vehicle or

20  two.  I'm not good with distance.  He definitely had a

21  car length or two behind me.

22      Q    Okay.  Was the collision that almost

23  occurred during the lane change or was it after the

24  lane change?

25      A    I believe it was after the lane change.

1      Q     Okay.  How do you know that?

2      A     I don't know that.  I can't see behind my

3  head.  I was focusing on Mr. Goodman's vehicle.  It

4  was an abrupt stop.  I only know that a collision

5  occurred because Mr. Kern exited his vehicle and

6  shouted at me.

7      Q     I want to talk about that in a second.

8      A     Yes, sir.

9      Q     How much time do you think elapsed from the

10 activation of your lights and sirens, which you say

11 you were in the left-hand lane completely, when

12 that -- you did not -- none of the turn into the curb

13 lane by you had occurred prior to lights and sirens;

14 right?  That's the testimony.

15     A     Wait, I didn't -- say that again.  I'm

16 sorry.

17     Q     You're saying your lights and sirens

18 activated and you were completely in the left-hand

19 lane; right?

20     A     Yes, sir.

21     Q     How much time do you think elapsed from when

22 you first turned on lights and sirens until when the

23 stop was complete?

24     A     The stop of -- Mr. Goodman stopping or --

25     Q     Yes.

1      A     -- the duration of this entire incident?

2      Q     No, I just want to get to the initial stop.

3    When Mr. Goodman's vehicle is stopped in the curb lane

4    on the side of the road.

5      A     Thirty seconds at best.  It happened pretty

6    immediately.

7      Q     Okay.  It might have been less, but you're

8    not sure?

9                MR. BECK:  Objection.

10     A     I'm not sure.  No, sir.

11     Q     Okay.

12                THE REPORTER:  Counsel, can I have you

13    put on your mic?  Thanks.

14    BY MR. WIEST:

15     Q     You're stopped.  Are your windows up on your

16    vehicle?

17     A     I don't recall that.

18     Q     Okay.  You don't know if they were up or

19    down?

20     A     No, sir.

21     Q     You said Mr. Kern yelled at you; right?

22     A     Correct, yes, sir.

23     Q     Were you -- I mean, you've seen the body

24    camera.  We're going to go over it later today.  Did

25    him yelling at you occur -- and you would agree with

1    me, your body camera activates as you're getting out

2    of the vehicle; correct?

3         A    Yes, sir.

4         Q    Was Mr. Kern yelling at you, as you describe

5    it, did that occur prior to activation of the body

6    camera or before?

7         A    I observed him and heard him shouting at me

8    as I exited my patrol vehicle with the body camera on.

9         Q    Okay.  So your testimony is that occurs,

10   that didn't occur prior to camera, that's on camera?

11        A    That's on camera.

12        Q    Okay.  Was he in or out of his vehicle at

13   that point in time?

14        A    He was out of his vehicle.

15        Q    So he was out of his vehicle prior to you

16   exiting your vehicle?

17        A    I believe so.

18        Q    Okay.  As you get to the side, as you

19   initiate the stop of Mr. Goodman, did you do anything

20   other than exit the vehicle prior to exiting the

21   vehicle?  And I know we talked to you, you had already

22   run his plates, but were you calling dispatch?  Was

23   there anything you were doing prior to your accident?

24        A    I wasn't -- no, not that I recall.

25        Q    Okay.  So you exit the vehicle.  And I

1  think -- you said Mr. Kern was yelling.  What was he

2  yelling.

3       A    Mr. Kern was shouting that I almost hit him

4  and that I cut him off.

5       Q    And what was your response?

6       A    I advised him that I -- if I recall

7  correctly, I advised him to give me a minute, and I

8  made contact with Mr. Goodman.

9       Q    Did he give you a minute?

10      A    Yeah, he complied.  I can't recall if I

11  spoke with Mr. Kern first or Mr. Goodman first, but I

12  know I advised Mr. Kern that I'd be right with him.

13      Q    What happened next?

14      A    I obtained -- I made contact with Mr.

15  Goodman, advised him the reason for the traffic stop,

16  and obtained his driver's license.

17      Q    Okay.  What happened after that?

18      A    I went back to my -- well in between this I

19  did call for backup.

20      Q    Why did you call for backup?

21      A    I had two subjects stopped at the same time.

22  One person I was conducting business with and one

23  person who stopped himself.

24      Q    Okay.  So you called for backup.  Did you

25  believe that you were threatened in any way?

1       A     I didn't know what the matter was.

2       Q     Okay.  Well, you just testified that Mr.

3  Kern said that you would cut him off; right?

4       A     Correct.

5       Q     So you knew that he was upset about that;

6  right?

7       A     Yes, correct.

8       Q     Did you think that it was going to escalate

9  and you needed backup?

10      A     I am a five-foot tall, 120 pound person.  If

11 I ever have multiple people out at a one time, one

12 person in which is upset, I will always call for a

13 second unit.

14      Q     Okay.  So had that happened prior to

15 September 22, 2022?

16      A     Yes, sir.

17      Q     How many times?

18      A     I cannot even tell you how many times,

19 referring back to what we spoke about during COVID.

20      Q     Was there anything else other than him being

21 upset with you for cutting him off that caused you to

22 want to call backup?

23      A     I didn't know if the subject I was speaking

24 with in the Infiniti was the suspect to the domestic

25 violence incident.  I had not run his credentials at

1    that point.  And referring back to, I didn't know the

2    name of the suspect prior to making contact with that

3    gentleman.

4        Q    How would you ascertain, because you didn't

5    know the name, how would you ascertain whether or not

6    Mr. Goodman was the individual that was involved in

7    the domestic violence, if that was a concern of yours?

8        A    One of my co-workers would advise once they

9    heard the name, and or a dispatcher could have

10   recalled.

11       Q    Okay.  So the name was known to others

12   within the Cleveland Heights Police Department or

13   dispatch.  It just wasn't known to you?

14       A    Correct.

15       Q    Okay.

16       A    I didn't respond as stated previously to

17   that call.  So I didn't know firsthand what the

18   suspect's name was.

19       Q    Was there an open warrant on that suspect?

20       A    I don't know at that time.  If the incident

21   previously happened, I don't recall if it, you know,

22   warrants take time to enter in the system.  Also, in

23   relation to that traffic stop, the license plates on

24   that Infiniti were not registered to the driver.

25       Q    Okay.  Was that another issue then for the

1   Infiniti?

2        A    It's a violation, but it was not an issue

3   for me personally.

4        Q    Okay.  So in other words, you could have

5   written a ticket for it, but you chose not to?

6        A    I could have written multiple citations, but

7   I opted not to.

8        Q    Okay.  What happened next?

9        A    I called for backup and I made contact with

10  Mr. Kern.

11       Q    Did you know who was going to be backup or

12  responding to backup?

13       A    I heard -- I don't know if at that moment --

14  yeah I did.  Officer -- Sergeant Wolf responded that

15  he'd be -- he stated over the air he would be

16  responding.

17       Q    Did you know prior to calling for backup

18  that Sergeant Wolf would be the person that would be

19  responding?

20       A    No, sir.

21       Q    Okay.  So you call for backup and it's

22  really whoever responds --

23       A    It's whoever's closest are in the area or

24  available.

25       Q    Okay.  So Sergeant Wolf responds and we're

1   going to -- we've got the dispatch call, we're going

2   to look at that later today too.  Sergeant Wolf

3   responds that he's going to be en route.  What did you

4   tell Sergeant Wolf or whoever you called for backup

5   about what was going on at the stop?

6        A    Over the air I stated that there was almost

7   a collision.  I believe I stated that I was out with

8   another party who was irate.  Along those lines; I

9   don't know verbatim what I stated.

10       Q    All right.  what happens next?

11       A    Mr. Kern was very upset.  He stated that I

12  almost struck his vehicle.  I almost -- I cut him off

13  and almost caused an accident.  A collision almost did

14  occur.  We were very close in proximity to one

15  another.  I understand his frustration regarding that

16  matter, and I did, I apologized to him.

17            I explained to him what happened and the

18  reason for the abruptness of the stop.  And he

19  obviously was frustrated.  He continued to repeat

20  himself.  I continued to apologize.  And then Sergeant

21  Wolf arrived on scene.

22       Q    As you were interacting with Mr. Kern, were

23  you also processing Mr. Goodman and his information?

24       A    I did not at that moment.  I waited until --

25  I had eyes on the vehicle.  I believe I ran it over

1  the air, but I don't know if I -- I think I provided

2  his information to dispatch over the air while I was

3  standing with Mr. Kern.

4      Q    Did Mr. Kern ever make it impossible for you

5  to question Mr. Goodman?

6                  MR. BECK:  Objection.

7                  Go ahead.

8                  THE WITNESS:  Mr. Kern did not make it

9  impossible, however he did delay my investigation with

10  Mr. Goodman in not knowing who the driver of that

11  vehicle was.

12  BY MR. WIEST:

13     Q    How so?

14     A    It -- I had to take my attention away from

15  Mr. Goodman to speak to Mr. Kern as I was approaching

16  Mr. Goodman's vehicle.

17     Q    Did Mr. Kern ever prevent you from talking

18  to Mr. Goodman?

19     A    No, he did not.  He only delayed it.

20     Q    Did you ever tell Mr. Kern to leave the

21  scene so that you could deal with Mr. Goodman?

22     A    I don't recall that I ever told him he

23  needed to leave.

24     Q    Okay.  Did you ever warn Mr. Kern to stop

25  interfering with your traffic stop and Mr. Goodman?

1    A    I advised Mr. Kern to stay where he was at

2  on the sidewalk and that I would be right with him.

3    Q    And did he do that?

4    A    He did, yes, sir.

5    Q    Okay.  In fact, was there ever a time other

6  than the production of identity that you gave Mr. Kern

7  a directive that he did not comply with?

8    A    I don't -- say that again.  I'm sorry.

9    Q    Did you ever give -- other than the identity

10  issue that we're going to talk about, the request for

11  identification, did you ever give Mr. Kern a directive

12  that he failed to comply with?

13    A    No.  No, sir.

14    Q    How long did Mr. Kern delay your ability to

15  deal with Mr. Goodman?

16    A    Just a short amount of time, seconds.

17    Q    What did Mr. Kern want from you?

18    A    Of my knowledge prior to making contact or?

19    Q    Well, during, I mean, didn't he ask you for

20  your name and badge number?

21    A    I don't recall, but I -- he probably did.

22    Q    Do you know why he wanted your name and

23  badge number?

24    A    I don't know his reasoning why.  I could

25  assume, but I don't know his actual reasoning.

1      Q    Okay.  What would your assumption be?  Let

2    me start there.

3                   MR. BECK:  Objection.

4                   Go ahead.

5                   THE WITNESS:  My assumption would be he

6    would want to know who he was talking to.  He was

7    upset.  Maybe he wanted to make a formal complaint.

8    BY MR. WIEST:

9      Q    Okay.  Did he ever tell you he wanted to

10   make a complaint?

11     A    Say that again?

12     Q    Did he ever tell you that he wanted to make

13   a complaint?

14     A    I don't recall if he said he was going to

15   make a complaint, but I do recall him saying he was

16   going to have multiple lawsuits.

17     Q    Okay.  We'll get into that.  One of the

18   things that you reported was that Mr. Kern was

19   recording the stop.  Do you remember that?

20     A    Yeah, he was.  Yes.  Yes, sir.  Sorry.

21     Q    Why did you report that he was recording the

22   stop?

23     A    I don't recall -- maybe on the -- I don't

24   recall that I -- why or if I did.

25     Q    Okay.

1    A    Maybe just to note that he -- that was his

2  action as I was conducting the stop.

3    Q    Okay.  Why would you say that?

4              MR. BECK:  Objection.

5              Go ahead.

6              THE WITNESS:  Just to state what he was

7  doing at the time.

8  BY MR. WIEST:

9    Q    Did you feel threatened if he was recording?

10   A    No.

11   Q    Okay.  Sergeant Wolf shows up.  What happens

12 next?

13   A    When Sergeant Wolf shows up, I go to -- he

14 stays with Mr. Kern, and I go back to Mr. Goodman's

15 car, and I just give him a verbal warning.  Just make

16 sure he gets his, you know, car straightened out, and

17 then I just let him go.

18   Q    How long into the stop before you released

19 Mr. Goodman?

20   A    Probably just a few minutes.

21   Q    Okay.  You agree that at the time that you

22 released Mr. Goodman, there was no other business that

23 you had in terms of Mr. Goodman that had to be done;

24 right?

25   A    I could have wrote him citations, no, but

1  he -- I had no reason to.

2      Q    So yeah, that wasn't my question.

3      A    Okay.  Sorry.

4      Q    So at the time that you let him go.  "Mr.

5  Goodman, have a nice day."

6      A    Yes, sir.

7      Q    There's nothing else then that you need to

8  do with respect to the stop with Mr. Goodman; correct?

9      A    No, sir, yes.

10      Q    You're done with the stop at that point?

11      A    I'm done with that stop with Mr. Goodman,

12  yes, sir.

13      Q    Okay.  All right.  What happens next?

14      A    I return back to -- as I'm approaching

15  Sergeant Wolf and Mr. Kern, I could hear that a

16  situation is escalating.

17      Q    How is it escalating?

18      A    I don't remember exactly what they were

19  saying, but it sounds like they're kind of getting

20  into an argument.  Mr. Kern was becoming even more

21  agitated.  I advised Mr. Kern to come talk to me in

22  hopes of de-escalating whatever the conversation had

23  been prior to going over.

24      Q    Did you hear Sergeant Wolf threatened him

25  with arrest?

Page 145

1        A     I don't recall that.

2        Q     Okay.  Why would you need to deescalate a

3   situation with respect to your supervisor?

4        A     Because sometimes people are more receptive

5   to speaking to other people.  I felt that I had the

6   scene pretty much under control prior to the backup

7   responding.

8        Q     Prior to September 22, 2022, I take it that

9   you knew and had worked with Sergeant Wolf for some

10  period of time.

11       A     I have.

12       Q     Did you believe that there was anything with

13  respect to Sergeant Wolf's demeanor or way of handling

14  things that may make the situation worse rather than

15  better that would make you the better person to de-

16  escalate?

17                  MR. BECK:  Objection.

18                  Go ahead.

19                  THE WITNESS:  No.

20  BY MR. WIEST:

21       Q     Had you ever had an occasion with respect to

22  Sergeant Wolf where he had lost his cool or temper

23  prior to September 22, 2022?

24       A     Not that I can recall, no.

25       Q     How was your relationship with Sergeant Wolf

1    prior to September 22, 2022?

2         A    We had a good working relationship.

3         Q    Were you aware that he had been the subject

4    of citizen complaints prior to September 22, 2022?

5         A    I did not know that.

6         Q    So what happened next with respect to the

7    stop?

8         A    So I am speaking with Mr. Kern, and I asked

9    him for his name.

10        Q    Why did you want his name?

11        A    I like to ask people for their names to know

12   who I'm speaking with.  In addition, I mean, I could

13   have wrote him a citation for failing to yield to my

14   emergency vehicle.  Also I ran -- I think I ran it or

15   Sergeant Wolf ran the license plate of the vehicle,

16   and it returned to a female, which he's obviously not

17   a female.

18        Q    Is that a violation?

19        A    Is what a violation?

20        Q    If it returns to a female?

21        A    No, sir.

22        Q    Okay.  I mean, for instance, my vehicle may

23   be titled in my wife's name.  There's nothing illegal

24   with me driving it; right?

25        A    No, absolutely.  No, no.

1        Q     Okay.  What happens next?

2        A     Mr. Kern asked why I needed his name, and

3    then Sergeant Wolf overheard that and steps in.

4        Q     Okay.  And then what happened?

5        A     Then we get into Sergeant Wolf stating if he

6    doesn't identify himself that it's obstruction, and he

7    could be arrested.

8        Q     Okay.  Did you agree with that statement?

9        A     Mr. Kern obstructed my traffic stop.  He

10   interfered with it.  I think we talked about that.

11       Q     That was the couple second delay?

12       A     He -- yes, he -- he interfered and delayed.

13       Q     Do you think he had an intention to delay

14   you?  Your traffic stop, that was his intention?

15              MR. BECK:  Objection.

16       A     I don't know what his intention was.

17       Q     The only evidence you had about what his

18   intention was was his request for your name and badge

19   number; correct?

20              MR. BECK:  Objection.

21       A     I don't know what his intention was with

22   obtaining that information either.

23       Q     You would agree that he did ask you for your

24   name and badge number; right?

25       A     I don't recall if he did or did not.

1       Q    You told me at the start, or earlier today,

2   that you had reviewed the video of the stop.  Your

3   body camera; correct?

4       A    I have, yes.

5       Q    You didn't see that on the video?

6       A    I don't recall every detail of the video.

7       Q    We'll go through the video.  That's okay.

8       A    Sure.

9       Q    All right.  What happens next?

10      A    So along the lines of Sergeant Wolf stating

11  if Mr. Kern doesn't provide his information that he'd

12  be arrested.  At which point Mr. Kern turns around and

13  places his hand behind his back and says, "Arrest me."

14          So Sergeant Wolf places Mr. Kern in

15  handcuffs.  And I'm just trying to tell Mr. Kern that

16  I just needed his information.  And as he's being

17  placed into handcuffs, Mr. Kern provided me with his

18  Social Security number.

19      Q    Let me ask, was he completely handcuffed at

20  the time that he provided you the Social?

21      A    I don't think he was completely.  I think he

22  was in the process and had maybe one on.  I don't

23  know.

24      Q    Okay.  Was he resisting Sergeant Wolf in any

25  way?

1      A    No, sir.

2      Q    What happens next?

3      A    So he's placed in handcuffs.  He's turning

4  around as Sergeant Wolf is handcuffing him and looking

5  kind of over his shoulder.  I think it was something

6  about -- I think he was complaining about -- about

7  Sergeant Wolf being rough with him or using force.

8           And Sergeant Wolf then responded to him like

9  to stop resisting.  Once that is completed, they walk

10  over to my police vehicle, 1181, and Sergeant Wolf

11  places Mr. Kern in the rear of my patrol vehicle.

12      Q    You believed that Sergeant Wolf had probable

13  cause for the arrest?

14      A    I think he was acting within his position,

15  yes.

16      Q    So then he would have had probable cause;

17  right?

18      A    Yes.

19      Q    And that was for the obstruction charge?

20      A    Mr. Kern needed to identify himself as

21  failing to yield to the emergency vehicle.

22      Q    Okay.  Which was the obstruction charge;

23  right?  The failure to identify?

24      A    Failure to yield to the emergency vehicle is

25  reasoning why I would need his identification.  In the

Page 150

1    event I opted to write him a citation for that, in

2    which I did not.

3         Q    Okay.  Did you ever tell Mr. Kern that you

4    wanted his identification or him to identify himself

5    because he failed to yield to lights and sirens and

6    you wanted to identify him for purposes of potentially

7    writing a citation?

8         A    I didn't have the opportunity to do that.

9         Q    Okay.  So the answer is no, you never did

10   that; right?

11        A    No, sir.

12        Q    So he is placed in your vehicle?

13        A    He is.  Yes, sir.

14        Q    Why was he placed in your vehicle instead of

15   Sergeant Wolf's vehicle?

16        A    I don't know.

17        Q    Did you ever put your hands on Mr. Kern?

18        A    I don't believe so, no.

19        Q    It was Sergeant Wolf that did that?

20        A    Yes, sir.

21        Q    He's placed -- did Sergeant Wolf open the

22   door to the vehicle?

23        A    I don't recall if it was Sergeant Wolf or if

24   it was Officer Torres.

25        Q    Torres and Webster had been on scene by

1  then?

2      A    Yes, sir.  I don't know if Torres was on

3  scene at that point.  I believe -- I don't recall

4  Webster, but I know Officer Torres was there.

5      Q    Okay.

6      A    I was speaking with him at my window.

7      Q    Okay.  Kern's put in the vehicle; correct?

8      A    Yes, sir.

9      Q    Then what happens?  By the way, was the

10  vehicle then closed, the door?

11     A    To my patrol vehicle?

12     Q    Yes.

13     A    Sergeant Wolf closes the vehicle.

14     Q    Okay.  Does he slam the door shut.

15     A    He does slam the door.  Yes, sir.

16     Q    Okay.  So he slams the door shut.  What

17  happens next?

18     A    I proceed to the driver's seat of my patrol

19  vehicle, and -- well, I think that we had a minute of

20  discussion.  And I didn't want to write the citation

21  to Mr. Kern, and I was ordered to write the citation

22  to Mr. Kern.

23     Q    Why didn't you want to write the citation to

24  Mr. Kern?

25     A    I just -- I don't know.  I just didn't think

1   it was necessary to write it.  He, at the end of the

2   day, gave us the information we needed.

3        Q    Okay.  So you didn't think it was necessary

4   to write it because he ultimately gave the

5   information?

6        A    He did, yes, sir.

7        Q    Was that the reason why you didn't think it

8   was -- was that the only reason you thought it wasn't

9   necessary to write it?

10       A    Yeah, I didn't agree with writing it.

11       Q    Because he gave the information?

12       A    He did, yes, sir.

13       Q    And for no other -- there was no other

14   reason why you disagreed with writing it; correct?

15       A    Yeah, I don't -- I don't -- didn't want to

16   write it.

17       Q    Let me be more specific.  Did you believe

18   that there was probably cause for the charges that you

19   had filed on Mr. Kern?

20       A    Yes, sir.

21       Q    So you thought there was probable cause for

22   it, but because he ultimately gave you the

23   information, you thought it was unnecessary?

24                 MR. BECK:  Objection.

25                 Go ahead.

1          THE WITNESS:  I -- it was not my choice

2   to place Mr. Kern in handcuffs or to arrest him or

3   write him a ticket.

4   BY MR. WIEST:

5      Q    You were there for all of that though;

6   right?

7      A    I was there for all of that.  I wrote the

8   citation under direct order of the supervisor to do

9   so.

10     Q    If you had thought that the orders were

11  unlawful or illegal or violated the Constitution, you

12  had the opportunity to call the lieutenant, the shift

13  lieutenant; correct?

14     A    I could have called the shift lieutenant if

15  I did believe that, yes.

16     Q    And you did not believe that though;

17  correct?

18     A    Correct.

19     Q    You had the opportunity to call the shift

20  lieutenant and stop what Sergeant Wolf was doing, but

21  you chose not to because you believed the actions that

22  he was taking was appropriate; fair?

23     A    I didn't -- at the time of that, I did not

24  even think at all to contact the lieutenant.  It

25  didn't even go through my mind to do so or that it was

1   even an option at that moment.

2       Q    So I understand you may not have thought

3   about it.  My question is, you had the opportunity,

4   you could have if you thought that what Sergeant Wolf

5   was doing was illegal or unconstitutional, you could

6   have contacted the shift lieutenant; correct?

7       A    If I thought so.

8            MR. BECK:  Objection.  You've already

9   asked that, but go ahead.

10           You can answer this last time.

11           THE WITNESS:  Yes, if I thought so yes.

12  BY MR. WIEST:

13      Q    And you did -- the reason you -- you did not

14  do so; fair?

15      A    Correct.

16      Q    Was there sufficient time for you to have

17  done so?  In other words, you could have told Sergeant

18  Wolf -- was there sufficient time to tell Sergeant

19  Wolf, "I don't think that this is appropriate.  I

20  don't think that this is constitutional.  I want to

21  get the lieutenant out to the scene."  Did you have

22  enough time to do that?

23           MR. BECK:  Objection.

24           Go ahead.

25           THE WITNESS:  I -- yes, I did.

1    BY MR. WIEST:

2        Q    Okay.  All right.  What happens next?

3        A    I -- we have a discussion.  I said I didn't

4    want to write the citation.  Sergeant Wolf advises me

5    to write the citation.  I sit down to write it, and

6    I'm like, "I don't even know what I'm writing him

7    for."  I don't believe I've ever even issued an

8    obstruction citation.

9            And we have like -- we have sort of like

10   little cheat sheets that we use that was created by an

11   FTO that gives us verbiage of, you know, like when

12   we're writing a citation.  I didn't see obstruction on

13   mine, so I really didn't even know what he wanted me

14   to write on it.  So I'm trying to figure that out.

15       Q    Had you ever written a citation prior to

16   September 22nd of 2022 for obstruction?

17       A    As stated, I don't believe that I have.

18       Q    Okay.  Did you have to look up the statute

19   or the ordinance?

20       A    I had to ask Sergeant Wolf for it.

21       Q    Did he provide you a copy of the ordinance

22   and its elements?

23       A    Sergeant Wolf wouldn't even come to my

24   vehicle to help me with it.

25       Q    Okay.  Did he -- why not?

1      A     I don't know.

2      Q     Was he mad?

3      A     I don't know the reasoning.  His reasoning,
4  maybe he felt that I should have known it.

5      Q     Well, was he mad?

6      A     I Don't know that he was mad or -- I don't
7  believe so.

8      Q     Okay.  Did he review the citation after you
9  had completed it?

10     A     I don't recall if he did or didn't.

11     Q     Okay.  What happens then?

12     A     As I'm completing the citation, Mr. Kern,
13  he's in the rear of my patrol vehicle and he's
14  talking -- we're talking, we're having conversation.
15  He states that his shoulder -- he's having arm or
16  shoulder -- some sort of pain.

17     Q     Did he look like he was in pain?

18     A     I didn't believe he looked like he was in
19  pain, but I don't know his pain levels.

20     Q     Okay.  Was he wincing?

21     A     What do you mean, wincing?

22     Q     Wincing, his face.  Was he wincing?

23     A     I don't -- I was writing the citation.  I
24  wasn't really paying attention to his face.

25     Q     Okay.

1      A     As soon as he -- as soon as he stated that

2   he had pain, I contacted dispatch for EMS immediately.

3      Q     Okay.  What happened next?

4      A     EMS arrived.  I finished writing the

5   citation, and I think Officer Torres got him out while

6   speaking with EMS.  And I think I went to talk to

7   Sergeant Wolf.

8      Q     And what did you talk to with Sergeant Wolf?

9      A     Probably regarding the citation, but I don't

10  recall exactly.  I'd have to see that body camera.

11     Q     Okay.  Anything else?

12     A     EMS -- Mr. Kern was going to go to the

13  hospital via EMS, but that would have resulted in us

14  having to tow his vehicle.  So he opted not to go with

15  them.  And then everybody left.

16           He was issued the citation.  He got into his

17  vehicle, and he -- I think he went -- he stated he was

18  going right over to the hospital.  I think he did go

19  to Metro Hospital in Cleveland Heights.

20     Q     Did you come to find out that he did, in

21  fact, go to the hospital?

22     A     Yes, he did.

23     Q     And that was through Sergeant Wolf that told

24  you that?

25     A     No.  Well, Sergeant Wolf did advise that

1  he -- Mr. Kern's car was in the parking lot of the

2  hospital, but Mr. Kern -- I was in the station later

3  in the evening and Mr. Kern came to the window with a

4  like a --

5       Q    Sling?

6       A    Yeah.  And he -- to make a complaint with

7  the lieutenant.  And he indicated that he had gone to

8  the hospital.

9       Q    He told you that?

10      A    Yes.

11      Q    Did he tell you anything else in that

12  interaction?

13      A    I think he said that something was wrong

14  with his arm or shoulder.  I think it was his

15  shoulder.

16      Q    And that was on September 22, 2022.

17      A    Yes.  I don't know if it was before midnight

18  or not.  I don't recall the time.  It could have been

19  the 23rd at that point.

20      Q    Did you see him at any point in time after

21  that?

22      A    I have never seen him after that, no.

23      Q    Okay.  Did you ever have occasion to review

24  the complaint that he had filed with the lieutenant?

25      A    I didn't see the complaint up until

1    reviewing the information for this week's preparation.

2         Q    Okay.  All right.  Let me ask it this way

3    because we've got that.  I'm not going to show you it.

4    I don't think it's an exhibit for you.  If -- would it

5    be Lieutenant Weber?

6         A    Williams is the lieutenant.

7         Q    Williams.  Okay.  If his report says that it

8    was received at 2300 hours on September 22nd, you

9    would have no reason to dispute that; right?

10        A    No.

11        Q    Okay.  Did you learn that Pamela Roessner

12   asked the Cleveland Heights Municipal Court to dismiss

13   the charge on or about October 3rd because the city

14   did not have sufficient information to sustain a

15   conviction?  And on further investigation after filing

16   the complaint, the city's discovered additional

17   evidence which raises a reasonable doubt as to the

18   defendant's guilt?

19        A    I don't recall knowing any of that

20   information.

21        Q    Did she ever call you or speak with you and

22   tell you that she was going to dismiss the charge that

23   you had filed against Mr. Kern?

24        A    I don't recall that.

25        Q    Was that ever the case where the

1  prosecutor's office would advise you that they were

2  going to dismiss a charge that you had filed?

3      A    Sometimes they do, sometimes they don't.

4      Q    Okay.

5      A    Sometimes we send charges to them for review

6  prior.

7      Q    Was that the case here?

8      A    No, that was just a criminal citation that

9  was issued.  So she wouldn't have been working at that

10 time to even review a charge.

11     Q    Because of the hour that it occurred?

12     A    Yes, sir.  And we write CVs, they, like

13 sometimes I think maybe they do.  I don't know.

14              MR. WIEST:  Greg, I've got other stuff,

15 but I think now is as good as any for a lunch break.

16              MR. BECK:  Yeah, we should break.

17              MR. WIEST:  Let's say one o'clock?

18              MR. BECK:  Yeah, one o'clock is good.

19              (Off the record.)

20              THE VIDEOGRAPHER:  Back on the record,

21 time is 1:06.

22 BY MR. WIEST:

23     Q    Okay.  That's fine.  Ma'am, I have a couple

24 follow-ups for you and then I want to get into some

25 video.

1      A    Yes, sir.

2      Q    And my first question is, would you agree

3  with me that a failure to yield for light sirens is a

4  serious offense?

5      A    Yes.

6      Q    I mean, it endangers public safety officials

7  in instances that are already risky, like pursuit

8  situations, people trying to get to a hospital if

9  you've got an ambulance, and things like that;

10  correct?

11      A    Yes.

12      Q    Do you have a general practice to apologize

13  to criminals who break the law?

14                MR. BECK:  Objection.

15                Go ahead.

16                THE WITNESS:  No, sir.

17  BY MR. WIEST:

18      Q    Why did you believe that it was necessary to

19  apologize to Mr. Kern in light of your testimony that

20  he had broken the law for failing to yield to lights

21  and sirens?

22                MR. BECK:  Objection.

23                Go ahead.

24                THE WITNESS:  Because I could

25  understand the frustration that he felt in almost

1    being involved in an accident situation.

2    BY MR. WIEST:

3         Q    Yeah, but if we believe your testimony, the

4    reason he was almost in an accident situation is his

5    fault for failing to yield to lights and sirens;

6    correct?

7         A    Yes, sir.

8         Q    So why do you believe it was appropriate or

9    that you should apologize to him for his frustration

10   when he was the one that broke the law?

11             MR. BECK:  Objection, this is the

12   second time you've asked.

13             You can answer it this last time.

14             THE WITNESS:  Okay.  as I've stated the

15   nature in which the traffic stop occurred, the

16   abruptness of the stop on all parties, I could

17   understand that it's very frustrating when you're

18   getting in the middle of a situation like that.

19   BY MR. WIEST:

20        Q    Okay.  Why did you never tell Mr. Kern at

21   the scene, as you were asking for his identification

22   or before or after that, that the reason you wanted

23   his identity was because he had broken the law for

24   failing to yield to lights and sirens?

25             MR. BECK:  Objection, you've already

1    asked that.

2                    But you can answer it this last time.

3                    THE WITNESS:  As stated, I didn't have

4    the opportunity to advise him of that.  Sergeant Wolf

5    intervened with the conversation.

6    BY MR. WIEST:

7        Q    Okay.  So your testimony is it was because

8    you did not have the opportunity to do so?

9        A    Correct.

10       Q    Okay.  You indicated before we went on break

11   the you had called for backup various times involving

12   stops or situations in which there were more than two

13   people involved -- or two or more people involved;

14   correct?

15       A    Yes, sir.

16       Q    Had you done that where the people involved

17   were black in the past?

18                   MR. BECK:  Objection.

19                   Go ahead.  You can answer.

20                   THE WITNESS:  Black, White, Hispanic.

21   All races.

22   BY MR. WIEST:

23       Q    Can you identify for me a single instance by

24   subject involved in the stop where you had done that,

25   where the subjects were white?

1              MR. BECK:  Objection.

2              Go ahead.

3              THE WITNESS:  Yes, sir.  I -- you want

4  me to provide you with the example?

5  BY MR. WIEST:

6      Q    Yeah, just the name of the subject.

7      A    I don't know the person's name.

8      Q    How about the date of the incident?

9      A    I couldn't tell you an exact date, no, sir,

10 but I can give you an incident.

11     Q    Do you have a charge number?

12     A    No, sir.

13     Q    Can you --

14     A    I wasn't prepared to provide that

15 information today.

16     Q    Can you provide me anything where I can go

17 and pull a police report and verify the incident?

18             MR. BECK:  At this moment?

19             MR. WIEST:  Yes.

20             MR. BECK:  If you can answer that, go

21 ahead.

22             THE WITNESS:  At this moment, I can

23 give you a time frame.  I couldn't -- and a location.

24 I could not give you an exact violation policy or

25 anything like that, but I could -- if you'd like to do

1    some digging, I could absolutely provide that for you.

2    BY MR. WIEST:

3        Q    As you sit here, though, you can't give me

4    that kind of information; correct?

5        A    No, sir, but I could provide you the street

6    name in which the Caucasian subject lives.  Lives and

7    or lived.

8            MR. WIEST:  Okay.  Greg, I want to get

9    into some video, and I tested this on a break.  I

10   think I can plug this in to that and it will pull it

11   up.

12           MR. BECK:  Oh, cool.

13           MR. WIEST:  If you've got a mouse.

14           MR. BECK:  I do.

15           MR. WIEST:  Perfect.

16           MR. BECK:  So it should work.

17           MR. WIEST:  Actually, okay, good.  But

18   actually before I do that, let me -- let's go into the

19   report.

20           THE WITNESS:  Yes, sir.

21   BY MR. WIEST:

22       Q    We previously marked this as a Exhibit 10.

23   Let me start by asking on this Exhibit 10, who filled

24   out this report?

25       A    As far as what part of it?

1      Q    Well, let me ask it this way.  There's a

2  bunch of signatures by you on everything other than

3  Sergeant Wolf's narrative on the second to last page.

4  Would you agree with that?

5      A    Yes, sir.

6      Q    Okay.  Would it be fair for me to assume --

7  not assume.  Would it be fair for me to state that

8  everything other than the narrative that Sergeant Wolf

9  provides on page five is something that you completed?

10     A    Yes, sir.

11     Q    Okay.  I do want to walk through this.  You

12 would agree this is the report from the September 22,

13 2022, incident involving Mr. Kern, Mr. Goodman, and

14 that stop; correct?

15     A    Yes, sir.

16     Q    Okay.  This indicates that the report date

17 was September 23rd of 2022; correct?

18     A    Yes, sir.

19     Q    So would this have been completed by you a

20 little bit after midnight it looks like on the 23rd?

21     A    Yes, correct.

22     Q    Okay.  Why did it take you five hours to get

23 to this report?

24     A    There's probably other calls of service that

25 I had to respond to in the meantime of that.

1       Q    Okay.  As you were completing this report

2   did you discuss its contents with Sergeant Wolf?

3       A    I didn't.  I did not.  No, sir.

4       Q    Okay.  There's a couple of offenses that are

5   listed.

6       A    Yes, sir.

7       Q    And you list obstructing official business,

8   29-21-31; right?

9       A    Yes, sir.

10      Q    And traffic stop pretext; right?

11      A    Yes, sir.

12      Q    Why didn't you also list failure to yield to

13  lights and sirens?

14      A    Because I wasn't charging anybody with that.

15  And with that, that's a traffic violation.  I

16  wouldn't -- I don't know if you're familiar with how

17  we issue traffic citations.  We don't write reports

18  like this for traffic.

19          The traffic violation would be listed on the

20  citation that we issue to the violator, and it

21  wouldn't reflect in the report.

22      Q    So you would not list all offenses that you

23  think the subject may have violated in a report?

24      A    No, sir.  He's not being charged with any of

25  that.

1      Q     What is the offense of Traffic Stop 5499?

2      A     Traffic Stop is something that dispatch

3   generates when -- so prior to something becoming a

4   police report, it's a -- we call it a CAD call.  I

5   don't know exactly what the acronym CAD stands for.

6   It's essentially a call to service.

7           For example, every time I initiate a traffic

8   stop, they create a call to service for that traffic

9   stop to say that I'm in relation to someone, a

10  vehicle, and a location.  Same instance goes for if I

11  respond to a residence for a barking dog complaint.

12  Maybe I get there and the call -- the dog is not

13  barking or I advise the owner of the dog of the

14  complaint.

15          That's a call to service prior to it

16  becoming an actual incident of police report.  And a

17  lot of times calls don't have to become police

18  reports, but there's always an initial dispatch of the

19  context of the call.

20     Q     So what is the 5499 code and what does that

21  mean?

22     A     I don't know what the codes mean.

23     Q     Okay.  I mean, it says free text.  Is that

24  something you would have entered yourself?

25     A     So no.  Again, as I stated, dispatch creates

1    a call to service.  Traffic stop was my reason for

2    this call of service.  As far as the code, those codes

3    are -- these, I don't know what these codes are.

4    These are drop-down bars that we choose within our --

5    our system.  The only time I would determine a code

6    would be the offense in which I'm charging somebody.

7         Q    Why would it have been dropped down in the

8    offense category then?

9         A    Why would what be dropped?

10        Q    Right, why does it say traffic stop under

11   offenses?

12        A    It's just the call to service of the reason

13   that I -- I could have deleted it.  I --

14        Q    Was there an option to have listed failure

15   to yield to lights and sirens?

16        A    I don't believe so, and if there was, I

17   would not have put that.

18        Q    Okay.  Up top there's persons involved.

19   What does INS mean?

20        A    The insured owner of the vehicle.

21        Q    Okay.  What does DRI mean?

22        A    The driver.

23        Q    What does ARE mean?

24        A    The arrested party.

25        Q    Okay.  And then victim is the victim?

1      A    Vic is the victim, yes, sir.

2      Q    Okay.  And is society like always -- is that

3  a drop down or is it something you put in?

4      A    So it's a -- it's -- our system requires for

5  certain offenses that there be a victim.  If there's a

6  domestic violence, we obviously would choose the

7  victim of a domestic violence.  Things such as

8  disorderly conduct, obstruction, noise complaints,

9  barking dog, we would choose us society as a victim.

10  Public intox.

11          And I don't know -- our system will not

12  approve the report if there's not a victim.  It'll pop

13  an error code, and I won't be able to bypass that

14  without a victim in place.  So with that being said,

15  society is usually the victim of those offenses.

16      Q    Okay.  I want to look at your narrative.

17      A    Yes, sir.

18      Q    And again this was done almost the same day

19  but about five hours after the incident.

20      A    Correct.

21      Q    This would have been when it was fresh in

22  your mind; correct?

23      A    Yes, sir.

24      Q    All right.  And I'm not going to read every

25  bit of it.  I want to just -- I want to talk about

1    some of it.

2        A    Yes, sir.

3        Q    Do you see in the first paragraph, "I

4    activated the overhead lights and sirens of marked

5    patrol vehicle 1181 and initiated a traffic stop on

6    Mayfield Road near Access Road."

7        A    Yes, sir.

8        Q    Or is that Access Road 1?

9        A    Access Road 1.

10       Q    Okay.  "As I initiated the traffic stop and

11   began to move into the right curb lane the Infiniti

12   came to an abrupt stop."

13       A    Yes, sir.

14       Q    What that suggests to me, and you can tell

15   me if whether this is true or not, is that Mr. Goodman

16   stopped, and you were not in the lane behind him at

17   the time of the stop.

18       A    If that's how you're perceiving it to be

19   written I could see where that would, you might

20   believe that, but no.  The vehicle was stopped and I

21   was in the lane.

22       Q    Well, because then you say, "I had to shout

23   to the vehicle to pull forward."

24       A    I couldn't read the plate how close we were

25   in the traffic stop.

1      Q    So he was so close to you that you couldn't

2 see down to his license plate?

3      A    Correct.

4      Q    Okay.  How did you shout to the vehicle to

5 pull forward?  Were you on the overhead?  The

6 speakers?

7      A    I don't recall the manner in which I did it.

8      Q    Okay.

9      A    It could have been on the mic.  I could have

10 shouted out the window.  I don't know.

11      Q    Okay.  Why did you need to see the license

12 plate?

13      A    So that I could make sure I'm calling it out

14 to the dispatcher.

15      Q    Didn't you already have that in the LEADS

16 system when you --

17      A    It was on my computer, but if I didn't look

18 at the computer while trying to focus on my subject.

19      Q    Okay.  "While initiating the traffic stop, a

20 white Tesla was falling closely behind, and due to the

21 abrupt stop and position from my patrol vehicle, the

22 Tesla and I almost struck one another."  That's what

23 you wrote?

24      A    Yes, sir.

25      Q    Why didn't you write, "The Tesla failed to

1  yield to lights and sirens and almost struck me?"

2                  MR. BECK:  Objection.

3                  Go ahead.

4                  THE WITNESS:  I'm not sure.  I don't

5  know.

6  BY MR. WIEST:

7      Q    Okay.  You then say, "Once the Infiniti

8  moved forward, I was able to position my patrol

9  vehicle and exit to make contact with the driver of

10 the Infiniti."  Do you see that?

11     A    Yes, sir.

12     Q    That suggests to me that prior to the

13 Infiniti moving forward, you were not in a position

14 with your patrol vehicle to make an exit.  Is that

15 fair?

16                 MR. BECK:  Objection.

17                 You can answer.

18                 THE WITNESS:  Okay.  Yes, sir.  We like

19 to position our vehicles in a more tactical manner,

20 kind of either canted or in an offset.  I was not

21 really able to do that with the abruptness of the

22 traffic stop.

23 BY MR. WIEST:

24     Q    Okay.  Before the Infiniti moved forward,

25 how far away were you from the Infiniti?

1      A     I don't know -- again, I don't know

2   distance.  We were pretty close, but I couldn't tell

3   you an exact distance.

4      Q     Let's do it this way.  Less than a car

5   length?

6      A     Less than a car length, yes, sir.

7      Q     Okay.  "While exiting my patrol vehicle, I

8   observed the Tesla pullover behind me on my traffic

9   stop.  The driver exited the vehicle and walked

10  towards me in an aggressive manner."  You told me

11  before that Mr. Kern was out of his vehicle before you

12  exited; remember that?

13     A     Yes, sir.

14     Q     This suggests to me that he was pulling

15  behind you while you were exiting.  Is that the case?

16                MR. BECK:  Objection.

17                You can answer.

18                THE WITNESS:  Yeah, I'd have to rewatch

19  the body camera video.  I don't recall.

20  BY MR. WIEST:

21     Q     Do you think the body camera video reflects

22  where the Tesla was?

23     A     As I --

24     Q     As you were exiting?

25     A     Not as I'm exiting, unless if I turned

1  around while it was activated.

2      Q    Okay.  Do you know what you meant when you

3  said, "While exiting my patrol vehicle, I observed the

4  Tesla pull over behind me on my traffic stop.  The

5  driver exited the vehicle and walked toward me in an

6  aggressive manner."

7      A    I don't -- I don't recall if it means that

8  he was already pulled over, if it was actively pulling

9  over.

10     Q    Let me ask this generally about police

11 reports.

12     A    Yes, sir.

13     Q    You would agree with me that it is very

14 important to make sure that as you write a police

15 report and narrative that it's accurate; correct?

16     A    Yes, sir.

17     Q    And that's in part so that you can rely on

18 it later; right?

19     A    Yes, sir.

20     Q    It's in part so that, if necessary, courts

21 can rely on it later; right?

22     A    Yes, sir.

23     Q    If necessary, your colleagues on the police

24 department can rely on it later?

25     A    Yes, sir.

1    Q    And ultimately, if necessary, the public can

2    rely on it later; right?

3    A    Yes, sir.

4    Q    It then says that the driver later

5    identified as Demetrius Kern, you've got his date of

6    birth in there, "was shouting at me stating that I ran

7    him off the road.  I advised the driver to stand by.

8    The driver stood on the tree lawn next to my patrol

9    vehicle, irate and recording the traffic stop.  I

10   called for another unit due to assist due to multiple

11   parties out on the stop."  Right?

12   A    Yes, sir.

13   Q    Why did you reflect that he had recorded the

14   traffic stop?

15   A    Just to state what he was doing during the

16   stop.

17   Q    Okay.  You then made contact with the driver

18   of the Infiniti, Larelle Goodman.  You advised Goodman

19   the reason for the traffic stop was due to expired

20   license plates.  "Goodman advised that he had just

21   purchased the vehicle and was in the process of having

22   the vehicle registration transferred to his name.  I

23   returned to the vehicle to run Goodman's Ohio driver's

24   license through LEADS."

25            Why didn't you reflect in this report that

1    you were delayed in obtaining Goodman's information

2    for a few seconds because of Mr. Kern?

3                    MR. BECK:  Objection.

4                    Go ahead.

5                    THE WITNESS:  I guess I wouldn't have

6    wrote that information in here.

7    BY MR. WIEST:

8        Q    Why not?

9        A    It was only a few seconds.  It wasn't an

10   extravagant amount of time.

11       Q    Okay.  "Upon returning to my patrol vehicle,

12   Kern was still standing on the tree lawn near my

13   patrol vehicle shouting at me and stating that I had

14   ran him off the road.  I made contact with Kern and

15   advised him that I apologized that the traffic stop

16   occurred in the manner in which it did."  That's a

17   true statement; right?

18       A    Yes, sir.

19       Q    Let me ask, had you had the opportunity to

20   review your body camera from this stop prior to

21   writing this report?

22       A    I could have, yes, sir.

23       Q    Did you though?

24       A    I don't recall that I did, no.

25       Q    Okay.  "I advised Kern that the driver of

1   the Infiniti stopped abruptly, causing me to have to

2   stop abruptly, which in turn caused Kern to stop

3   abruptly, almost resulting in a motor vehicle

4   accident.  Kern continued to state I ran him off the

5   road.

6           "I advised Kern that my overhead lights and

7   sirens were activated, and he stated that he did not

8   hear them.  At this point Sergeant Wolf arrived on the

9   scene.  I provided dispatch with the license plate of

10  the Tesla."  That's Mr. Kern's vehicle; right?

11      A    Yes, sir.  The vehicle he was operating.

12      Q    And it returned to Brandy Wilson; right?

13      A    Yes, correct.

14      Q    Before Sergeant Wolf showed up, you had the

15  opportunity to tell Mr. Kern, as he was shouting at

16  you and saying that you ran him off the road, that he

17  failed to yield to lights and sirens; correct?

18      A    I could have said that, yes.

19      Q    You didn't; correct?

20      A    No.

21      Q    All right.  You then asked Kern for his last

22  name, and he asked why.  You then advised that you

23  wanted to know who you were speaking with, and Kern

24  became irate again and refused to provide his name;

25  right?

1      A    Correct.

2      Q    You didn't tell him that the reason you

3  wanted his last name and why was because he was

4  involved in breaking the law and failing to yield to

5  lights and sirens and you had the right to that

6  information; correct?

7      A    Correct.

8      Q    All right.  You could have told him that

9  though; right?

10     A    I could have, yes, sir.

11     Q    Okay.  Sergeant Wolf spoke with Kern while I

12  returned to speak with Goodman and advised him on the

13  traffic stop; right?

14     A    Yes, sir.

15     Q    And then you say, upon clearing the traffic

16  stop with Goodman, and there's everything that

17  follows; right?

18     A    Yes, sir.

19     Q    And we're going to talk about that.

20     A    Okay.

21     Q    When you say, clearing the traffic stop with

22  Goodman, you mean you released him and he was free to

23  go.

24     A    Yes, sir.

25     Q    The traffic stop with respect to Goodman,

1   when you say clearing, that's over at that point in

2   time; correct?

3       A    Yes, sir.  He's left the scene.

4       Q    Okay.  And there was no other work you had

5   to do at that point with respect to Mr. Goodman; fair?

6       A    Correct.

7       Q    Okay.  "Sergeant Wolf called over the radio

8   for more units due to Kern."  This was after Goodman

9   had left?

10      A    Yes.

11      Q    "For more units due to Kern failing to

12  identify himself.  I returned back to Sergeant Wolf

13  and Kern and advised Kern to come and speak with me.

14  I explained to Kern that failing to identify himself

15  is obstruction."  Right?

16      A    Yes, sir.

17      Q    If the traffic stop with Goodman was done,

18  how would failing to identify himself be obstruction

19  to that stop at this point, right, where you explained

20  to him that failing to identify is obstruction?

21      A    Can you repeat the question?  I'm sorry.

22      Q    Yeah, I'm looking at your sentence in your

23  report.  I explained to Kern that failing to identify

24  himself is obstruction.  Do you see that?

25      A    Yes, sir.

1      Q    That's about a sentence and a half after you

2  had indicated that you had cleared the traffic stop

3  with Goodman; right?

4      A    Correct.

5      Q    Goodman's gone; right?  We talked about

6  this.

7      A    Yes, sir.

8      Q    How would Kern, not identifying himself at

9  that point in time, be obstructing the Goodman traffic

10  stop?

11              MR. BECK:  Objection.

12              Go ahead.

13              THE WITNESS:  I could have charged Kern

14  with obstructing the traffic stop from me to being

15  delayed and having to speak with Mr. Kern, delaying me

16  in speaking with Mr. Goodman.  I opted -- I would not

17  have done that.

18  BY MR. WIEST:

19      Q    Well, you didn't say here that Mr. Kern

20  delayed my interactions with Goodman.  What you said

21  is failing to identify himself is obstruction; right?

22      A    Correct.

23      Q    And my question is, given that premise, how,

24  given that Goodman is gone, would him failing to

25  identify himself be obstruction?

1          MR. BECK:  Last time you're going to

2     answer this question.  This is like the third time.

3     Go ahead.

4          THE WITNESS:  Okay.  As I stated, Mr.

5     Kern obstructed the traffic stop at the very beginning

6     of the traffic stop.  Regardless of the amount of time

7     it was obstructed, it was delayed.  It was

8     obstruction.

9     BY MR. WIEST:

10     Q    "Sergeant Wolf then advised Kern that

11     obstruction is a crime, and that if he did not

12     identify himself he would be arrested."

13     A    Yes, sir.

14     Q    "Kern then stated to arrest him."  I take it

15     that doesn't mean Sergeant Wolf was supposed to arrest

16     himself.  That means Kern then stated to arrest Kern;

17     right?  The "him" is referring to Mr. Kern?

18     A     Yes, he advised Sergeant Wolf to arrest him

19     then and placed his hands behind his back.

20     Q    "As Sergeant Wolf was placing Kern in the

21     handcuffs, I advised Kern that all he needed to do was

22     identify himself," at which point Kern stated he did

23     not have his identification with him, and he began to

24     provide you with his social security number.

25          "While providing me with his social security

1    number, Sergeant Wolf stated that Kern was going to be

2    cited for obstruction.  Kern became agitated and

3    twisted his body around in an attempt to speak to

4    Sergeant Wolf.  In the process of twisting around he

5    asked Sergeant Wolf if he was going to break his

6    wrists and that he was not resisting.  While placing

7    Kern in the back of patrol vehicle 1181, he advised

8    Sergeant Wolf not to push him."

9         The "he" is referring to Mr. Kern in that

10   statement?

11        A    Yes.

12        Q    Okay.  "It should be noted that Mr. Kern was

13   not pushed.  I then advised Sergeant Wolf that if Kern

14   checked clear through LEADS, that he could be

15   advised," and I'm thinking that's maybe a typo, and

16   released?

17        A    And released, yes, sir.

18        Q    Okay.  And "Sergeant Wolf stated that I was

19   to issue Kern a citation for obstruction.  While

20   writing the citation, Kern started to complain of pain

21   and stated that his arm was popped out.  Kern then

22   requested an ambulance.  The squad arrived on the

23   scene."  Kern said he wanted to go to the hospital,

24   and then we talked about this, but since it involved

25   the potential of the vehicle being towed, he would

Page 184

1    drive himself; right?

2        A    Correct.

3        Q    As you sit here today, you've reviewed body

4    camera footage, you've gotten through this deposition

5    today, is there anything in this narrative that you

6    think should be changed?

7                    MR. BECK:  Objection.

8                    Go ahead.

9                    THE WITNESS:  I guess probably maybe a

10   little bit more information.

11   BY MR. WIEST:

12       Q    On what?

13       A    Had I known something like this was going to

14   lead to a deposition, I would have indicated every

15   single little detail, including how the duration of

16   time it took me to advise Mr. Kern, the duration of

17   time of maybe the traffic stop.

18            But in my almost six years of writing

19   reports, the only time I've ever listed a duration of

20   time in having any subject detained was an arrest that

21   was taking another agency an extremely long amount of

22   time to respond to retrieve the prisoner.

23       Q    Okay.  Would you agree with Sergeant Wolf

24   never personally observed the elements of the

25   obstruction charge?

1       A    I indicated over the radio that I had a

2  party who stopped himself.  It was out on my traffic

3  stop.  So visually, he did not observe that.  But my

4  radio traffic reflected that.

5       Q    Okay.  We're going to go through the radio

6  traffic this afternoon.

7       A    Yes, sir.

8       Q    Let's go ahead.  I actually wanted to start

9  with -- let's do a couple more exhibits before we hit

10 the video.  I'm sorry to be doing this, but I want to

11 get these in.  Do you know if you looked up the text

12 of the obstruction charge under either the city

13 ordinance or Ohio statute prior to citing Mr. Kern?

14 Or was it provided to you?

15      A    Sergeant Wolf provided me with the code he

16 wanted me to cite it under.

17      Q    So I want to be clear about this testimony.

18 Did he give you a copy of the statute or the city

19 ordinance, the text of it, or did he just say charge

20 525-07?

21      A    I don't recall.  I don't recall him giving

22 me anything.  I just recall him advising me of the

23 code.

24      Q    Let's look at because I just -- I think it's

25 important to pin this down.  This is Exhibit 21.

1          (Exhibit 21 was marked for

2          identification.)

3          All right.  525-07 is obstructing official

4    business; right?

5    A    Yes, sir.

6    Q    And this is the city ordinance; right?

7    A    Yes, sir.

8    Q    And there's a parallel Ohio revised code.

9    I'll tell you, it's the second page of this exhibit.

10   And my question is, do you know if you reviewed either

11   the text of the ordinances as we see it and reviewed

12   it for its elements or the -- either the ordinance or

13   the statute prior to citing Mr. Kern?

14   A    I don't recall if I did or did not.

15   Q    Okay.  How do you know if your narrative in

16   the citation that we're going to look at in a minute

17   met the elements of the charge if you didn't look it

18   up?

19   A    I didn't look it up on the traffic stop.

20   Q    Okay.  So would you agree with me that if

21   you didn't look up -- and I think you told me before,

22   you had never cited anybody for obstruction before;

23   correct?

24   A    I don't recall doing it, no.

25   Q    Did you know what the elements were of the

1    offense?

2        A    I did, yes.

3        Q    How did you know what the elements were of

4    the offense?

5        A    Through training.

6        Q    When did you have training on what

7    obstruction was?

8        A    I don't recall the exact dates or which

9    course it was, as I stated when we were going over my

10   training certificates.

11       Q    Okay.  What were -- well let me ask, without

12   looking at the statute or the ordinance, what are the

13   elements of an obstruction charge?

14       A    Someone that's preventing me from conducting

15   an investigation.

16       Q    And that's -- that was your understanding at

17   the time of what the elements were?

18       A    Yes.

19       Q    Okay.  Let's look at the actual elements.

20       A    Okay.

21       Q    Number one, you would agree with me that

22   they cannot have a privilege to do so; correct?

23       A    Yes, sir.

24       Q    And they have to have the specific purpose

25   to prevent, obstruct, or delay the performance by a

1  public official of any authorized act; right?

2      A    Yes, sir.

3      Q    What did you believe Mr. Kern's purpose was

4  in his interactions with you?

5      A    I don't know what Mr. Kern's purpose was.

6      Q    What evidence did you have at the time you

7  cited him that what he was doing was with the purpose

8  to prevent, obstruct, or delay the performance by a

9  public official of any authorized act.

10              MR. BECK:  Objection.

11              Go ahead.

12              THE WITNESS:  He delayed me and -- he

13  delayed my response to Mr. Goodman's vehicle.

14  BY MR. WIEST:

15      Q    So you -- I just want to understand this

16  testimony.

17      A    Yes, sir.

18      Q    Because he delayed you by a few seconds, and

19  that was the result, you think he had -- his purpose

20  in what he was doing was to prevent, obstruct, or

21  delay the performance by a public official?

22      A    I don't know what his purpose was.

23      Q    Did you ask him?

24      A    After we spoke, he was upset that I -- we

25  almost got into a collision.

Page 189

1      Q    Do you think that in light of him being

2  upset about the collision, that that meant he had a

3  purpose to obstruct the Goodman traffic stop?

4                  MR. BECK:  Objection.

5      A    I didn't know at the time of my

6  investigation, prior to speaking with Mr. Goodman,

7  what Mr. Kern's purpose was.

8      Q    Okay.  After you spoke with Mr. Kern, did

9  you determine what his purpose was?

10     A    Yes, his purpose was that he was upset and

11 agitated and wanted to confront me regarding the

12 situation.

13     Q    And you think that -- was that a purpose of

14 preventing, obstructing, or delaying your duties?

15                 MR. BECK:  Objection.

16                 Go ahead.

17                 THE WITNESS:  He purposefully stopped

18 his vehicle, exited it, and delayed my investigation

19 with Mister -- So yes, the answer would be yes.

20 BY MR. WIEST:

21     Q    Do you think the purpose was to talk to you

22 to get your ID?

23     A    When it initially happened, I don't know

24 what his purpose was.  Upon speaking with him after,

25 he didn't ask me for an ID.

1       Q    Other than what he was saying verbally, did

2    he do any act that hampered or impeded your

3    interactions with Mr. Goodman?

4       A    No.

5       Q    Did you understand that obstruction required

6    the doing of an act and not merely verbal

7    interactions?

8                 MR. BECK:  Objection.

9                 Go ahead.

10                THE WITNESS:  He -- a verbal

11   interaction is an act; is it not?

12   BY MR. WIEST:

13      Q    Were you trained on that?

14      A    I don't recall that.

15      Q    What's your basis then for saying that, for

16   instance, asking you for your name and badge number

17   would be an act under the obstruction charge?

18      A    That's -- asking for my name and badge

19   number is not an act under an obstruction charge.  The

20   act is Mr. Kern exiting his patrol vehicle, taking my

21   attention away from Mr. Goodman, and delaying my

22   contact with Mr. Goodman.

23      Q    Did Mr. Kern stand between you and Mr.

24   Goodman's vehicle?

25      A    Mr. Kern was coming towards me, and once

1    advised, he did stay where I advised him to stay.

2         Q    Okay.  So he was complying with your

3    requirements?

4         A    Yes, sir.

5         Q    Had you ever had any training, for instance,

6    in the Sixth Circuit's case of Patrizi vs. Huff about

7    the elements of an obstruction charges published

8    decision clearly established law?  Did you ever have

9    any training on that?

10                   MR. BECK:  Objection.

11                   Go ahead.

12                   THE WITNESS:  I don't recall.

13   BY MR. WIEST:

14        Q    Okay.  How long does a delay have to be

15   before it becomes obstruction?

16                   MR. BECK:  Objection.

17        A    I don't know.

18        Q    Have you had any training on how long the

19   delay had to be before it was obstruction?

20        A    I don't recall.

21        Q    Okay.  All right.  All right.  I do want to

22   go through one other.  Did I give you the charges yet?

23   I don't think I have.  Have I given you 24 yet?  No?

24   The charge sheet?

25        A    No.

1      Q     Okay.  I'm looking, and I don't have it

2  there.  Give me a second.  There it is.  The one-

3  pagers are the difficulty because I have a whole stack

4  of them.  These were the charges that you filed

5  against Mr. Kern; correct?

6      A     Yes, Sir.

7      Q     And it looks like they were sworn to on

8  September 22, 2022?

9      A     Yes, sir.

10     Q     "On 9/22/22, Kern did interfere with a

11  traffic stop unrelated to him.  When asked to identify

12  himself, Kern refused multiple times.  Once Kern was

13  detained, he identified himself."  First of all,

14  that's your handwriting; correct?

15     A     Yes, sir.

16     Q     It's also your signature that was sworn to

17  and subscribed; correct?

18     A     Yes, sir.

19     Q     Did you understand that you were making this

20  statement under oath just like you're testifying here

21  today?

22     A     Yes, sir.

23     Q     Have we talked about all of the ways that

24  you believe that Mr. Kern interfered with the traffic

25  stop of Mr. Goodman?

```
 1      A    Today?

 2                MR. BECK:  Objection.

 3                Go ahead.

 4                THE WITNESS:  Yes, sir.

 5  BY MR. WIEST:

 6      Q    We have talked about it all; correct?

 7      A    I believe so yes.

 8      Q    And I just want to be clear, when you say

 9  traffic stop unrelated to him, you're referring to Mr.

10  Goodman's traffic stop; correct?

11      A    Yes, sir.

12      Q    Okay.  All right.  As an aside, you don't

13  dispute, do you, that the charges were dismissed by

14  the court on October 3rd; do you?

15      A    I don't know when.  I just learned prepping

16  for this case that they were dismissed.

17      Q    Okay.  Here.  Let's just look.

18                MR. BECK:  I'm sorry.  What's this?

19                MR. WIEST:  It's Exhibit 25.

20                (Exhibit 25 was marked for

21                identification.)

22                MR. BECK:  25.

23  BY MR. WIEST:

24      Q    You're not disputing the court record, the

25  judge's entering in the motion of the prosecutor
```

1    that's contained in Exhibit 25; are you?

2         A    No, sir.

3         Q    Okay.  All right.  Now we're ready to do

4    video.  I want to start with the -- and I'm going to

5    mark that.

6                   (Exhibit 17 was marked for

7                   identification.)

8              Give me a second.  Let me ask about the

9    internal affairs investigation before we go through

10   the video.  When did you become aware that there was

11   going to be an internal affairs investigation over the

12   Kern incident?

13        A    When internal affairs detectives showed up

14   to a part-time job that I was working on.

15        Q    Okay.  What part-time job was that?

16        A    It was for a Jewish holiday at the Park

17   Synagogue.

18        Q    Okay.  So they just showed up out of the

19   blue?

20        A    Well, they called me to ask where I was at,

21   and they told me they had to come interview me

22   regarding the matter.

23        Q    So they showed up and it wasn't at the

24   station then?

25        A    No, sir.

1      Q      So it was before this interaction on this

2  video?

3      A      This interaction is at the Park Synagogue.

4      Q      Oh it is?

5      A      It -- yes.

6      Q      So I note that you're in uniform.  I'm going

7  to go through this on October 5th.  Was it, like, a

8  detail you were working?

9      A      Yes, sir.

10     Q      Okay.  Okay.  You knew -- by the way, did

11  they tell you what they were going to talk to you

12  about?

13     A      I assumed it would be this.  I don't recall

14  if they told me, but I don't really get into

15  situations where I'd be needing to speak with an

16  internal affairs investigation.

17     Q      Was this the first time you had spoken with

18  Internal regarding anything?

19     A      As far as I can remember, yes, sir.

20     Q      Why did you assume that this would be

21  something that you would need to speak with Internal

22  about?

23     A      Because -- well, they came to me.  I didn't

24  go to them.  But Mr. Kern had mentioned multiple times

25  that he was going to sue us and he did make the formal

 1   complaint.

 2        Q    You were aware of the formal complaint?

 3        A    He's -- I assumed he would make a complaint.

 4        Q    Okay.  I mean, you told me before that you

 5   were there the night that he was --

 6        A    He did.  He came in.

 7        Q    Okay.  Had you reviewed your body camera

 8   prior to the internal coming to meet with you?

 9        A    No, sir.

10        Q    Did they give you either Garrity or Miranda

11   warnings prior to this interview?

12        A    I don't recall.

13        Q    Okay.  I know it's not on the -- the video's

14   not that long.  We're going to look at actually both

15   the videos.  Prior to speaking with Internal, did you

16   know that you were making official statements?

17        A    With Internal Affairs?

18        Q    Yes.

19        A    Yes, sir.

20        Q    Did you know that you had to be truthful

21   with Internal?

22        A    Yes, sir.

23        Q    Is what you've told internal as truthful as

24   the testimony that you've given here today?

25        A    Yes, sir.

1      Q    Okay.  Let's look at the first interaction.

2  It's only about five minutes.

3                 (Video played.)

4           You would agree that that's the date and

5  time of the -- this internal interview?

6      A    Yes, sir.

7      Q    Okay.  Did they tell you that they were

8  going to be recording this?

9      A    Yes, sir.  The body camera.  He's using the

10  body camera.  It was on the table.

11      Q    Okay.

12                 (Video played.)

13           You said that your cruiser was in between

14  two lanes.  That's what you told Internal.  How was

15  your cruiser between two lanes?

16      A    I, either changing the lane over or -- I

17  don't recall.

18      Q    Are you saying that your cruiser was between

19  the left-hand lane and the curb lane?

20      A    I don't recall.

21      Q    This was a week and a half or so after the

22  stop on the 22nd.  It was the 22nd to October 5th;

23  right?

24      A    Yes, sir.

25      Q    Okay.  It was fresher in your mind than it

1    is today; would you agree?

2        A    At that time, probably yes, sir.

3        Q    Okay.

4                 (Video played.)

5                 So what you told internal on October 5th was

6    that you weren't behind the Infiniti until after he

7    pulled over; right?  We just heard that.

8        A    Yes, sir.

9        Q    All right.

10                (Video played.)

11                So Mr. Kern veered off to the side of the

12   road to avoid a collision?

13       A    I don't know what I meant by veered off when

14   I stated that.

15       Q    Did he jump the curb?

16       A    I don't recall.

17       Q    Okay.

18                (Video played.)

19                Mr. Kern was cursing you out?

20       A    Yes, sir.

21       Q    How was he cursing you out?

22       A    If I recall he was saying, "You almost

23   fucking hit me."

24       Q    Okay.  Anything else?

25       A    I think he just repeated that often.  I

1    don't recall.

2         Q    Your body camera was activated for that

3    portion of the interaction; correct?

4         A    Yes, sir.

5         Q    Okay.

6                   (Video played.)

7                   You said, "That went down as obstructing,"

8    when Mr. Kern was saying, "Why, why, why."  That's

9    what you told Internal; correct?

10        A    Yes, sir.

11        Q    That suggests to me that what you're

12   charging the obstruction as is the failure to

13   identify.

14                  MR. BECK:  Objection.

15                  You can answer.

16   BY MR. WIEST:

17        Q    Would you agree that that's what you told

18   Internal?

19        A    I cited Kern for what I was advised to cite

20   him for.  So yes, it went down as obstructing.

21                  (Video played.)

22        Q    You would agree that what you told Internal

23   is Kern saying "why, why, why" went down as

24   obstructing; correct?

25        A    Yes, sir.

1      Q    Okay.

2                 (Video played.)

3           So you would agree that Sergeant Wolf at

4    this point in the video of your interview with

5    Internal was not being truthful with respect to his

6    accusations of resisting arrest?

7      A    Yeah, correct.

8      Q    Okay.

9                 (Video played.)

10          So you told Internal on October 5th, a week

11   and a half after this incident, that Mr. Kern

12   committed no other offense other than obstructing?

13                MR. BECK:  Objection.  That's not --

14                MR. WIEST:  I'll play it again.

15                MR. BECK:  "Crimes" was the word.

16                THE WITNESS:  I heard it if you

17   don't -- you don't have to play it again if you don't

18   wish to.

19                MR. WIEST:  Hold on.  Maybe it'll go.

20   Let me close it and try it again.

21                MR. BECK:  No, if you just back it up.

22                MR. WIEST:  Yeah, it was like frozen,

23   Greg.

24                (Video played.)

25   //

1    BY MR. WIEST:

2        Q    So the detective asked you if Mr. Kern

3    committed any other crime other than what Sergeant

4    Wolf said was obstructing, and your answer was no.

5        A    Correct.

6        Q    Was that a truthful statement?

7        A    Correct.

8        Q    Are you aware that failure to yield to

9    lights and sirens is fourth degree misdemeanor in the

10   state of Ohio.

11       A    No.

12       Q    You weren't aware that at the time?

13       A    No.

14       Q    Are you aware of that today?

15       A    I am now.

16       Q    When did you become aware of that?

17       A    When you told me the degree of the

18   misdemeanor just now.

19            (Video played.)

20       Q    Okay.  Having reviewed that video now, just

21   now with Exhibit 17, your internal affairs interview

22   on October 5th, is there anything that you think you

23   need to change or that you told them that was

24   inaccurate?

25       A    No.

1    Q    Okay.  I'm going to look at what I'm marking

2  as 17a because there was a second internal affairs

3  interview that you had, I believe, at the station.

4                  (Exhibit 17a was marked for

5                  identification.)

6                  Do you remember that?

7    A    I don't remember that.

8    Q    It was around October 20th?

9    A    I don't remember that.

10   Q    It was pretty short.

11   A    Yeah, I don't recall that one.

12              MR. WIEST:  We'll look at that real

13  quick.  I've got to open up your VS player to get that

14  one on.  So we'll see how I do with this.  And just

15  for the record, I'm marking this as 17a.

16              MR. BECK:  Thank you.

17              MR. WIEST:  Maybe.  I'm sorry.  It

18  takes about 40 seconds.  It like comes on, we get this

19  note video and then it comes on, but I didn't want to

20  skip it.

21              THE WITNESS:  Yes, sir.

22              (Video played.)

23              I know it's an hour and six, but that

24  was the only three minutes of the content.  Do you

25  recall the -- do you recall that second interview now

Page 203

1   having seen it?

2       A    Yes.

3       Q    Okay.  And do you agree that it was on

4   October 20, 2022?

5       A    Yes, sir.

6       Q    Do you dispute -- well, let me ask it a

7   different way.  Was everything that you told Internal

8   Affairs on October 20, 2022 truthful?

9       A    Yes, sir.

10      Q    Is there anything that you would change

11  about your answer?

12                 MR. BECK:  Objection.

13                 Go ahead.

14                 THE WITNESS:  No, sir.

15  BY MR. WIEST:

16      Q    Yeah.  Anything you would change?

17      A    No.

18      Q    Okay.  Let's look at your body camera

19  footage from the date in question.  We just looked at

20  17 and 17a.  Actually, before I do that, I want to

21  look at the radio traffic before we get into your body

22  camera footage.

23                 MR. KACZKOWSKI:  Excuse me, Chris.

24                 MR. WIEST:  Yes?

25                 MR. KACZKOWSKI:  I'm a little hard of

1    hearing.  Could you turn up the volume just a little

2    bit?

3                    MR. WIEST:  I am technically deficient.

4    Oh.  For me, you need me to speak up?

5                    MR. KACZKOWSKI:  No, no, no.  I mean,

6    there's a little dial over there if you could, if it's

7    available.  That would be great.

8                    MR. KACZKOWSKI:  Yeah, on the right, in

9    the bottom there, you see there's a little.  No, you

10   do it with the cursor.

11                   MR. WIEST:  Oh, you do it with the

12   cursor?  Oh, let me try the cursor, sorry.  We'll

13   figure this out.  Okay.  Let me try that.

14                   MR. KACZKOWSKI:  If you get the chance.

15                   MR. WIEST:  Yeah, yeah, yeah.  No,

16   we'll do that.

17                   MR. KACZKOWSKI:  Thank you.

18                   MR. WIEST:  Let's -- I want to go

19   through the radio traffic next.  And I've marked this

20   as Exhibit 16.

21                        (Exhibit 16 was marked for

22                        identification.)

23                        Stand by.  Hold on, let me adjust

24   volume before we --

25                        (Video played.)

1    BY MR. WIEST:

2        Q    So would you agree that this is the dispatch

3    audio from the Demetrius Kern, Larelle Goodman traffic

4    incident?

5        A    Yes, sir.

6        Q    And the first instance that we hear is you

7    indicating a lights and sirens issue after Mr. Kern

8    was out of the vehicle complaining about you cutting

9    him off.  And he was recording you.  Do you agree?

10       A    I don't know at what point that I stated

11   that information over the radio.

12       Q    Well, let's look.

13                  (Video played.)

14                  So that's where you hear Sergeant Wolf

15   saying that he's en route?

16       A    Yes, sir.

17       Q    Okay.  And what you said, I just want to go

18   back one more time.

19                  (Video played.)

20                  "81, stand by.  It's going to be on

21   Mayfield."  That's what you just said; right?

22       A    Yes, sir.

23       Q    And then --

24                  (Video played.)

25                  "Send me another unit because another party

1    does not know how to yield to lights and sirens."

2         A    Yes.

3         Q    Is that the statement?

4         A    Yes, sir.

5         Q    Okay.

6                   (Video played.)

7              "He's sitting here recording me."  Correct?

8    That's what you said?

9         A    I don't know what I said.

10        Q    Here, I'll play it again.

11                  (Video played.)

12        A    "He's standing there recording me."

13        Q    Yes.

14        A    Oh, yes.

15        Q    Okay.

16                  (Video played.)

17             Do you know -- the thought occurs to me in

18   listening to this audio that this isn't necessarily

19   from a time frame perspective what's going on.

20        A    Yeah, that confused me for a minute.

21        Q    You would agree that these calls are spaced

22   in actuality over a period of time?

23        A    Correct.

24        Q    My sense of it is, and maybe we need to ask

25   a dispatcher, is that what they've recorded here is

1    the calls going back and forth, and they're kind of

2    all in a row, as opposed to maybe the actual time.

3    Would you agree that that's the case?

4         A    Yes, sir.  Agree.

5         Q    Okay.

6                   (Video played.)

7                   It looks like there was some other stuff

8    going on at the same time.

9         A    Yeah.

10        Q    You know that's kind of what I wanted to

11   just cover was that initial part of it anyways.  Let's

12   go ahead.  I want to go over your body camera footage.

13   I've marked this as Exhibit 11.

14                  (Exhibit 11 was marked for

15                  identification.)

16        A    Yes, sir.

17        Q    I want to start with where this begins.

18   This begins with you exiting your vehicle; fair?

19        A    Yes, sir.

20        Q    What we don't have on camera is what led up

21   to this, the initial stop aspect of this; fair?

22        A    Yes, sir.

23        Q    I think your testimony is that your lights

24   and sirens had been activated before the camera;

25   correct?

1        A     Yes, sir.

2        Q     Okay.  I'm looking at timestamps 9/22/22,

3   18:58:45.  Was that -- is that timing roughly

4   accurate?  I realize it might be -- not Greenwich, you

5   know, down to the observatory, but, you know.

6        A     Yes, sir.

7        Q     Sometimes I've had cases with body cameras

8   that are like four hours off, five hours off.  That's

9   not the case here.

10       A     No.

11       Q     Okay.  All right.  I'm going to refer to

12  timestamps today then, as we talk about this in the

13  transcript, based on the timestamp at the top right.

14  In other words, you know, 18:58:45 would mark --

15  actually 18:58:43 would mark the very beginning of

16  this video; right?  I mean, 42 is the very beginning

17  of this video; right?

18       A     Yes, sir.

19       Q     And at this point in time, Goodman's in

20  front of you, Kern's vehicle is behind you; correct?

21       A     Yes, sir.

22       Q     All right.

23              (Video played.)

24              Okay.  "One second."  Is that in reference

25  to Mr. Kern?

1      A     Yes, sir.

2      Q     Okay.  And he's behind you?

3      A     It appears to be so yes.

4      Q     Was he out of the vehicle at that point in

5  time?

6      A     I don't recall.  And it's obviously not

7  reflecting.

8      Q     Right.  I'll tell you, I mean, you did not

9  turn all the way around to go look at him.  I've been

10  through this like a bunch.  At least not -- you do

11  later, I mean we do later see where he's at, but not

12  in this initial interaction.  You're out.

13          By the way, you talked to me before about

14  tactical positioning of your vehicle.  Did you see how

15  your vehicle was kind of at an angle?  I can, I can --

16     A     Yep, can you replay it?

17     Q     I will.

18     A     Sorry, I was listening to you.

19          (Video played.)

20     Q     See how your vehicle is kind of turned a

21  little bit to the left there?

22     A     Yes, sir.

23     Q     Is that what you meant by tactical

24  positioning of your vehicle?

25     A     It should be more so -- if a vehicle is

1   here, my car should really be with my front end

2   pointing that direction, but even more so of an offset

3   for officer safety.

4        Q    If, for instance, somebody were to do

5   something dangerous like start shooting at you in the

6   worst case scenario, it would allow you to get cover

7   behind the vehicle is the premise of it?

8        A    That or if somebody were to maybe like rear-

9   end that vehicle it wouldn't go in to myself and the

10  other party.  It would go off to the other side.

11       Q    Okay.  So it's also to help prevent rear-end

12  collisions.

13       A    I'm sure there's multiple others.

14       Q    Okay.  I'm looking at the distance between

15  you and Goodman, and it looks like maybe a car length?

16       A    Again, I'm not good with distance, give or

17  take.

18       Q    Okay.

19            (Video played.)

20            So I didn't hear Mr. Kern in this body

21  camera say that he had almost run you off the road.

22       A    Correct.

23       Q    Could I assume that that statement had

24  occurred prior to the activation of your body camera?

25       A    Yes, sir.

1        Q    Was your window open?

2        A    I don't recall.  I'd have to -- we'd have to

3    go back to that and see if it was when I opened the

4    door.

5        Q    I'll be honest with you.  I couldn't tell.

6    But we can go back and look real quick.

7        A    Sure.

8                  (Video played.)

9                  Yeah, I can't tell either.

10        Q    I, like, froze frame.  I could not figure it

11    out.  I did like frame by frame.  I couldn't tell.

12                  (Video played.)

13                  Was he out of his vehicle?  Do you know if

14    he was out of his vehicle at this point in time?

15        A    I can't recall.

16        Q    Okay.  Obviously when I say he, I meant Mr.

17    Kern out of his vehicle at this point in time.

18        A    Correct.

19        Q    Because I need to specify who he is because

20    you got Mr. Goodman right up top there.  All right.

21    Let's --

22                  (Video played.)

23                  So 18:58:57, you have now reached Mr.

24    Goodman's vehicle; correct?

25        A    Yes, sir.

1      Q      Other than one -- your statement to Mr. Kern

2    of one second, which you made, you would agree with

3    me, on the way to Mr. Goodman's vehicle; correct?

4      A      Yes, sir.

5      Q      Was there any other interactions with Mr.

6    Kern other than him, you know, I suppose, raising his

7    voice in a manner that you were able to hear him, "You

8    almost ran me off the road."  Was there anything else

9    that you recall about that initial interaction that's

10   not on camera?

11     A      No, sir.

12     Q      Okay.

13                 (Video played.)

14             You asked that Mr. Goodman was okay.  Why

15   did you ask Mr. Goodman if he was okay?

16     A      Because he stopped abruptly and appeared to

17   be concerned.

18     Q      Okay.

19                 (Video played.)

20             Why did you ask if Mr. Goodman knew that guy

21   behind you?

22     A      Because I've experienced in my six years

23   here that sometimes people are either driving to the

24   same location, dinner or whatever it might be.  And a

25   lot of times, if it's a family member, they'll stop

1    and just wait to see what's happening, or you know,

2    the people behind us are not aware of why I may

3    initiate a traffic stop with a vehicle.

4         Q    Did you think that Mr. Kern was a family

5    member of Mr. Goodman?

6         A    I didn't know.  That's why I asked the

7    question.

8         Q    Okay.

9                   (Video played.)

10              By the way, we saw Mr. Kern.  I'm going to

11   go back ten seconds, so we can freeze him.  Maybe.

12   I'm going to have to reopen it, which is fine.

13              You would agree with me that up to now --

14   and this is 19:08 -- nothing Mr. Kern has done has

15   delayed your interactions with Mr. Goodman; fair?

16        A    I disagree.

17        Q    Okay.  When do you think Mr. Kern delayed

18   your interaction with Mr. Goodman?

19        A    When I had to turn around and face away from

20   the vehicle I initiated a traffic stop to advise

21   him --

22        Q    When you said one minute or one second?

23        A    Yes, sir.  I had to take my eyes off that

24   vehicle.

25        Q    Okay.  And you would agree with me that at

1   the time you were walking forward towards Mr.

2   Goodman's vehicle; correct?

3        A    Correct, yes, sir.

4        Q    Did anything Mr. Kern do -- I mean we see

5   that -- we don't see you stop your forward momentum

6   towards Mr. Goodman's vehicle.  Do you agree?

7        A    Agree.

8        Q    But you think taking your eyes off of Mr.

9   Goodman's vehicle somehow delayed this traffic

10  interaction for one second?

11       A    Yes, sir.

12       Q    Okay.

13                 (Video played.)

14            Okay, Mr. Kern -- by the way, let's look at

15  where he's standing.  You would agree with me, that's

16  Mr. Kern?  This is at 19:16 seconds.

17       A    Yes, sir.

18       Q    Mr. Kern is standing well behind your

19  vehicle, kind of almost right where that turn on the

20  sidewalk is; correct?

21       A    Yes, sir.

22       Q    I mean, he's not approaching you or your

23  vehicle there is he?

24       A    No, sir.

25       Q    And he's on the public sidewalk correct?

Page 215

1        A     Yes, sir.

2              (Video played.)

3        Q     Do you know whether or not you ran him off

4   the road?

5        A     I did not run him off the road.

6        Q     How do you know that?

7        A     When I looked into my mirror to move over to

8   initiate my traffic stop, I did not see any vehicles

9   in my vision.

10       Q     Okay.  So where was he located?

11       A     He was in the curb lane when I looked in the

12  mirror, at least a car length behind me.

13       Q     You said he wasn't in your vision.  How far

14  back was he?

15       A     I don't know the exact distance.  I had

16  enough space to merge over.

17       Q     Do you know how many car lengths?

18       A     As I stated, I don't know the distance.

19              MR. BECK:  You've already asked her

20  that a dozen times.

21              You don't have to answer any more

22  questions about car lengths or distance.

23              (Video played.)

24  BY MR. WIEST:

25       Q     Oh wait, was that Sergeant Wolf that we just

Page 216

1    saw that was pulling up?

2         A    It should be, yes, sir.

3         Q    And that was at about 19:01:40?  Fair?

4         A    Yes, sir.

5         Q    Might have been a couple seconds before

6    then.

7         A    Yeah, approximately.

8         Q    Okay.

9                   (Video played.)

10             You said, "You asked me who you were talking

11   to."  Do you hear that?

12        A    Yes, sir.

13        Q    I didn't hear him ask you yet in this video

14   for your name and badge number.  Did you?

15        A    I did not, no.

16        Q    Obviously, when you say "You asked me who

17   you were talking to," that suggests that he did ask.

18        A    Yes, sir.

19        Q    Do you agree that prior to the mobile -- I'm

20   sorry.  Prior to your body camera being activated,

21   that he had asked you for your name and badge number?

22        A    Yes, sir.

23        Q    Did you give it to him?

24        A    I would imagine.  I always introduce myself

25   when I speak to anybody, so if he asked for that, I

1    would have no reason not to give it to him.

2         Q    Okay.  So you're -- do you recall having

3    given him your name and badge number before you got

4    out of the vehicle?

5         A    I don't recall, but if he did ask for it,

6    I'm sure I provided it.  I would never not do that.

7         Q    Would you have done that from within your

8    vehicle?

9         A    No, sir, I don't believe so.

10        Q    Okay.  So if he asked you prior to you

11   getting out of the vehicle for your name and badge

12   number, would it be the case that maybe you hadn't

13   given it to him at that point because you were dealing

14   with the traffic stop?

15                  MR. BECK:  Objection.

16                  Go ahead.

17                  THE WITNESS:  No, sir.  Not unless if

18   he was asking for it while he was shouting out of the

19   window.

20   BY MR. WIEST:

21        Q    Well --

22        A    Which also wasn't captured on the body

23   camera.

24        Q    Right and that's my point because I didn't

25   hear him and we're at 19:02:18.  I did not see

1  anything thus far in this interaction where he has

2  asked you for your name and badge number, and yet you

3  just told him, "You asked me for my information.  I'm

4  asking you for yours."  Right?

5       A    Correct.

6       Q    I'm summarizing it but that's what it was.

7       A    Correct.

8       Q    Which suggests to me that he had asked you

9  for your name and badge number, but it had been while

10  you were still inside your vehicle prior to the body

11  camera being activated.

12       A    Correct.

13       Q    Right, because otherwise we would have seen

14  it on the camera.

15       A    Correct.

16       Q    And my question is, given that circumstance,

17  do you know whether or not you have given him your

18  name and badge number?

19       A    I can't -- at this moment I cannot recall.

20       Q    Okay.

21            (Video played.)

22            So he asked if he was free to go.  Did you

23  hear that?

24       A    Can you replay it?  I was -- I'm sorry.  I'm

25  listening to three things.

1      Q    Sure.  I may have to close and reopen it.

2      A    Sorry.

3      Q    It's okay.

4      A    Sorry.  I'll listen better.

5      Q    I've got the timestamps.  We're okay.

6           (Video played.)

7           So did you hear him ask whether he was

8  detained or whether he was free to go?

9      A    Yes, sir.

10     Q    And Wolf responded if you want to be.  Did

11  you hear that?

12     A    I didn't hear that.  I was listening to my

13  radio traffic.  I'm sorry.

14     Q    That's okay.  Did you tell Mr. Kern that he

15  was free to go at this point in the interaction?

16     A    I did not tell him that, no.

17     Q    Why not?

18     A    Because I'm obviously speaking over the

19  radio and listening to dispatch regarding the other

20  vehicle I have.

21     Q    Did you ever -- do you know, and we can look

22  at the whole video, do you know if you ever told Mr.

23  Kern from this point forward whether he was free to

24  go?

25     A    After he was issued a citation I believe so.

1      Q    Okay.  But prior to that did you ever tell

2  him he was free to go?

3      A    I don't recall that, no.

4      Q    You would agree that the situation, at least

5  as it presents at 19:02:30, is that Mr. Kern is out of

6  his vehicle.  It looks like he's on the grass strip

7  between the sidewalk and the street; fair.

8      A    Correct.

9      Q    Your lights and sirens are activated.  Well

10  maybe not your siren.  Your lights are activated.

11      A    Correct.

12      Q    And you've got your vehicle there by the

13  side that's right kind of in front of him in this

14  video frame; right?

15      A    Yes, sir.

16      Q    You are wearing your issued uniform, your

17  firearm, your shield, your badge and shield, and

18  everything else; correct?

19      A    Yes, sir.

20      Q    And, okay.  And that's at 347.  We'll see if

21  I have to restart the video.

22                  (Video played.)

23          I take it that you walked back to deal with

24  Mr. Goodman because you had Sergeant Wolf on the scene

25  to, for lack of a better term, cover Mr. Kern?

1      A     Correct.

2      Q     Okay.

3            (Video played.)

4            Okay.  19:02:50, you've released Mr.

5   Goodman, you tell him to have a good day.  Would you

6   agree?

7      A     Yes, sir.

8      Q     Okay.  The Goodman traffic stop from this

9   point forward is done and finished; fair?

10     A     Correct, yes, sir.

11     Q     Okay.

12           (Video played.)

13           You told him that the failure to identify

14  himself was obstruction and this is at 19:03:58;

15  correct?

16     A     Yes, sir.

17     Q     Why didn't you tell him, "Hey --" I mean by

18  the way, you just had almost 20 seconds of interaction

19  with him that uninterrupted by Sergeant Wolf; correct?

20     A     Yes, sir.

21     Q     Why didn't you tell him, "Hey, you didn't

22  yield to lights and sirens.  I have the right to

23  charge you.  Give me your identification."

24           MR. BECK:  All right.  You've asked

25  that at least six or seven different times through all

1    the documents.

2                    MR. WIEST:  Mr. Beck, I'm going to make

3    a record.  Because if we're going to get the judge on

4    the phone, I want to make a record.  We're now looking

5    at the video.  Your client's testimony was she did not

6    have the opportunity to do this.

7                    And now we have video with 20 seconds

8    in which she did have the opportunity to do it, and

9    I'm entitled to impeach her, and you're not entitled

10   to interfere with me in my impeachment of her.  Now

11   you can make your record, and we'll go get the judge

12   on the phone.

13                   MR. BECK:  I'm just saying to you that

14   this is -- you've asked this question at least six

15   times.

16                   I'm not telling you, you can't answer.

17                   I'm telling her she's going to answer

18   it this last time, which is what I've tried to do.  If

19   you want to call the judge, call the judge.  And I'll

20   simply say exactly what I just said, that you have

21   repeatedly asked the same question.

22                   MR. WIEST:  Are you instructing your

23   witness not to answer?

24                   MR. BECK:  I didn't say that.  Before

25   you went into your tirade, I was about to tell her

1    that you will answer this question the last time,

2    but --

3              MR. WIEST:  Well, it may not be the

4    last time because I'm -- we're going to look at more

5    opportunities than she had also, and I'm entitled to

6    cross-examine her And confront her with respect to her

7    testimony.

8              MR. BECK:  Well you get to ask one time

9    that question, right, of why you didn't say something.

10   That's what you keep asking.

11             MR. WIEST:  Unless, one, she doesn't

12   answer, or two, we look at video and I look at

13   particular instances that undermine the testimony.

14             MR. BECK:  Well, you and I both know,

15   just because you don't like the answer doesn't mean

16   you get to repeat it.  But ask your question.  Go

17   ahead.  If you want to call the judge, call the judge.

18   BY MR. WIEST:

19       Q    Ma'am, we just looked at 20 seconds of video

20   in which you had an interaction with Mr. Kern, and you

21   got to speak with him uninterrupted by Sergeant Wolf;

22   correct?

23       A    Correct.

24       Q    You didn't tell him in that 20-second

25   interval that he failed to yield to lights and sirens,

1   and you could have written him a citation for that,

2   and that's why he had to identify; correct?

3        A    Mr. Kern was already advised that he failed

4   to yield to lights and sirens when I made contact with

5   him.  In this 20 second interaction I was trying to

6   explain to him the nature of the situation and that

7   all we needed was his name.

8             I felt in my experience of this job, had I

9   stated to him I could write you this ticket, I really

10  feel that would have escalated the situation even

11  more.

12       Q    So my question was, you didn't tell him in

13  that instance right there on the video --

14       A    Correct, I did not.

15       Q    Okay.  Thank you.  All right.

16             (Video played.)

17             So he just asked you what crime he

18  committed, and your response was there was no crime;

19  correct?

20       A    Correct.

21       Q    Was that a true statement?

22       A    It was not, no.

23       Q    Okay.  But that's what she told him at the

24  scene at 19:04:02 on your body camera; correct?

25       A    Yes, sir.

1     Q     Okay.  So you lied to him?

2                   MR. BECK:  Objection.

3                   THE WITNESS:  Can I answer?

4                   MR. BECK:  Yeah, you can answer.

5     Answer until I tell you not to.

6                   THE WITNESS:  Yeah, okay.  Well, I did

7     state that so -- I would not have cited him for this.

8     But yes, I guess if legally it would be a lie.

9     Legally, obstruction is a crime.

10    BY MR. WIEST:

11    Q     Okay.  Well, I'm not even referring to the

12    obstruction.  I'm also referring to the failure to

13    yield.

14    A     Wait, I didn't -- what is -- are we asking

15    that question again?

16    Q     Well, Mr. Kern said, "What crime did I

17    commit?"  And you said, no crime; right?

18    A     Failure to yield was a traffic violation.

19    It wasn't a criminal violation.

20    Q     So your testimony is a fourth degree

21    misdemeanor is not a criminal violation?

22    A     And as we learned today, previously stated,

23    once you told me that, I now know that it's a fourth

24    degree misdemeanor.  At that time, I did not consider

25    the traffic violation as criminal.

1       Q     Are minor misdemeanors criminal?

2       A     Minor misdemeanors are criminal.

3       Q     Do both traffic tickets and other

4 misdemeanors all go through the municipal court?

5       A     Yes, sir.

6       Q     And you think that there's a difference

7 between a traffic violation of the law and other

8 violations of the law?

9       A     I don't know.

10      Q     Okay.  Did you have any training by the city

11 of Cleveland Heights about traffic offenses not being

12 crimes?

13      A     I don't recall.

14      Q     Okay.

15            (Video played.)

16            By the way, the first time that I have heard

17 Mr. Kern use foul language is right there after he's

18 in handcuffs, after he's indicating that his rights

19 are being violated, and after he asks you if you were

20 going to allow Sergeant Wolf to violate his rights;

21 would you agree?

22      A     On body camera, yes.

23      Q     Okay.  Is it your testimony that there had

24 been curse words prior to that?

25      A     I don't recall exactly verbatim what he

1    stated out of the window.

2        Q    Okay.  This is it.  Do you know generally

3    what he stated out the window?

4        A    No, it was two years ago.  I don't recall.

5        Q    Okay.  And this is at 19:05:34; correct?

6        A    Yes, sir.

7                (Video played.)

8            Let me ask.  Had Sergeant Wolf asked prior

9    to putting Mr. Kern in handcuffs at 19:06 or prior to

10   then, what had happened?

11       A    No, sir.

12       Q    You didn't tell him not to arrest him;

13   correct?  You didn't tell Sergeant Wolf not to arrest

14   him; correct?

15       A    No, I don't believe so.  No, sir.

16               (Video played.)

17       Q    So you said you were getting behind him.

18   When he stopped abruptly?

19       A    Yes, sir.

20       Q    And that was on the scene right there and

21   then correct?

22       A    Yes, sir.

23       Q    All right.

24               (Video played.)

25           So Sergeant Wolf told you to write him for

1   failure to yield.  Did you hear that?

2       A    Yes, sir.

3       Q    Why didn't you write him for failure to

4   yield?

5       A    Because it was a very frustrating situation.

6   I could have wrote him tickets.  I could have wrote

7   Mr. Goodman tickets.  It's not what I'm out here

8   really doing.

9       Q    Okay.

10              (Video played.)

11              You told Sergeant Wolf he didn't want to

12  write the failure to yield.  Did you just hear that

13  right now?  I can go back.

14      A    Yeah.  Yes, sir.

15      Q    Why didn't, just for the record, why didn't

16  she want him -- why didn't you want to write the

17  failure to yield?

18              MR. BECK:  Objection.

19              Go ahead.

20              THE WITNESS:  I didn't want to write

21  Mr. Kern any citations.

22  BY MR. WIEST:

23      Q    Okay.  Why was that?

24      A    Because I could understand his frustration

25  in the situation.

1        Q    Okay.

2                  (Video played.)

3             Okay.  So Sergeant Wolf said, "I don't want

4    to argue with somebody for an hour the legalities.

5    They can come to court."  That's what he told you.

6        A    Yes, sir.

7        Q    You would agree with me this traffic stop is

8    about, I don't know, seven minutes in; fair?

9        A    Yes, sir.

10       Q    Plainly, we weren't even close to an hour.

11       A    Correct.

12       Q    We weren't even to a quarter of an hour;

13   correct?

14       A    Correct.

15       Q    All right.

16                 (Video played.)

17            This is the first instance where Mr. Kern

18   indicates that you've got a lawsuit coming; correct?

19       A    Yes, sir.

20       Q    This is while he's in handcuffs.  After he's

21   been arrested at 19:07:09; correct?

22       A    Yes, sir.

23                 (Video played.)

24       Q    And then this is where you say, I'm going to

25   write him a ticket for obstruction at 19:08:46; right?

1   In response to Sergeant Wolf's directive to you?

2       A    Yes, sir.

3       Q    Is there a reason at this point in time, why

4   you did not call for the lieutenant?

5       A    I had no really idea that I should do that.

6   Also, the lieutenant was probably the only other

7   supervisor in there.  He wouldn't have come on -- I

8   don't believe he would have come out anyway.  How --

9   somebody would have to supervise the jail.

10      Q    So the lieutenant was there to supervise the

11  jail?

12      A    A officer in charge is always in the office

13  to oversee the inmates.

14      Q    And is the officer in charge, would that be

15  the lieutenant?

16      A    It would either be the lieutenant or a

17  sergeant or both, if they're both available.

18      Q    Okay.  If you needed a lieutenant on scene,

19  could another officer have covered that?

20      A    Not unless if they have training.  It would

21  have to be a sergeant, a lieutenant, or a captain.

22      Q    Okay.  Would there have been a captain on

23  shift at 7 at night?

24      A    No.  No, sir.  Not unless that there was one

25  in the detective bureau.

1      Q    Okay.  One other question, why didn't you

2  just tell Wolf to write his own citation if he wanted

3  it written?

4      A    I guess I wouldn't tell a supervisor what to

5  do.  It's a direct order from my supervisor.  Maybe

6  with my military training and background that's just

7  not something I felt comfortable doing.

8      Q    If Sergeant Wolf would have told you that he

9  was sick of Mr. Kern's threats of a lawsuit and that

10  you should repeatedly taser him, would you have

11  followed that order?

12     A    No, sir.  We don't carry tasers.

13     Q    Okay.  How about pepper spray?

14     A    No, sir.  We don't carry pepper spray.

15     Q    Do you have a collapsible baton?

16     A    I don't carry that with me, sir.

17     Q    What do you use that's not lethal when you

18  need to use more force than, you know, just hands-on.

19     A    My only training is hands-on.  We don't

20  carry any of that.

21     Q    If Sergeant Wolf would have told you to

22  engage in pain compliance by striking Mr. Kern because

23  of his mouth, would you have complied with that order?

24     A    No, sir.

25     Q    Why not?

1      A     Mr. Kern was not using any excessive force

2  against us, so I don't have the authorization to use

3  excessive force against him.

4      Q     Would that have been the case even if

5  Sergeant Wolf would have told you to use force against

6  him?

7      A     Correct.

8      Q     Okay.  So it's some orders that you know

9  that you shouldn't follow if they're plainly illegal

10  and others maybe you should?

11              MR. BECK:  Objection.

12              Go ahead.

13              THE WITNESS:  Sergeant Wolf informed --

14  Sergeant Wolf ordered me to write this citation.  I

15  know, and you know, and the court knows, citations can

16  be thrown out.  If citations are issued, we're all

17  going to contest in court, and as we're watching, body

18  camera doesn't lie.

19  BY MR. WIEST:

20      Q     So your sense of it was, I'm going to write

21  this and let the court figure it out?

22      A     I'm being ordered to do so, so yes.

23      Q     Okay.

24      A     Correct.

25              (Video played.)

1           Do you normally apologize to people who are

2    under arrest with probable cause --

3                 MR. BECK:  Objection.

4                 Go ahead.

5    BY MR. WIEST:

6         Q    -- carrying out your police duties?

7         A    As I stated previously, I apologized to Mr.

8    Kern because we are both in a very frustrating

9    situation.

10        Q    So my question is, do you recall any other

11   incident other than this in which you apologized to

12   somebody that was under arrest for your writing a

13   citation?

14        A    Yes, sir.

15        Q    How many times has that happened?

16        A    I can't recall the exact amount of times.

17        Q    More than a dozen?

18        A    Absolutely.

19        Q    Why would you apologize to somebody for

20   writing a citation that you thought was appropriate?

21   Why else?  I'm not talking about this incident.  I'm

22   just talking about generally.

23        A    Maybe people are crying because they are

24   about to get points on their license.  That's the

25   number one example I could provide.  But if you're

1  driving 55 miles an hour in a 35 mile an hour zone,

2  that was a choice that they made.  I have to issue

3  them a citation.

4      Q    Okay.  So in those --

5      A    And I apologize in the manner that they're

6  crying.  I feel sad for them.

7      Q    Yeah, in that instance, you've got somebody

8  that's upset.  They broke the law, and you're

9  effectively telling them, I'm sorry, but I've got to

10  do my job.

11      A    Correct.

12      Q    Okay.  Was that the nature of the apology

13  that you were saying to Mr. Kern in this instance?

14  Were you telling him, hey, there's body camera and I'm

15  sorry the sergeant told me to do it?

16      A    I apologized to Mr. Kern on multiple

17  occasions of frustration he has experienced based on

18  the whole situation.

19      Q    What do you think his frustration -- well,

20  let me ask it this way.  What was your perception of

21  his frustration?

22          MR. BECK:  Objection.

23          Go ahead.

24          THE WITNESS:  As I stated previously,

25  he was very frustrated in the manner of which the

Page 235

1  traffic stop occurred.

2  BY MR. WIEST:

3      Q    Did you think his frustration was justified?

4      A    I do, yes, sir.

5      Q    Okay.

6               (Video played.)

7               Mr. Kern asks you if I broke the law, then

8  I've got to identify myself.  You heard him say that;

9  right?

10     A    Yes, sir.

11     Q    And you're saying -- and then what your

12  response was, you got out of the car and you have to

13  identify yourself; right?

14     A    Yes, sir.

15     Q    You didn't tell him, "Hey, you failed to

16  yield to lights and sirens, you did commit a crime."

17  Correct?  That's not what you told him.

18     A    No, sir.

19     Q    Okay.

20               (Video played.)

21               So the basis of the obstruction charge here,

22  as you explained it to Mr. Kern at 19:10:02, was that

23  the sergeant asked him for his identification, asked

24  Mr. Kern for his identification, and Mr. Kern failed

25  to provide it; correct?

Page 236

1      A      Correct.

2              (Video played.)

3              You said, "Our prosecutor is really good."

4      A      Correct.

5      Q      What was the basis of that statement?

6      A      Prosecutor Pam Roessner is very -- she's

7   very understanding, and I would say she's pretty,

8   like, lenient and reasonable with making decisions on

9   everything from traffic stops to criminal charges.

10     Q      And you would -- do you think that she knows

11  the law?

12             MR. BECK:  Objection.

13             You can answer.

14             THE WITNESS:  I do.

15  BY MR. WIEST:

16     Q      Okay.  and in this instance what she chose

17  to do with this, having reviewed the evidence, was to

18  dismiss the charges; correct?

19     A      Correct.

20     Q      Mr. Kern didn't even need to come in and try

21  and negotiate some kind of plea; did he?

22             MR. BECK:  Objection.

23             Go ahead.

24             THE WITNESS:  I don't -- I don't know

25  the answer to that.

Page 237

1               (Video played.)

2    BY MR. WIEST:

3        Q    Your position to Mr. Kern at 19:11:17 in the

4    video was you're just doing what you were told to do.

5        A    Yes, sir.

6        Q    Okay.

7               (Video played.)

8               Who is 60?

9        A    Sergeant Wolf.

10       Q    Okay.

11       A    8560 is his call number.

12       Q    8560.

13       A    Yes, sir.

14       Q    I was -- just for the record in reference to

15   a video statement you made at 19:11:40.

16               (Video played.)

17               Mr. Kern indicates he needs an ambulance at

18   around 19:11:54.  He said his arm was popped out;

19   correct?

20       A    Yes, sir.

21       Q    Okay.

22               (Video played.)

23               Is that you asking Sergeant Wolf what the

24   code is for obstruction?

25       A    Correct.

1     Q   Okay.  And that was at 19:12:12; correct?

2     A   Yes, sir.

3     Q   Or there abouts.  At this point would be
4 fair to say that you were asking because you didn't
5 know what the code was?

6     A   I didn't know what the code was off the top
7 of my head no.

8     Q   And you hadn't looked at the elements of the
9 offense?

10    A   I knew what the elements were.  The code, as
11 you can see in that video, we have a cheat sheet of
12 common offenses that we write, and I didn't have that
13 code on that cheat sheet because I don't personally
14 believe that this is a common thing we write.

15    Q   Okay.  Had you ever -- I don't know if I
16 asked you this, but if I did, I apologize.  Had you
17 ever written an obstruction charge prior to September
18 22, 2022?

19    A   I -- you did ask multiple times.

20    Q   I'm sorry.

21    A   I did state that I don't recall if I did or
22 did not.

23    Q   Okay.

24          (Video played.)

25          So Mr. Kern indicates that Sergeant Wolf had

1   done something to his arm, and your statement back to

2   him was you didn't see what Sergeant Wolf had done to

3   him?

4        A    Correct.

5        Q    Okay.  Was that a truthful statement?

6        A    Yes, sir.

7        Q    Okay.

8                  (Video played.)

9             This is a 19:15:40.

10       A    Yes, sir.

11       Q    And you said, "Tell him to come here.  I

12  don't know what verbiage."

13       A    Yes, sir.

14       Q    When you say "him come here," were you

15  referring to Sergeant Wolf?

16       A    Yes, sir.

17       Q    Who are you asking to have him come up?  Was

18  it Torres or Webster?

19       A    Officer Torres.  I don't know that I was

20  aware Torres was on -- if he was on scene or not.

21       Q    You don't know -- let me clarify that.  You

22  don't know if Torres or Webster was on scene?

23       A    I was asking Officer Torres.

24       Q    Okay.  And you don't know if Webster was on

25  scene?

Page 240

1      A     Not at that point yet, no.

2      Q     Okay.  If you knew the elements of the

3  obstruction charge, why wouldn't you just list the

4  elements?

5      A     Getting lackadaisical and relying on that

6  stupid cheat sheet where the verbiage is already

7  nicely neatly written out.  I guess I just didn't know

8  what -- how he wanted me to write.

9      Q     When you say he --

10     A     Sergeant Wolf, yes, I'm sorry.

11     Q     Okay.

12     A     We get too fixated on those sheets.

13     Q     And what do those sheets generally have on

14  them?

15     A     It will say, an example of one I can

16  remember is like, disorderly conduct, which we write

17  all the time, and it says, "no person shall cause

18  annoyance, inconvenience, or alarm to another persons,

19  or provoke a violent response," depending on which one

20  we're going for, to wit, so and so did X, Y, Z.

21     Q     So it begins with the elements of the

22  offense, the statute --

23     A     Correct.

24     Q     -- and then it gets into the specific

25  behavior that the defendant did to violate it.  That's

1  how you're supposed to fill that out for the verbiage;

2  correct?

3       A    How we do it in Cleveland Heights, yes,

4  correct.

5       Q    And the cheat sheet, I'm guessing, doesn't

6  have the specific incident on it, because that you're

7  reporting.  It's got -- when you say the cheat -- what

8  the cheat sheet has on it is the elements of the

9  offense; fair?

10      A    Correct.  Yes.

11      Q    And when you're asking for Sergeant Wolf to

12  give you the verbiage, I mean you know what Mr. Kern

13  had done because you witnessed it.

14      A    Correct.

15      Q    You're asking Sergeant Wolf for the elements

16  of the offense?

17      A    Correct.

18      Q    Would you agree that your reason you're

19  asking for that was because either you were unsure

20  about what they were.  Or you didn't know.

21      A    No.

22      Q    If you knew what the elements of the offense

23  were, why would you need to ask Sergeant Wolf?

24      A    I wanted him to tell me what he wanted me to

25  write on the citation that he ordered me to write.

1      Q    Did that include the elements of the

2  offense?

3      A    No, it would include everything -- well,

4  yes.  It would the elements of the offense and the to

5  wit in which he wanted me to write it.

6      Q    Okay.  If he would have not told you

7  anything, would you have been able to complete that

8  citation?

9      A    If he would have not told me any --

10     Q    What he wanted on it?

11     A    As far as the code or the --

12     Q    The verbiage.  Would you be able to complete

13  the citation?

14     A    I did complete the citation without -- I

15  don't believe he gave me verbiage.  I don't recall.  I

16  have to watch the rest of the video.

17     Q    Let's watch the rest of the video and then

18  we can go there.  By the way, I forgot for the record

19  purposes, that was at about 19:16:45 where you had

20  asked for the verbiage; right?  About five seconds

21  prior to that.

22     A    Correct.  About.

23     Q    Okay.

24          (Video played.)

25          So you walked back to Sergeant Wolf at about

1  19:17, it was about 12 to 15 seconds, about a three-

2  second walk back.  And then you walked up, he's

3  sitting in his cruiser, and you asked, what do you

4  want me to put for this verbiage -- Or "What do I put

5  for this verbiage?"  Correct?

6      A    Yes, sir.

7      Q    I didn't hear his response.  Did you?

8      A    I didn't.

9      Q    Well, let's go back.  We'll try and get it.

10  It's at 19:17:06.  It looks like you're walking back.

11     A    Yes, sir.

12     Q    We may need to close it and redo it.  Which

13  is fine.  Let me do that real quick.

14              (Video played.)

15              "When asked to identify himself, he

16  refused."  What did he say back to you?

17     A    I think he said, "Yeah."

18     Q    Okay.

19     A    I can't make out, but I'm pretty sure he

20  said --

21     Q    Do you want to hear it one more time?

22     A    No.

23     Q    You think it was "yeah"?

24     A    I believe so.

25     Q    Okay.

1              (Video played.)

2              You were referring to EMS being assholes?

3       A     Yeah.  Hitting their siren and causing us

4    all to jump.

5       Q     Okay.

6              (Video played.)

7              So Mr. Kern, it looks like gets back out of

8    the vehicle at about 19:19:24?

9       A     Yeah, approximately.

10      Q     About.  He says he's going to go to the

11   hospital, and then there's this discussion about

12   towing of the vehicle.

13      A     Yes, sir.

14      Q     Okay.

15             (Video played.)

16             So you're completing the citation right now?

17   Is that what's going on?

18      A     Yes, sir.

19      Q     Okay.  What did you just say?

20      A     "Some janky rusty ass cuffs."

21      Q     Okay.  How old were your handcuffs?

22      A     Those were not my handcuffs.  Those were

23   Sergeant Wolf's handcuffs.

24      Q     Okay.  Did those get returned to him?

25      A     Yes.  They should have.  Yes, sir.

1        Q     It looks like Mr. Kern was handcuffed and in

2   the vehicle for about 20 minutes; would you agree?

3        A     Approximately.

4        Q     Okay.  And that was your vehicle; correct?

5        A     Yes, sir.

6        Q     Was there anything that kept you from

7   allowing him to -- from removing the handcuffs

8   allowing him to wait while you wrote the citation by

9   the side of the road?

10       A     No, sir.

11       Q     You could have done that?

12       A     Sergeant Wolf made the choice to place him

13  in handcuffs and place him in my patrol vehicle.

14       Q     Right, but once he's in your patrol car,

15  effectively you have custody of him; correct?

16       A     Correct.

17       Q     Is there anything that kept you from taking

18  him out of the handcuffs in that period?

19       A     That I was writing the citation out.

20       Q     Okay.  Could you have chosen to have let him

21  out of the handcuffs during that period?

22       A     I don't know.

23       Q     Okay.  Did anyone in Cleveland Heights or

24  the department train you about whether or not you

25  could release somebody from handcuffs while you're

1   writing a citation?

2        A    No, sir.

3        Q    Okay.

4               (Video played.)

5        By the way, the traffic stop, you would agree

6   with me, it was never the case that Mr. Kern was

7   stopped for a traffic violation; correct?

8        A    No, sir.

9        Q    It was Mister -. is that correct?

10       A    Correct.

11       Q    It was Mr. Goodman that was stopped for a

12  traffic violation; correct?

13       A    Correct, yes, sir.

14       Q    Okay.

15               (Video played.)

16       You're walking back to Sergeant Wolf's

17  vehicle at that point in time when the video cuts off.

18       A    Yes, sir.

19       Q    His window's coming down at that point in

20  time; correct?

21       A    Yes, sir.

22       Q    What conversation did you have with him at

23  that point in time?

24       A    I probably asked him if he wanted to sign

25  the citation.

1     Q    Why would you ask him if he wanted to sign
2  the citation?
3     A    Since he was the one that ordered me to
4  write it.
5     Q    Do you remember that that was the case or
6  not?
7     A    I'm sure it was the case, yes.
8     Q    Okay.  And did he agree to sign the
9  citation?
10    A    If his signature's not on it, then no.
11    Q    I mean, we've seen the citation.  It's in
12  your pile there.
13    A    Yeah.  No, it's not on it.
14    Q    Look at Exhibit 24, I believe.
15              (Exhibit 24 was marked for
16              identification.)
17    A    Nope, his signature's not on it.
18    Q    Do you know why he refused to sign the
19  citation?
20    A    I don't recall.  And I don't know if he --
21  if I asked him to sign it -- the officer in charge has
22  to dock the citation at the bottom.  If you look at
23  it, you can see that Lieutenant Williams is the one
24  who did that.  Sergeant Wolf could have done that as
25  well.

1      Q    Okay.  All right.  I've got a little more.

2    Are you good?  Can we keep going?

3      A    How many more hours?

4      Q    I think we've got about an hour.  It might

5    be less, but now is as good as -- let's take a small

6    break.

7      A    Let's take a break.

8              MR. BECK:  Let's take a break.

9              (Off the record.)

10             THE VIDEOGRAPHER:  We're back on the

11   record.  Time is now 3:34.

12   BY MR. WIEST:

13     Q    All right.  I want to look with you about

14   the handcuffing incident by Sergeant Wolf.  And I just

15   want to go over that with you real quick.

16     A    Yes, sir.

17     Q    And what I really want to focus in on is how

18   much of that you captured.

19     A    Yes, sir.

20             (Video played.)

21     Q    Okay.  This is at 19:04:30, and this is the

22   point of the video, it may have been a second before

23   then, in which we can see Sergeant Wolf with his hands

24   on Mr. Kern effecting the arrest of him.  Would you

25   agree?

1        A     Yes, sir.

2        Q     You would agree that we cannot see from this

3   angle exactly what Sergeant Wolf is doing with Mr.

4   Kern's hands.

5        A     Yes, sir.

6        Q     Or for that matter, the bottom portion of

7   his arms; correct?

8        A     Correct.

9        Q     All right.

10                 (Video played.)

11             We just saw this little bit of a turn that

12   Mr. Kern did.  You said he made a turn.  Is that what

13   you were referring to?  I'm going to get the time

14   stamp.  If I can, it went black on me there.

15                 (Video played.)

16             You would agree that right now, at least at

17   19:04:47, the only thing we can see is Mr. Kern's top

18   left shoulder; correct?

19        A     Correct.

20                 (Video played.)

21             Is that the turn that you're referring to

22   that he made, that Mr. Kern made?

23        A     Correct.  Yes, sir, correct.

24        Q     So this is at 19:04:53.  We see him, maybe a

25   quarter of his body is kind of twisted.  It looks like

1    he's -- is he twisting to his right?

2         A    He's twisting to his right, yes, sir.

3         Q    Okay.

4                   (Video played.)

5              You would agree at this point in the video,

6    at 19:04:58, we cannot see really anything other --

7    any of the top portion of Mr. Kern's body on your body

8    camera; correct?

9         A    Correct.

10                  (Video played.)

11        Q    And at this point at 19:05:03 you turned

12   away from Sergeant Wolf; correct?

13        A    Yes, sir.

14        Q    So you're not -- were you looking at

15   Sergeant Wolf and Mr. Kern this point in time?

16        A    I don't recall.

17        Q    Okay.  And now you're turning back towards

18   them at 19:05:04; right?

19        A    Correct.

20                  (Video played.)

21        Q    By the way, at this point, Mr. Kern is being

22   escorted to your vehicle at 19:05:28.  You would agree

23   that Sergeant Wolf's body is between you and Mr. Kern;

24   correct?

25        A    Yes, sir.

1                    (Video played.)

2               The same is true right now in 19:05:36.

3  Sergeant Wolf is still pretty much between you and Mr.

4  Kern; correct?

5       A    Yes, sir.

6       Q    We can see a portion of Mr. Kern's left arm

7  and his left hand there; correct?

8       A    Yes, sir.

9                    (Video played.)

10      Q    And then we've got Sergeant Wolf with the

11 door closed, 19:05:52; correct?

12      A    Yes, sir.

13      Q    Okay.  Would you agree that most of the

14 arrest is not depicted on your body camera?

15      A    I agree.

16      Q    Okay.  You've stated a couple times that you

17 don't think that Sergeant Wolf twisted Mr. Kern; do

18 you recall that?

19      A    Correct.

20      Q    You agree with me that you weren't in a

21 position to see whether or not that occurred for most

22 of the arrest; correct?

23      A    Correct.

24      Q    And it would be fair to say that if just

25 because you didn't see it didn't mean that it didn't

Page 252

1  occur; correct?

2       A    Correct.

3       Q    Okay.  Couple more follow-ups.  We're done

4  with the video for today.  Let's look at some

5  interrogatory responses.  Mark this as 40a.

6                 (Exhibit 40a was marked for

7                 identification.)

8            Ma'am, these are the interrogatory responses

9  that we saw from -- it was a combined response for the

10  city by the city and yourself.  Have you seen these

11  before?

12      A    Yes, sir.

13      Q    Have you had the opportunity to review the

14  interrogatory responses?

15      A    Yes, sir.

16      Q    I want to ask you, I have questions about

17  some of these interrogatory responses.

18      A    May I make a statement?

19      Q    Yes.

20      A    My name is spelled wrong on this if

21  that's -- that's probably relevant.

22      Q    Okay.  How is your name spelled?

23      A    It's spelled C-A-R-L-Y.

24      Q    Okay.  Did we spell your name wrong on the

25  complaint?  Yes?  No?

1      A    On this, yes.

2      Q    Okay.  And the right spelling is C-A-R-L-Y;

3  correct?

4      A    Yes, sir.

5      Q    Okay.  Do you know what knowledge Chief

6  Britton has about the claims or defenses in this case?

7      A    I do not.

8      Q    How about Detective Mathis, was he one of

9  the internal detectives?

10     A    Yes, sir.

11     Q    Was the other one Detective Pearson?

12     A    Yes, sir.

13     Q    Who was Detective Robinson?

14     A    Detective Robinson, he's -- he's part of the

15  union.  He's a union rep for us.

16     Q    Is he, like, the union representative that

17  deals with disciplinary matters?

18     A    Yes.

19     Q    That, like, appears in formal disciplinary

20  proceedings?

21     A    He operates under the union as a

22  representative in multiple functions.  And I don't

23  know if at that time -- he is I believe now an IA

24  investigator, so I'm not sure what his role was in

25  this matter.

1 Q Was he the president of the union?

2 A I don't know his position.

3 Q Okay.  Are Cleveland Heights Police

4 Department subject to a collective bargaining

5 agreement?

6 A Yes.

7 Q Okay.  Torres and Webster also responded to

8 the scene?

9 A Yes, sir.

10 Q Okay.  Is there any knowledge that any of

11 those folks have that we haven't already talked about?

12   MR. BECK:  Objection.

13   Go ahead.

14   THE WITNESS:  Not that I'm aware of.

15 BY MR. WIEST:

16 Q Okay.  All right.  There's a lawsuit that's

17 identified in number 15, Itson vs. Cleveland Heights.

18 Do you have any knowledge of that?

19 A No, sir.

20 Q Okay.  All right.  That's all I've got on

21 these responses.  Ma'am I've got a -- I'm just batting

22 a little bit of clean up and then we've got one more

23 exhibit to do.  How long would it have taken you, and

24 I'm just talking about the temporal time, because I

25 know we've talked about other aspects of this today.

1   How long would it have taken you to have told Mr. Kern

2   that you needed his identification because he had

3   broken the law by failing to yield to lights and

4   sirens.  How long would that have taken?

5        A    A few seconds.

6        Q    Okay.  All right.  Let me give you 36.  I

7   received an anonymous email not long after filing this

8   lawsuit.

9                (Exhibit 36 was marked for

10               identification.)

11            Have you seen or do you know anything about

12   the contents of this email?

13       A    No, sir.

14       Q    Has anybody told you or has there been

15   anyone within the department who's told you that they

16   sent an email to Mr. Kern's lawyers on the filing of

17   the lawsuit?

18       A    No, sir.

19       Q    Okay.  Do you disagree with the prosecutor's

20   decision to dismiss the charges against Mr. Kern?

21       A    I do not.

22       Q    Okay.  I need to ask some follow-up

23   questions generally.  Do you own a home?

24       A    I do not.

25       Q    Do you have a bank account?

Page 256

1      A     I do.

2      Q     Where is that at?

3                MR. BECK:  She's not going to give you

4  any of that.  You don't have a right to that knowledge

5  now.

6                MR. WIEST:  Okay.  We have punitive

7  damages in this case, and I am entitled under existing

8  precedent to ask questions about the amounts of her

9  assets for the purposes of having the jury assess the

10  amount of punitive damages.

11                MR. BECK:  I know that, but I've just

12  never had anybody try to get it this early in the

13  case.  What I'm suggesting to you is that if the case

14  proceeds closer, I'm going to give you information on

15  that.  And I want to put it on the record, and I don't

16  think it's relevant at this point.

17                MR. WIEST:  Are you instructing her not

18  to answer?

19                MR. BECK:  I am.

20                MR. WIEST:  Okay.  For the record, I

21  was going to ask, and I'm assuming the instruction is

22  not to answer, about bank account amounts, other

23  account amounts, net worth, net assets for the

24  preceding two years, and I'm assuming that you're

25  going to instruct her not to answer on all of that for

Page 257

1    the record.

2                    MR. BECK:  I am.

3                    MR. WIEST:  Okay.  That's fine.  We'll

4    take that up later with the judge.  Okay.

5    BY MR. WIEST:

6         Q    Do you have any regrets sitting here today

7    with respect to the interaction with Mr. Kern?

8                    MR. BECK:  Objection.

9                    You can answer.

10                   THE WITNESS:  Yes.

11   BY MR. WIEST:

12        Q    And what were those?

13                   MR. BECK:  Objection.

14                   Go ahead.

15                   THE WITNESS:  With the knowledge that I

16   have now, I wish I would have just walked away and

17   called another supervisor.

18   BY MR. WIEST:

19        Q    Has the City of Cleveland Heights offered

20   any additional follow-up training on obstruction

21   charges following the September 22, 2022, incident

22   with respect to its officer?

23        A    Only the OPOTA courses.

24        Q    Okay.  How many of those have you taken?

25        A    One every year.

1      Q    Did you authorize your attorneys to make a

2   $25,000 offer of judgment last night?

3                MR. BECK:  Objection.

4                You're not going to answer anything

5   with respect to communications between me and --

6                MR. BRUNS:  You're her agent.  If it's

7   not authorized, it's not even an offer.  We're

8   entitled to know if it was authorized.

9                MR. WIEST:  Yeah, and I'm just looking

10   for a yes or no.  I don't want to know any substance

11   of communications.

12                MR. BECK:  The fact that it was sent to

13   you means it was authorized.

14                MR. WIEST:  That's not necessarily

15   true.

16                MR. BRUNS:  That's not the law.

17                MR. BECK:  She's not going to answer

18   what communications she had with me or what she

19   authorized or didn't authorize.

20                MR. WIEST:  Okay.  And so you're

21   instructing her not to answer on the basis of

22   privilege?

23                MR. BECK:  I am.

24   BY MR. WIEST:

25      Q    Just for the record, you're relying on his

1  instruction not to answer as well on all of those

2  things that he told you you're not going to answer on;

3  correct?

4                    MR. BECK:  Yes.

5                    THE WITNESS:  Yes.

6                    MR. WIEST:  Thank you.  It's your

7  privilege to assert even though he instructs you; you

8  actually have to assert it.

9                    THE WITNESS:  Okay.

10                   MR. WIEST:  So I was just -- we're just

11  doing this.

12                   MR. BECK:  We're wordsmithing at this

13  point, but I'm telling you not to answer.  I'm

14  instructing you not to answer, and you're following

15  that.

16  BY MR. WIEST:

17     Q    Okay.  All right.  As you sit here today, do

18  you believe that Mr. Kern's rights were violated in

19  the interactions on September 22, 2022, by either you

20  or Sergeant Wolf?

21                   MR. BECK:  Objection.

22                   Go ahead.

23                   THE WITNESS:  No.

24                   MR. WIEST:  Okay.  I don't think we

25  have anything else.

1                    MR. KACZKOWSKI:  I do not.

2                    MR. BECK:  We'll read it.

3                    THE REPORTER:  Can I keep you on record

4    for one moment though?  I just need to know about

5    transcripts.

6                    MR. WIEST:  Yeah, we are ordering

7    E-tran.  No rush.

8                    MR. BECK:  Same.

9                    THE REPORTER:  Are you as well?

10                   MR. BECK:  Yes.  No rush.

11                   (Signature reserved.)

12                   (Whereupon, at 3:47 p.m., the

13                   proceeding was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF DEPOSITION OFFICER

2              I, DAVID ROSS, the officer before whom the

3    foregoing proceedings were taken, do hereby certify

4    that any witness(es) in the foregoing proceedings,

5    prior to testifying, were duly sworn; that the

6    proceedings were recorded by me and thereafter reduced

7    to typewriting by a qualified transcriptionist; that

8    said digital audio recording of said proceedings are a

9    true and accurate record to the best of my knowledge,

10   skills, and ability; that I am neither counsel for,

11   related to, nor employed by any of the parties to the

12   action in which this was taken; and, further, that I

13   am not a relative or employee of any counsel or

14   attorney employed by the parties hereto, nor

15   financially or otherwise interested in the outcome of

16   this action.

17                                          DAVID ROSS

18                               Notary Public in and for the

19                                       State of Ohio

20

21   [X] Review of the transcript was requested.

22

23

24

25

Page 262

1                    CERTIFICATE OF TRANSCRIBER

2            I, REAGAN JONES, do hereby certify that this

3     transcript was prepared from the digital audio

4     recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

                                    <%32504,Signature%>
15                                  REAGAN JONES

16

17

18

19

20

21

22

23

24

25

Page  2024

June 30,

To: GREGORY A. BECK, ESQUIRE

Case Name: Kern, Demetrius v. Wolf, Naftali, Et Al.


Witness:  Carly Lewis Deposition Date:  6/13/2024

Dear Sir/Madam:


Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness signature notarized and forward the completed page(s) back to us at the Production address
 email to Barlow@BarlowReportingServices.com


If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.



Sincerely,


Production Department



NO NOTARY REQUIRED IN CA

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
           ASSIGNMENT REFERENCE NO: 6742301
 3         CASE NAME: Kern, Demetrius v. Wolf, Naftali, Et Al.
           DATE OF DEPOSITION: 6/13/2024
 4         WITNESS' NAME: Carly Lewis

 5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.

 7         I have made no changes to the testimony
     as transcribed by the court reporter.
 8
     _____         _____
 9   Date                     Carly Lewis

10         Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
                Statement; and
14         Their execution of this Statement is of
                their free act and deed.
15
           I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                        _____
18                      Notary Public

19                      _____
                        Commission Expiration Date
20

21

22

23

24

25
```

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 6742301
3         CASE NAME: Kern, Demetrius v. Wolf, Naftali, Et Al.
          DATE OF DEPOSITION: 6/13/2024
4         WITNESS' NAME: Carly Lewis

5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.

7         I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).

9         I request that these changes be entered
    as part of the record of my testimony.

10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.

13  _____        _____
    Date                       Carly Lewis
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:

17        They have read the transcript;
          They have listed all of their corrections
18              in the appended Errata Sheet;
          They signed the foregoing Sworn
19              Statement; and
          Their execution of this Statement is of
20              their free act and deed.

21        I have affixed my name and official seal

22  this _____ day of_____, 20_____.

23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

1                          ERRATA SHEET

2

3      PAGE/LINE(S) /          CHANGE          /REASON

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19
       _____        _____
20     Date                    Carly Lewis

21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22     DAY OF _____, 20_____ .

23                     _____
                       Notary Public
24
                       _____
25                     Commission Expiration Date