IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO -

CLEVELAND DIVISION

_____

DEMETRIUS KERN,

       Plaintiff,

   v.                         Case No.

NAFTALI WOLF, CARLI LEWIS, AND     1:23-CV-1327

CITY OF CLEVELAND HEIGHTS,

       Defendants.

_____

DEPOSITION OF

CHIEF CHRISTOPHER BRITTON

DATE:         Friday, June 14, 2024

TIME:         9:10 a.m.

LOCATION:    Baker Dublikar Beck Wiley & Mathews

             400 South Main Street

             North Canton, OH 44720

REPORTED BY: David Ross

JOB NO.:     6742454

1                   A P P E A R A N C E S

2   ON BEHALF OF PLAINTIFF DEMETRIUS KERN:

3        CHRISTOPHER WIEST, ESQUIRE

4        Chris Wiest, Atty at Law, PLLC

5        50 East Rivercenter Boulevard, Suite 1280

6        Covington, KY 41011

7        chris@cwiestlaw.com

8        (513) 257-1895

9

10  ON BEHALF OF PLAINTIFF DEMETRIUS KERN:

11       TOM BRUNS, ESQUIRE

12       Connell, Vollmer & Armstrong, Stratache Tower

13       40 North Main Street, #2010

14       Dayton, OH 45423

15       tbruns@bcvalaw.com

16       (513) 312-9890

17

18  ON BEHALF OF DEFENDANTS THE CITY OF CLEVELAND HEIGHTS

19  AND CARLI LEWIS:

20       GREGORY A. BECK, ESQUIRE

21       Baker Dublikar Beck Wiley & Mathews

22       400 South Main Street

23       North Canton, OH 44720

24       beck@bakerfirm.com

25       (330) 499-6000

```
 1              A P P E A R A N C E S (Cont'd)

 2   ON BEHALF OF DEFENDANT NAFTALI WOLF:

 3        PATRICK KASSON, ESQUIRE (by videoconference)

 4        TOMMY H. KACZKOWSKI, ESQUIRE

 5        Reminger Co., LPA

 6        200 Civic Center Drive, Suite 800

 7        Columbus, OH 43215

 8        pkasson@reminger.com

 9        tkaczkowski@reminger.com

10        (614) 232-2418

11        (614) 232-2443

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   EXAMINATION:                              PAGE

 3        By Mr. Wiest                           9

 4        By Mr. Kasson                        157

 5        By Mr. Wiest                         173

 6

 7                  E X H I B I T S

 8   NO.             DESCRIPTION               PAGE

 9   Exhibit 1a      Amended Notice of Deposition    10

10   Exhibit 2       Training Certificates for

11                   Sergeant Wolf                91

12   Exhibit 3       Employee Performance

13                   Evaluations, Sergeant Wolf   103

14   Exhibit 4       New Supervisor Training Checklist   85

15   Exhibit 5       Performance Appraisal Reports,

16                   Sergeant Wolf                86

17   Exhibit 6       Complaint re: Sergeant Wolf,

18                   5/19/2020                    88

19   Exhibit 7       Complaint re: Sergeant Wolf,

20                   5/24/2021                    92

21   Exhibit 8       Training Certificates,

22                   Carli Lewis                 105

23   Exhibit 9       Training Assessments,

24                   Carli Lewis                  96

25   Exhibit 26      Complaint Against Officers   110
```

```
 1              E X H I B I T S (Cont'd)

 2   NO.              DESCRIPTION                    PAGE

 3   Exhibit 27       Torres Statement              121

 4   Exhibit 28       Complaint Form, Rough Draft   122

 5   Exhibit 29       Complaint Form, Final Draft   123

 6   Exhibit 30       Sergeant Wolf's Garrity Warning  128

 7   Exhibit 32       Confident Non-Escalation

 8                    Certificate, Sergeant Wolf    130

 9   Exhibit 33       Report by Detective Mathis and

10                    Detective Pierson             131

11   Exhibit 34       Letter from Chief Britton to

12                    Sergeant Wolf, 2/24/2023      135

13   Exhibit 35       Pre-Disciplinary Hearing      143

14   Exhibit 41       Mayor Seren's Statements,

15                    Cleveland Jewish News         149

16

17     P R E V I O U S L Y  M A R K E D  E X H I B I T S

18   NO.              DESCRIPTION                    PAGE

19   Exhibit 1        Policy and Procedure Manual    17

20   Exhibit 17       Video of IA Interview         117

21   Exhibit 25       Dismissal Charges Against

22                    Mr. Kern, 10/3/2022           109

23

24

25
```

1                          I N D E X (Cont'd)

2                D O C U M E N T S   R E Q U E S T E D

3    NO.              DESCRIPTION                      PAGE

4    1                Training List                     43

5    2                Sergeant Wolf IA Interview       119

6    3                Complete Copy of Exhibit 29      125

7    4                Interview Between Sergeant Wolf

8                     and the IA Investigators         154

9

10          QUESTIONS INSTRUCTED NOT TO ANSWER

11                       PAGE       LINE

12                        13          3

13                        14          15

14                        15          16

15                        16          23

16                       106          17

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                    THE REPORTER:  Good morning.  My name

3    is David Ross; I am the reporter assigned by Barlow Reporting

4    to take the record of this proceeding.  We are now on

5    the record at 9:10 a.m.

6                         This is the deposition of Chief Britton

7    taken in the matter of Demetrius Kern vs. Naftali Wolf

8    et al. on June 14, 2024, in North Canton, Ohio,

9    Hamilton County [sic].

10                        I am a notary authorized to take

11   acknowledgments and administer oaths in Ohio.  .

12                        Additionally, absent an objection on

13   the record before the witness is sworn, all parties

14   and the witness understand and agree that any

15   certified transcript produced from the recording of

16   this proceeding:

17                        - is intended for all uses permitted

18                          under applicable procedural and

19                          evidentiary rules and laws in the

20                          same manner as a deposition recorded

21                          by stenographic means; and

22                        - shall constitute written stipulation

23                          of such.

24                        At this time will everyone in

25   attendance please identify yourselves for the record,

1  beginning with you, Mr. Wiest.

2              MR. WIEST:  My name is Chris Wiest.

3  With me is Tom Bruns.

4              Just to correct the introductory

5  statement, this is the deposition of the City of

6  Cleveland Heights pursuant to FRCP 30(b)(6) and the

7  topic list thereto.

8              The case is not in Hamilton County,

9  Ohio.  The case is in the United States District Court

10  for the Northern District of Ohio in the Cleveland

11  Division.

12              With that, I will move to other

13  Counsel.

14              THE REPORTER:  Thank you.  Apologies.

15              MR. BECK:  Gregory Beck on behalf of

16  Cleveland Heights and Officer Lewis.

17              THE REPORTER:  Okay, I thank you.

18              MR. KASSON:  Patrick Kasson on behalf

19  of Officer Wolf.

20              MR. KACZKOWSKI:  Tommy Kaczkowski on

21  behalf of Officer Wolf.

22              THE REPORTER:  Thank you.

23              Hearing no objection, I will now swear

24  in the witness.

25              Chief Britton, please raise your right

1   hand.

2   WHEREUPON,

3                   CHRISTOPHER BRITTON,

4   called as a witness and having been first duly sworn

5   to tell the truth, the whole truth, and nothing but

6   the truth, was examined and testified as follows:

7                   THE REPORTER:  Thank you.

8                   You may proceed.

9                       EXAMINATION

10  BY MR. WIEST:

11      Q    Chief Britton, my name is Chris Wiest.  We

12  met just a couple seconds ago.  I represent Demetrius

13  Kern along with Tom Bruns in this matter.  Sir, have

14  you given a deposition before?

15      A    I have.

16      Q    Okay.  I'm sure you're familiar with the

17  ground rules.  I'm going to go through them real

18  quick.  If you do not understand a question today, and

19  I am sure I'm going to ask one if not more than one

20  bad question, let me know.  I'll rephrase; okay?  If

21  you do answer, I'm going to assume you understand;

22  okay?

23              And that gets to my second rule.  I need

24  verbal answers to my questions.  Head nods and things

25  like that are not going to be sufficient for a court

Page 10

1    reporter; okay?

2        A    Understood.

3        Q    Okay.  If you need a break at any point

4    today, let us know, we're happy to take one.  And the

5    only rule that I've got on that is if there's a

6    question pending, I'm going to ask that answer before

7    we go on break; okay?

8        A    Okay.

9        Q    All right.  I'm going to hand you what I

10   have marked as Exhibit 1a.

11              (Exhibit 1a was previously marked for

12              identification.)

13              It is the amended notice of deposition for

14   today's deposition of the City of Cleveland Heights

15   pursuant to FRCP 30(b)(6).  And let me start with,

16   have you seen this deposition before?

17       A    Yes.

18       Q    Okay, this notice of deposition.  There's a

19   topic list that's attached to this and I think there's

20   29 topics.  Do you see that?

21       A    Yes.

22       Q    Have you had occasion to review the topic

23   list?

24       A    Yes.

25       Q    Are you prepared to speak to all of the

1   topics that are in this topic list?

2       A    Yes, to the best of my ability.  Yes.

3       Q    Is there any inquiry that you believe that

4   you needed to conduct to answer any of these topics

5   that you were not able to conduct?

6       A    Well, I would say I reviewed -- I reviewed

7   this list here and reviewed policies, personnel files,

8   recordings to familiarize and prepare for -- to cover

9   these topics.

10      Q    Okay.  Was there anything you think you

11  needed to do in addition that you were not able to do

12  to be prepared to speak to these topics today?

13      A    No.

14      Q    Okay.  Can you tell me, did you speak with

15  anyone to be prepared to speak to these topics today

16  other than Mr. Beck and people at his law firm?

17      A    Well, I guess if you could be more specific?

18  I was asked to question in email about the Lexipol

19  policy in email --

20      Q    Yeah, yeah, yeah.  I don't -- so any email

21  communications with Mr. Beck or his firm I don't want

22  get into.  What I'm after with this is, did you need

23  to speak with, for instance, the mayor or other people

24  internal to the City of Cleveland Heights other than

25  your outside law firm, to be prepared to speak to the

1   topics today?

2        A    Are you talking -- just to -- just to

3   clarify -- you meaning after I received this?

4        Q    Yes, sir.

5        A    No, I haven't.  Other than Mr. Beck, I

6   haven't.

7        Q    Okay.  And that's a standing instruction

8   that I'm going to give you today.  I do not -- you

9   should assume for any of my questions, I am not asking

10  about communications -- and by that, I mean phone

11  calls, in-person, email that you've had with Mr. Beck

12  or any of his colleagues at his law firm -- I don't

13  want to know about any of that.  You shouldn't talk to

14  me about any of that.  And that is a standing issue

15  for today's questions; okay?

16       A    Okay.

17       Q    I want to start with Topic Number 1, Nate

18  Wolf.  When did he begin employment with the City of

19  Cleveland Heights?

20       A    I -- I don't know off the -- I don't know

21  off the top of my head what his hire date was.

22       Q    Okay.  Do you know approximately what year

23  he began?

24       A    Are you asking me to give an estimation

25  guess?  Because I --

1       Q    I mean --

2       A    I -- I can't.

3       Q    Okay.  I think the easiest thing to do is

4   for us just to certify the question.  All right.

5   We're going to go through some disciplinary measures

6   that have been taken.  What discipline are you aware

7   of that's been imposed against him to date?

8       A    I know -- I know he has previous discipline

9   matters.  Well, including the matters relative to

10  Mr. Kern, but he also has previous discipline.

11  Well --

12      Q    How many times --

13      A    Well, at least two -- two others.

14      Q    Okay.  Do you know what those were in

15  relation to?

16      A    I'd have to -- to be clear and specific, I

17  would have to look at the -- the original

18  documentation.  But I know there's documentation

19  noting failure to de-escalate.  And the other one

20  might -- may be a similar nature.  Like I said, I

21  would have to look specifically at any paperwork or

22  documentation up.

23      Q    Okay.  Prior to hiring Naftali Wolf, what

24  due diligence was conducted on him by way of

25  background investigation or otherwise?

1     A     I can't speak to that, sir.  I wasn't the

2  chief at the time or part of the hiring process.

3     Q     Who would know that?

4     A     The chief at the time.

5     Q     Who was that?  Do you know?

6     A     I'm not certain, but I believe it was Chief

7  Robertson.

8     Q     Okay.  Do you still have contact for Chief

9  Robinson?

10    A     Yes.

11    Q     I mean, this is Topic Number 2.  It was on

12 the list.  Is there a reason why you didn't call Chief

13 Robertson to be prepared to speak to it?

14    A     No.

15    Q     Okay.  We'll certify that question and Topic

16 2 as well.  How many complaints has the City of

17 Cleveland Heights received involving or regarding

18 Naftali Wolf?

19    A     I don't -- I don't have an exact number.  I

20 don't know the exact number.

21    Q     I'm sure you're aware, Chief, we did a

22 public record request prior to filing on this lawsuit.

23 And we've obtained some of those.  We're going to go

24 through some of those.  We've actually produced some

25 of those in discovery.  Are you aware of anything else

1   other than -- let me back up.  Are you aware of our

2   open records request?

3        A    Yes.

4        Q    Were you involved in helping to process or

5   review that open records request?

6        A    Yes.

7        Q    Are you aware of anything other than what's

8   in that open records request, in terms of complaints

9   that you've received that may not be documented?

10       A    I'm not aware of any.

11       Q    Okay.  All right.  And we're going to go

12   through some of those today.  All right.  Carli Lewis,

13   do you know what date she began employment with the

14   City of Cleveland Heights?

15       A    I do not know as top of my head.

16       Q    Okay.  All right.  We'll certify that

17   question.  Has any discipline ever been imposed

18   against her?

19       A    Not to my knowledge.

20       Q    Okay.  Have you received any complaints

21   about her?

22       A    Other -- off the top of my head no, other

23   than the matter at hand here with Mr. Kern.

24       Q    The Kern matter, okay.  All right.  The

25   current status of both Sergeant Naftali Wolf and

1    Officer Carli Lewis is they're both actively employed

2    today with the City of Cleveland Heights; fair?

3        A    Correct.

4        Q    Okay.  Do you know what due diligence was

5    performed by the City of Cleveland Heights prior to

6    the hiring of Carli Lewis?

7        A    I do not.

8        Q    Who would know that?

9        A    The chief of police at that time.

10       Q    Was that Chief Mecklenburg?

11       A    Yeah.  That would have been Chief

12   Mecklenburg.

13       Q    Okay.  All right.  Do you have a phone

14   number for Chief Mecklenburg?

15       A    I believe so.

16       Q    I mean, she still lives in the city of

17   Cleveland Heights; right?

18       A    I don't know.

19       Q    Okay.  Is there anything that prevented you

20   from calling Chief Mecklenburg to be able to answer

21   question number -- or Topic Number 5 on our list?

22       A    No.

23       Q    Okay.  We'll certify the topic and the

24   questions related to it.  And I think we talked about

25   complaints with Carli Lewis.  The only one you're

Page 17

1    aware of is the one related to Mr. Kern?

2        A    Correct.

3        Q    Okay.  All right.  We can do the policies

4    and procedures.  And I know that you had talked about

5    that a little bit.  I'm going to hand you what's

6    previously been marked and used in this case as

7    Exhibit 1 in this case.

8                (Exhibit 1 was previously marked for

9                identification.)

10               Chief, is this the policy and procedure

11   manual that was enforced from July 1, 2022, through at

12   least October 1, 2022?  And I realize it's not all of

13   it.  I will tell you, all of it was like 800-some

14   pages.  I tried to pull the relevant parts of it that

15   I thought may have some bearing on aspects of this

16   case.

17       A    Sir, in regards to the policy, what you've

18   provided me here, I don't -- I can't say if there was

19   any changes.  Because Lexipol, you know, was in charge

20   of monitoring, making changes, updates and so forth to

21   the policy manual.  So what you're showing me here,

22   you know, the, you know, there's several policies

23   here.  Some may have been updated or changed or

24   modified from --

25       Q    What was in place --

```
 1      A    What was in place at the time.

 2      Q    Are you aware of any specific changes and

 3 differences -- and by the way, Chief, if I've looked,

 4 it looks like there's a copyright on the bottom left

 5 of 10/31/22; do you see that?

 6      A    I do.

 7      Q    Who was the police chief on 10/31/22?

 8      A    10/31/22 would have been me.

 9      Q    Okay.  That was one question I had.

10      A    Yeah.

11      Q    Because we got Mecklenburg there.  Let me

12 ask, this was produced to us in discovery, Exhibit 1.

13 Or at least, all of Exhibit 1 was actually produced to

14 us in discovery.  And frankly, I got it by way of our

15 open records request as well, which obviously occurred

16 after the incident.

17           And my firm wasn't involved until early, I

18 would say, you know, I think we got involved in May or

19 June of 2023.  And the complaint in this manner was

20 filed in July of '23 if I recall correctly.  Do you

21 know if there's been any changes to the policy and

22 procedure manual, say, between July 1 of '22, and when

23 this policy manual was first produced to us?

24      A    I don't know -- I don't know of any

25 specific -- any specific policy itself that might have
```

1    been changed or --

2         Q    Okay.  Who would know that?

3         A    That would be Captain Cinadr.

4         Q    Can you spell that, please?

5         A    Yeah.  C as in Charlie, I-N-D-R.

6         Q    C-I-N-D-R?

7         A    C-I-N-D-R, correct.  Or, or -- wait.

8    C-I-N-A-D-R, I apologize.

9         Q    Cinadr.  Okay.  And was that the first name?

10        A    Matt, Captain Matthew.

11        Q    Okay.  Is he with Cleveland Heights Police

12   Department?

13        A    Correct.

14        Q    And what is his role?

15        A    He is my patrol division captain.  Until

16   recently, he -- part of his responsibilities was --

17   works with Lexipol on changes, updates, so forth

18   regarding Lexipol.

19        Q    When did Cleveland Heights first implement

20   Lexipol?

21        A    2021 -- or no, probably prior to that.

22   Yeah, beginning of -- ending 2020, beginning of 2021,

23   maybe.

24        Q    Okay.  As I understand Lexipol, they've got

25   kind of a national presence where they provide

Page 20

1    policies, and in some cases training on policies to

2    police departments.  Would you agree with that?

3         A    Yes.

4         Q    And that's done by way of a contract with

5    the municipality?

6         A    Correct.

7         Q    Would you agree that maybe the best way to

8    figure out when that went in would be to try and

9    obtain the first contract with Lexipol between the

10   City of Cleveland Heights and Lexipol?

11        A    That would -- I would agree with that.

12        Q    Okay.  All right.  Is that something that

13   would be easy to determine?  Like, could we have you

14   make a call on a break to figure out when that was

15   first implemented?

16        A    Yep.

17             MR. BECK:  Let me just interject for

18   the record.

19             MR. WIEST:  Yeah.

20             MR. BECK:  I was just going to talk to

21   you.  I think according to Captain Cinadr, it was

22   July 21, 2021, that you began with Lexipol, according

23   to his email communication.

24             THE WITNESS:  That -- that sounds about

25   right.

1              MR. WIEST:  Okay.

2              MR. BECK:  July of 2021 --

3    BY MR. WIEST:

4        Q    And Chief, I'm not trying to beat you up.

5    I'm just trying to get the information.  And so if

6    that's the date and you agree with Captain Cinadr, I'm

7    happy to take that as the as the answer.

8        A    Yeah, that sounds -- that sounds fair.

9        Q    Okay.

10             MR. BECK:  I'm sorry -- July 29th.

11             MR. WIEST:  July 29th.

12             MR. BECK:  Yeah, you an refresh his --

13             Why don't you take a look at that note

14   and then that'll reflect that refresh your

15   recollection.

16             MR. WIEST:  Yeah.

17             MR. BECK:  And then you can answer

18   Mr. Wiest's question.

19             THE WITNESS:  Yeah.  After review of

20   Captain Cinadr's email, I would agree with July 29th.

21             MR. WIEST:  Okay.

22             MR. BECK:  2021?

23             THE WITNESS:  2021.

24             MR. BECK:  Thank you.

25             Thanks, Chris.

1    BY MR. WIEST:

2        Q    When Lexipol was implemented, what did the

3    City of Cleveland Heights do to inform its department

4    about the implementation of the Lexipol policies?

5        A    Yeah.  So I was the administrative captain

6    then under Chief Mecklenburg.  And we sent out -- I'm

7    pretty certain we sent out, maybe through emails or,

8    you know, other form of communications, that the

9    police department was in the process of, you know,

10   working with Lexipol to create our -- our current

11   policies and procedures.

12            And from -- once we completed the review and

13   we all agreed upon it, it was distributed to all

14   the -- to all the officers.  And to the best of my

15   memory, they -- we gave them a couple of months to

16   review the new policies and procedures and accept and

17   acknowledge that they -- they understood and received

18   the new policies and procedures manual.

19       Q    When you say distributed to officers, was it

20   distributed in paper form, in electronic form?

21       A    Electronic.

22       Q    And was, like, an email that was sent out to

23   the department?

24       A    I believe that's the manner it was sent out.

25       Q    Okay.  And so, was it an email where you

1    said, "We've got this new policy manual, it's, you

2    know, more than 800 pages.  Please review it when you

3    have time."  And then you made them sign off and said,

4    "Yeah, we reviewed it"?

5        A    Well, sort of.  Yeah, it was sent out -- the

6    policies and procedures is maintained electronically.

7    So there's not -- I mean, yes, do I have some like you

8    produced here.

9        Q    Right.

10       A    But it's an electronic signature you click

11   on, acknowledging that you've -- you've reviewed it

12   and understood the policies and procedures.  It

13   wasn't -- it wasn't at your convenience.  I'm pretty

14   sure we gave them a deadline; "You have to have this

15   reviewed because this is going into effect by a

16   certain date."

17       Q    Okay.  Well, that was my next question.  So

18   the manual was made available to the department prior

19   to its effective date.  And the expectation was the

20   officers would have reviewed it prior to the effective

21   date.  And then the effective date comes and then it's

22   enforced; is that correct?

23       A    Correct.  That sounds right.

24       Q    Okay.  Do you know when the effective date

25   was?  Was it July 29th?

1     A   It -- it would have been around that time.

2     Q   Okay.

3     A   It would have been.

4     Q   And so the manual would have been available

5 a month or two prior to that for officer review?

6     A   Correct.

7     Q   Was there any testing that the department

8 did to ensure that the officers had actually reviewed

9 the entirety of the manual?

10    A   Not -- not -- I would not say -- there

11 wasn't testing itself when it was implemented.  Like I

12 said, you have to -- through Lexipol, you have to sign

13 into your sign-in, if you will.  And you have to

14 read -- and there's an electronic, you know, at the

15 bottom, it reads some something along lines, "You've

16 read and understood this policy.  And by clicking

17 this, you, you know, accept."

18       So it wasn't like a -- it's not a hand

19 signature.  It's a electronic acknowledgement.

20    Q   And was that one acknowledgement for the

21 whole policy?

22    A   It was -- no.  You had -- you had a -- I'm

23 for certain -- there's for each separate policy,

24 there's a review and acknowledgement for each separate

25 policy.

1        Q     So, like, Policy 102, for instance, on page

2    18, is the Oath of Office Policy.  Are you saying

3    there would have been a separate sign off for 102?

4        A     Just by that example alone, yeah.  There

5    should have been a acceptance for -- for that policy.

6        Q     Okay.  Where have those records been

7    maintained in terms of the officer acknowledgement of

8    having received and reviewed the particular policies?

9        A     Like I mentioned, previously, Captain

10   Cinadr, you know, that was part of his responsibility.

11   So that's all kept, I don't -- I'm not a computer guy,

12   per se.  But it's all kept in the computer system.

13             So Captain Cinadr can log into the system,

14   and he can tell by officer who -- who read and

15   accepted or acknowledged, you know, a particular

16   policy.

17       Q     Was there ever the occasion where the police

18   department would do in-service training on the policy

19   manual where you sit down with the platoon or

20   whatever -- whatever division of the police it happens

21   to be, and a particular section or sections of the

22   policy would be reviewed?

23       A     We -- there's -- I don't know the specific

24   amount.  But yearly, there's mandated topics by the

25   state to be covered.  And along with that, there's

1   certain topics, if you will, in the manual that are

2   supposed to be reviewed yearly.  And you know, even

3   under Chief Mecklenburg, I know, and myself during --

4   we would incorporate certain topics into our yearly

5   training.

6         Q    Okay.  Were there records or syllabuses of

7   that training that was kept by the City of Cleveland

8   Heights?

9         A    It would have been, those -- those records,

10  I believe -- I believe Captain Cinadr might have

11  records of those.

12        Q    Okay.  All right.  Okay, I think you told me

13  Captain Cinadr would also be able to speak to changes

14  between this manual that we've got as Exhibit 1, which

15  is a portion of the whole police manual that was

16  produced to us, and what might have been enforced from

17  July 1, '22, through October 1, '22; fair?

18        A    Yes.

19        Q    Okay.  All right.  I'd love to just knock

20  that topic out.  I don't know if you can send him an

21  email and see if there were changes between this

22  version we've got as Exhibit 1 and what was enforced

23  from 7/1/22 through 10/1/22?

24             MR. BECK:  Yeah, he -- and actually, he

25  did take a question that he's asking.  Which policy

1   changes are we specifically looking for?  I mean, I

2   have your lists here.  Are they the ones that you've

3   marked in your exhibit --

4                   MR. WIEST:  Yes.

5                   MR. BECK:  -- are the ones you want me

6   to ask him about?

7                   MR. WIEST:  Yes.

8                   MR. BRUNS:  Exhibit 1.

9                   MR. WIEST:  Yeah, the ones in

10  Exhibit 1.

11                  MR. BECK:  All right.  So at a break --

12                  MR. WIEST:  Perfect.

13                  MR. BECK:  If that works, I will send

14  him a note and include those on the list and ask him

15  to follow up on that.  And hopefully, later on in the

16  day, he'll let us know.

17                  MR. WIEST:  Yeah, that would be

18  helpful.

19                  MR. BECK:  Would that work?

20                  MR. WIEST:  Yep.

21                  MR. BECK:  Thank you.

22  BY MR. WIEST:

23      Q   All right, Chief.  I'd like to go through

24  the policy manual with you with what we've got.  And

25  then we'll address any changes that Captain Cinadr may

1    identify later.

2            You've got in front of you Exhibit 1.  And

3    I've got some specific questions about it.  If you

4    don't mind getting to page 13.  And I really want to

5    look at 100.6, Constitutional Requirements.  There's a

6    policy that required, "All members shall observe and

7    comply with every person's clearly established rights

8    under the United States and Ohio constitutions."  Do

9    you see that?

10       A    I do.

11       Q    What training did the City of Cleveland

12   Heights provide on what clearly established rights

13   there were under the United States and Ohio

14   constitutions?

15       A    Of the -- off the top of my head, I can't

16   speak to what specific training.  But I -- to the best

17   of my memory going through the police academy, you

18   know, constitutional rights are covered in basic

19   police academy training and under the policies and

20   procedures manual.

21       Q    What did the City of Cleveland Heights do to

22   ensure that the officers that it was hiring had an

23   understanding of what clearly established rights were

24   in the United States Constitution?  Do you know?

25       A    Again, I can't speak to specific training

Page 29

1    other than, you know, police academy training, you

2    know, what's outlined in the policies and procedures

3    manual.

4        Q    Was there any specific training that the

5    City of Cleveland Heights had that addressed, if

6    you're aware whether or not there was clearly

7    established right to use any force if the arrest was

8    illegal?

9        A    I'm sorry, sir.  Can you repeat the

10   question?

11       Q    Yeah.  What training, if any, are you aware

12   of that the Cleveland Heights provided that no force

13   can be used to effect an illegal arrest; was there

14   any?

15       A    I'm not hearing the -- the -- to effect of

16   what kind of arrest?

17       Q    Illegal arrest?  There was an unlawful

18   arrest and unconstitutional arrest.

19                MR. BECK:  Objection.

20                Go ahead.  You can answer.

21                THE WITNESS:  Again, as stated, I -- I

22   don't know of any specific training.

23   BY MR. WIEST:

24       Q    Did the City of Cleveland Heights ever

25   provide any specific training to its officers that

1  they had to have a reasonable objective belief that a

2  crime had been committed, and thus probable cause

3  existed prior to effecting an arrest?

4      A    Again, I would refer to, you know, policies

5  and procedures, police academy training, any other

6  specific training I'm not aware of.

7      Q    Okay.  Did the City of Cleveland Heights

8  ever provide any training on the duty to intervene and

9  prevent constitutional violations by other officers?

10     A    I don't recall any specific training.

11     Q    Okay.  Did the City of Cleveland Heights

12  ever offer any specific training on the citizen's

13  clearly established first amendment right to make

14  complaints about police?

15     A    I'm sorry, can you repeat the question?

16     Q    Did the City of Cleveland Heights ever

17  provide any specific training about citizen's first

18  amendment rights to make complaints about police?

19     A    I believe that's covered under the policies

20  and procedures manual.

21     Q    Okay.  Other than what may be in the

22  manual -- and we're going to look at it later, is

23  there any other specific training that you're aware

24  of?

25     A    Not that I'm aware of.

Page 31

1       Q    Okay.  Did the City of Cleveland Heights

2   ever provide any specific training about a clearly

3   established right that citizens have not to be

4   retaliated against for making complaints against the

5   police?

6                    MR. BECK:  Objection.

7                    Go ahead.

8                    THE WITNESS:  That would -- that

9   would -- anything related to arrest is covered in the

10  policies and procedures.

11  BY MR. WIEST:

12      Q    Okay.  Did the City of Cleveland Heights

13  ever make any specific training about the clearly

14  established right not to be arrested without probable

15  cause?

16                   MR. BECK:  Objection.

17                   Go ahead.

18                   THE WITNESS:  Again, anything related

19  to that would be covered in the policies and

20  procedures.

21  BY MR. WIEST:

22      Q    Okay.  Did the City of Cleveland Heights

23  ever provide any specific training that you're aware

24  of about clearly established case law involving

25  obstruction charges under Ohio law?

1        MR. BECK:  Objection.

2        Go ahead.

3        THE WITNESS:  Not that I'm aware of.

4  BY MR. WIEST:

5    Q    Okay.  All right.  We may have some more of

6  this later.  We're going to go through the policy

7  manual.  How about in a more general manner, was it

8  ever the case that the police department was brought

9  in in a training session where maybe it was the law

10  department or someone went through and said, "Hey,

11  these are the highlights of what clearly established

12  rights are under applicable Sixth Circuit United

13  States Supreme Court case law.

14        "You guys need to make sure you're complying

15  with it."  Was that kind of training ever done?

16    A    I recall in the matter of Mr. Kern when I

17  was told or I was aware that our assistant

18  prosecutor -- or the prosecutor, rather, had done some

19  in-service training related to the topic.

20    Q    Prior to the arrest of Mr. Kern?

21    A    Correct.

22    Q    Do you know when that occurred?

23    A    I do not know, sir.

24    Q    Do you know the topics of what occurred with

25  respect to that?

1      A    Not specifically.

2      Q    Okay.  Who would know that?

3      A    I would say Captain Cinadr and/or Prosecutor

4    Roessner.

5      Q    Okay.  I don't know if you know this, Carli

6    Lewis was deposed yesterday.  And she told us that the

7    in-service training was done -- she called it "jail

8    training."

9      A    Uh-huh.

10     Q    And she said, "Hey, it's not just about

11   jails, but it's when our whole platoon comes in and

12   does some training."  Is that what you're referring to

13   as this in service training?

14     A    Now that you mentioned that, yeah.  I

15   believe Captain Cinadr has in the past arranged with

16   Prosecutor Roessner, she'll -- she'll come in if we

17   have time.  You know, I mentioned jail training's one

18   of those mandated topics.  So we incorporate to make a

19   full day or fill in time, Prosecutor Roessner would --

20   would come in and talk about certain topics.

21     Q    Okay.  But you're not certain what

22   specifically may have been presented by her to the

23   department in that regard?

24     A    Now that you mention it, I believe the topic

25   was, you know, what is obstruction or failure to

1    identify oneself.

2        Q    Do you know when that training occurred?

3        A    That -- it would have been -- it would have

4    been before the Mr. Kern incident.

5        Q    Okay.  But you don't know if it was years

6    before, months before, anything like that?

7        A    I think it was, you know, maybe five, six

8    months prior, maybe.  It could have been longer.

9        Q    When that training occurred, do you know if

10   there was any quizzing or testing that went on by the

11   City of Cleveland Heights to its officers to make sure

12   that they had appreciated the training and understood

13   it?

14       A    I'm not aware of any documentation.

15       Q    Is there any record of Officer Lewis or

16   Sergeant Wolf having attended this particular

17   training?

18       A    I believe there would have been a -- well,

19   there would have had to been a sign-in sheet, if you

20   will, to keep track of attendance.

21       Q    Okay.  Do you know what prompted the

22   particular training on failure to identify and

23   obstruction?  Were there prior incidents that the City

24   of Cleveland Heights had had with its officers in

25   those charges?

1        A    I don't recall.

2        Q    Okay.  All right.  If you turn the page to

3   15, there's the 102.3 Oath of Office as required by

4   the Ohio Constitution and ORC 3.22, 3.21.  Why is an

5   oath of office required?

6        A    Well, I mean, you know, under the guidelines

7   by the state and the ORC, you have to be a sworn in

8   law enforcement officer.

9        Q    The oath that's taken is that the officer

10  will solemnly swear or affirm that he or she will

11  support the Constitution and laws of the United States

12  of America, the Constitution and laws of the state of

13  Ohio, and the laws and ordinances of the city of

14  Cleveland Heights and to the best of their ability

15  will discharge the duties of their office; right?

16  That's what it says?

17       A    Correct.

18       Q    I know that that's required by law.  Is that

19  the only reason the city of Cleveland Heights requires

20  the officers to take that oath?

21                MR. BECK:  Objection.

22                Go ahead.  You can answer.

23                THE WITNESS:  I guess I'm not

24  understanding the question.  I mean --

25  //

1   BY MR. WIEST:

2       Q    Let me be more specific, because that was

3   one of the ground rules that I meant to go over.  If

4   you don't understand the question, you should tell me.

5   So I appreciate the clarification point.

6            Is a reason that the oath of office is

7   administered from the perspective of the City of

8   Cleveland Heights, is that they expect their officers

9   to adhere to the Constitution and laws, for instance,

10  of the United States?  And you want to make sure that

11  they do so and so you make them take an oath to do so?

12      A    Correct.

13      Q    Okay.  All right.  Would you turn the page,

14  Chief?  There's an order section.  There's actually a

15  couple of order sections in the policy and procedure

16  manual.  This is one of them.  We'll look at another

17  one later today.

18            This is 200.3.4 and 200.3.5.  The

19  expectation is that members -- that's everybody in the

20  police department -- will respond to and make a good

21  faith and reasonable effort to comply with the lawful

22  orders of their superior officers; right?  And then,

23  underneath that there's a proviso for when an order

24  may not be lawful; correct?  That's 200.3.5.

25      A    Well, this -- that specific -- I guess I'm

1    back to maybe I'm unclear about your question or --

2        Q    Okay.  You would agree 200.3.4 requires

3    members to respond to and make good faith and

4    reasonable efforts to comply with lawful orders;

5    right?

6        A    Correct.

7        Q    200.3.5 says that no member is required to

8    obey any order that outwardly appears to be in direct

9    conflict with any federal law, state law, or local

10   ordinance; right?

11       A    Correct.

12       Q    And so the expectation is if it's an

13   unlawful order, if it violates federal law, state law

14   or lawful ordinance, then the expectation is that the

15   officers will not comply with it; right?

16       A    Correct.

17       Q    And then what follows that is what happens

18   if an officer is unsure if the order is lawful.  If

19   the legality of an order is in doubt, the affected

20   member shall ask the issuing supervisor to clarify the

21   order or confer with a higher authority; right?

22       A    Correct.

23       Q    If a sergeant gives a patrol officer an

24   order that may not be lawful, is the expectation of

25   this policy that the officer will go back to the

Page 38

1    supervisor and say, "Hey, I'm not sure if this is

2    lawful"?  Or should they go to the higher authority,

3    or is it in their discretion?

4        A    Are you -- are you indicating, like, they

5    should?  Or is -- are we talking about a specific

6    scenario or --

7        Q    Well, I'm going to eventually get to a

8    specific scenario.  But I'm specifically asking about

9    200.3.5 and the general effect of how this policy

10   works.  I'm not into any specific scenario other than

11   the officer has doubt about the legality of an order.

12   Okay, that's the premise of that sentence; right?

13       A    Yeah.  If it -- if as it reads, if the

14   affected member shall ask the issuing supervisor to

15   clarify the order.

16       Q    Or confer with a higher authority?

17       A    Correct.

18       Q    One question I have is, is it for the

19   affected member to confer with a higher authority?  Or

20   is it to ask the supervisor to confer with his or her

21   supervisor?

22       A    I'm just going to -- well, I mean, as the

23   policy reads, the affected member shall ask the

24   issuing supervisor.  So it's referencing what you

25   said, if a sergeant's issuing an officer an order and

Page 39

1    there's doubt, the officer should clarify with the

2    issuing supervisors such as a sergeant.

3        Q    Okay.  And if they're still in doubt about

4    the legality of an order, is it for the officer to

5    take it to the lieutenant?  Or should they tell the

6    sergeant to take it to the lieutenant?

7        A    I understand the -- what the policies and

8    procedures read.  But, I mean, it's -- I would say

9    depending on the circumstance.

10       Q    Okay.  How is an officer on the scene to

11   determine what the expectation is in terms of the

12   circumstance?  Has there been any training on that

13   particular issue by the City?

14       A    I don't recall anything -- any specific

15   training.

16       Q    One of the things that came up in

17   yesterday's deposition as we were talking with Officer

18   Lewis and the handling of Mr. Kern was that -- and I'm

19   sure you've seen the video.  There's this discussion

20   about, as she's writing the citation, that Mr. Kern

21   can challenge it in court, can go see the prosecutor.

22   There's this apology that she's issuing about having

23   to do this because she's been ordered to do it.

24            And I asked her, I said, "Was there anything

25   that kept you from going to Lieutenant?"  And what she

Page 40

1    said is, "I couldn't have called the lieutenant out

2    because the lieutenant was at the station monitoring

3    the jail."

4              If a supervisor is needed on the scene, how

5    do you get jail coverage in that instance?

6                   MR. BECK:  Objection.

7                   Go ahead.

8                   THE WITNESS:  Just under that scenario,

9    I mean, if, you know, another supervisor was needed at

10   the scene, you know, there would have to be an

11   arrangement for it or figure something out.

12   BY MR. WIEST:

13       Q    Okay.  There's no standing policy to address

14   that?

15       A    I don't believe so, no.

16       Q    Okay.  Would you agree that the duties under

17   200.3.5, they're mandatory?  In other words, if the

18   member doubts the legality of an order, the onus is on

19   the member to ask the supervisor to either clarify it

20   or to confer with a higher authority?

21                   MR. BECK:  Objection.

22                   Go ahead.

23                   THE WITNESS:  Well, I would say as it

24   reads, the affected member shall ask the issuing

25   supervisor to clarify the order.

1  BY MR. WIEST:

2      Q    And "shall ask" imposes a mandatory duty;

3  right?

4      A    Correct.

5      Q    Okay.  All right, next page, this is 203.2.

6  This is on the training policy.  And it's got -- 203.2

7  says, "The department shall administer a training

8  program that will meet the standards of federal,

9  state, local and Ohio police officer training academy

10  training requirements."

11          What federal requirements are there -- I'm

12  aware of OPOTA and the state requirements.  What

13  federal requirements are there on the department?

14      A    Sure.  Off the top of my head I don't know

15  any -- I don't know, you know, the specific training

16  requirements at the federal level.

17      Q    203.4 says, "The chief of police or his

18  designee will be responsible for developing or

19  reviewing, updating, and maintaining the departmental

20  training plan so that required training is completed.

21  The chief of police or his designee should review the

22  training plan annually."  Let me ask, is there a

23  training plan for the department?

24      A    Well, I mean, is there -- are you talking

25  about, is there a plan in place I develop at the

1  beginning of the year?  Or is there outlined training

2  for the year?

3      Q    Well, all I know is what's in the plan.  I'm

4  asking, under 203.4, it says they'll be "developing,

5  reviewing, updating and maintaining the department

6  training plan so that required training is completed."

7  And I'm asking what that training plan is.

8          I mean, the follow up was going to be -- I

9  had some follow-up questions on it.  How often is it

10  updated and all that.  But I just want to know, is

11  there a training plan to begin with?

12     A    There's not a -- I would say there's not a

13  written out formal training plan other than, you know,

14  Captain Cinadr and I, you know, usually at the

15  beginning of the year, we meet, discuss, you know,

16  what -- what training that we have to do this year.

17  And we -- we work together, and we -- we come up with

18  a training plan depending on schedules, who's

19  available --

20     Q    How do you determine what training you have

21  to do in a year?

22     A    Some of it's outlined in the -- in the

23  training -- or in the policies and procedures.  And

24  other's mandated by the state for the jail training.

25     Q    Okay.  Is there a record where you guys,

1    like, keep your training list?  Even if it's your

2    notes of a meeting that you may have with Captain

3    Cinadr, is there any written record of the development

4    of each year's training?

5        A    I don't have one specifically.  I don't know

6    if Captain Cinadr may have a list, I don't know.

7                   MR. BECK:  Are you asking for that?

8                   MR. WIEST:  I mean, I know it would be

9    probably within the scope of the existing request for

10   production.  I can identify which ones on a break.

11   But, you know, the short answer is yes.  At least for

12   22, because it deals with the training for the year.

13                  MR. BECK:  Okay, because I'm trying to

14   make a list here of the things.

15                  MR. WIEST:  Yeah, okay.

16   BY MR. WIEST:

17       Q    Yeah, if you look at 203.2, it says that "It

18   is a priority of this department to provide continuing

19   education and training for the professional growth and

20   development of its members."  How does the department

21   fulfill that priority?

22       A    As I indicated previously, you know, each

23   year, Captain Cinadr and I discuss topics we want

24   covered in addition to what's mandated.

25       Q    Okay.  203.6 has the daily training

1    bulletins.  Chief, as I understand it, Lexipol puts

2    out bulletins every day on something; right?  On some

3    topic, it depends, it varies; correct?

4         A    Correct.

5         Q    And then let me ask this, does Cleveland

6    Heights require its officers to complete those every

7    day?

8         A    To the best of my memory, sir, it's not

9    completed every day.  I believe you have a timeframe

10   to complete those daily training bulletins.

11        Q    So one question I had, for instance, is, as

12   I understand it, officers aren't working every single

13   calendar day; right?

14        A    Correct.

15        Q    The schedule is such that I think we learned

16   yesterday, there's 3 twelves and an eight; right?  Or

17   maybe it's -- I know it ends up being 80 hours over

18   two weeks.  But my math may be off.  Is the

19   expectation that the DTBs, the daily training

20   bulletins, be completed when officers are on shift?

21        A    Correct.

22        Q    And so if they're not on that day, there's

23   not an expectation that they complete at least that

24   day, the training bulletins; correct?

25        A    Correct.  No, we don't require them to do

Page 45

```
 1   off duty.
 2        Q     And so when they come back on duty, do they
 3   then have to make up the ones that had been put out
 4   for the days when they were off duty?
 5        A     Correct.
 6        Q     Okay.  So if they are seven in a day and
 7   they work three days, they'll make up all seven while
 8   they're on shift?
 9        A     Correct.
10        Q     Okay.  Has there been any adjustment of the
11   DTBs by the academy commander?
12        A     The academy commander's not -- that's always
13   been Captain Cinadr and I.
14        Q     Okay.
15        A     We -- well, let me back up.  I want to
16   clarify.  Are you talking about -- is the academy
17   commander and -- the daily training bulletins?  Or --
18   we don't have, to the best of my knowledge, I'm pretty
19   certain that Lexipol produces the daily training
20   bulletins.  So we're not involved in --
21        Q     The substance; right?
22        A     Correct.
23        Q     Yeah.
24        A     So I would say no, the academy commander is
25   not part of that process.
```

Page 46

1      Q    Well, I'm looking at -- if you look at page

2  27, under 203.6, it says, "However, the number of DTBs

3  may be adjusted by the academy commander."

4      A    Correct.

5      Q    And I was wondering, has there been any

6  adjustment by the academy commander of the number of

7  DTBs, per that section of the policy?

8      A    Not that I -- not that I am aware of.

9      Q    Okay.  Do you know what the substance of the

10  DTBs has been in terms of, have there been any

11  addressing constitutional rights, are you aware of?

12      A    Not that I'm immediately aware of.

13      Q    Are the DTBs -- because Lexipol is a

14  national operation.  They provide manual and support

15  to police departments all over the country; correct?

16      A    Correct.

17      Q    Are the DTBs specific to Ohio law?  Or are

18  they put out nationally, effectively, for police

19  departments, do you know?

20      A    Well, I would say, you know, based upon, my

21  you know, because I -- based on my knowledge,

22  they're -- the DTBs are relevant to our -- our city of

23  Cleveland Heights.  Not unless it's relevant to you

24  know, Ohio, you know, state law or federal law.

25      Q    Okay.  Are DTBs then generally a review of

Page 47

1    some portion of the policy manual?

2         A    Repeat the question, please?

3         Q    So your testimony was the DTBs are specific

4    Cleveland Heights; right?  And my question is, are the

5    DTBs, then, specific to the policy manual?  Is that

6    what they cover, or do they cover more than the policy

7    manual?

8         A    It should be primarily to the policy manual.

9         Q    Okay.  Okay.  I think that answers what I

10   needed on that.  Let's look at 300, it starts at page

11   37.  This is the use of force policy.  And

12   specifically, I want to look at the use of force at

13   300.3, it's on page 38.

14             "Officers shall use only that amount of

15   force that reasonably appears necessary, given the

16   facts and circumstances perceived by the officer at

17   the time of the event to accomplish a legitimate law

18   enforcement purpose."  Correct?

19        A    Correct.

20        Q    The premise is, first of all, prior to using

21   force, there has to be a legitimate law enforcement

22   purpose; right?

23        A    To use of force?

24        Q    Yes, sir.

25        A    Could you clarify?  Because when you talk

1  about law enforcement purposes, are you talking about

2  in your duties as a law enforcement officer?

3      Q    I am.

4      A    I would say -- I would say yes.

5      Q    For instance, gratuitous force, you know,

6  striking a citizen because you're mad at him when the

7  there's no legitimate law enforcement purpose, I mean,

8  that's not going to be a valid use of force; right?

9      A    No.

10     Q    Okay.  The premise of any force is there's

11 got to be a legitimate law enforcement purpose;

12 correct?  To effect a lawful arrest, for instance, to

13 overcome resistance, perhaps.  I mean, that's the

14 premise of the use of force; correct?

15     A    Correct.

16     Q    Has there been any specific use of force

17 training that's been given to the City of Cleveland

18 Heights department other than what's in the policy

19 manual?

20     A    As I indicated before, I'm pretty certain

21 the use of force topic, we cover that yearly.  And as

22 I mentioned earlier, that during our mandated

23 training, we've always made it a priority topic to

24 include in our training.

25     Q    Okay.  There's a duty to intercede and

1   report at 300.2.1.  Do you see that right above 300.3?

2        A    I do.

3        Q    And there's a duty that appears under that

4   section to intercede when the officer is in a position

5   to do so to prevent the use of unreasonable force.  Do

6   you see that?

7        A    I do.

8        Q    Would you agree that no force can be used to

9   effect an arrest if there's no probable cause for the

10  arrest?

11                MR. BECK:  Objection.

12                Go ahead.

13                THE WITNESS:  Say that one more time,

14  sir?

15  BY MR. WIEST:

16       Q    That no force can be used in effecting an

17  arrest if there's no probable cause for the arrest?

18                MR. BECK:  Objection.

19                Go ahead.

20                MR. KASSON:  Objection.  Form.

21                THE WITNESS:  I guess, can you rephrase

22  the question?  I mean --

23  BY MR. WIEST:

24       Q    Sure, I'll do it this way.  How much force

25  is reasonable to effect an arrest if there's no

1    probable cause for the arrest?

2                    MR. BECK:  Objection.

3                    Go ahead.

4                    THE WITNESS:  Well, I mean, just by

5    those words alone, you can't make an arrest if there

6    is no probable cause.

7    BY MR. WIEST:

8         Q    Okay.  Because it would then be an illegal

9    arrest; correct, Chief?

10                   MR. BECK:  Objection.

11                   Go ahead.

12                   THE WITNESS:  Under that scenario, what

13   you're describing, yeah.  That would be.

14   BY MR. WIEST:

15        Q    And in fact, we look at some of that on the

16   next page, 300.3.2.  "Any officer has reasonable cause

17   to believe that the person to be arrested has

18   committed a crime or public offense may use reasonable

19   force to effect the arrest to prevent escape or to

20   overcome resistance;" right?

21        A    Correct.

22        Q    And the premise of that entire use of force

23   is there has to be reasonable cause to believe that

24   the person to be arrested has committed a crime or

25   public offense; right?

1          MR. BECK:  Objection.

2          Go ahead.

3          THE WITNESS:  Correct.

4  BY MR. WIEST:

5     Q    Okay.  300.6, it's at page 42.  "This policy

6  requires that once it's reasonably safe to do so,

7  medical assistance shall be obtained for any person

8  who exhibits signs of physical distress, has sustained

9  visible injury, expresses a complaint of injury or

10  continuing pain, or was rendered unconscious;" right?

11     A    Yes.

12     Q    And then "Any individual exhibiting signs of

13  physical distress after an encounter should be

14  continuously monitored until the individual can be

15  medically assessed;" right?

16     A    Correct.

17     Q    Who makes the medical assessment under this

18  policy?

19     A    Well, I mean, if, you know, based on -- on

20  the policy here, if you know, obviously, if there's

21  someone if there's a visible -- obvious visible injury

22  to somebody and/or someone complains of injury or

23  requesting medical assistance, then the paramedics

24  are -- are summoned.

25     Q    Okay.  So it's not the officer making the

Page 52

1    medical assessment; it's paramedics, EMS, maybe a

2    hospital?

3         A    Correct.

4         Q    Okay.  All right.  302, it starts on page

5    49.  You would agree with me that 302 covers handcuffs

6    and other restraints; correct?

7         A    Correct.

8         Q    302.1 specifically says it's guidelines for

9    the use of handcuffs and other restraints during

10   detentions and arrests; correct?

11        A    Correct.

12        Q    302.3 says, "Only members who have

13   successfully completed Cleveland Heights Police

14   Department approved training on the use of restraint

15   devices described in this policy are authorized to use

16   these devices."  Do you see that?

17        A    Yes.

18        Q    What is the Cleveland Heights Police

19   Department approved training, or is there multiple

20   forms of training?

21        A    Well, there's -- I'm aware of various

22   companies that do training on this topic.  But, you

23   know, that are approved by the Cleveland Heights

24   police department in the academy.

25        Q    Okay.  Well, one of my questions was with

1    respect to 302.3, is that just what is taught in the

2    academy?  Or is there more that the City of Cleveland

3    Heights requires in terms of the use of restraints?

4         A    Well, I know there's officers in the

5    department who are subject control officers that teach

6    in the academy, and they have specialized training.

7         Q    Okay.  Is that taught in-house?

8         A    To the best of my memory, I -- those are

9    specialized topics taught through OPOTA, through the

10   state.  So you have to have specialized -- to the best

11   of my memory, sir, you have to have the specialized

12   training through OPOTA to be an instructor.  And you

13   have to have specialized training to -- I think that's

14   one of those topics, use of force, subject control.

15   That's an additional segment of training for the

16   specialized topic.

17        Q    Is that required for all members of the

18   department to have that specialized training?

19        A    To be -- no, it's not.

20        Q    Okay.  Everyone in the department has had,

21   I'm assuming -- you tell me if this is true --

22   training at least on the use of handcuffs; fair?

23        A    Yes.

24        Q    And is that just what is taught in the

25   police academy?  Or is there additional training

1  beyond that?

2      A    No, we do that, if I remember correctly,

3  just not -- yeah, just not too long ago, within the

4  past -- this year, I would say we had in-service

5  training to cover, you know, use of force, subject

6  control.

7      Q    Is that for every member of the department?

8      A    Correct.

9      Q    Was there any of that training that occurred

10  in service prior to September 22, 2022?

11      A    I -- I recall receiving, you know, similar

12  training, you know, in the past.  But I couldn't tell

13  you -- tell you when.

14      Q    Okay.  Would there be records of that that

15  would be kept by the department?

16      A    Yes.

17      Q    Who would maintain those records?

18      A    Either -- well, it would depend on how far

19  back.  But those should be at the -- at the academy

20  command, down at the police academy who maintains the,

21  you know, the training record.

22      Q    Who is that right now?

23      A    Right now it's Sergeant Lasker.

24      Q    Okay.  All right.  302.3.1 permits the

25  restraint of detainees; correct?

```
 1      A    I'm sorry, which policy?

 2      Q    302.3.1?

 3      A    302.3 --

 4      Q    It's --

 5      A    Yep, I got you.

 6      Q    It does permit the detention of -- or I'm

 7   sorry, the restraint of detainees; correct?

 8      A    Correct.

 9      Q    And you could tell me if this is the case.

10   That is allowed only for as long as is reasonably

11   necessary to assure the safety of officers and others;

12   correct?

13      A    Correct.

14      Q    And as I understand that policy, and you can

15   tell me if this is your understanding of it.  That

16   would require in the first instance to implement that

17   restraint, some issue of either officer safety or

18   safety to others; would you agree?

19                 MR. BECK:  Objection.

20                 Go ahead.

21                 THE WITNESS:  Can you repeat that

22   again?

23   BY MR. WIEST:

24      Q    Yeah.  To restrain an individual who's not

25   being placed under arrest, a detainee, that -- as a
```

Page 56

1   predicate to do that, there has to be some issue

2   that's presented that creates either a safety issue

3   for officers or a safety issue for others.  Do you

4   agree that that's what the policy indicates?

5                   MR. BECK:  Objection.

6                   Go ahead.

7                   THE WITNESS:  Yes.

8   BY MR. WIEST:

9       Q    Okay.  All right.  Let's look at 302.4.

10  Would you agree that 302.4 indicates that handcuffs,

11  including temporary nylon or plastic cuffs, may be

12  used only to restrain a person's hands to ensure

13  officer safety?

14      A    That -- I would not -- in its entirety, no,

15  I would not agree entirely with that.  I mean, that's

16  part of the reason to handcuff or use plastic or --

17  nylon or plastic cuffs.

18      Q    Okay.  Would you agree that that's how the

19  302.4 policy begins?  It says, "Handcuffs, including

20  temporary nylon or plastic cuffs, may be used only to

21  restrain a person's hands to ensure officer safety?"

22      A    I would agree with that.

23      Q    Okay.  And then the next page indicates that

24  "Although recommended for most arrest situations,

25  handcuffing is discretionary and not an absolute

1    requirement of the department;" correct?

2        A    Correct.

3        Q    It says, "Officers should consider

4    handcuffing any person they reasonably believe

5    warrants that degree of restraint;" right?

6        A    That's what it reads.

7        Q    And then it says, "However, officers should

8    not conclude that in order to avoid risk, every person

9    should be handcuffed regardless of circumstances;"

10   right?

11       A    Correct.

12       Q    It says, "In most situations, handcuffs

13   should be applied with the hands behind the person's

14   back;" correct?

15       A    Correct.

16       Q    There is discretion, though, to handcuff in

17   the front; right?

18       A    Correct.

19       Q    When would it be appropriate under

20   department policy to handcuff in the front?

21       A    You know, as outlined in the policy, if

22   there's, you know, discomfort to a person's size, or

23   maybe a person only has one arm or some other

24   physical, you know -- anything else that might, like,

25   cause injury or -- by handcuffing someone in the back.

1      Q    Okay.  Has the department received

2  complaints about handcuffing individuals in the back

3  other than Mr. Kern?

4      A    I don't know off the top of my head.

5      Q    Do you recall any such complaints that

6  you've received --

7      A    I don't recall any.

8      Q    Okay.  The policy ends -- the last sentence

9  of the policy says, "Handcuffs should be removed as

10  soon as it is reasonable or after the person has been

11  searched and is safely confined within a detention

12  facility;" correct?

13      A    Correct.

14      Q    Okay.  All right.  Let's go to policy 319,

15  it begins on page 154.

16              THE WITNESS:  If I may interrupt here.

17  Is there a lot of questions in this section?  I think

18  I'm due for a break.

19              MR. WIEST:  Chief, I told you at the

20  beginning we could take a break whenever you want.  We

21  can do it now.

22              THE WITNESS:  I think I'm at that

23  point, yep.

24              THE REPORTER:  Watch your microphone.

25              Okay.  We're going off record now at

 1   10:17 a.m.

 2                    (Off the record.)

 3                    THE REPORTER:  We are back on record at

 4   10:30 a.m.

 5   BY MR. WIEST:

 6        Q    Alright, Chief, you've got in front of you

 7   Exhibit 1.  You might want to look at 319, starting on

 8   page 154 of the policy manual.  This is the Standards

 9   of Conduct aspect of the policy manual; correct?

10        A    Correct.

11        Q    We looked at this before in another

12   iteration earlier in the manual.  But 319.3.1 and

13   319.3 covers lawful directions and orders from

14   supervisors and unlawful orders.  And we've already

15   talked about that in the prior section; correct?  I

16   mean, it's the same language?

17        A    Correct.

18        Q    Okay.  All right.  319.5.3 and 156 --

19        A    I'm sorry, 319 --

20        Q    319.5.3, it's on page 156.

21        A    Okay.  319.5.3, okay.

22        Q    Okay.  There is a policy against

23   discrimination; correct?  It says, "Unless required by

24   law or policy, discriminating against, opressing, or

25   providing favoritism any person because of actual or

Page 60

1    perceived characteristics such as race, ethnicity,

2    national origin, religion, sex, sexual orientation,

3    gender identity or expression, age, disability,

4    economic status, cultural group, veteran status,

5    marital status, and any other classification or status

6    protected by law, or intentionally denying or impeding

7    another and the exercise and enjoyment of any right

8    privilege, power or immunity knowing the conduct is

9    unlawful" -- that's prohibited by the manual; correct?

10        A    Correct.

11        Q    Okay.  Have you ever charged an officer with

12   a violation of 319.5.3?

13        A    No.

14        Q    Okay.  There's Performance Standards,

15   319.5.8.  And my first question is, A, says, "The

16   failure to disclose or misrepresent any material facts

17   or making any false or misleading statement on any

18   application, examination, form or other official

19   document, report, or form or during the course of any

20   work-related investigation" -- that's prohibited by

21   that section; right?

22        A    Correct.

23        Q    Does that include standard police reports?

24   Does that section prohibit false or misleading

25   statements on police reports?

Page 61

```
 1      A     Sorry, let me --

 2            Correct.

 3      Q     Okay.  Does it include criminal charges,

 4  making false or misleading statements on any criminal

 5  charge?

 6      A     Correct.

 7      Q     Okay.  319.5.9, it starts on the bottom of

 8  158, it runs into 159.  Does subsection C, "Exceeding

 9  lawful police officer powers by unreasonable unlawful

10  or excessive conduct," does that include charging or

11  arresting someone without probable cause?

12                  MR. BECK:  Objection.

13      A     That was, I'm sorry, letter which?

14      Q     C, "Exceeding lawful police officer powers

15  by unreasonable, unlawful, or excessive conduct."

16      A     That would be a violation of the policy.

17      Q     Okay.  F, is "Discourteous, disrespectful,

18  or discriminatory treatment of any member of the

19  public or any members -- or any member of the

20  department or the city."  Does that include the use of

21  profanity by officers?

22      A     Yes.

23      Q     Okay.  And then B, we talked about

24  unreasonable and unwarranted force before; right?

25      A     Correct.
```

Page 62

1      Q    Okay.  Would telling a citizen -- if a
2  citizen asked if they're under arrest and an officer
3  were to respond, "Do you want to be," is that
4  discourteous, disrespectful, or discriminatory
5  treatment?
6                  MR. BECK:  Objection.
7                  Go ahead.
8                  THE WITNESS:  That -- I don't know how
9  to answer that.  I mean, that's -- your -- it's, you
10  say, "could be."  I mean, yeah, it could be.
11                  But just by it alone, I wouldn't, you
12  know -- without any other, you know, facts or evidence
13  to, surrounding that.
14  BY MR. WIEST:
15      Q    Okay.  You would need more context is what
16  you're telling me?
17      A    Thank you, correct.
18      Q    Okay.  Okay, 321, is Police Reporting.  By
19  the way, Chief, I know we looked at the false or
20  misleading statements.  Would that include false or
21  misleading statements that officers make to internal
22  affairs in an investigation?  Would that be prohibited
23  by that section as well?
24      A    Correct.
25      Q    Okay.  Or to a member of the public -- would

1  false or misleading statements be  -- well, let me

2  look and go back.  No, strike that.

3        Report Preparation.  Report preparation is

4  in -- this is 320.1.  "Report preparation is a major

5  part of each employee's job."  Do you agree with that?

6        A    I would.

7        Q    "The purpose of reports is to document

8  sufficient information to refresh the employee's

9  memory and to provide sufficient information for

10  follow-up investigation and successful proper

11  prosecution;" is that correct?

12        A    Yes.

13        Q    Okay.  It says, "Report writing is the

14  subject of substantial formal and on the job

15  training."  What formal training is provided on report

16  writing?

17        A    During the police academy.

18        Q    Okay.  Is there any training that follows

19  that the City of Cleveland Heights has provided

20  specifically with respect to report writing?

21        A    There possibly could be something in the

22  DTBs, you know, through Lexipol.  But I -- I don't

23  have a knowledge of any mandated or formal training

24  that we provide for report writing.

25        Q    Okay.  321.1.1 governs report preparation.

1    And it begins with, "Employees should ensure that

2    their reports are sufficiently detailed for their

3    purpose and reasonably free of errors prior to

4    submission."

5            And then, at the very bottom, I just wanted

6    to look at the bottom paragraph in that section.  "All

7    reports shall accurately reflect the identity of the

8    persons involved, witnesses, all pertinent information

9    seen heard or assimilated by any other sense, and any

10   actions taken.  Employee shall not suppress, conceal

11   or distort the facts of any reported incident, nor

12   shall any employee make a false report orally or in

13   writing.

14           "Generally, the reporting employee's opinion

15   should not be included in reports unless specifically

16   identified as such."  That's the policy of 321.1.1;

17   correct?

18       A    Correct.

19       Q    Is the expectation that every material fact

20   of an incident should be contained within a police

21   report?

22               MR. BECK:  Objection.

23               Go ahead.

24               THE WITNESS:  Yes, it should be.

25   //

1   BY MR. WIEST:

2        Q    Because of the volume of work that the

3   department has, it would be difficult to recall

4   specific incidents without the use of police reports

5   generally?  And I'm not suggesting every incident,

6   right.  There might be an officer-involved shooting

7   sticks in people's minds because it's material.  I'm

8   talking about more run of the mill incidents; right?

9   Traffic stops, for instance, there's a lot of those?

10       A    Correct.

11       Q    And the way that officers make sure that

12  they can recall what happened is they put it in their

13  reports; correct?

14       A    Or a document, correct.  Or are documented

15  on a traffic citation.

16       Q    On the citation itself?

17       A    Correct.

18       Q    Right.  And that would include, for

19  instance, in a charge, making sure that you've got all

20  the facts that support the elements of the crime

21  within the citation or the police report; correct?

22       A    Correct.

23       Q    Okay.  Has that ever been communicated other

24  than by way of policy manual to the department?  Has

25  there been any other training on that?

1       A     I don't recall specifically.

2       Q     Okay.  Let me ask this about reports and

3  criminal citations.  Has the department ever provided

4  training to Cleveland Heights officers that minor

5  misdemeanors are in fact crimes?

6       A     I'm sorry, repeat that?

7       Q     Has the department ever provided training to

8  its officers that minor misdemeanors are crimes?

9       A     I don't recall any specific type of

10  training.

11       Q     Was that covered in the police academy?

12       A     I can't say for sure, but I would imagine it

13  would be.

14       Q     How about traffic offenses?  Are those

15  crimes?

16       A     Traffic offenses, yes.

17       Q     Has that training been given to Cleveland

18  Heights officers?

19       A     Yes.

20       Q     Okay.  And you would expect them to know

21  that; right?

22       A     Correct.

23       Q     Okay.  I want to look at 336.  And we may

24  just be able to skip over this if you tell me what I

25  think you're going to tell me about this.  It starts

Page 67

1    on page 215, on the bottom right.

2        A    Okay.

3        Q    This is public safety video surveillance

4    systems.  Is that like the pole-mounted cameras in

5    certain areas of the city?

6        A    Yes.

7        Q    Are there any such cameras in the city of

8    Cleveland Heights?

9        A    Yes.

10       Q    Okay.  Are there any such cameras in the

11   area of Mayfield Road or in around that vicinity where

12   the current incident occurred?

13       A    I don't believe so, no.

14       Q    Okay.  All right.  336 does not cover the

15   in-car cameras or the body-worn cameras?  Those are

16   separate sections of the policy; right?

17       A    Correct.

18       Q    Okay.  That's all I needed from that.  All

19   right.  401 is bias-based policing.

20       A    What page are you at?  Sorry.

21       Q    249.  Other than what's in this manual, has

22   there been any specific training that's been provided

23   by the City of Cleveland Heights on bias-based

24   policing?

25       A    Yes.

1      Q    What has been provided in that regard?

2      A    It would have been -- I don't remember the

3  year, sir.  But you know, a couple of years ago we

4  partnered with Cleveland State University.  And I

5  forget the main instructor's name, but we all attended

6  a eight-hour session.  Topic include bias-based

7  policing, cultural sensitivity.

8      Q    Let me ask about the timing of that

9  training.  Was it prior to September 22nd of 2022?

10      A    Correct.

11      Q    Was it in the aftermath of, for instance,

12  the George Floyd incident?

13      A    Yes.

14      Q    And I suppose it might have been in reaction

15  to that, just to make sure that there was training?

16      A    If I remember correctly, yes.  It was after

17  the George Floyd incident.  And there was a -- when

18  Chief Mecklenburg was here, there was -- I'm not sure

19  the specific -- I know there was a, you know, a

20  request by the department to do training covering this

21  topic of bias-based policing, cultural sensitivity.

22      Q    Do you remember anything beyond the general

23  subject matter from that training?  Any takeaways from

24  the training?

25      A    The specific context?

1       Q      Yes, sir.

2       A      Not specifically, sir.

3       Q      Okay.  Was there any testing that occurred

4    after the training?

5       A      I don't recall.

6       Q      Okay.  All right.  Does the department

7    conduct any analysis of its officers and the citations

8    they write with respect to race to see if there's a

9    disparate pattern for any of the officers and their

10   policing activities with respect to race?

11      A      Could you be more specific?  Do I --

12      Q      Yeah.  Is there statistical analysis that

13   has ever occurred within the department to see if any

14   officers are disproportionately, you know, citing or

15   having incidents with respect to racial issues with

16   defendants?

17      A      Not that I'm aware of done by the police

18   department.

19      Q      Okay.  Is that data available?

20      A      I believe so.  I know over the past --

21   course of the past couple of years, the -- I forget

22   the name of the -- name of the group.  But we're

23   compliant with HAL [ph] Collaborative.  And I believe

24   part of that is that we -- we collect that data.  But

25   that's all, you know, stored in the computer.  So

Page 70

1    there's certain criteria we have to keep track of.

2         Q    Okay.  And I understand it may be a

3    significant undertaking to perform that kind of

4    analysis, and that might be why it's not been done.

5    Is that the case?  To see if there's a

6    disproportionate pattern from any Cleveland Heights

7    officers with respect to race?

8         A    I guess I'm not sure what you're asking, I

9    mean --

10        Q    Yeah.  I mean, it'd be a resource issue;

11   right?  To go and do that kind of data analysis to see

12   if any officers' citation patterns, for instance, are

13   disproportionate with respect to particular racial

14   groups?

15        A    Yeah.  I believe it would be a huge, you

16   know, a big project.

17        Q    Right.  All right.  I'm going to talk about

18   421 with you.

19        A    Policy 421?

20        Q    Yes, sir, policy 421.  It begins --

21   actually, I've got one other question, I think, before

22   that just real quick.  Yeah, 420, real quick, at 305.

23        A    Okay, yep.

24        Q    Okay.  There is a shift lieutenant generally

25   that's in charge of every shift within the department;

1    correct?

2         A    Correct.

3         Q    And as I understand the testimony yesterday,

4    I'd like you to confirm it or deny it.  The shifts

5    generally run in 12-hour shifts; correct?

6         A    Correct.  The primary patrol shifts do, yes.

7         Q    I know you've had some overlap to make sure

8    that during shift change, you're not without coverage;

9    right?

10        A    Correct.

11        Q    And I suppose, though, the primary shifts is

12   where you've got the lieutenants; right?  And so

13   you've got a lieutenant on nights and a lieutenant on

14   days effectively; fair?

15        A    Yeah.  There's a lieutenant on each -- each

16   shift.  So there's four shifts.  So there's a

17   lieutenant on each of the four platoons.

18        Q    Okay.  And they're available, ultimately,

19   to -- if an issue arises within the shift, for

20   officers to be able to escalate things to; correct?

21        A    To be able to do what?

22        Q    Escalate things to?  In other words, if

23   something's going on, you know -- go up the chain.

24   There's somebody on to answer questions within the

25   chain of command?

Page 72

1      A     Correct.

2      Q     Who do the lieutenants report to, the patrol

3   captain?

4      A     Correct.

5      Q     And then the patrol captain reports to you?

6      A     Correct.

7      Q     I suppose, Chief, the patrol captain is also

8   available after hours if necessary to take a call;

9   fair?

10      A     I would say Captain Cinadr's an exceptional

11   captain, and yes, does make himself available.

12      Q     Right.  And if it came to it, for instance,

13   serious incidents, officer-involved shooting --

14   something serious, Chief, you're also available;

15   right?

16      A     Correct.

17      Q     Okay.  All right.  Let's look at 421.  421

18   covers the in-camera cars; would you agree?

19      A     Yes.

20      Q     And my understanding is that there's a

21   number of cars that are maintained and used by the

22   city of Cleveland Heights, police cars that do not

23   have cameras; correct?

24      A     Yeah.  The majority -- a majority of the

25   cars do not have functioning dash cameras.

1     Q     And was that always the case?

2     A     No.

3     Q     When did that become the case?

4     A     Probably the past couple of years.

5     Q     And why is that?

6     A     To the best of my knowledge, the -- the dash

7  camera systems are old and outdated.  And you know,

8  the updates aren't available.  You know, technical --

9  so there's a couple of reasons.

10     Q     Does that really come down to a resource

11  issue?  I mean, do you guys need more funding to

12  update those?  Is that the crux of it?

13     A     Yeah, I would say, you know, budgetary and

14  resources.

15     Q     Chief, I am assuming, and I want you to

16  confirm or deny this.  Is it the case that you as the

17  chief of police are involved with helping to prepare

18  the yearly budget that goes to the city council for

19  the police department?

20     A     Yes.

21     Q     And can you tell me how that works?  Does

22  that -- and I realize there was a charter change and

23  now the city's got a strong mayor; right?

24     A     Correct.

25     Q     Do you prepare the first draft of that

1    budget?  Or how is that -- since Mayor Seren has taken

2    office, or the strong mayor has been implemented, how

3    has the budget been developed?

4         A    What we do is -- or what I have done in --

5    so last year -- well, let me back up.

6              I believe -- so I just for timeframe, I took

7    oath as chief, October -- or April 1, 2022.  And I

8    believe Chief Mecklenburg already had the budget done

9    for 2022.  So last year, you know, towards the end of

10   the year for this year, I -- was my first time being

11   involved in it.  And reviewing -- you know, I had the

12   budget from last year.  And so I was kind of working

13   off last year's budget to prepare for this year's

14   budget.

15        Q    And then when you were done with it, did it

16   go to the city administrator or the mayor or council?

17        A    I don't recall.  But yeah, I believe, to the

18   best of my memory, I believe we -- we had a -- if I

19   remember correctly, there was actually a sit-down

20   session with the mayor to go over budget requests.

21        Q    Okay.  Since you've been chief, have you

22   ever made a request for MVR improvements that have not

23   been approved by someone up the chain, whether it's

24   the mayor, administrator, or city council?

25        A    I will tell you it was during -- yeah.  In

1    preparation for this year's budget, last year was

2    the -- the introduction of providing funds to the

3    police department to get dash camera videos in the new

4    police cars.  It was actually introduced or suggested

5    by city council.

6         Q    It was something the council wanted to do?

7         A    Correct.

8         Q    And they saw the value in that for the

9    reason that we all see values in cameras in incidents;

10   correct?

11        A    Correct.

12        Q    Which is, it helps protect officers against

13   false accusations; right?  That's one benefit of

14   cameras; right?  Because you've got no "he-said, she-

15   said."  You've got a camera; correct?

16        A    Correct.

17        Q    It also helps hold officers accountable if

18   they commit misconduct; correct?

19        A    Correct.

20        Q    And in all events, it helps improve

21   transparency to the public about what is occurring;

22   would you agree?

23        A    Correct.

24        Q    Okay.  Has that been a priority of council

25   prior to this year?

Page 76

1      A     I can't say for sure.

2      Q     Okay.  Because prior to you becoming chief,

3  you were the administrative captain; right?

4      A     Correct.

5      Q     You were kind of the number two in the

6  department; correct?

7      A     Correct.

8      Q     Did Chief Mecklenburg involve you at all in

9  the budget preparations to sort of allow you to have

10  some OJT prior to taking the chief position?

11      A     No, not really.  No.

12      Q     Just threw you into it?

13      A     Yes, pretty much.

14      Q     Okay.  Did you know that she was going to

15  retire?

16      A     Yes.

17      Q     Okay.  That wasn't very fair, Chief.  All

18  right.  The MVRs, by the way, you would agree they

19  operate the manner where the lights go on and there's

20  30 seconds of play generally, or some amount -- it's a

21  setting on the camera, where you can pick up what

22  happens prior to the lights; correct?

23      A     That's my understanding, yeah.

24      Q     All right.  My understanding -- I just want

25  to clarify this.  There was no MVR that either

1    Sergeant Wolf had, or Officer Lewis had with respect

2    to Mr. Kern.  Neither camera was equipped with an

3    MVR -- or I'm sorry, neither cruiser was equipped with

4    an MVR; correct?

5         A    Well, I don't know if the equipment was

6    there, that I can't say.  But there wasn't working

7    equipment or there was no recording.

8         Q    Okay.  Let's look at 423 at page 316.  This

9    is the body-worn camera policy.  I'm going to have you

10   confirm that in a second.  Let me start with the

11   background.  Policy 423 covers portable audio and

12   video recorders; correct?

13        A    Yes.

14        Q    And that is the body-worn camera units;

15   correct?

16        A    Correct.

17        Q    Does every patrol officer with the City of

18   Cleveland Heights, are they equipped with a body-worn

19   camera?

20        A    They're assigned one, yes.

21        Q    Okay.  And my understanding is that the body

22   worn camera is activated and deactivated with a button

23   on the camera unit itself; correct?

24        A    Correct.

25        Q    And it is left to the officer to decide

1  whether and when to activate it, consistent with this

2  policy number 423; correct?

3      A    Well, there's -- they're supposed to follow

4  the policy when to activate it and deactivate it.

5      Q    Okay.  Okay, 423.2 indicates that "The use

6  of recorders is intended to enhance the mission of the

7  department by accurately capturing contacts between

8  members of the department and the public;" right?

9      A    Correct.

10     Q    423.6 talks about activation.

11     A    Okay, yes.

12     Q    And the portable recorder should be

13  activated in any of the following situations; "A, all

14  enforcement and investigative contacts including stops

15  and field interview situations;" right?

16     A    Correct.

17     Q    B is "traffic stops, including but not

18  limited to traffic violations, stranded motorist

19  assistance, and all crime interdiction stops;"

20  correct?

21     A    Correct.

22     Q    Is the expectation that prior to initiating

23  lights and sirens on a stop that the body-worn camera

24  will be activated?

25     A    Yeah.  I don't think it's specifically in

1  the -- in the policy.  But through, you know, as far

2  as I remember, under -- even going back to Chief

3  Robertson, the expectation was always relayed to

4  before you even get out of the car, activate your body

5  camera so it's on.

6      Q    Okay.  And that's once the stop has

7  occurred?

8      A    Well, once the decision is made -- once you

9  turn your lights on, you know -- you know you're going

10  to do a traffic stop, before you get out of the car,

11  make sure your camera is on.

12      Q    And I just want to be very, very clear about

13  this.  Is it once the stop -- the cars have come to a

14  stop and you're going to exit the vehicle it has to be

15  on?  Or does it need to be on at the same time as the

16  lights and sirens when you're doing the stop?  Do you

17  know?

18      A    I'm not sure if it's specifically outlined

19  on when it tells you to -- at what point during --

20  since we're referencing a traffic stop, at what point

21  it has to be turned on.

22      Q    So I'm looking at the policy and it says,

23  "Members should activate the recorder anytime the

24  member believes it would be appropriate or valuable to

25  record an incident;" correct?

Page 80

1      A    Correct.

2      Q    Would it be valuable or appropriate to

3  record the stop from the time the lights and sirens

4  are activated?  Or is it okay if you do it later?

5      A    Can you -- can you let me know what you're

6  referring to?

7      Q    Yeah.  423.6 --

8      A    Okay.

9      Q    First full paragraph underneath it.

10  "Members should activate the recorder anytime the

11  member believes it would be appropriate or valuable to

12  record an incident;" right?

13      A    Correct.

14      Q    And my question is, is it appropriate or

15  valuable to record an incident from the second the

16  lights and sirens go on?

17              MR. BECK:  Objection.

18              Go ahead.

19              THE WITNESS:  As I indicated, like,

20  what we always -- to avoid -- to ensure that the

21  officer had their body-worn cameras on when they turn

22  their lights and sirens on and/or -- and before they

23  get out of the car, make sure your camera is on.

24  BY MR. WIEST:

25      Q    Is turning the lights and sirens on part of

1  the traffic stop?

2       A    Sure.

3       Q    Would you agree that that's part of an

4  enforcement or an investigative contact?

5       A    For sure, yes.

6       Q    Okay.  And so if it says, "the portable

7  recorders should be activated in any of the following

8  situations, A, all enforcement and investigative

9  contacts," that would include the lights and sirens

10  aspect of the stop; correct?

11                 MR. BECK:  Objection.

12                 Go ahead.

13                 THE WITNESS:  I would say, like, the

14  portal -- or the excuse me, the policy should --

15  should be, "be activated," but yeah.  We -- it should

16  be -- cameras should be turned on, you know, during a

17  traffic stop.

18  BY MR. WIEST:

19       Q    Okay.  All right.  If you look, Chief,

20  423.12, it's at 320.  It talks about training on the

21  beat, the body-worn cameras, BWCs.

22       A    Got it.

23       Q    Is there annual training on BWC operations

24  conducted by the City of Cleveland Heights?

25       A    I don't know off the top of my head if -- I

1  don't recall us -- or in my time or this year, we

2  required training other than what's in the policy.

3      Q    Okay.  All right, 424, it's on page 321.

4  424.4 says, "The Cleveland Heights Police Department

5  recognizes the right of persons to lawfully record

6  members of this department who were performing their

7  official duties."  Did I read that correctly?

8      A    Which section, sir?  I'm sorry.

9      Q    424.2, the policy.

10     A    I got it.  Correct.

11     Q    Has there ever been training within the city

12  of Cleveland Heights, for instance, on the fact that

13  the Northern District of Ohio has issued a published

14  case finding that the right to record police in the

15  course of performance of their duties is clearly

16  established.  Has that training ever been given to the

17  department?

18             MR. BECK:  Objection.

19             Go ahead.

20             THE WITNESS:  I don't think any

21  formalized training regarding that case has been part

22  of a training curriculum.

23  BY MR. WIEST:

24     Q    Okay.  In any event, though, it is this

25  policy that people can record interactions; correct?

1    A    Correct.

2    Q    And that includes their own traffic stops?

3  People can hit the play button or the record button on

4  their phone, right, and record that traffic stop as

5  long as they're not interfering?

6    A    Correct.

7    Q    Okay.  All right.  Let's look at 429, policy

8  429.  It starts on page 337.  I want to look at 429.3,

9  general considerations.  It says, "Individuals or

10  groups present on the public way such as public

11  facilities, streets or highways generally have the

12  right to assemble, rally, demonstrate, protest or

13  otherwise express their views and opinions through

14  varying forms of communication, including the

15  distribution of public printed matter."  Do I have

16  that right?

17    A    That's what the policy reads.

18    Q    Right.  And then it says, "These rights may

19  be limited by laws or ordinances regulating such

20  matters as the obstruction of individual or vehicle

21  access or egress, trespass, noise, picketing,

22  distribution of handbills and leafleting and

23  loitering;" correct?

24    A    Correct.

25    Q    "However, officers shall not take action or

Page 84

1   fail to take action based on the opinions being

2   expressed;" correct?

3       A    Correct.

4       Q    Would you agree that the content of the

5   opinions would include for instance, grievances that

6   have been lodged against officers, for instance,

7   you're not doing your job, you almost caused a traffic

8   violation.  Those sorts of things would not be the

9   basis to take action against someone; would you agree?

10      A    Generally speaking, no.

11      Q    Okay.  Has the City of Cleveland Heights

12  provided any specific First Amendment training to its

13  department, other than what's in this particular

14  Section 429?

15      A    Other than in the police academy, I don't

16  know of any other specific training.

17      Q    Okay.  1004 is an anti-retaliation policy.

18  That includes, for instance, a prohibition on

19  reporting -- or retaliating against someone who

20  reports abuse of authority or inappropriate conduct;

21  correct?

22      A    Uh-huh.  I'm sorry, yes.

23      Q    If an officer were to report a supervisor

24  for engaging in an abuse of authority or inappropriate

25  conduct, would they have protection under this 1004

1    section?

2         A    Yes.

3         Q    Have you ever had anyone invoked this 1004

4    section within the City of Cleveland Heights police

5    department?

6         A    I don't know personally.  I'm unaware.

7         Q    Okay.  All right.  Let's look at -- Chief, I

8    want to go through some exhibits with you.  I want to

9    look at some records with respect to Sergeant Wolf,

10   Exhibit 4.

11                  (Exhibit 4 was marked for

12                  identification.)

13              Chief, this looks like a checklist, as near

14   as I can tell, that is given to new supervisors.

15   Would you agree?

16        A    Uh-huh.  Yes.

17        Q    And specifically, this is the new supervisor

18   training form for Sergeant Wolf; correct?

19        A    Correct.

20        Q    I looked through this and did not see

21   anything with respect to constitutional rights in this

22   training checklist for supervisors.  Do you see

23   anything where that would be involved in the training

24   for supervisors?

25                  MR. BECK:  Objection.

Page 86

1                    Go ahead.

2                    THE WITNESS:  I don't see anything here

3      in that, the exact wording that you just asked.

4      BY MR. WIEST:

5          Q     Okay.  Or in that general subject matter

6      that would relate to constitutional rights?

7                    MR. BECK:  Objection.

8                    Go ahead.

9                    THE WITNESS:  I can't say if

10     constitutional rights -- if in fact it's in any of

11     these topics here.

12     BY MR. WIEST:

13         Q     Okay.  You don't know one way or the other?

14         A     No.

15         Q     Okay.  Who would know?

16         A     Captain Cinadr.

17         Q     Okay.  All right.  I want to look at some

18     performance appraisal reports that were provided with

19     respect to Sergeant Wolf.  I'll mark this as

20     Exhibit 5.

21                    (Exhibit 5 was marked for

22                    identification.)

23                    The first appraisal report was for Sergeant

24     Wolf's violation of, it looks like traffic laws and

25     the use of overhead lights to perform a U-turn that

Page 87

1  was not for police purposes on October 29, 2017.  Do

2  you agree?

3      A    Yes.

4      Q    At the time, he was a police officer and not

5  a supervisor; correct?  We know that because meeting

6  attendee is Officer Wolf and Sergeant Gideon; right?

7      A    Correct.

8      Q    Okay.  The next issue was on the next page,

9  looks like October 20, 2020.  That was a sick time

10  issue.  I'm not really interested in sick leave

11  issues.  I don't know that that matters for my

12  purposes.

13          The next page is a write up that it looks

14  like then-Officer Wolf received for not appearing in

15  court when directed to do so; correct?

16      A    Correct.  Well, this is -- this is just a --

17      Q    Amendment of file --

18      A    Correct.

19      Q    Subject failure to appear in court; right?

20      A    Correct.

21      Q    Is this like a warning?

22      A    No, this is -- I haven't used this.  But you

23  know, it's past practice.  The chief of police

24  would -- you were scheduled to be in court.  This is a

25  memo, "Please submit in writing a signed memo to the

Page 88

1   chief why you did not appear in court."

2        Q    Okay.

3        A    So there's nothing else.  I don't know if --

4   what the outcome was.

5        Q    Okay.  I'll mark Exhibit 6.

6             (Exhibit 6 was marked for

7             identification.)

8             This was a complaint that was issued and

9   resolved with respect to then-Officer Wolf, who was

10  not a supervisor at the time, on May 19, 2020;

11  correct?

12       A    Correct.

13       Q    And the findings were that he failed to

14  thoroughly investigate a crime and failed to complete

15  a written police report as outlined in the job

16  description of a police officer.  And he was counseled

17  for it, it looks like; correct?

18       A    Correct.

19       Q    He indicated that he acknowledged his error

20  in judgment and understands his job responsibilities;

21  correct?

22       A    Correct.

23       Q    And I think you're going to tell me that

24  that's your signature there at the bottom?

25       A    That -- that is my signature at the bottom.

Page 89

1       Q    Because you were -- that was when you were

2   the captain; correct?

3       A    Correct.

4       Q    And this was in respect to an incident, I

5   believe -- well, let me ask.  Do you have recollection

6   of this incident?

7       A    Can I take a moment just to review it real

8   quick?

9       Q    Yes, absolutely.  It's not a memory test.

10      A    Yeah, I --

11      Q    This was a -- this was this began with what

12  looks like some kind of assault situation; right?

13      A    Correct.

14      Q    And Wolf gets called to the scene; right?

15  He responds; correct?

16      A    Correct.

17      Q    And then, Wolf didn't bother to find out the

18  details of the situation; right?  I mean --

19      A    Yeah.  From what I remember, the officers

20  responded initially to the scene but didn't -- didn't

21  file a report, didn't take photographs, no witness

22  statements, so forth.

23      Q    And this was a domestic, it looks like

24  domestic type situation in which a report -- there was

25  mandatory state reporting; correct?

1      A     Correct, yeah.  A complaint was subsequently

2  filed for felonious assault.

3      Q     Right.  What additional training did the

4  City of Cleveland Heights provide in response to this

5  incident to make sure that Sergeant Wolf, prior to

6  taking action in the case, would fully investigate the

7  circumstances?

8      A     Let's see.  I would say with most certain

9  certainty that during my counseling session with him

10  this -- that topic was discussed.

11      Q     Okay.  Did you think you needed to put him

12  through any additional training to make sure that he

13  would do that in the future?

14      A     No.

15      Q     Do you know the -- well, let's look.

16  Because there's a police report on the incident.  You

17  would agree that the persons involved in this

18  particular incident based on the police report were

19  both Black?

20      A     Yes.

21      Q     Okay.  And there was a complaint about how

22  one of these individuals was treated by Sergeant Wolf;

23  would you agree?

24      A     I think just based on the email from

25  Lieutenant Meilstrup, by the -- what's written in

Page 91

 1    here, that Johnson Butler came into the police

 2    department a short window -- excuse me, came to the

 3    police window a short time ago.

 4              And I don't like to guess, but here I'm just

 5    guessing on what's written here, is that Lieutenant

 6    Meilstrup probably looked at the previous call for

 7    service to see what happened and what was done, if

 8    anything was done previously.

 9        Q    Okay.  And it was findings of policy

10    violations as a consequence of that; right?

11        A    Correct.

12        Q    Okay.  You would agree that Sergeant Wolf

13    was promoted to sergeant, and we'll get the exact

14    date, within a year of this incident; correct?

15        A    Sir, I don't know off the top of my head

16    exactly when sergeant -- when he was promoted to

17    sergeant.

18        Q    Okay.  Here, I'll get it for you.  We've got

19    those records.  All right.  Let's look, that's

20    Exhibit 2.  I'm handing you Exhibit 2.

21                   (Exhibit 2 was marked for

22                   identification.)

23              If you go back -- actually, it was a little

24    bit over a year.  He was brought into sergeant on

25    June 28, 2021.  It's about three pages back in the

Page 92

1  exhibit.  And the certificate says, Promotion to

2  Sergeant, Classified Service."  Here you go.

3      A    Okay.

4      Q    "Naftali Wolf was promoted to sergeant on

5  June 28, 2021;" correct?

6      A    Correct.

7      Q    Okay.  All right.  Let's see, we're on 6.

8  Let's look at 7.

9                  (Exhibit 7 was marked for

10                  identification.)

11             This is another complaint on May 24th of

12  2021, that was sustained against Wolf for, among other

13  things, "escalated an interaction with Ms. Brigid."

14  Do you see that?

15      A    It reads here "It was determined that

16  Conkly, Wolf, Trillin all escalated the interaction

17  with Ms. Brigid."

18      Q    Okay.

19      A    And that was, it's noted here the complaint

20  was sustained and resolved with the complaint.

21      Q    Okay.  We'll look at -- there's an incident

22  report that follows this.  And I didn't see Ms. Brigid

23  listed in the report, did you?

24      A    I don't see her name listed in the cover

25  page or the name section.

Page 93

1      Q    Okay.  You will agree with me that the race

2  of the arrested person, the victim, and the witness,

3  they're all Black; correct?

4      A    Correct.

5      Q    What was done to Sergeant Wolf as a

6  consequence of the resolution of this complaint?  And

7  I'm happy to show you, no further action.  It looks

8  like there was a 30-minute conversation with the

9  complainant and no further action; right?

10     A    Yeah, I can only comment on what I see

11  written here.

12     Q    Okay.

13     A    So I don't know, I can't say if anything

14  further happened.

15     Q    Okay.  Who would know that?

16     A    Captain Cinadr and/or the chief of police.

17     Q    Okay.  Is that whose signatures is down

18  there, is it Captain Cinadr's?

19     A    Yes, sir.

20     Q    Okay.  It looks like Captain Cinadr talked

21  with Conkly, Wolf, and Trillin?

22     A    I don't want to guess, so I'm -- I'm

23  assuming.

24     Q    Okay.  Was there any follow-up training?

25  And by the way, I want to go into her complaint on the

Page 94

1    second page.  The complainant, it looks like it was

2    Mary Brigid, "observed several officers on top of a

3    Black man."

4         A    I'm sorry, you're on the --

5         Q    "The reasons for the complaint" on the

6    second page, that was sustained.  Do you see that?

7         A    What part are you at, sir?  I'm sorry.

8         Q    Right there.  I'm in the narrative.  "She

9    observed several officers" --

10        A    Oh, got you.  Okay.

11        Q    "On top of a Black man and stopped to make

12   sure he was all right.  The officers said terrible

13   things to her, yelled at her, and told her to go back

14   to 'her hoity toity life.'  They told her she was

15   being charged with obstruction of justice, 'and it

16   will be sent in the mail.'"  Do you see that?

17        A    I do.

18        Q    And Wolf was involved in that; correct?

19             MR. BECK:  Objection.

20   BY MR. WIEST:

21        Q    First page.

22        A    Yes, correct.

23        Q    And the obstruction charge was directed

24   towards -- and I think we talked about this -- an

25   incident involving a number of Black individuals;

 1    correct?

 2                    MR. BECK:  Objection.

 3                    Go ahead.

 4                    THE WITNESS:  I'm sorry?

 5    BY MR. WIEST:

 6        Q    The incident involved -- we looked at the

 7    police report -- a number of Black individuals;

 8    correct?

 9                    MR. BECK:  Objection.

10                    Go ahead.

11                    THE WITNESS:  Yes.

12    BY MR. WIEST:

13        Q    What additional training was given to

14    Sergeant Wolf, if anything -- I think he was still an

15    officer, by the way, at this point in 2021.  We just

16    looked at the promotion date.

17               What training was provided to him regarding

18    obstruction and/or dealing with citizens in escalating

19    things?  Was there any?

20        A    Are you saying in general or as a result

21    of --

22        Q    As a result of this incident?

23        A    I -- I'm unaware.

24        Q    Okay.  Who would know that, if anyone?

25        A    I would -- I would refer to Captain Cinadr,

Page 96

1    if he was aware, or if there was something in his

2    personnel file.

3         Q    Okay.  You would agree that this incident

4    was in May of '21; correct?

5         A    Yes.

6         Q    It looks like it was closed out June 4th of

7    21; right?

8         A    Correct.

9         Q    And less than a month later is when the City

10   of Cleveland Heights decided to promote Naftali Wolf

11   to sergeant; correct?

12        A    I'm sorry, when was he promoted again?

13        Q    The end of June.

14        A    Yes.

15        Q    You would agree with me that if Sergeant

16   Wolf had received additional training as a consequence

17   of this complaint and incident, it would be documented

18   in some way; correct?

19        A    Should be; yeah.

20        Q    Okay.  All right.  I'm going to talk about

21   Carli Lewis.  Chief, I'm going to hand you -- we went

22   over this -- some of this yesterday, Exhibit 9.

23                  (Exhibit 9 was marked for

24                  identification.)

25                  This is the final field training, well, the

1  first two pages of the final field training assessment

2  by Lewis Alvis related to Carli Lewis.  And then what

3  follows are some evaluations of hers on the exhibit.

4  And I wanted to start with the field training of

5  Officer Lewis.

6            What is documented is that -- and I just

7  want to highlight this.  "Officer Lewis sometimes

8  struggled with what information was necessary to

9  document as sometimes information she would obtain was

10  irrelevant to the actual complaint."  Do you see that?

11       A    I do.

12       Q    A couple sentences down, "There were times

13  where Officer Lewis ran into a call for service that

14  had circumstances she had not yet encountered.

15  Officer Lewis had the common sense to check with her

16  FTO to make sure she was handling the situation

17  correctly, instead of guessing and/or giving the

18  complainant wrong information."  Right?

19       A    Correct.

20       Q    And then it also documented that, "She did

21  have trouble trying to determine whether the call for

22  service required lights and sirens, but this can be

23  corrected with experience."  Right?

24       A    Correct.

25       Q    On the second page, there was documentation

1    that indicated that Officer Lewis did struggle with

2    the process of signing criminal complaints and what

3    paperwork might be needed if a warrant were to be

4    issued; right?  It says that; right?

5         A    Yes.

6         Q    Are you aware of any follow-up training that

7    was provided to Officer Lewis by the City of Cleveland

8    Heights to address some of the concerns where there

9    were some deficiencies by her field training officer?

10        A    I'm not aware of any formal training.

11        Q    Okay.  Go a couple pages back, we get into

12   her first evaluation, and she makes an employee

13   comment.  It's on 210.19.

14        A    Okay.

15        Q    She says, employee comments, "Over the next

16   six months, I hope to learn and understand more

17   policies and procedures as well as city and state

18   ordinance."  Do you see that?

19        A    Yes.

20        Q    Are you aware of any follow-up training that

21   the City of Cleveland Heights provided to her to help

22   her learn and understand more policies and procedures

23   as well as city and state ordinance?

24        A    I'm not aware.

25        Q    Okay.  Let's look at what her comment was

1    about five months later on July of 2019.  Go about

2    six, seven pages back.  It was employee comments.

3    Employee comments, "Continue to expand knowledge of

4    city and state laws/ordinances.  Continue learning and

5    implementing policies and procedures."  Is there

6    anything that you're aware of that the City of

7    Cleveland Heights did to make sure that she would

8    expand her knowledge of city and state laws and

9    ordinances and continue to learn and implement

10   policies and procedures?

11        A    I'm not aware of anything specific.

12        Q    Was it the practice of the City of Cleveland

13   Heights to not address officers who are indicating

14   that they need to expand their knowledge of city and

15   state laws and ordinances?

16                  MR. BECK:  Objection.

17                  Go ahead.

18                  THE WITNESS:  You know, I -- I don't

19   want to assume or -- or speculate.  But I would, you

20   know, as Lieutenant Williams to be, you know, if he's

21   her supervisor, knowing that he would have taken steps

22   or actions to help her, you know, expand on her

23   knowledge.

24   BY MR. WIEST:

25        Q    If she testified yesterday that there was no

1  corrective action, would you be in a position to

2  dispute that?

3                  MR. BECK:  Objection.

4                  Go ahead.

5                  THE WITNESS:  I guess if you -- I'm not

6  sure what you're --

7  BY MR. WIEST:

8      Q    If Ms. Lewis testified yesterday that there

9  was no follow-up training to address these specific

10 issues that we just looked at, would you be in a

11 position to dispute that?

12                 MR. BECK:  Objection.

13                 Go ahead.

14                 THE WITNESS:  What do you mean,

15 dispute?

16 BY MR. WIEST:

17     Q    To dispute her testimony?  To say, "Yeah, we

18 did provide training?"

19     A    No, I wouldn't be able to dispute her

20 testimony or prove otherwise.

21     Q    Okay.  All right.  I think, let me get back

22 to my outline, Chief.  Carli Lewis was involved in a

23 lawsuit that was filed March 19, 2021, in the matter

24 of Elizabeth Benson vs. Carli Lewis in the City of

25 Cleveland Heights related to an auto collision that

1    occurred.  Are you familiar with that?

2         A    I know of it.

3         Q    Okay.  And we are specifically looking at

4    Topic 11.  It was filed in the Cuyahoga County Common

5    Pleas Court, CV-22-971937.  And that was a situation

6    in which Officer Lewis proceeded through a red light

7    and was not on an emergency call.  Are you aware of

8    that?

9         A    I know of the lawsuit.  I don't -- I don't

10   know the specifics.

11        Q    Are you aware that Officer Lewis, in

12   defensive of herself, claimed that her lights and

13   sirens were on?

14        A    I'm not aware of any such statement --

15        Q    Okay.  Are you aware Ms. Benson testified

16   under oath that the lights and sirens were not in fact

17   on?

18             MR. BECK:  Objection.

19             Go ahead.

20             THE WITNESS:  I don't have specific

21   knowledge of what was said or -- or I don't remember.

22   I mean, I'm aware of the -- but don't have specific.

23   BY MR. WIEST:

24        Q    Have you had occasion, following the filing

25   of that lawsuit, to provide Officer Lewis any

1  additional training about the use of lights and

2  sirens?

3      A    I don't remember.  There's a possibility

4  Chief Mecklenburg or -- or there might have been.

5  There -- there possibly could have been, but I don't

6  remember.  I don't recall.

7      Q    Okay.  All right.  Are you aware of any

8  other traffic incidents or accidents or lawsuits,

9  other than obviously this matter, we're going to get

10  into the current interaction in a bit, that Officer

11  Lewis has been involved in?

12     A    I'm -- I don't recall.

13     Q    Okay.  Chief, I am not going through all of

14  a bunch of records with you.  But I do want to

15  authenticate, and I do just want to identify some of

16  these.  Exhibit 2, we looked at.  You've got that in

17  front of you.  It is, it's right there.

18     A    It's back here, okay.

19     Q    Yeah.  These are training certificates that

20  were in the personnel file for Sergeant Wolf; would

21  you agree?  I think it also includes his promotion to

22  Sergeant?

23     A    Yes, I would agree.

24     Q    Okay.  Does the City of Cleveland Heights

25  maintain those records in the ordinary course of their

Page 103

1    business?

2         A    Yes.

3         Q    Okay.  I've shown you before -- okay, I

4    haven't shown you before.  I'm going to hand you

5    Exhibit 3.

6                   (Exhibit 3 was marked for

7                   identification.)

8              These are Sergeant Wolf's employee

9    performance evaluations, I think going back to 2019 --

10   2018, I'm sorry -- or 2017.  Would you agree that

11   that's what these are?

12        A    '17, '18, '19, '20 -- yes, I would agree.

13        Q    Okay.  These are also kept in the ordinary

14   course of business for the City of Cleveland Heights?

15        A    Yes.

16        Q    Okay.  Exhibit 4, we looked at this before.

17   This is the new supervisor training checklist I think

18   I handed to you for Sergeant Wolf.  Correct?

19        A    Oh, yes, sir.

20        Q    This is also maintained in the ordinary

21   course of business for the City of Cleveland Heights?

22        A    Yes.

23        Q    And in fact, all of these are also public

24   records, 2, 3 and 4; right?

25        A    Yes.

1       Q     Okay.  I know we've looked at 5 before, but

2    those are performance appraisal reports that were

3    issued to Sergeant Wolf; correct?

4       A     Yes.

5       Q     Also public records; correct?

6       A     Yes.

7       Q     Also kept in the ordinary course of

8    business?

9       A     Yes.

10      Q     Six was the complaint form in May of 2020.

11   We looked at that before.  I think you were the

12   investigating officer on that one; correct?

13      A     Yes.

14      Q     Related to Sergeant Wolf; right?

15      A     Yes.

16      Q     And that is also public record within the

17   City of Cleveland Heights?

18      A     Yes.

19      Q     Okay.  All right, 7 we looked at also.  That

20   was the Mary Brigid complaint?

21      A     Yes.

22      Q     Also a public record that's kept by the City

23   of Cleveland Heights in the ordinary course of its

24   business?

25      A     Yes.

Page 105

1      Q    Okay.  I think I've shown you, I don't -- I
2  think I have.  You've got 8, too -- do you have
3  Exhibit 8?  If you don't, I'll give it to you.
4      A    Let's see -- 6, 5, 1 -- I don't believe so,
5  sir.
6      Q    Okay, I'm going to hand you Exhibit 8.
7              (Exhibit 8 was marked for
8              identification.)
9              Exhibit 8 are the training certificates for
10  Carli Lewis; would you agree?
11     A    Yes.
12     Q    Those are also public records and records
13  that are kept in the ordinary course of business by
14  the City of Cleveland Heights; right?
15     A    Yes.
16     Q    Okay.  Nine were the evaluations of Carli
17  Lewis that we looked at as well as the FTO evaluation;
18  correct?
19     A    Yes.
20     Q    Also public records kept in the ordinary
21  course of business by the City of Cleveland Heights;
22  correct?
23     A    Correct.
24     Q    All right.  I'll look at -- no, I don't want
25  to look at 32 yet.  Okay.  All right, let's talk

Page 106

1    about -- I want to make sure that I -- other than what

2    we've looked at, are you aware of any other training

3    by the City of Cleveland Heights that were directed at

4    either Sergeant Wolf or Carli Lewis from January 2015

5    to the present?  Have you looked at everything that

6    you're aware of?

7         A    Yes.

8         Q    Okay.  All right.  Have there been, from

9    January 15, 2015, through February 1, 2023 -- and I'm

10   not talking about Mr. Kern's situation.  I'm talking

11   about any other complaints or use of force incidents

12   related to unlawful stops or detentions or arrests

13   that have been made with respect to officers from the

14   City of Cleveland Heights?

15        A    Without looking at records, I can't say for

16   sure.

17        Q    Okay.  I don't know that we can get that on

18   a break.  But I'd like to pin that down today.  If we

19   can't, we can't.  Otherwise I'm going to certify the

20   question.

21             MR. BECK:  You can certify.  My problem

22   is I just got a push back, or a note back from the

23   Captain.  He's out for -- I asked him for the

24   identification with respect to the policy so it's

25   going to take me a little while to get that.

1                    MR. WIEST:  That's okay.

2                    MR. BECK:  And at the same time, then,

3    I'll see what I can find out --

4                    Off the record.

5                    MR. WIEST:  Yeah, we can go off the

6    record.

7                    THE REPORTER:  Okay, standby, please.

8                    Off the record at 11:44.

9                    (Off the record.)

10                   We are back on record at 11:58 a.m.

11   Thank you.

12   BY MR. WIEST:

13       Q    Okay.  Chief, if you look at a Topic 21, I

14   know I asked you about Fourth Amendment complaints.

15   I'm assuming you've got the same answer for Topic 21,

16   which is First Amendment complaints; fair?  You'd have

17   to look at records to figure that out?

18       A    So my response is, yeah.  When I got in some

19   conversations with Mr. Beck, I had assigned this --

20   this topic specifically to Sergeant Jackman [ph] to go

21   through our records and copy all the complaints from

22   that timeframe.

23       Q    Okay.  And that wasn't just Fourth

24   Amendment, use of force type things?  It was also

25   First Amendment too, on --

1       A     Yeah everything specifically requested.

2                  MR. WIEST:  Mr. Beck indicated on a

3    break that he had received some of that, and they're

4    voluminous.  And there's no way we're going to be

5    prepared to ask questions about them today.  So we

6    have agreed we're going to keep these topics open for

7    follow up after we have had the opportunity to review.

8                  So Chief, we may have some -- well, we

9    will have some follow-up questions on it.  I'm going

10   to try to facilitate everybody's schedule to do that.

11   Hopefully I don't -- I need to see what they are.  But

12   I'm going to try and do it by Zoom, you know, so we

13   can make it easier on everybody.

14                 Unless it's insane volume, in which

15   case we may need to do something in person.  But let

16   us take a look at that.  And I think that's the game

17   plan.

18                 Is that fair, Greg?

19                 MR. BECK:  Yeah, that's fair.

20                 MR. WIEST:  Okay.  All right.

21   BY MR. WIEST:

22       Q     Has there been any Brady List determinations

23   that you're aware of relative to either Sergeant Wolf

24   or Carli Lewis?

25       A     There is not.

1     Q    Okay.  All right.  Do you know how the
2   prosecuting attorney made the determination to drop
3   Mr. Kern's criminal complaint that was filed by -- I
4   guess officially by Carli Lewis at the direction of
5   Naftali Wolf?
6     A    Wait, can you repeat it?
7     Q    Yeah, the prosecutor, Chief -- in fact,
8   let's go look at that real quick, just so we've got --
9   we're all there.  I think it was Exhibit 24.  No, it's
10   25.  Chief, I'm handing you Exhibit 25, it was
11   previously marked yesterday.
12               (Exhibit 25 was previously marked for
13               identification.)
14          It's copy of the prosecutor's motion to
15   dismiss and the judge's dismissal of the charges
16   against Mr. Kern on October 3rd of 2022.  Do you know
17   what was communicated between the prosecuting
18   attorney's office and anybody within the police
19   department at Cleveland Heights that led to that
20   dismissal, if anything?
21     A    Yes.
22     Q    What happened?
23     A    So I -- to the best of my memory, I
24   recall -- I don't know if it was -- I recall receiving
25   the -- the handwritten complaint for Kern.

1      Q    Let's look at that.  Is that Exhibit 24 --

2      A    Okay, this is the --

3      Q    The handwritten complaint you were referring

4  to?

5      A    No.  Let me clarify.  This is the --

6  summons.  The -- when I say complaint, I know

7  Mr. Kern, I think Lieutenant Williams filled it out on

8  his behalf.  But when I -- so, the complaint against

9  the officers.

10     Q    So that's what you're referring to?

11     A    Correct.

12     Q    Which is Exhibit 26.

13     A    Correct.

14     Q    Okay.  Now I'm with you.

15          THE REPORTER:  Are we marking 26?

16          MR. WIEST:  We are.

17          THE REPORTER:  Okay, standby.

18          (Exhibit 26 was marked for

19          identification.)

20  BY MR. WIEST:

21     Q    Okay.  So, and I'm going to get into the

22  substance of this later with you.

23     A    Okay.

24     Q    But just for identification purposes, you

25  had received Exhibit 26.  And I want to know how the

1    communications with the prosecutor's office.

2        A    So I recall specifically walking down --

3    again the best of my memory.  I don't know if it

4    was -- I believe -- I believe, I'm almost certain it

5    happened after I received the complaint from

6    Lieutenant Williams, you know.  Because this is

7    Lieutenant Williams's writing, so he apparently had

8    written it on his behalf.

9            But after I got this complaint, I reviewed

10   the body camera footage.  I don't know if the initial

11   report was -- let's see, he filed a complaint.

12       Q    He did it the night of the incident.

13       A    Right.  All right.  So then the next

14   morning, I'm pretty certain I reviewed the body camera

15   footage, and I walked down to the prosecutor's office

16   and asked for them to review it.

17       Q    Okay.  And so they looked at -- when you

18   say, "the body camera footage," did you review

19   Sergeant Wolf's body camera footage, Officer Lewis's

20   body camera footage, or both?

21       A    Both.

22       Q    Okay.  I know there were some other officers

23   that were also on scene.  There was some limited

24   footage from Webster and Torres too?

25       A    Correct.

1        Q    Did you review that too?

2        A    Yes.

3        Q    Okay.  I think one of the officers, like,

4    deactivated and activated again.  There are actually

5    two clips from either Webster or Torres.  I'm not sure

6    which.  So you had reviewed all of that; correct?

7        A    Correct.

8        Q    And then did you turn that footage over to

9    the prosecutor's office?

10       A    I specifically remember walking down there.

11   We had a discussion about it, and I asked for

12   Prosecutor Roessner, and I believe -- and I believe

13   the assistant law director, Laure Wagner, had reviewed

14   it too.  And it was based upon their review that that

15   determination was made.

16       Q    When you say, "that determination," you mean

17   the checkboxes in the Exhibit 25, where they said, "We

18   don't have evidence to sustain the charges"?

19       A    Correct.

20       Q    Okay.  Did they talk to you at all about why

21   that was?

22       A    I don't -- I don't recall specifically.

23       Q    Okay.  Did you agree with their

24   determination?

25       A    Yes.

1      Q   Was there any follow-up training that was

2  conducted department wide as a consequence of the Kern

3  incident?

4      A   Do you -- do you mean in terms of the

5  incident itself, or as a result of discipline?

6      Q   So we're going to talk about Sergeant Wolf's

7  disciplinary -- kind of how that all unwrapped in a

8  couple minutes.  And I don't mean specific to the

9  disciplinary issues with him, because we're going

10  to -- I'm going to handle that differently.

11         I'm looking at, hey, maybe we need to go

12  back over obstruction, probable cause, First Amendment

13  issues with the department.  Anything like that that

14  was done as a follow up?

15      A   Yes, I believe I instructed, in a

16  conversation with Sergeant Wolf, I guess -- just to

17  paint the picture, you know, what happened.  But I

18  recall having a conversation with Sergeant Wolf, you

19  know, about the incident.

20         I said, you know, "If you needed further

21  clarification or -- and/or you need further

22  clarification on this."  I believe I told him, "Why

23  don't you make a follow-up counseling session with

24  Prosecutor Roessner to clarify if you need further

25  training or clarification on things."

1      Q    Okay.  Did you consider whether or not you

2  needed to do that beyond Sergeant Wolf?  In other

3  words, was this a broader sort of department-wide

4  training?

5      A    I don't recall specifically.

6      Q    And that was left up to Sergeant Wolf as to

7  whether or not he should meet with the prosecutor's

8  office to get further clarification on maybe the

9  elements of instruction?

10     A    Yeah, I don't think I, like, put it in

11  writing or ordered him to do that.  I think it was

12  just general conversation.

13     Q    Okay.  Right, but it was left up to him if

14  he needed it --

15     A    I think so, yes.

16     Q    Okay.  Would you agree that at the time of

17  the incident with Mr. Kern on September 22, '22, that

18  Sergeant Wolf and Carli Lewis were in the performance

19  of their duties and acting under color of law?

20     A    Yes.

21     Q    And they were both on shift at the time;

22  correct?

23     A    Correct.

24     Q    Okay.  All right.  I know we're going to

25  look at the discipline on Sergeant Wolf.  Do you

1    believe that Carli Lewis's actions that day was

2    consistent with the custom, policy, or practice in the

3    City of Cleveland Heights?

4         A    Yes.

5         Q    Okay.  She did what you would expect her to

6    do?

7         A    Yes.

8         Q    Okay.  All right.  Okay, let's talk about

9    the issue with Mr. Kern.  Chief, when was the last

10   time that you reviewed the body camera footage?

11        A    I looked at it, it had to be a few weeks

12   ago.  Once I knew this was coming about, I, you

13   know --

14        Q    One question that I've got is, you would

15   agree with me that at least from a timeline

16   standpoint, the footage that we've got begins with

17   Officer Lewis at the scene there on Mayfield Road;

18   right?  Where she's getting out of her vehicle?

19        A    Correct.

20        Q    We don't have any footage prior to that;

21   correct?

22        A    Correct.

23        Q    Was there ever any action or investigation

24   taken by the department to determine when specifically

25   Officer Lewis activated her lights and sirens?

1    A    I -- I don't -- I know I -- I ordered an

2  internal investigation into the incident and the

3  complaint.  I can't say for sure if there was

4  questioning relative to that.

5    Q    Okay.  Did you ever make a determination

6  whether or not Mr. Kern violated the law by failing to

7  yield the lights and sirens?

8    A    I -- I am only going off of what Carli Lewis

9  had -- had indicated.  So I never made a formal

10  determination.

11    Q    Okay.  When you say "indicated," do you mean

12  indicated to internal affairs?

13    A    Yeah.  Reviewing the -- you know watching

14  her body camera, and -- I believe and her, you know,

15  and her internal affairs statement.

16    Q    She made the statement to internal affairs

17  that Mr. Kern committed no crime.  Do you recall that?

18                    MR. BECK:  Objection.

19                    Go ahead.

20                    THE WITNESS:  I recall her that -- I

21  recall her saying that he didn't do anything wrong.  I

22  don't know if I don't recall her using that specific

23  crime, but I recall her, you know, that she had

24  mentioned, "Well, I could have cited you for failure

25  to yield."  Something along those lines.

 1  BY MR. WIEST:

 2      Q    Okay.  I'm going to refresh your

 3  recollection.

 4      A    Okay.

 5      Q    We previously have marked this yesterday.

 6              MR. WIEST:  Give me a second, Greg.

 7  Maybe.  There we go.

 8  BY MR. WIEST:

 9      Q    I'm okay at technology, Chief.  I'm not

10  great.

11      A    I'm not -- I'm lucky I can send off an

12  email.

13      Q    Okay.  We previously marked this as

14  Exhibit 17.

15              (Exhibit 17 was previously marked for

16              identification.)

17          We played it at length yesterday with

18  Officer Lewis.  This is the interview with the

19  detectives.

20              (Video played.)

21          Okay.  So you had reviewed the IA statement

22  and you had heard where Officer Lewis said that there

23  was no crime on what Sergeant Wolf said was

24  obstruction; right?

25              MR. BECK:  Objection.

1          Go ahead.

2          THE WITNESS:  Well, there's, you know,

3     there's statements made in the body camera video that

4     are similar, but not all the -- it's not the exact

5     same.

6     BY MR. WIEST:

7          Q     Okay.  I'm just talking about the IA.  You

8     had had heard that interview; correct?

9          A     Yes.

10         Q     Okay.  Would you agree that it's department

11    policy for officers to make sure that they're making

12    truthful statements when there's an internal affairs

13    investigation?

14         A     Absolutely, yes.

15         Q     Okay.  And when speaking to internal

16    affairs; correct?

17         A     Correct.

18         Q     One of the questions that I've got, there's

19    actually two interviews with internal affairs and

20    Officer Lewis that we've been provided.  Do you know

21    if Sergeant Wolf spoke to internal affairs also?

22         A     Uh-huh.

23         Q     He did?

24         A     Yes.

25         Q     Was that recorded?

1        A     Yeah, I remember I watched a video.

2                 MR. BRUNS:  We don't have it.

3                 MR. WIEST:  It's not been produced us.

4                 MR. BECK:  There is a recorded

5     interview.  It's long, but it's --

6                 MR. WIEST:  Okay.  We're going to want

7     that for sure.

8     BY MR. WIEST:

9        Q    Do you know how long that interview was?  Is

10    there only one interview?

11       A    I know for sure there's one.  I don't -- I'm

12    not aware of second one.

13       Q    Second?  Okay.  Was it the same detectives

14    that conducted both -- this entire investigation?

15       A    Yes.

16       Q    Okay.  Who are those detectives?  I know

17    we've got that in the interrogatories.

18       A    Detective Mathis, M-A-T-H-I-S, and Detective

19    Earl Pierson.

20       Q    Is that --

21       A    P-I-E-R-S-O-N, I believe it is.

22       Q    Who's in the video right here?  Is that

23    Detective Mathis?

24       A    That's Detective Pierson.

25       Q    Pierson, okay.  And so it would be Detective

1   Mathis typically behind the camera?

2       A    Correct.

3       Q    Okay.  All right.  And that was Exhibit 17.

4   All right.  Mr. Kern also came in, and I know we

5   looked at Exhibit 26.  He made the complaint; right?

6       A    Uh-huh.  Correct.

7       Q    And my understanding is, Lieutenant Williams

8   took this down because of the arm issue; right?

9       A    That's what Lieutenant Williams indicates.

10      Q    Right.  Yeah.  And it looks like Mr. Kern,

11  if you look, you can tell he's kind of got some

12  squiggly -- there?

13      A    Correct.

14      Q    I know a written statement was also obtained

15  by Officer Torres.  Have you seen that before?

16      A    You mean a police report?

17      Q    I don't think it's a police report.  I think

18  this might have been internal that got -- the

19  statement I've handed you, Exhibit 27.

20              MR. WIEST:  I'm looking for 27.  Oh, it

21  was in the -- yeah, you know what it was in the -- I'm

22  sorry.

23  BY MR. WIEST:

24      Q    Chief, I actually stapled it, or my

25  associate did, to 26, the last page of 27.  It should

Page 121

1    be 27.

2                    THE REPORTER:  So we'll mark it 27?

3                    MR. WIEST:  Yeah, it's marked 27

4    separately.

5                    (Exhibit 27 was marked for

6                    identification.)

7    BY MR. WIEST:

8        Q    Was that Torres's statement?

9        A    Yes.

10       Q    Okay.  Did you speak with Torres about what

11   happened?

12       A    No.

13       Q    Okay.  Did you personally speak with Lewis

14   about what happened?

15       A    I believe at one point I had a brief

16   conversation with her indicating to her that -- that I

17   was initiating an internal investigation that she's

18   going to have to submit to an interview by detectives.

19       Q    Okay.  And did you have a conversation with

20   Wolf about what happened?

21       A    Yes.  Probably similar in context about, you

22   know, that I have to initiate internal investigations.

23       Q    You didn't document either of those contacts

24   with either Wolf or Lewis; did you?

25       A    I did not, no.

1       Q    Okay.  All right.  And then I want to look

2   at, there was a rough draft, Chief, of findings -- oh,

3   is that your handwriting, the rough draft?

4       A    Yes.

5       Q    Okay.

6                 THE REPORTER:  Is this 28?

7                 MR. WIEST:  It is, it's Exhibit 28.

8   Thank you.

9                 (Exhibit 28 was marked for

10                identification.)

11  BY MR. WIEST:

12      Q    What else did you need to do for the rough

13  draft to become final; do you know?

14      A    I can't say if there was anything

15  specifically.  I guess I'd marked "rough draft,"

16  meaning that this was my rough draft, you know,

17  pending, you know, me proofreading it and making sure

18  everything was in there that needed to be in there.

19      Q    Okay.  All right.  And there's a signed

20  statement in that rough draft, if you look, on the

21  last page by Lieutenant Williams?

22      A    Yes.

23      Q    Okay.  Did you agree with those findings?

24      A    Yes.

25      Q    Okay.  Did you agree with everything in this

1   rough draft?  Or did you feel like there needed to be

2   more that needed to be done or tweaks that needed to

3   occur?

4        A    To the best of my memory, I don't think

5   there was much that had changed from -- if anything,

6   changed from the rough draft to the final draft.

7        Q    Okay.  All right.  So you agreed with it;

8   correct?

9        A    Yes.

10       Q    Okay.  One of the things that I thought was

11  interesting is there's this completion date of

12  investigation/inquiry, November 14, 2022, and the

13  "completed by" is you.  And obviously, you've got the

14  chief of police.  And then I've got a second sort of

15  findings that occurred.  This is Exhibit 29, that was

16  actually signed, that Exhibit 29.

17                   (Exhibit 29 was marked for

18                   identification.)

19                   And one question I had, Chief, about 28 and

20  29 was:  is 29 the final of 28 or not?  And the reason

21  I ask is, I got 9/22.  But then 11/14 on 28.  Do you

22  see that?

23       A    Yeah.  To clarify that, like I said, this

24  was the rough draft.  That might have been, like --

25  the November 14th might have been around -- there was

1  close to completion or, you know, about to -- about to

2  be done.

3         But then, in the course of -- you can see I

4  had Lieutenant Williams.  It was -- it was -- I had

5  assigned the shift.  Because Lieutenant Williams was

6  the OIC.  So I had him do a preliminary review.  So

7  then once I got that done, that's probably the, you

8  know, why I have a rough draft.  And then the -- the

9  later dated, Exhibit 29.

10     Q    Okay.  If you look at 29, are you saying

11  that 29 was the final?

12     A    I would say it was, because I would say this

13  is the final because it has my signature on it as

14  chief.  And this one doesn't have any signatures on

15  it.

16     Q    I mean, there's a lot more detail in 28

17  versus 29; right?  I mean there's three pages of

18  narrative in 28; right -- two and a half?

19     A    Yeah, it appears so.  I don't know --

20     Q    And, Chief, one of the questions I had -- if

21  you look at the very bottom, in that block on the

22  first page of 29.  It looks like almost there's like

23  maybe more text that may have been cut off.  I don't

24  know whether there was or wasn't.  But if you look at

25  the very bottom, it looks like almost like there's

Page 125

1    maybe sentences underneath.

2            Do you see that?  At the very bottom there?

3    And the sentence doesn't look like it's actually

4    complete in 29, "Kern states the whole time Officer

5    Lewis was saying to Sergeant Wolf, 'She would like to

6    let him Kern leave'" -- I'm not sure that that's

7    actually the end of that sentence.  Do you know?

8        A    "Kern states the whole time" -- "Kern states

9    the whole time Officer Lewis was saying to Sergeant

10   Wolf that she would like to let him, Kern, leave."  I

11   don't know.  That sounds correct to me.  But I -- I

12   see what you're saying.

13           I, you know, I -- if you're not -- I'm

14   just -- from my -- with this system, if you're not

15   careful of -- if you put too much stuff in the block,

16   it won't -- so that's why I'm saying --

17       Q    And that's why I'm looking at your draft,

18   where you're, like, paginating in Exhibit 28.  Do you

19   see that?  Like, "page 1 of 3," "page 2 of 3," there

20   at the bottom of each of those?  Is Exhibit 29 kept in

21   electronic form?

22       A    It's probably saved on my -- it's probably

23   on my computer somewhere.

24       Q    Okay.  I'm going to ask you, Chief, to go

25   back and look at that for me.  Because I want to make

1   sure that Exhibit 29 is in fact all of this exhibit.

2   And if there's something cut off, we're going to want

3   you to fix that.  I mean, kind of like you did in 28,

4   right?  Where we can get the whole thing.  You know,

5   if there's pages that are missing.  And if it's the

6   complete exhibit, I'd just like confirmation of that.

7   If you can do that for us?

8        A    Yeah.

9        Q    Okay.  Yeah, look at exhibit -- the draft

10  for me -- in 28.  There's a statement that, "Sergeant

11  Wolf believed in good faith that Kern was violating

12  the law."

13       A    I'm sorry, sir.  Can you direct me to where

14  you're at?

15       Q    Yeah, 28, second page.

16       A    Okay.  Okay.

17       Q    "Based upon the review, I have determined

18  that even though Sergeant Wolf believed in good faith

19  that Kern was violating the law, that there was a lack

20  of evidence to support an arrest of Kern."  Do you see

21  that?

22       A    Yes.

23       Q    Why did you make the determination that

24  Sergeant Wolf believed in good faith that Kern was

25  violating the law?

1    A    That was -- that was determined based on my

2  review of his IA investigation.

3    Q    Okay.  His IA interview?

4    A    Correct.  And his -- based upon his pre-

5  disciplinary hearing.

6    Q    You told me that the prosecutor's office had

7  put on some training about obstruction charges.  Do

8  you remember that?

9    A    Uh-huh.

10    Q    Prior to the Kern incident?  Is that a yes?

11    A    Well, I -- I'm pretty sure that -- yes.

12  That's a yes.

13    Q    Why would you make a determination that

14  Sergeant Wolf acted in good faith if he had acted

15  contrary to recent training that had been put on by

16  the prosecutor's office?

17              MR. BECK:  Objection.

18              Go ahead.

19              THE WITNESS:  I would say that I made

20  that determination based upon the IA interview of him.

21  During that interview and I believe in the pre-

22  disciplinary hearing, he indicated that he made those

23  decisions based upon his understanding of previous

24  training.

25  //

1    BY MR. WIEST:

2        Q    Okay.  So you determined that Sergeant Wolf

3    was confused as a consequence of previous training?

4                MR. BECK:  Objection.

5        A    I -- I wouldn't say confused.  I would say

6    that there was a misunderstanding, or it wasn't

7    totally clear on --

8        Q    The training did not make clear to Sergeant

9    Wolf what was required for an obstruction charge was

10   the termination that you came to --

11       A    That's what I would say.  I'm sorry.

12       Q    Okay.  All right.  30, Chief, this is, it

13   looks like Sergeant Wolf's Garrity warning; correct?

14               (Exhibit 30 was marked for

15               identification.)

16       A    Correct.

17       Q    Okay.  And that was on October 20th of 2022?

18       A    Correct.

19       Q    Okay.  If I look at your signed Exhibit 29,

20   it looks like you had signed this on October 1st of

21   2022; correct?

22       A    Correct.

23       Q    Why would there be a need to provide

24   Sergeant Wolf a Garrity warning 21 days after that?

25       A    I -- I'm trying to look back and think.  But

1    I think what happened was I had Lieutenant Williams

2    do -- do his internal review of the incident.  So I'm

3    guessing this is -- this is when I got this back

4    from -- on October 1, 2022, this is -- this is when I

5    got this back from Lieutenant Williams.  So I think

6    that's -- the date and my signature reflect when

7    Lieutenant Williams completed his -- his review.

8         Q    Was October --

9         A    First, 2022.

10        Q    Okay.

11        A    So I think that was separate from -- from

12   the IA, or --

13        Q    Okay.  I mean, you also signed 10/1/22 under

14   the second page of this Exhibit 29.  Are you telling

15   me that that was just when you received it initially,

16   or --

17        A    I'm -- I'm saying I -- I'm guessing -- well,

18   I don't like to guess.  With my signature and date,

19   from the best of my memory, this is when I got this

20   back from Lieutenant Williams, when he completed and

21   submitted this to me.

22        Q    Okay.  If you go back to Exhibit 28, and you

23   go to the page 3 of 3.

24        A    Exhibit 28, page 3.

25        Q    Twenty-eight.  That's the draft report.  It

1    says, "Based upon this determination, Sergeant Wolf

2    was ordered to complete further training.  Sergeant

3    Wolf completed a 24-hour course called Confident Non-

4    Escalation.  The course was completed on October 26,

5    2022, and the certificate was attached."  And I've got

6    the certificate, actually, at Exhibit 32.

7                      (Exhibit 32 was marked for

8                      identification.)

9              So was that going to be kind of the outcome

10   of this investigation?

11        A    No.

12        Q    Okay.  What else?

13        A    I guess, what do you mean -- what do you

14   mean, sir?

15        Q    Well, what else was being considered by the

16   department at the end of October 2022 in response to

17   the Kern incident?

18        A    Well, as I mentioned earlier, I had ordered

19   an internal investigation to be conducted.

20        Q    Okay.

21        A    So based upon the preliminary information I

22   had, and I believe based upon the information I got

23   back from Lieutenant Williams, I felt there was a --

24   Sergeant Wolf needed further -- further training in

25   de-escalation.  And so instead of, you know,

1   recognizing a need for further training, instead of

2   waiting until the conclusion of the IA, you know, I

3   saw concern for further training.  And that's why I

4   ordered him to go through the training.

5       Q    Okay.  I'm going to hand you what I marked

6   as Exhibit 33.

7                  (Exhibit 33 was marked for

8                  identification.)

9              It's dated October 10, although I don't --

10  it may be the case that this was completed after

11  October 10.  And the only reason I say that is if you

12  go to the third page, it looks like there were some

13  interviews on October 20th.  Do you see that?

14      A    Yes.

15      Q    Do you know when you received this report by

16  Detective Mathis and Detective Pierson?

17      A    I -- I don't recall, sir.

18      Q    Do you know if it was prior to November of

19  2022?  And Chief, I'm wondering because on this rough

20  draft at Exhibit 28, it suggests that maybe the

21  completion of the investigation was November 14th of

22  '22.  And I'm just wondering if that, in fact, is the

23  case?

24      A    I'm sorry, sir.  Would you show me again

25  what you're referring to?

1     Q     Yeah.  I'm wondering if in fact it was the

2 case that the investigation was done on November 14th

3 of 2022, as reflected in the rough draft at Exhibit

4 28?

5     A     I can't say for sure.

6     Q     Okay.  You don't have any specific

7 recollection?

8     A     No, sir.

9     Q     Who would know the answer to that question?

10    A     I'm thinking -- I -- well, let me -- let me

11 just clarify.  Are you referring to Exhibit 33?

12    Q     Yeah.  When was the report received by you,

13 and the IA investigation closed with, you know, all

14 actions that were required to complete it having been

15 done?

16    A     I would have to -- maybe Detective Mathis

17 might know, since he's the author of this document.

18    Q     Okay.  All right.  Who would make the

19 determination as to whether the internal investigation

20 would be complete?

21    A     Me.

22    Q     And you can't tell me when that happened?

23    A     Based on my recollection, sir, is I don't

24 remember ever saying or writing anywhere or

25 documenting, "this date, this matter is concluded."  I

Page 133

1    would say the -- the matter was concluded when I

2    administered the discipline.

3         Q    Do you recall any follow up that needed to

4    be done between the issuance of the report by

5    Detective Mathis and your receipt of it at Exhibit 33,

6    and any other steps that you would need to impose the

7    discipline?

8         A    I mean, just to clarify, are you asking if I

9    had to do anything after I received that?

10        Q    Right, after you received the report but

11   prior to notifying Sergeant Wolf that you considering

12   discipline, was there any other follow-up steps that

13   had to be done?

14        A    Not from my staff.  It was, I think, after

15   that point, you know, it was, you know, in my hands

16   in -- you know, going forward with -- with discipline.

17        Q    How long do disciplinary -- by the way,

18   Chief, would you agree that if you're going to impose

19   discipline, it should be done in a timely manner to

20   effect corrective action?

21        A    I agree.  But timely, you know -- it's

22   supposed to be done timely, in a timely manner.

23        Q    Is four months timely?

24             MR. BECK:  Objection.

25             Go ahead.

1            THE WITNESS:  Well, I would say this

2   was an in-depth investigation that took a lot of time

3   and, you know, conducting interviews, reviewing

4   documents.  The scheduling of, you know, the -- the

5   interviews, me reviewing, you know, I -- amongst my

6   other duties.  You know, my -- you know, so I -- I

7   think four months was -- I would think it was done

8   pretty quick.

9   BY MR. WIEST:

10       Q    Would you agree that there were no

11  interviews that were conducted after October 20th,

12  relative to this matter -- October 20, 2022?

13       A    Well, I would say I had an interview with

14  Sergeant Wolf during his, you know, pre-disciplinary

15  hearing.

16       Q    That was after you gave him notice that you

17  were considering disciplinary action; correct?

18       A    Correct.

19       Q    Okay.  Were there any interviews relative to

20  the internal affairs investigation that were conducted

21  after October 20th of 2022?

22       A    I don't believe so.

23       Q    Okay.  You would agree that you gave

24  Sergeant Wolf notice that you were considering

25  disciplinary action -- I'll hand you Exhibit 34 -- on

Page 135

1    February 24, 2023?

2             Right?

3    A    Oh, I'm sorry, was there --

4    Q    You would agree that you gave Sergeant Wolf

5    notice that you were considering disciplinary action

6    against him on February 24, 2023; correct?

7    A    Correct.

8    Q    What had happened, if anything, relative to

9    Mr. Kern's complaint between the receipt of the

10   detective report in October of 2022 and the notice to

11   Sergeant Wolf on February 24, 2023?

12   A    I'm not sure what you -- what you mean.

13   Q    Had anything else been done relative to

14   Mr. Kern's complaint between the completion of the

15   detective report at Exhibit 33 that we looked at in

16   October of 2022, and the notice to Sergeant Wolf on

17   February 24, 2023, that you were considering

18   disciplinary action against him?

19   A    I don't think anything -- anything else

20   happened.

21   Q    Okay.  Did you prepare the letter yourself?

22   Or did you have someone on your staff prepare the

23   letter to Sergeant Wolf at Exhibit 34?

24                  (Exhibit 34 was marked for

25                  identification.)

Page 136

1      A     I prepared it myself.

2      Q     Okay.  How many of these disciplinary-type

3    matters do you have to deal with in a year?

4      A     Well, since I have became chief, there's

5    been a -- there's been a few.

6      Q     Okay.  Can you ballpark that for me?  I

7    mean, hundreds, dozens?

8      A     No.  I don't know, six, seven, eight maybe.

9    Somewhere around there.

10     Q     How long does it take you to prepare the

11   Exhibit 34 notice that you're considering disciplinary

12   matters?

13     A     This -- this probably took me several hours.

14     Q     Okay.  One of the things that occurs in very

15   late January and/or early February of 2023 is there is

16   viral reporting of this incident that hits social

17   media and local news in Cleveland; correct?

18                  MR. BECK:  Objection.

19                  Go ahead.

20                  THE WITNESS:  Oh, sorry.

21                  MR. BECK:  You're good.

22                  THE WITNESS:  Yes.

23   BY MR. WIEST:

24     Q     And you were aware of that; correct?

25     A     Correct.

1       Q    Is that what prompted the Exhibit 34 letter

2   to Sergeant Wolf?

3       A    No.  I -- you know, part of my duties is to

4   investigate all complaints and follow through that.

5   And so that wasn't the only -- just some videos and

6   social media, you know, stuff wasn't -- you know, the

7   primary -- or it wasn't even really a reason at all

8   for me to, you know, proceed with disciplinary

9   matters.

10      Q    Is it your testimony that you would have

11  issued the Exhibit 34 notice to Sergeant Wolf without

12  any media coverage of the incident?

13      A    Well, this was issued based upon the -- the

14  investigation.

15      Q    So I understand that the investigation led

16  to the letter, but that wasn't my question.  My

17  question was, would you have issued the Exhibit 34

18  letter to Sergeant Wolf had there been no media

19  coverage of the incident?

20      A    Well, yeah, I -- I would have.  You know,

21  minus that, the social media stuff had no bearing on

22  my determination, you know.  I had initiated the

23  internal investigation almost promptly after receiving

24  the complaint.  And so, yeah.  My -- I would have --

25  this would have happened anyway.

1      Q    Okay.  You would agree with me, Chief, that

2  in Exhibits 28 and 29, the complaint forms, there's no

3  mention of imposing discipline on Sergeant Wolf;

4  correct?

5      A    Correct.

6      Q    And in fact, in Exhibit 28, we already

7  talked about this.  You made a determination that

8  Sergeant Wolf believed, "in good faith, that Kern was

9  violating the law;" correct?

10     A    What part is that?  Sorry, page 2.  Correct.

11     Q    Okay.  All right.  Let's look at the

12  substance of the Exhibit 34, page 3 of 7.  Tell me

13  when you're there.

14     A    I'm there.

15              THE REPORTER:  I'm sorry, we've marked

16  this already?

17              MR. WIEST:  We have marked it.  It's

18  Exhibit 34.

19              THE REPORTER:  Okay, I just didn't have

20  it here.  Thank you.

21              MR. WIEST:  Yeah.  And for the record,

22  it's the February 24, 2023, letter from Chief Britton

23  to Sergeant Wolf.

24              THE REPORTER:  Thank you.

25              MR. WIEST:  Thank you.

1    BY MR. WIEST:

2        Q    At page 3, you make the statement, second

3    full paragraph, "Your conduct that day brought

4    disrepute on the public image of the police

5    department.  Your conduct was unprofessional and

6    incomplete -- incompetent.  You made no initial effort

7    to avoid conflict or to de-escalate the situation.  It

8    wasn't until you arrested Kern, did you try to

9    ascertain all the facts to establish probable cause of

10   the arrest."  Right?

11       A    Correct.

12       Q    You wrote it, and you signed it; right?

13       A    Correct.

14       Q    Those were true statements; correct?

15       A    Correct.

16       Q    How is that consistent with Sergeant Wolf

17   acting in good faith?

18                MR. BECK:  Objection.

19                Go ahead.

20                THE WITNESS:  As indicated, you know,

21   based upon my -- my review, to what he believed, he

22   was -- he was performing in good faith under the law.

23   But in actuality, based upon the review, it was

24   incorrect.

25   //

1   BY MR. WIEST:

2       Q    Okay.  This document's -- hold on.  In an

3   interview on October 20, 2022, you stated to Detective

4   Mathis and Pierson that you, "interpreted that Kern

5   was," "obstructing her traffic stop."

6            You also stated, "I knew I was a little bit

7   jumping the gun, I can tell you that."  You told

8   detectives that your actions were based upon your

9   "interpretation of what occurred."  Also, you told

10  detectives you were not clear of what obstructing was.

11  And the case law is very unclear, despite receiving

12  legal update training in October 2021.

13           If you were unclear about the case law

14  related to "obstruction" or "interference of a traffic

15  stop, you should have sought further clarification."

16  Those were the statements you made to Sergeant Wolf in

17  the Exhibit 34 letter; correct?

18      A    Correct.

19      Q    And those were true statements; correct?

20      A    Correct.

21      Q    And you believe nevertheless, though, that

22  Sergeant Wolf believed in good faith that Kern was

23  violating the law?

24      A    I'm sorry, can you repeat that?

25      Q    I guess, Chief, I'm trying to understand how

Page 141

1    you reconcile that paragraph with your statement in,

2    it looks like either October or November of 2022, that

3    Sergeant Wolf, "believed in good faith that Kern was

4    violating the law"?

5                    MR. BECK:  Objection.

6                    Go ahead.

7                    THE WITNESS:  Well, again, I would say

8    sir, is, you know, based upon my review of his IA

9    interview and his pre-disciplinary hearing, you know,

10   at that time and in the moment, his interpretation of

11   what was going on that he was obstructing based upon

12   the information from Officer Carli Lewis.

13                    But in fact, I don't know it was my

14   determination that he wasn't doing -- he wasn't -- I

15   don't know how to put it.  But as I say -- that I

16   believed he -- he truly believed that he was acting in

17   good faith and doing what he -- was doing right.  But

18   in fact, he wasn't wrong, as I indicated in there.

19                    It was his responsibility.  If he

20   indicated that he had received training that wasn't

21   clear, he should have immediately got clarification

22   from -- he should have received further clarification.

23   BY MR. WIEST:

24       Q    Was there any effort made by the Cleveland

25   Heights police department, given that Sergeant Wolf

Page 142

1   was not clear about what obstructing was, following

2   this determination to train other officers or to

3   follow up and conduct additional training?

4        A    I can't say specifically, sir.  I do

5   remember -- I don't want to say that.  But I can't say

6   specifically.  I didn't order, like, department-wide

7   training or updates on the --

8        Q    Okay.  That was what I was after.  I was

9   wondering if there was department-wide training on it.

10  Would you agree that the Exhibit 34 preceded, was

11  before the pre-disciplinary hearing?

12       A    I'm sorry?

13       Q    The exhibit 34 on February 24, 2023, was

14  prior to the pre-disciplinary hearing?

15       A    Correct.

16       Q    Okay.  I mean, so you didn't have the

17  benefit of whatever Sergeant Wolf was going to say at

18  the pre-disciplinary hearing at the time that you

19  authored the Exhibit 34 letter; correct?

20       A    I'm sorry, sir, I'm --

21       Q    You didn't have the benefit of -- because

22  you've talked a couple times to me about Sergeant

23  Wolf's input at the pre-disciplinary hearing.

24       A    Correct.

25       Q    That had not occurred, though, as of the

1    time of the Exhibit 34 letter; right?

2         A     Correct.  This was based upon, like I

3    mentioned, the --

4         Q     The IA investigation?

5         A     Correct.

6         Q     Okay.  All right.  Great.  And then

7    obviously, Sergeant Wolf was ordered to appear on

8    Tuesday, February 28th to conduct the pre-disciplinary

9    hearing.  And that's on page 7 of the Exhibit 34.

10        A     Correct.

11        Q     This indicates that it was going to occur on

12   February 28th at two p.m.  And it actually occurred at

13   1900 hours that day.  Do you know why that was?  I'll

14   show you here.

15        A     Yeah, if you could show me that.

16        Q     Yeah, I'm not trying to trick you, Chief.

17   Exhibit 35.  It's a March 22, 2023, communication.

18                  THE REPORTER:  Marking?

19                  MR. WIEST:  Yes.

20                  (Exhibit 35 was marked for

21                  identification.)

22                  THE WITNESS:  That would -- that would

23   have to be an error on my part, a typo.  I -- or I

24   don't recall doing -- I don't know why I would do --

25   //

Page 144

1   BY MR. WIEST:

2       Q    Well, one thought that occurred to me was he

3   had certified union representation and an attorney at

4   that hearing, and maybe it was to accommodate their

5   schedules?  I don't know, Chief, you tell me.  Or

6   maybe that's the incident and --

7       A    You know what, I'm -- I think I'm confused.

8   I'm confused.  So it says, "on Tuesday, February 28,

9   2023."  I don't think I put a time in there.  "I met

10  with you to conduct a pre-disciplinary hearing

11  relative to an incident that occurred on Thursday,

12  September 22, 2022, at approximately 1900 hours."  So

13  I think that's --

14      Q    Okay, now I understand.  The 1900 was the

15  event --

16      A    Right.

17      Q    Not the disciplinary hearing.  Okay.  All

18  right.  I want to ask, let's look at page 5.

19      A    Exhibit 35?

20      Q    Yes, sir, Exhibit 35.  And I'm looking at

21  the pre-disciplinary hearing subsection, that header.

22  Do you see that?

23      A    Yes.

24      Q    "Sergeant Wolf acknowledged receipt of the

25  charging letter.  And he was then afforded the

1    opportunity to be heard on each of the seven

2    specifications;" right?

3         A    Correct.

4         Q    "But he denied knowingly and/or

5    intentionally violating anyone's constitutional rights

6    in specification three;" right?

7         A    Correct.

8         Q    You then say, "He took responsibility for

9    his actions and attributed his actions to having a

10   'bad day.'"  Did you ask him why he had a bad day?

11        A    I don't -- I don't recall.

12        Q    Okay.  He indicated -- and I'm not sure if

13   this is supposed to be -- it says, "Since prior to

14   this incident."  Does it mean that prior to the

15   incident he's been in continuous counseling for anger

16   management and PTSD-related issues, or after the

17   incident?  Do you know?

18        A    It would have been prior to the incident.

19        Q    Was the department aware that it had a

20   supervisor that was in counseling and treatment for

21   anger management and PTSD prior to the Demetrius Kern

22   incident?

23        A    I don't -- I don't recall having specific

24   knowledge.

25        Q    Okay.  Do you know if his immediate

Page 146

1    supervisor had knowledge of that?

2        A    I'm unaware.

3        Q    Okay.  Who was at the time of the incident,

4    Sergeant Wolf's immediate supervisor?

5        A    Well I know that -- that would have been

6    Lieutenant Williams.

7        Q    Okay.  Does it concern you as a police chief

8    if you've got officers that are in counseling and

9    treatment for anger management and PTSD?

10                MR. BECK:  Objection.

11                You can answer.

12                THE WITNESS:  Oh.  Yes.

13   BY MR. WIEST:

14       Q    Is there anything that you think the

15   department should do in making sure that the treatment

16   is going to be effective for the officer if they're in

17   anger management and PTSD treatment?

18                MR. BECK:  Objection.

19                Go ahead.

20                THE WITNESS:  Well, I -- now looking

21   back at that, once that information was shared with

22   me, I felt confident that he was -- he was -- had been

23   and was currently in counseling for these specific

24   issues.  So I didn't -- I didn't feel it was necessary

25   to mandate something through the city.

1  BY MR. WIEST:

2      Q    Okay.  Well, in fact, Chief, you asked

3  him -- actually didn't just ask him, you ordered

4  him -- if you look at page 7, to continue counseling

5  and provide proof of participation and periodic

6  updates documenting progress with his medical

7  provider; right?

8      A    Yes.

9      Q    Did he indicate to you when he began

10  treatment for PTSD and anger management?

11      A    I don't recall if he told me specifically.

12      Q    Were you concerned that he had been treating

13  for that, and this incident with Mr. Kern nevertheless

14  occurred, even with the benefit of that treatment?

15              MR. BECK:  Objection.

16              Go ahead.

17              THE WITNESS:  I'm sorry, could you

18  repeat that?

19  BY MR. WIEST:

20      Q    Did you have a concern that he had been

21  treating for PTSD and anger management prior to the

22  Kern incident, and that the incident occurred,

23  suggesting that maybe that treatment hadn't been

24  effective?

25              MR. BECK:  Objection.

1                   Go ahead.

2                   THE WITNESS:  Yeah, I was concerned.

3    And, you know, it increased my -- I don't know if

4    awareness is the right term.  But it increased my -- I

5    need to pay closer attention on what's going on.  But

6    as mentioned, I -- he said he was currently in

7    treatment and counseling for these issues.

8    BY MR. WIEST:

9         Q    Okay.  All right.  I know we talked about

10   some media coverage that occurred in February of 2023

11   related to the to the Demetrius Kern incident.  Were

12   you aware that the mayor had made some public

13   statements concerning some reform he'd like to see in

14   the police department?

15        A    I recall him making statements.  I don't

16   recall what they were specifically.

17        Q    Okay.  And that they were related to

18   policies and procedural changes that he'd like to see

19   in the police department?

20        A    I remember him making a statement, but the

21   exact statement, I don't recall.

22        Q    Okay.  Did you agree with his public

23   statements?

24                   MR. BECK:  Objection.

25                   Go ahead.

Page 149

```
 1                    THE WITNESS:  I can't -- I don't
 2    remember what the specific --
 3                    MR. WIEST:  The statements were?
 4                    THE WITNESS:  -- statements were.
 5    BY MR. WIEST:
 6        Q    Let's look real quick.  Sorry, I didn't know
 7    we were going to get into this today.  Chief, I'm
 8    going to hand you what I've marked as Exhibit 41.
 9                    (Exhibit 41 was marked for
10                    identification.)
11             Have you seen Exhibit 41 before, that
12    included Mayor Seren's statements to the Cleveland
13    Jewish News?
14        A    Is it -- is it -- is his statement
15    specifically in here?
16        Q    It is.  Yeah, and I would direct you to --
17    where the mayor starts making comments is on the third
18    page back.  Specifically, I'm looking at, "Seren said
19    he first became aware of the incident as a result of
20    viral video, as policies adopted under the previous
21    form of government directed at the police department
22    internally investigate and resolve complaints about
23    police conduct without notifying the city manager
24    and/or mayor."  Do you see that??
25        A    What part is that?
```

Page 150

```
 1          Q     Third page back.

 2          A     One, two --

 3          Q     Yep, right there.

 4          A     And I'm sorry, which -- this one?

 5                MR. BRUNS:   Third paragraph.

 6     BY MR. WIEST:

 7          Q     Yeah.

 8          A     Okay.

 9          Q     Were you aware of that at the time?

10          A     Am I -- was I aware of the statement?

11          Q     That the mayor had made the statement to the

12     press?

13          A     Yes.

14          Q     Okay.  On the next page, this is Mayor

15     Seren's public statement about how the situation was

16     going to be handled.  It says, "Cleveland Heights

17     Police Chief Chris Britton investigated the complaint

18     and ordered Wolf to attend a de-escalation training

19     session as a result."  Do you see that?

20          A     I'm sorry, sir.  What page?

21          Q     Very top of the fourth page back.

22          A     Okay.

23          Q     Do you know why Mayor Seren would have been

24     under the impression that the only thing that was

25     being done about this would be de-escalation training,
```

1    at least as of February 1, 2023?

2        A    In terms of -- in terms of my handling of --

3    I never -- I didn't tell the mayor initially about the

4    complaint.  I've never, well, you know, based on my

5    experience -- or I know it's a new mayor.  But you

6    know, even with a previous city and administrator --

7    or city manager rather and/or administrator, I didn't

8    inform the mayor initially until I had some more

9    facts -- facts to give them.

10       Q    What facts did you need to give the mayor

11   after the internal investigation was completed by the

12   detectives?

13       A    Well he was, you know, after it was, you

14   know, after we had discussed the incident and I -- you

15   know, he was aware that I -- I was doing my duty, and

16   I initiated the internal investigation right away.

17   And after we had talked about it, we had, I don't

18   know, one or two at-length conversations about the

19   disciplinary process.

20       Q    Okay.  "The mayor indicates that he has

21   spent the last four days reviewing the unedited body

22   camera footage and documentation related to the

23   incident;" correct?

24       A    That's -- yes.

25       Q    Did he ask you for the body camera footage?

Page 152

1      A    I -- I can't say for sure.  I don't recall.

2      Q    Okay.  "The mayor indicates that the

3   situation, 'Clearly demonstrates' that the City's

4   existing policy of handling complaints internally

5   without alerting the mayor is 'insufficient for a

6   government with an elected mayor and illuminates why

7   these policies must change.'"  Did you agree with that

8   sentiment?

9            MR. BECK:  Objection.

10           Go ahead.

11           THE WITNESS:  I would say that was -- I

12  take responsibility for that.  And I should have told

13  the mayor sooner, you know.  He should have been made

14  aware of it, you know, once I got the complaint.

15  BY MR. WIEST:

16     Q    Okay.  The mayor then indicated, "'Executive

17  oversight of the division of police must become the

18  standard in Cleveland Heights.  I have already begun

19  work to change how Cleveland Heights handles

20  complaints about police conduct.  During last year's

21  budget process, I announced I would create a new

22  bureau of professional standards within the Cleveland

23  Heights division of police to formalize internal

24  controls and accountability.

25           I will appoint the first captain of this

1   bureau next month.'"  Let me unpack that just a little

2   bit.  The mayor in the budget process of 2022

3   indicated that he wanted to create a Bureau of

4   Professional Standards.  Is that true?

5        A    That's what he -- that's what he wrote.

6        Q    Was it true?

7        A    I don't recall.  I know -- I know that -- I

8   know we talked about his vision, and I agreed it

9   was -- it was a good idea that, you know, going

10  forward.

11       Q    Has that been created to date?

12       A    Yes.

13       Q    Okay.  Was the first captain of the bureau

14  appointed in -- earlier in, I don't know, March or

15  April of 2023?

16       A    Yes.

17       Q    Okay.

18       A    So beginning of -- yeah.  So it would have

19  been, you know, close to the beginning of 2023.

20       Q    Okay.

21            MR. BECK:  Can we take a break when --

22            MR. WIEST:  Yeah.

23            THE REPORTER:  We're going off record

24  now at 1:16 p.m.

25            (Off the record.)

1          THE REPORTER:  We are back on record at

2    1:32 p.m.  Thank you.

3          MR. WIEST:  All right.  Just before we

4    proceed, Mr. Beck's indicated that he's going to

5    produce to us the interview between Sergeant Wolf and

6    the Internal Affairs investigators.  Just like Topics

7    20 and 21, we're going to reserve on those for

8    potential follow up and keep the deposition open for

9    those, although I do have some more questions to just

10   wrap today.  And Chief, I think we've only got about

11   15 minutes or so left.

12   BY MR. WIEST:

13        Q    Let me begin here.  And I'm just batting

14   some cleanup.  If your officers were going to charge a

15   citizen with a crime, is it the city's expectation and

16   your expectation of the police chief for them to know

17   the elements of the offense, and if they don't, to

18   look up the elements before making a charging

19   decision?

20        A    Absolutely, yes.

21        Q    Okay.  Is failing to yield to lights and

22   sirens a crime?

23        A    Yeah, it's a traffic offense.

24        Q    It's a serious traffic offense; right?

25        A    Uh-huh.

1    Q    Yes?

2    A    Oh, yeah.  Yes.

3    Q    And because it could potentially jeopardize

4  officer safety in the case of a police car's lights

5  and sirens; right?  Correct?

6    A    Correct.

7    Q    Or if it's an ambulance or an EMS, it could,

8  you know, impede the potential safety of that vehicle

9  or people that they're responding on behalf of; right?

10    A    Correct.

11    Q    Is it would be your expectation to typically

12  file charges when appropriate, when an offense like

13  that has been committed?

14    A    Well, it depends on the contents of, you

15  know, what was going on.  But, you know, if it's a

16  flagrant, you know, obvious, you know -- then I, yeah.

17  There would be a -- would substantiate a -- the charge

18  for that.

19    Q    Chief, you would agree that for a lights and

20  sirens failure to yield violation, the lights and

21  sirens have to be on at least a sufficient amount of

22  time for the motorist to appreciate the fact that

23  they're on and then take action; right?

24    A    I would agree.

25    Q    Okay.  All right.  Mr. Kern met with you, I

Page 156

1  believe, in either late September or early October of

2  2022; correct?

3      A    Yeah.  It was in close proximity to -- it

4  was brought to my attention yesterday that he had

5  recorded that conversation.  So it was, you know,

6  probably a day or two after he filed the complaint.

7      Q    Okay.  Have you had occasion to review that

8  recording?

9      A    I listened to it yesterday morning.

10     Q    Okay.  Do you agree that you told him that

11  you didn't know whether or not the issues that arose

12  with Mr. Kern on September 22, 2022, were due to a

13  lack of knowledge, a training problem, or you didn't

14  know what it was?

15     A    I did say that.

16     Q    Okay.  You avoided me playing that recording

17  for you.  All right.  Let me see.

18              MR. WIEST:  Subject to the reservations

19  on Topics 20, 21, and the documents that are being

20  produced as well as the internal on Sergeant Wolf,

21  that interview that we're just now receiving -- and

22  we're going to continue the depo in progress for those

23  follow ups, we're done.

24              MR. BECK:  Okay.  Pat, do you have

25  anything?

Page 157

1                MR. KASSON:  I do.

2                     EXAMINATION

3    BY MR. KASSON:

4        Q    Hey, Chief, how are you?

5        A    Good afternoon.  I'm good, you?

6        Q    Can you see me okay?

7        A    Yes.

8        Q    I can't see my screen.  I can't tell whether

9    my camera's oriented or not.  I represent Wolf in this

10   case.  I just have a few questions for you; okay?

11       A    Yes, sir.

12       Q    Let's talk about stuff that maybe the public

13   doesn't generally understand.  I think the public

14   would understand that police work is dangerous, and

15   you would agree; right?

16               MR. WIEST:  Objection to form.

17               MR. BECK:   -- answer.

18               THE WITNESS:  Very dangerous.

19   BY MR. KASSON:

20       Q    But one of the problems with being a police

21   officer is you never really know what situation is

22   going to be the dangerous one; right?

23               MR. WIEST:  Objection to form.

24               MR. BECK:  You can answer.

25               THE WITNESS:  Oh, okay.

1          You are correct.

2    BY MR. KASSON:

3          Q    An innocuous domestic violence stop can turn

4    very dangerous for a police, for example; right?

5               MR. WIEST:  Objection to form.

6               MR. BECK:  Chief, you can answer until

7    I tell you not to.

8               THE WITNESS:  All right, very good.

9               You're correct.

10   BY MR. KASSON:

11         Q    And so you're familiar with how police

12   officers are trained to deal with this idea that every

13   situation has the possibility to be dangerous; fair?

14              MR. WIEST:  Objection.  Form.

15         A    Correct.

16         Q    And the problem with a police officer being

17   injured is once a police officer becomes disabled,

18   they're unable to help other people; right?

19              MR. WIEST:  Objection to form.

20         A    Correct.

21         Q    Right.  And so part of an officer's training

22   in dealing with any type of situation is how to keep

23   themselves safe in their dealings; right?

24              MR. WIEST:  Objection to form.

25         A    Correct, yes.

1      Q    In fact, in any situation, when you're --
2    strike that.
3          When you're evaluating new officers, one of
4    the things you evaluate them on is whether they are
5    keeping themselves safe in the performance of their
6    duties?
7                MR. WIEST:  Objection to form.
8      A    Yes, correct.
9      Q    For example, if I'm an officer and I roll in
10   to break up a fight, one of the things you'd look for
11   with me is you want to make sure that I didn't let
12   myself get within arm's distance of someone unless I
13   needed to be there; right?
14               MR. WIEST:  Objection to form.
15     A    Yes.  I -- I would -- I would criticize if
16   you went in by yourself.
17     Q    Exactly.  And so one of the police officers'
18   duties when they're doing anything is to make sure
19   that they keep themselves safe; fair?
20               MR. WIEST:  Objection to form.
21     A    Yes, correct.
22     Q    They're no good to anybody else if something
23   happens to them; right?
24               MR. WIEST:  Objection to form.  Asked
25   and answered.

Page 160

1       A    Correct.

2       Q    All right.  Let's talk about traffic stops.

3  Police are trained that traffic stops can be an

4  exceptionally dangerous situation; right?

5               MR. WIEST:  Objection to form.

6       A    You're correct.

7       Q    One of the reasons police stops are

8  dangerous is as you're approaching the car, you don't

9  have the best view of the person driving and what's in

10  the front seat; right?

11               MR. WIEST:  Objection to form.

12       A    Correct.

13       Q    All right.  You walk up on somebody and

14  they're standing straight up, you got a good view of

15  them, you got a good view of their hands.  But when

16  you do a traffic stop, you don't have those

17  advantages; do you?

18               MR. WIEST:  Objection to form.

19       A    No.

20       Q    Okay.  And so one of the things police

21  officers are trained as part of their duties in a

22  traffic stop is to maintain a very good focus on the

23  car as they approach the car; right?

24       A    Correct.

25       Q    And in fact, as you're walking away from the

1   car, you want to keep your eyes on it the best you can

2   as you're going back to run a plate or whatever;

3   right?

4                   MR. WIEST:  Objection to form.

5       A    Correct.

6       Q    So in a traffic stop, one of the duties of

7   an officer is when they stop, keep a good focus on the

8   car.  Try to watch the hands, and make sure nothing

9   happens as you approach; right?

10                  MR. WIEST:  Objection to form.

11      A    Correct.

12      Q    Right.  And then that starts the minute you

13  pull over and start to get out of the car; right?

14                  MR. WIEST:  Objection to form.

15      A    Correct.

16      Q    All right.  And you would expect Officer

17  Lewis, when she pulled this car over that's at issue

18  in this case, to maintain that good focus on the car

19  in front of her to make sure she's safe during that

20  stop; right?

21                  MR. WIEST:  Objection to form.

22      A    Correct.

23      Q    In this particular stop, there was a BOLO

24  out on this car -- well, strike that.

25                  There was a BOLO out about a silver car;

Page 162

1  right?

2            MR. WIEST:  Objection to form.

3      A    Correct.

4      Q    And then the BOLO was about someone who had

5  engaged in a violent act; fair?

6            MR. WIEST:  Objection to form.

7      A    Correct.

8      Q    Right.  So Officer Lewis, at the time she

9  pulled this car over, she suspected it might be the

10 car with the person in it who performed -- the violent

11 act that the BOLO was out; fair?

12           MR. WIEST:  Objection to form.

13     A    Correct.

14     Q    All right.  So that's especially true -- if

15 Officer Lewis is pulling over a car, which may have

16 someone who's suspected of a violent act, it's

17 especially true that her duty is to make sure she's

18 very careful and safe as she approaches the car;

19 right?

20           MR. WIEST:  Objection.  Form.

21     A    Correct.

22     Q    And you want that because one of the most

23 important things to you as a police chief is that your

24 officers stay safe?

25           MR. WIEST:  Objection to form.

Page 163

1      A    Correct.

2      Q    And I'm sure you have counseled police

3  officers who did not perform the duty of keeping

4  themselves safe over the course of your career; right?

5           MR. WIEST:  Objection to form.

6      A    I'm sure, yes.

7      Q    Okay.  All right.  Let's talk about this

8  actual stop if we could.  So Officer Lewis pulls over.

9  She gets out of her car and is turned towards the

10 silver car she pulled over; right?

11          MR. WIEST:  Objection to form.

12     A    I'm sorry, can you repeat that?

13     Q    Sure.  At this traffic stop, Officer Lewis

14 pulls over the silver car and gets out of her car, and

15 is facing the silver car; correct?

16          MR. WIEST:  Objection to form.

17     A    Correct.

18     Q    Mr. Kern pulls over behind Officer Lewis;

19 right?

20          MR. WIEST:  Objection to form.

21     A    Correct.

22     Q    And Mr. Kern makes a choice to yell at

23 Officer Lewis; correct?

24          MR. WIEST:  Objection to form.

25     A    Correct.

Page 164

1      Q     You would infer as a police officer that

2  Mr. Kern intended to get Officer Lewis's attention?

3                MR. WIEST:  Objection to form and

4  foundation.

5      A     I would say yes.

6      Q     And you understand that actually, Mr. Kern

7  has law enforcement training.  He was a correction

8  officer; right?

9                MR. WIEST:  Objection to form.

10     A     I wasn't aware of that.

11     Q     Okay.  Would you expect a correction officer

12  to understand that police officers need to be careful

13  when they're engaged in a stop?

14                MR. WIEST:  Objection to form.

15     A     Yes.

16     Q     Okay.  So Mr. Kern yells at Officer Lewis.

17  And what's she do?  She turns away from the silver car

18  and looks at Mr. Kern; doesn't she?

19                MR. WIEST:  Objection to form.

20     A     Yes.

21     Q     And then, only after Mr. Kern comes on the

22  scene, she calls for backup; right?

23                MR. WIEST:  Objection to form.

24     A     Correct.

25     Q     She called for backup because there were two

Page 165

1    people there when she thought she was just going to

2    have to deal with one; right?

3                    MR. WIEST:  Objection to form.

4        A    Correct.

5        Q    And as a result of her calling for backup,

6    Officer Wolf had to come as backup; right?

7                    MR. WIEST:  Objection to form.

8        A    Correct.

9        Q    And you would expect her to call for backup

10   if she thought she needed it, because part of her duty

11   is to keep herself safe; right?

12                   MR. WIEST:  Objection to form.

13       A    Correct.

14       Q    All right.  So Officer Williams was on duty

15   at the time -- strike that, I'm sorry.

16            Officer Wolf was on duty at the time that he

17   received a call for backup; right?

18                   MR. WIEST:  Objection to form.

19       A    Correct.

20       Q    And whatever police work he was doing at the

21   time he was on duty, he had to abandon that and come

22   in aid of an officer; right?

23                   MR. WIEST:  Objection to form.

24       A    Well, he responded, sir.  I don't know what

25   he was doing prior to -- at the time of the call.

1      Q    Sure.  Well, he was on duty; right?

2      A    Correct.

3      Q    All right.  You would expect one of your

4  officers who was on duty to be doing some type of

5  police work; right?

6                MR. WIEST:  Objection to form.

7      A    Yes.

8      Q    Okay.  They are either patrolling, they're

9  responding to a call, something; right?

10                MR. WIEST:  Objection to form.

11      A    Yes.

12      Q    And, but officers are trained if they get a

13  call for backup, you go and back to the other officer

14  up; right?

15                MR. WIEST:  Objection to form.

16      A    Correct.

17      Q    All right.  So whatever type of police work

18  Officer Wolf was doing at the time he received for the

19  backup, he had to abandon that and come for backup per

20  department policy; right?

21                MR. WIEST:  Objection to form.

22      A    Correct.

23      Q    All right.  So then what happens next?  She

24  goes and deals with the driver in the silver car;

25  correct?

Page 167

1           MR. WIEST:  Objection to form.

2      A    Correct.

3      Q    All right.  And her dealing with the driver

4  in the car, the silver car, that was delayed by

5  Mr. Kern's conduct.  Can we agree?

6           MR. WIEST:  Objection to form.

7      A    Yes.

8      Q    Okay.  Then she comes back and has realized

9  that this isn't the car we're looking for with the

10 BOLO; right?

11          MR. WIEST:  Objection to form.

12     A    Correct.

13     Q    All right.  She makes the decision not to

14 ticket him for the violation that the car had; right?

15          MR. WIEST:  Objection to form.

16     A    Correct.

17     Q    And police officers have discretion when and

18 when not to ticket or enforce the law; right?

19          MR. WIEST:  Objection to form.

20     A    Correct.

21     Q    It's a concept called selective enforcement?

22          MR. WIEST:  Objection to form.

23     A    Well, I have to say, I've never heard of

24 that term "selective enforcement" before.

25     Q    You, in the course of your career, have made

1    the decision not to ticket someone who was polite

2    about it, who said they were sorry, and you got the

3    feeling that we're going to go fix it right away;

4    right?

5              MR. WIEST:  Objection to form.

6      A    Correct.

7      Q    And that's not unusual for a police officer

8    to make a decision to enforce or not to enforce a law

9    based upon how the person is behaving; right?

10             MR. WIEST:  Objection to form.

11     A    Correct.

12     Q    When you were on the road and pulling folks

13   over, you were way less likely to write somebody a

14   ticket if they were -- strike that.

15             You were more likely to go ahead and give

16   someone the ticket if they were screaming and yelling

17   at you and being obscene, versus they were polite and

18   apologized and said they made a mistake; right?

19             MR. WIEST:  Objection.

20             MR. BECK:  Objection.

21             You can answer.

22             THE WITNESS:  Yeah.  A person's

23   demeanor would -- would play in part if a citation was

24   issued or not.

25   //

1    BY MR. KASSON:

2        Q    So Officer Lewis makes the decision to let

3    the silver car go; right?

4                  MR. WIEST:  Objection to form.

5    BY MR. KASSON:

6        Q    What she should have done next is get in her

7    car and continue her police work that day; right?

8                  MR. WIEST:  Objection to form.

9        A    I'm sorry, if you could back up a second.

10   You asked if Officer Lewis decided to let the silver

11   car go?

12       Q    Right.  She decides that she's not going to

13   detain the silver car; right?

14       A    Correct.

15       Q    Right.  So she comes back to her car.  She's

16   on patrol; isn't she?

17                  MR. WIEST:  Objection to form.

18       A    Well, at the -- yeah.  She's on -- on

19   patrol, looking for a car involved in a crime.

20       Q    But she was detained from going back on

21   patrol by Mr. Kern's conduct; can we agree?

22                  MR. WIEST:  Objection to form.

23       A    I don't know if I would use the word

24   "detain."  But Officer Lewis was distracted or her --

25   her focus was then turned to Mr. Kern.

1      Q    Right.  Mr. Kern's screaming and yelling at

2  her.  And she had to stay and deal with Mr. Kern

3  screaming and yelling at her as opposed to getting in

4  her car and going back on patrol; correct?

5                MR. WIEST:  Objection to form.

6      A    Correct.

7      Q    Okay.  So her going back on patrol was

8  delayed by Mr. Kern's conduct of screaming and yelling

9  at her; fair?

10                MR. WIEST:  Objection to form.

11      A    Correct.

12      Q    All right.  When you made -- well, let me

13  start with this.  Do you know what the collective

14  knowledge document is -- or strike that.

15                Do you know what the collective knowledge

16  doctrine is with respect to probable cause?

17                MR. WIEST:  Objection to form.

18      A    I'm not familiar with that -- with that, or

19  that, with that.

20      Q    So when you made the determination that

21  Officer Wolf did not have probable cause, we can agree

22  you did not consider the collective knowledge

23  doctrine; correct?

24                MR. WIEST:  Objection to form.

25      A    Yeah, I'm not -- I'm not familiar with

1    that -- with that.

2         Q    Right.  And because you're not familiar with

3    it, you were unable to consider that doctrine when you

4    determined that Officer Wolf lacked probable cause;

5    correct?

6                   MR. WIEST:  Objection to form.

7         A    Well, I would say the -- that determination

8    of lack of probable cause was ultimately made by the

9    prosecutor.

10        Q    We'll get to that in a second.  But you had

11   put that in a document; right?

12                  MR. WIEST:  Objection to form.

13        A    Correct.

14        Q    And when you put the lack of probable cause

15   in a document, you did not have the benefit of

16   understanding what the collective knowledge doctrine

17   is; did you?

18                  MR. WIEST:  Objection to form.

19        A    I did not.

20        Q    Okay.  Now, let's talk about the prosecutor

21   deciding not to prosecute.  That happens occasionally;

22   right?

23                  MR. WIEST:  Objection to form.

24        A    Correct.

25        Q    Right.  It's not like -- now, that's the

Page 172

1   role of the prosecutor.  You bring him cases and the

2   prosecutor has the discretion to bring it or not bring

3   it right; correct?

4              MR. WIEST:  Objection to form.

5       A    Correct.

6       Q    All right.  And Officer Wolf, when he's at

7   the scene backing up Lewis, he's delayed in going back

8   and doing whatever police work he was doing by Lewis

9   still screaming -- strike that.

10             Officer Wolf is delayed going back and doing

11  whatever he was going to do by Kern screaming at

12  Lewis; right?

13             MR. WIEST:  Objection to form.

14      A    I would -- I would kind of disagree with

15  that.  I mean, it's -- that's part of his duties is to

16  assist officers and direct them and lead them and deal

17  with -- part of policy is to deal with citizen

18  complaints.

19      Q    Sure, sure.  And also one of his duties with

20  respect to Lewis would be a training function; right?

21             MR. WIEST:  Objection to form.

22      A    Correct.

23      Q    And one of the ways more senior officers

24  train is they sit back a little bit, watch how the

25  younger officer handles it, and then maybe they'll

Page 173

1    step in a little bit later; right?

2                    MR. WIEST:  Objection to form.

3        A    Correct.

4        Q    And it's not uncommon as part of the

5    training function that a senior officer will explain

6    to a younger officer, "This is the offense that

7    occurred here;" right?

8                    MR. WIEST:  Objection to form.

9        A    Correct.

10       Q    Okay.

11                   MR. KASSON:  That's all I have.  Thanks

12   for your time.

13                   MR. WIEST:  I've got a couple follow

14   ups.

15                        EXAMINATION

16   BY MR. WIEST:

17       Q    Chief, would you agree with me that it is

18   not permissible to violate clearly established law and

19   constitutional rights all in the name of officer

20   safety?

21                   MR. BECK:  Objection.

22                   But you can answer.

23                   MR. KASSON:  Objection.

24                   THE WITNESS:  I'm sorry, repeat your --

25   //

Page 174

1   BY MR. WIEST:

2       Q    Yeah.  Chief, would you agree with me that

3   it is not permissible for officers to violate clearly

4   established law and constitutional rights, all in the

5   name of officer safety?

6                   MR. BECK:  Objection.

7                   Go ahead.

8                   THE WITNESS:  I would say, you know,

9   just by that phrasing alone, no.

10  BY MR. WIEST:

11      Q    It's not permissible; correct?

12      A    Correct.

13      Q    Okay.  All right.  Chief, is it the case

14  that anytime someone makes a complaint about an

15  officer in your department, they're taking away police

16  officer resources to deal with that complaint?

17      A    I wouldn't -- I wouldn't say -- it's

18  utilization of the resources, but not necessarily

19  taking away.

20      Q    The officers that are receiving the

21  complaint could be doing something else; correct?

22      A    Yeah, could be but -- yes, I mean, it's part

23  of their job.

24      Q    Okay.  Are they delaying policing the

25  performance of their duties?

1      A    I would say, when you say, "delay

2  performance of their duties," taking complaint is part

3  of their duties.  So it wouldn't -- I mean, maybe

4  delaying another aspect of their duties, but --

5      Q    Okay.  And if Mr. Kern is requesting an

6  officer's badge and name, is that delaying an officer

7  in the performance of their duties?

8      A    It depends on what's going on at that

9  particular moment.

10     Q    Was it in the case of what happened on

11  September 22, 2022?

12     A    Without reviewing the video, I would say I

13  don't recall specifically at what moment during the

14  interaction he asked for her badge number or name and

15  badge number.  But if just in general -- I would, just

16  in general in conversation sort of standing there, I

17  would say no.

18     Q    Okay.  And would you agree with me that if a

19  citizen asked for a name and badge number, an officer

20  should respond to that?

21     A    Yes.

22     Q    Chief, you didn't know what the collective

23  knowledge doctrine was, and I am assuming you're not a

24  lawyer; right?

25     A    You are correct.  I'm not aware of that

1   doctrine.

2       Q    Okay.  If I were to tell you that the

3   collective knowledge doctrine effectively imputes the

4   knowledge of one officer to another.  In other words,

5   if Officer A knows, for instance, that there's a

6   silver car that was involved in the domestic and they

7   put out a BOLO on it, that what that first officer

8   knows can be imputed to the second for purposes of

9   probable cause; okay?

10          If I were to give you that explanation.  Do

11  you know what collectively the department knew about

12  Mr. Kern prior to Sergeant Wolf deciding to have him

13  charged with obstruction, other than what Wolf and

14  Lewis experienced on the scene?

15      A    Do I -- did have prior knowledge about

16  Mr. Kern?

17      Q    Yeah, right.  Did anybody in the department

18  have prior knowledge about Mr. Kern and what went on

19  on September 22nd, other than what Wolf and Lewis

20  experienced at the scene of that incident?

21      A    I'm unaware.  I don't believe so.

22      Q    Okay, thank you.

23              MR. WIEST:  That's all I've got.

24              MR. BECK:  Anything else?

25              MR. KASSON:  No, I'm good.  Thanks,

Page 177

1    guys.

2                    MR. WIEST:  Thanks.

3                    MR. BECK:  All right.  We'll read it.

4    Thanks.

5                    THE REPORTER:  How about transcripts?

6                    MR. WIEST:  We're ordering.  E-tran, no

7    rush.

8                    THE REPORTER:  Thank you.

9                    MR. KASSON:  I'll take a copy, please.

10                   THE REPORTER:  Excellent.  Okay.  Let

11   me get us off record.  We're going off record now at

12   1:58 p.m.

13                   (Signature reserved.)

14                   (Whereupon, at 1:58 p.m., the

15                   proceeding was concluded.)

16

17

18

19

20

21

22

23

24

25

Page 178

CERTIFICATE OF DEPOSITION OFFICER

1

2          I, DAVID ROSS, the officer before whom the

3   foregoing proceedings were taken, do hereby certify

4   that any witness(es) in the foregoing proceedings,

5   prior to testifying, were duly sworn; that the

6   proceedings were recorded by me and thereafter reduced

7   to typewriting by a qualified transcriptionist; that

8   said digital audio recording of said proceedings are a

9   true and accurate record to the best of my knowledge,

10  skills, and ability; that I am neither counsel for,

11  related to, nor employed by any of the parties to the

12  action in which this was taken; and, further, that I

13  am not a relative or employee of any counsel or

14  attorney employed by the parties hereto, nor

15  financially or otherwise interested in the outcome of

16  this action.

                              <%26476,Signature%>
17                              DAVID ROSS

18                    Notary Public in and for the

19                              State of Ohio

20

21  [X] Review of the transcript was requested.

22

23

24

25

1              CERTIFICATE OF TRANSCRIBER

2          I, SYDNEY COLE, do hereby certify that this

3  transcript was prepared from the digital audio

4  recording of the foregoing proceeding, that said

5  transcript is a true and accurate record of the

6  proceedings to the best of my knowledge, skills, and

7  ability; that I am neither counsel for, related to,

8  nor employed by any of the parties to the action in

9  which this was taken; and, further, that I am not a

10  relative or employee of any counsel or attorney

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of this action.

13

14                          <%30789,Signature%>

15                                  SYDNEY COLE

16

17

18

19

20

21

22

23

24

25