IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

CLEVELAND DIVISION

~~~~~~~~~~~~~~~~~~~~

DEMETRIUS KERN,

              Plaintiff,


         vs.          Case No.  1:23-CV-1327


NAFTALI WOLF,

et al.,


              Defendants.

              ~~~~~~~~~~~~~~~~~~~~

                   Deposition of

              OFFICER JOSEPH TORRES


                 June 21, 2024
                   11:12 a.m.

                   Taken at:
       Baker, Dublikar, Beck, Wiley & Mathews
                400 South Main Street
                North Canton, Ohio


         Christine M. Emery, Notary Public

1    APPEARANCES:

2

3        On behalf of the Plaintiff:

4            Law Office of Christopher D. Wiest,

5            by

6            CHRISTOPHER D. WIEST, ESQ.

7            25 Town Center Boulevard, Suite 104

8            Crestview Hills, KY  41017

9            513-257-1895

10           chris@cwiestlaw.com

11

12               -and-

13

14           Bruns, Connell, Vollmar &

15           Armstrong, LLC, by

16           THOMAS B. BRUNS, ESQ.

17           4555 Lake Forest Drive, Suite 330

18           Cincinnati, OH  45242

19           513-312-9890

20           tbruns@bcvalaw.com

21

22

23

24

25

Page 3

1    APPEARANCES, continued.

2

3         On behalf of the Defendants City of

4         Cleveland Heights and Officer Carly

5         Lewis:

6                  Baker, Dublikar, Beck, Wiley &

7                  Mathews, by

8                  ANDREA K. ZIARKO, ESQ.

9                  400 South Main Street

10                 North Canton, OH  44720

11                 330-499-6000

12                 andreaz@bakerfirm.com

13

14        On behalf of the Defendant Naftali

15        Wolf:

16                 Reminger Co., LPA, by

17   via Zoom:    THOMAS N. SPYKER, ESQ.

18                 200 Civic Center Drive, Suite 800

19                 Columbus, OH  43215

20                 614-232-2420

21                 tspyker@reminger.com

22   ALSO PRESENT:

23   via Zoom:    Barlow Reporting &

24                 Video Services, LLC

25                        ~ ~ ~ ~ ~

1            TRANSCRIPT INDEX

2

3    APPEARANCES................................    2

4

5    INDEX OF EXHIBITS ........................ 5

6

7    EXAMINATION OF OFFICER JOSEPH TORRES

8    BY MR. WIEST...............................    6

9    BY MR. SPYKER............................    52

10   BY MR. WIEST...............................    56

11

12   REPORTER'S CERTIFICATE....................    60

13

14   EXHIBIT CUSTODY

15   EXHIBITS RETAINED BY ATTORNEY WIEST

16

17

18

19

20

21

22

23

24

25

Page 5

```
1                    INDEX OF EXHIBITS

2    NUMBER              DESCRIPTION            MARKED

3  Exhibit 11  Officer Carly Lewis Body .....  22
             Camera Footage
4
   Exhibit 12  Sergeant Naftali Wolf Body ...  20
5             Camera Footage

6  Exhibit 13  Officer Joseph Torres Body ...  10
             Camera Video
7
   Exhibit 14  Officer Joseph Torres Body ...  10
8             Camera Video

9  Exhibit 16  Audio........................  11

10 Exhibit 31  Officer Joseph Torres' .......  48
             Written Statement
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               OFFICER JOSEPH TORRES, of lawful

2    age, called for examination, as provided by the

3    Federal Rules of Civil Procedure, being by me

4    first duly sworn, as hereinafter certified,

5    deposed and said as follows:

6          EXAMINATION OF OFFICER JOSEPH TORRES

7    BY MR. WIEST:

8          Q.    Officer Torres, can you state your

9    name for the record?

10         A.    Joseph Torres.

11         Q.    Okay.

12               MR. WIEST:  Let's go off record.

13               (Discussion had off the record.)

14         Q.    Let me ask, just by way of

15   background, when -- you got your high school

16   diploma; correct?

17         A.    Correct.

18         Q.    What year?

19         A.    '04.

20         Q.    2004?  Where did you graduate from?

21         A.    Midpark.

22         Q.    Okay.  Do you have any college?

23         A.    Some credits, yes.

24         Q.    Where have you been taking those

25   at?

1          A.     Tri-C.

2          Q.     Okay.  When -- what was your first

3    law enforcement job?

4          A.     Cleveland Heights.

5          Q.     Okay.  What year was that?

6          A.     2019.

7          Q.     2019?  Okay.  Did you go to the

8    police academy with Cleveland Heights?

9          A.     I did.

10         Q.     Okay.  Was that 2018?  2019?

11         A.     Yeah.

12         Q.     Okay.  Were you open enrollment or

13   were you --

14         A.     I was open.

15         Q.     Okay.  And so they had job

16   postings, you applied while you were in the

17   academy?

18         A.     They hired me within two year --

19   two months of the academy.

20         Q.     Okay.  Did you apply while you were

21   still in the academy with Cleveland Heights?

22         A.     Yeah.

23         Q.     Okay.

24         A.     They said they wanted me, so I was

25   like all right.

```
 1          Q.    Okay.  When was -- and then I take
 2   it you did three months of field training on
 3   joining the department or so, three to six
 4   months?
 5          A.    Yeah.
 6          Q.    Okay.  Who was your field training
 7   officer?
 8          A.    Triller.
 9          Q.    Okay.
10          A.    Sergeant Triller.
11          Q.    Okay.  When did it become the
12   occasion that Sergeant Wolf started supervising
13   you?
14          A.    (Pause.)
15          Q.    And if I were to tell you that he
16   was promoted in June of 2021 would that --
17          A.    Yeah, when he got promoted is when
18   he came to our shift.
19          Q.    Okay.  I see.  Okay.
20          A.    We moved around a lot.  I moved
21   around a lot.  Yeah.  '21, probably.
22          Q.    So if I were to -- like I said, if
23   I were to tell you June '21, you think not long
24   after that, probably --
25          A.    Yeah.
```

1          Q.     -- or maybe right at that time?

2          A.     Yeah, around the time that he got

3    promoted.

4          Q.     Okay.  All right.  Prior to

5    September of 2022 had you had any training by

6    the City of Cleveland Heights on an obstruction

7    charge and what the elements of that charge

8    were?

9          A.     Yeah, we have a -- a monthly

10   training that we go through.

11         Q.     Okay.

12         A.     And then sometimes, you know, those

13   obstructions or, you know, various different

14   charges are within that training.

15         Q.     And you think that had occurred

16   prior to September of 2022?

17         A.     Sure.

18         Q.     All right.  I want to talk about

19   your involvement with the stop of Demetrius

20   Kern.  Not the stop, but the interaction with

21   Demetrius Kern on September 22nd, 2022.  We've

22   got some body camera footage and I marked --

23   there's actually two different videos, 13 and

24   14.

25                       -  -  -  -  -

1            (Thereupon, Exhibit 13, Officer

2            Joseph Torres Body Camera Video, was

3            previously marked for purposes of

4            identification.)

5                 -  -  -  -  -

6                 -  -  -  -  -

7            (Thereupon, Exhibit 14, Officer

8            Joseph Torres Body Camera Video, was

9            previously marked for purposes of

10           identification.)

11                -  -  -  -  -

12      Q.   And I think 14 is actually before

13   13.  I'm going to play Exhibit 14 for you.  If

14   you look at the top right on the body camera it

15   says September 22nd, 2022, at 19:05:39.  Do you

16   see that?

17      A.   Yes.

18      Q.   Did you -- let me ask, what caused

19   you to show up at the scene that day?

20      A.   Officer Lewis stated she pulled

21   somebody over and a male had jumped out on her

22   traffic stop.

23      Q.   Okay.  And was that something that

24   had come by way of a radio call?

25      A.   Yes.

1        Q.    And it was a call for assistance?

2        A.    Correct.

3        Q.    Sergeant Wolf had indicated that he

4    was also responding to that call for

5    assistance.  Were you aware of that?

6        A.    Correct.

7        Q.    Did you know when you were

8    proceeding to this scene that Sergeant Wolf was

9    already en route?

10       A.    No.  I don't recall anybody being

11   -- or who turned up.  It could have been any

12   one of us.

13       Q.    Were you involved in any other stop

14   or situation that required you to be doing

15   anything prior to responding to the scene or

16   were you just out patrolling?

17       A.    I was out patrolling --

18       Q.    Okay.

19       A.    -- from what I recall, yeah.

20       Q.    Okay.  I -- let's before we get

21   into the body camera, because I think we've got

22   a little bit of audio.  Exhibit 16, this is the

23   police radio traffic.

24                   -  -  -  -  -

25                   (Thereupon, Exhibit 16, Audio, was

1                      previously marked for purposes of

2                      identification.)

3                           -  -  -  -  -

4                      (Whereupon video was played.)

5        Q.    Did you hear that?

6        A.    Yeah.

7        Q.    Was that the radio call that caused

8  you to respond to the scene?

9        A.    Yes, as soon as she said that, yes.

10       Q.    And what she said is -- and I just

11  want to play it back.

12                     (Whereupon video was played.)

13       Q.    81 radio, stand by.

14                     (Whereupon video was played.)

15       Q.    It's going to be on Mayfield.

16                     (Whereupon video was played.)

17       Q.    Across from the first access road.

18                     (Whereupon video was played.)

19       Q.    Because another party does not know

20  how to yield to lights and sirens.

21                     (Whereupon video was played.)

22       Q.    He's sitting here recording me.

23                     (Whereupon video was played.)

24       Q.    Saying I almost ran him off the

25  road.

1          Did I -- did I read that back

2    correctly?

3          A.    (Witness nodding affirmatively.)

4                MR BRUNS:  Is that a yes?

5          Q.    Is that a yes?

6          A.    Yes.

7          Q.    I didn't go through ground rules,

8    and I -- but I will need verbal responses from

9    you today, if possible, just so we can try to

10   get out of here.

11               So what you knew in responding to

12   the radio call was that Officer Lewis was at

13   the scene, you knew that that was Officer

14   Lewis; correct?

15         A.    Correct.

16         Q.    That she said another party doesn't

17   know how to yield to lights and sirens.  He was

18   recording.  And he almost -- and saying that he

19   al -- that she almost ran him off the road;

20   correct?

21         A.    Yes.

22               MR. SPYKER:  Objection.  To the

23   omission of the confrontation language that's a

24   few seconds after that.

25               (Whereupon video was played.)

Page 14

1          Q.    Then what is -- what we hear is

2    Sergeant Wolf responding 8515 en route.  Had

3    you heard that?

4          A.    I can't recall --

5          Q.    Okay.

6          A.    -- if I did or I didn't.

7                (Whereupon video was played.)

8          Q.    Okay.  My understanding is that

9    this particular dispatch all runs together and

10   there may be some time differentials, but we'll

11   look at the body camera later on.

12               Going back to your body camera.

13   Sorry.  Exhibit 14.  You are already out of

14   your vehicle at 19:05:39 when this body camera

15   starts; correct?

16         A.    Yes.

17         Q.    Do you recall what you saw pulling

18   up to the scene?

19         A.    I -- I believe Carly was dealing

20   with the other vehicle.

21         Q.    The one --

22         A.    The one she --

23         Q.    -- the first, Goodman?

24         A.    -- she stopped.  Yes.

25         Q.    Okay.

1          A.    She was dealing with that and she

2     instructed me to talk to the guy.  And I was

3     already en route to talk to Mr. -- what's his

4     name, Kern?

5               MR BRUNS:  Kern.

6          Q.    Kern.

7          A.    Kern.

8          Q.    So the guy she asked you to speak

9     to was Mr. Kern?

10         A.    Yes, I believe so.

11         Q.    Okay.  Not the driver, not that --

12         A.    Not the one that she got pulled

13    over, no.

14         Q.    Actually, it looks like -- had she

15    already cleared the one that was --

16    Mr. Goodman, had he -- had he already left the

17    scene when your body camera started?

18         A.    I can't remember.

19         Q.    So I'm looking here.  I see it

20    looks like Officer Lewis' car there on the top

21    left of this video at -- and this is one second

22    into your body camera; correct?

23         A.    Yes.

24         Q.    Her lights are on; right?

25         A.    Yes.

1        Q.    And it looks like the back door is

2   open; correct?

3        A.    Yes.

4        Q.    It looks like Sergeant Wolf at the

5   right and Officer Lewis there at the left;

6   correct?

7        A.    This is -- this is not my first

8   body cam.

9        Q.    Okay.  So 19:05:39.  Let's go look.

10            (Whereupon video was played.)

11        Q.    So I will represent to you I think

12   it is your first body cam.

13        A.    Okay.

14        Q.    And I'm going to tell you why I

15   thought the other one was your first one.  This

16   time stamp at the top right says 19:12 and the

17   other one had 19:05.

18        A.    Okay.

19            MS. ZIARKO:  I'm going to object.

20   We'll figure it out.

21        Q.    Well, let me start with this

22   question.

23            MS. ZIARKO:  You can ask him.

24        Q.    Let me start with this question,

25   you agree with me, this is cam 1, it says

1    19:12:55; right?

2          A.    Yes.

3          Q.    And if we look at what we've marked

4    as cam two, that starts at 19:05:39.

5                Do you see that at the top right?

6          A.    Yes.

7          Q.    Is there any time syncing issue

8    that you're aware of in terms of errors with

9    the time stamp at the top right?

10         A.    There could be, because I believe I

11   was the first one on scene before Wolf, or

12   maybe I wasn't.  I can't recall.  To be honest,

13   I can't.

14         Q.    No, that's fair.

15         A.    I thought I was the first one to

16   respond and talk to the gentleman first from

17   what I --

18         Q.    Let me ask this:  Had you reviewed

19   the body camera footage before your testimony

20   today?

21         A.    I haven't reviewed anything.

22         Q.    Okay.  Had you ever reviewed the

23   body camera footage --

24         A.    No.

25         Q.    -- from this incident?

1      A.    They -- they pull it.  Like as soon

2   as there was an incident they pull everything.

3   So I haven't --

4      Q.    Okay.

5      A.    -- been able to go back and look at

6   my body cam footage or anything like that.

7      Q.    Here's what I'd like to do then,

8   because you haven't reviewed it.  And I think

9   it would be helpful for you, before I start

10  asking you questions about it, for me to play

11  this through.  As you do that I want you to

12  look at the -- the top right with the time

13  stamp, because I will tell you there's a little

14  bit of a break between the two cameras.  And

15  I'm going to have some questions about that for

16  you, so I just want you to pay attention to

17  that as you watch it.

18     A.    Okay.

19     Q.    And when I've played both of these

20  for you and I've refreshed your recollection

21  I'm going to have some questions about the

22  video.

23     A.    Okay.

24     Q.    Does that make sense?

25     A.    Yes.

1        Q.    Okay.

2              (Whereupon video was played.)

3        Q.    And this is Exhibit 14.

4              (Whereupon video was played.)

5        A.    I still don't know how to open the

6    door.

7              (Whereupon video was played.)

8        Q.    Okay.  That was what I've marked as

9    Exhibit 14.  I want to look at Exhibit 13 with

10   you also and then I've got some questions.

11             (Whereupon video was played.)

12       Q.    All right.  Let me start back where

13   we began.  The first video that I played, the

14   Exhibit 14, do you agree having reviewed them

15   that that happened first?

16       A.    No.

17       Q.    So you think --

18       A.    I think I was there already.  I

19   don't think I -- I had my body cam on.

20       Q.    Okay.

21       A.    Because I remember -- I remember

22   Carly, from what I could recall, Carly telling

23   me to stay with the guy.  And then I -- I was

24   there during the interaction between Wolf and

25   him and then Wolf handcuffing him.

Page 20

1        Q.    So you -- let's go back to 14.

2              (Whereupon video was played.)

3        Q.    So where the body camera begins at

4   Exhibit 14 you would agree Mr. Kern is already

5   handcuffed --

6        A.    Yes.

7        Q.    -- and I think he may be in the

8   cruiser?

9        A.    Correct.

10       Q.    Okay.  And you think you were there

11  before that?

12       A.    Yeah, I thought so.  Yeah.

13       Q.    Let's -- I think maybe --

14       A.    Is it possible that I could watch

15  Carly's body cam?

16       Q.    I was going to play Wolf's for you,

17  but we can do that instead.

18       A.    Either or.

19       Q.    Let's look at Wolf's.  It's Exhibit

20  12, for the record.

21                   -  -  -  -  -

22              (Thereupon, Exhibit 12, Sergeant

23              Naftali Wolf Body Camera Footage,

24              was previously marked for purposes

25              of identification.)

```
 1                    -   -   -   -   -

 2                 (Whereupon video was played.)

 3        Q.    This is 20 seconds into Exhibit 12,

 4   Wolf's body camera.

 5                 (Discussion had off the record.)

 6        Q.    At the top right it looks like

 7   it's 19:01:14.  You're not present at the scene

 8   right here; correct?

 9        A.    No.

10                 (Discussion had off the record.)

11        Q.    Is that correct?

12        A.    Correct.

13        Q.    Okay.  I'm going to move this up to

14   the handcuffing.

15                 (Whereupon video was played.)

16        Q.    This is 3:02.

17                 (Whereupon video was played.)

18        Q.    Okay.  So I think we see you there

19   at five minutes into Sergeant Wolf's body

20   camera?

21        A.    That's correct.

22                 MR BRUNS:  What time?

23        Q.    At 19:05:54 is the time stamp on

24   the top right of the BWC.

25                 Do you know how long you had been
```

Page 22

1    -- like did you witness the handcuffing?

2          A.    I believe I did.

3          Q.    Okay.  And your body camera wasn't

4    activated for that, apparently?

5          A.    I guess not.

6          Q.    Do you know why not?

7          A.    No, I can't tell you.

8          Q.    Let me --

9          A.    Just --

10         Q.    Let's look at --

11         A.    -- out of habit.

12         Q.    -- Officer Lewis' just to make

13   sure.  Because I do want to go back.  I'm going

14   to look at Exhibit 11 with Officer Lewis.

15                   -  -  -  -  -

16              (Thereupon, Exhibit 11, Officer

17              Carly Lewis Body Camera Footage, was

18              previously marked for purposes of

19              identification.)

20                   -  -  -  -  -

21              (Whereupon video was played.)

22         Q.    So this is at 5:25 into Exhibit 11.

23   We see Sergeant Wolf.  We see Officer Lewis.  I

24   don't see that you're on the scene yet; do you?

25         A.    No.

1          Q.     Okay.

2                 (Whereupon video was played.)

3          Q.     So this is at 6:18 seconds.  If you

4    remember your vehicle was off to the left

5    there --

6          A.     Uh-huh.

7          Q.     -- and I don't see you yet having

8    arrived at the scene.  Would you agree with me?

9          A.     Correct.

10         Q.     Okay.

11         A.     That might have been me in the

12   background coming right now.

13         Q.     You mean the sirens that we hear?

14         A.     Right.

15         Q.     I agree with you.  Let's go look.

16                (Whereupon video was played.)

17         Q.     Okay.  They're in.  So this is at

18   7:06.  You would agree that having looked at

19   these body cameras, and maybe you can tell me,

20   if you go -- if we go back to your first one,

21   as you're exiting.

22                (Whereupon video was played.)

23         Q.     Do you think that maybe that is the

24   beginning of your interaction --

25         A.     Yeah.

1       Q.     -- at the scene now?

2       A.     Yes.

3       Q.     Okay.  I think we're all there now.

4       A.     Yes.

5       Q.     Because the first thing I hear is

6   this comment Mr. Kern makes to Sergeant Wolf

7   about he's full of machismo, we hear that on

8   your body camera.  And then we later see on

9   both Wolf and Lewis' body camera different

10  angles of you at the scene; correct?

11      A.     Correct.

12      Q.     And, by the way, I'm looking now

13  back at Exhibit 14, Torres cam 2, you think

14  that is the start of your body camera is -- you

15  were activating it once you were out of your

16  car walking up to the interaction with -- we

17  see Mr. Kern is not yet placed in the cruiser.

18  He's in handcuffs.  The arrest has occurred.

19  We see Officer Lewis there on the left and

20  Sergeant Wolf on the right at the four second

21  mark of the body camera; correct?

22      A.     Yes.

23      Q.     Okay.  A couple of things occurred

24  to me in reviewing this interaction.  At 1:25,

25  okay, let's -- let's look.  This is your body

1   camera, 13 seconds.

2              (Whereupon video was played.)

3        Q.    Did she just say maybe we're making

4   a mistake?

5        A.    Yes.

6        Q.    And this is at 21 seconds into

7   Torres cam 2; correct?

8        A.    Yes.

9        Q.    Okay.  The she, by the way, was

10  Officer Lewis and she was speaking to Sergeant

11  Wolf; correct?

12       A.    Correct.

13       Q.    All right.

14             (Whereupon video was played.)

15       Q.    So you witnessed Officer Lewis tell

16  Sergeant Wolf that she wanted to let him go and

17  Sergeant Wolf's response is we can't, he's in

18  handcuffs.  Did you hear that?

19       A.    Yes.

20       Q.    Did you know -- you would agree

21  with me that the -- the initial traffic stop

22  with Mr. Goodman had been completed by the time

23  that you arrived on scene?  That was the

24  vehicle that was actually in front of --

25       A.    Yes.

1          Q.    -- Officer Lewis' vehicle, that

2    wasn't there when you showed up; correct?

3          A.    Correct.

4          Q.    Okay.  You obviously were not there

5    and you have no personal knowledge about what

6    happened prior to you showing up; correct?

7          A.    Correct.

8          Q.    There is a break between these two

9    body cameras, about a two minute break, do you

10   have any independent recollection of what

11   occurred in that two minutes?

12         A.    What could have occurred was I

13   talked to Carly and Sergeant Wolf.

14         Q.    Do you remember that?

15         A.    Yeah, I could have.  I don't

16   remember.  I don't recall.

17         Q.    Okay.

18         A.    I thought I was on scene, you

19   know -- I'm probably getting things intermixed

20   with previous stops or something.  But I don't

21   recall.

22         Q.    Okay.

23         A.    I could have been talking to -- to

24   Wolf.  I could have been talking to both of

25   them like individually.

1       Q.    Do you know why you stopped your

2    body camera between the two -- the two

3    instances of body camera that we've got?

4       A.    Probably because he's already in --

5    in handcuffs in -- in the back, so if I'm going

6    to have a private conversation.  Or probably

7    because I felt like the incident was over and

8    I'm ready to roll.  But I remember Wolf asking

9    me to go talk to him and I put my body cam back

10   on maybe.

11      Q.    Okay.

12            (Discussion had off the record.)

13      Q.    Why would you have stopped the body

14   camera for a private conversation?

15      A.    To have a private conversation.

16      Q.    Okay.  What kind of things would

17   you have wanted to talk about privately?

18      A.    Their opinion on what's

19   transpiring.

20      Q.    Do you recall them --

21      A.    Or what was going on previously to

22   that incident.

23      Q.    Okay.  Do you recall them telling

24   you anything?

25      A.    No.

Page 28

1          Q.    Okay.  Did you believe that the

2     failure to -- by Mr. Kern to identify himself

3     was a valid basis for an obstruction charge?

4                MS. ZIARKO:  Objection.

5                MR. SPYKER:  Objection.

6          A.    So for so long that's what we were

7     doing.  If you failed to identify it's

8     obstruction.

9          Q.    Okay.

10         A.    Until Pam came and she --

11               MS. ZIARKO:  Listen to the

12    question.

13         A.    Yeah.

14         Q.    Okay.  So that was the practice of

15    the department for a period of time until Pam

16    the prosecutor, Pam Roessner; correct?

17         A.    From what we talked about, yes.

18    But there's also failure to appear, that's

19    another POC.  Or, I'm sorry, not failure to

20    appeal, failure to identify.

21         Q.    Okay.  A failure to identify charge

22    requires that the person has committed or is

23    committing or is about to commit a criminal

24    offense; correct?

25         A.    Correct.

Page 29

```
 1        Q.    You can also do that if they happen

 2   to be a witness to an offense of violence

 3   that's a felony; correct?

 4        A.    Correct.

 5        Q.    Did you have any personal knowledge

 6   that Mr. Kern had committed or was committing

 7   or was about to commit a criminal offense?

 8              MS. ZIARKO:  Objection.

 9              MR. SPYKER:  Objection.

10              THE WITNESS:  When you say

11   objection, do I answer?

12              MS. ZIARKO:  Yes, I'm sorry.

13              THE WITNESS:  All right.  I don't

14   -- I don't --

15              MS. ZIARKO:  I'll tell you --

16              THE WITNESS:  -- know what I'm

17   supposed to do.

18              MS. ZIARKO:  -- if I object and

19   you're not to answer, I'll tell you.

20              THE WITNESS:  Okay.

21        A.    Could you repeat the question?

22        Q.    Did you witness and have personal

23   knowledge of Mr. Kern having committed a

24   criminal offense?

25              MR. SPYKER:  Objection.
```

1                MS. ZIARKO:   Objection.

2        A.     Yes and no.

3        Q.     Okay.  Tell me why you say that.

4        A.     Good faith.  I mean, if somebody

5    jumped out on you -- in my mindset, when I was

6    going there, lights and sirens, because

7    somebody jumped out on her traffic stop.

8    Right?

9        Q.     That's what you thought showing up

10   to the scene?

11       A.     Correct.

12              So if you're going off of that then

13   we want to identify who are you?  Like what are

14   you doing?  Why are you jumping out on this

15   traffic stop behind an officer?

16              So, for me, it depends.  In his

17   situation, I don't -- I don't know.  I

18   wasn't -- I wasn't Carly.

19       Q.     Okay.

20       A.     I wasn't there.  I just obviously

21   saw what transpired afterward.

22       Q.     And I want to be clear about my

23   question, Officer Torres.  I'm not asking what

24   Carly or Sergeant Wolf may or may not have

25   seen.  I am asking whether you witnessed

Page 31

```
1    Mr. Kern commit a felony offense while you were

2    on the scene?

3         A.    Negative.

4               MS. ZIARKO:  Objection.

5         Q.    You did not; correct?

6         A.    No.

7               MR BRUNS:  Is that correct?

8         Q.    Is that correct?

9         A.    Yes.

10        Q.    Okay.  Had the practice of charging

11   people with obstruction of official business

12   for failing to identify themselves, had that

13   stopped as of the date of this current

14   incident, September 22nd, 2022; do you know?

15        A.    I don't know.

16              MS. ZIARKO:  Objection as to form.

17              Go ahead.

18              MR. SPYKER:  Objection.

19              MS. ZIARKO:  Go ahead.

20        Q.    You don't know?

21        A.    No.

22        Q.    Okay.  Do you know whether or not

23   you thought it was a valid charge?

24        A.    I thought so.

25        Q.    Why?
```

1        A.    Failure to identify is obstruction

2    of official business, I mean, in my thought

3    process.

4        Q.    Okay.  Does that suggest to you

5    that maybe the practice had not stopped as of

6    the date of the current incident?

7             MS. ZIARKO:  Objection.

8        A.    No.  It -- it came down that --

9    from Pam.  I don't know if it was before or

10   after, but it was around that time.  Could be

11   before.  Could be after.  It might have been

12   before.  That we -- you know, the POC is

13   failure to identify.

14       Q.    Mr. Kern indicated to you that his

15   shoulder was hurting when you went back up to

16   the car; correct?

17       A.    Yes.

18       Q.    Was -- did he display anything to

19   you that indicated that, in fact, his shoulder

20   was hurting?  In other words, was he wincing?

21   Anything physically that you observed?

22       A.    I don't think so.

23       Q.    You don't think so?

24       A.    No.  I think verbally.  That was

25   it.  Verbally telling me that --

1          Q.     Did you --

2          A.     -- his shoulder hurt.

3          Q.     -- see him kind of holding his arm

4    in a way that looked like it was hurt?

5          A.     When I uncuffed him.

6                 MS. ZIARKO:  Objection.

7          Q.     After you uncuffed him?

8          A.     Yes.

9          Q.     Okay.  That's a good point.

10   Because as he's cuffed behind himself he can't

11   really move; can he?

12         A.     Correct.

13                MS. ZIARKO:  Objection.

14         Q.     Correct?

15         A.     Correct.

16         Q.     After you removed the cuffs he was

17   holding his shoulder as if it were -- his arm

18   as if it were injured?

19         A.     I believe so.

20         Q.     Okay.  Did you think that his arm

21   was injured, having observed the scene?

22         A.     No.

23         Q.     Okay.  Why do you say that?

24         A.     Because it didn't seem like it was

25   to me other than him holding his arm.  But when

Page 34

1    I was taking off the handcuffs and everything

2    he was kind of, in my opinion, moved a little

3    freely.  I had shoulder injuries and it didn't

4    look like it was wincing to me.

5         Q.    Okay.  So I want to be clear about

6    what we're talking about here.  That occurs

7    when you take off the handcuffs in Exhibit 13.

8    I'm at 4:06 into Exhibit 13.

9              (Whereupon video was played.)

10        Q.    So I'm looking at 4:20.  Your

11   testimony is you don't think he's wincing?

12             MS. ZIARKO:  Objection.

13        A.    No.  He's angry.

14        Q.    Okay.

15             (Whereupon video was played.)

16        Q.    I'm looking at 4:45.  Is he holding

17   his arm now a little?

18        A.    I can't --

19        Q.    You can't tell?

20        A.    No.

21        Q.    Okay.

22             (Whereupon video was played.)

23        Q.    You said I don't like that.  Did

24   you hear that?

25        A.    Yeah.  I don't like the way the

Page 35

1    cuffs were because I was going to cuff him in

2    the front.

3         Q.    Okay.

4         A.    But they were reversed so I had to

5    take them off to reset them to put them the

6    correct way.

7         Q.    So when you say you don't like that

8    you were referring to the -- how the cuffs

9    were?

10        A.    The angle of the cuffs.

11        Q.    Okay.

12        A.    Right?  So they were backwards.

13        Q.    How was he cuffed in the back with

14   the cuffs?  When you took them off were those

15   backwards, too?

16        A.    No.  No.  They're going to stay the

17   way the cuffs are.  Do you want me to

18   demonstrate?

19        Q.    If you -- yeah.  I mean, if you do,

20   I'll just --

21        A.    So the cuffs so you're like this

22   (indicating), right, in the back.

23        Q.    Okay.

24        A.    So, and he didn't have these kind

25   of cuffs.  He had the other ones.

Page 36

1      Q.    What are the other ones?

2      A.    The -- it looks like -- just the

3  ones that go like this (indicating).

4      Q.    So, just for the record, you're

5  flexing -- they are the kind that flex up and

6  down kind of?

7      A.    Yeah.

8      Q.    Okay.

9      A.    So if he had these then I could put

10  those on comfortably.

11      Q.    When you say if he had these,

12  you're talking about cuffs that are attached

13  together by way of a chain link basically?

14      A.    Correct.

15      Q.    And the ones --

16      A.    So these are different.  I could,

17  you know, I could mess with these.  The ones

18  that he had on weren't.

19      Q.    The ones that Sergeant Wolf had put

20  on Mr. Kern were the flex kind?

21      A.    The flex, yes, exactly.  So --

22      Q.    Okay.

23      A.    I think it was.  Either way it

24  looked uncomfortable for him to be -- if I --

25  when you switch them to the front to be that

1    way.  So I had to take them off completely and

2    set them on --

3         Q.    Okay.

4         A.    -- on him right way.  More

5    comfortable.

6         Q.    Okay.

7         A.    If not, it would have been all

8    twisted up.

9         Q.    Okay.

10             (Whereupon video was played.)

11        Q.    Mr. Kern reported to you that he --

12   and this is at the scene; correct?

13        A.    (Witness nodding affirmatively.)

14        Q.    That he had not had prior injuries

15   to his shoulder?

16        A.    Correct.

17        Q.    Okay.

18             (Whereupon video was played.)

19        Q.    You told Mr. Kern, approximately

20   5:25 into Exhibit 13, that you had no knowledge

21   about what happened; correct?

22        A.    Yes.

23        Q.    Okay.  That was a true statement at

24   the time?

25        A.    Unknown.

1        Q.    You did have knowledge about what

2   happened?

3        A.    I might have.  I might have, you

4   know, talked to another officer.  I don't know.

5   I don't think so.

6        Q.    You don't think so?  You don't

7   recall anything sitting --

8        A.    Correct.

9        Q.    -- here today?

10            Okay.  All right.  Do you recall

11  anything else about this incident that we have

12  not seen on body camera?

13       A.    No.  As far as?  As far as what?

14       Q.    As far as any of the

15  interactions --

16       A.    (Cross-talk)

17       Q.    -- with Mr. Kern or Sergeant Wolf

18  or Officer Lewis; correct?  There's nothing we

19  haven't seen on body camera that you recall?

20       A.    Correct.

21       Q.    Okay.  After this incident clears

22  did you have occasion to speak with either

23  Sergeant Wolf or Officer Lewis about what had

24  happened?

25       A.    I can't recall.  I know it went to

1    -- it went viral.  I mean, everybody had

2    something to say.

3         Q.    Okay.  That was like five, six

4    months later, though; correct?

5         A.    Possibly.

6         Q.    Okay.  I want to be more specific.

7    Did you ever tell Sergeant Wolf that you

8    thought Officer Lewis was insubordinate in any

9    way?

10        A.    Yes.

11        Q.    When was that?

12        A.    We talked about it.  I don't recall

13   when it was.  It could have been right after

14   that.

15        Q.    Right after -- when you say right

16   after that, right after the --

17        A.    The incident, the whole incident.

18        Q.    -- the incident of September 22nd,

19   2022?

20        A.    Yeah.  Yes.

21        Q.    Okay.  Why did you think Officer

22   Lewis was insubordinate?

23        A.    I'm military background.  And he's

24   a sergeant.  And I just -- in that situation I

25   just felt there was too much going back and

Page 40

1    forth.

2         Q.    Between Officer Lewis and Sergeant

3    Wolf?

4         A.    Correct.

5         Q.    When were you in the military?

6         A.    '09.

7         Q.    Okay.  Until -- until 2009?

8         A.    I -- when was I in the military?  I

9    joined in '09.

10        Q.    Oh, you joined in '09?

11        A.    Yeah.

12        Q.    What branch?

13        A.    Marine Corps.

14        Q.    And when were you discharged?

15        A.    2013.

16        Q.    Okay.  What was your -- were you

17   honorably discharged?

18        A.    Yes.

19        Q.    What was your MOS?

20        A.    1812.

21        Q.    Which was?

22        A.    Tanks.

23        Q.    Okay.  Did you learn ever in the

24   course of your military duties that you should

25   not follow illegal orders?

1           MS. ZIARKO:  Objection.

2      A.    No.

3           MR. SPYKER:  Objection.

4      Q.    So your military training was that

5   you should follow all orders regardless?

6      A.    No.  No.  Yeah.  You don't do --

7   you do what's right.

8      Q.    You don't follow illegal orders;

9   correct?

10     A.    Correct.

11     Q.    If Sergeant Wolf had given Officer

12  Lewis, for instance, a directive to beat

13  Mr. Kern while he was in handcuffs and he

14  wasn't resisting would she appropriately fail

15  to follow that order?

16          MS. ZIARKO:  Objection.

17     A.    Negative.

18          MR. SPYKER:  Objection.

19     Q.    She should not follow that order;

20  correct?

21     A.    She should not follow that order,

22  correct.

23     Q.    Okay.  Do you know whether or not

24  officer -- you heard Officer Lewis say that

25  Mr. Kern did not commit any crimes, you heard

1    that; right?

2           A.    Yes.

3           Q.    Do you believe that she should have

4    followed an order to charge Mr. Kern even

5    though -- well, let me back up.

6                 In terms of who had the most

7    knowledge about what was going on at this

8    scene, including the initial stop, would you

9    agree that Officer Lewis was probably that

10   person?

11                MS. ZIARKO:  Objection.

12          A.    Of course.

13                MR. SPYKER:  Objection.

14          Q.    She was there first; correct?

15          A.    Yes.

16          Q.    And if she had indicated to

17   Sergeant Wolf that Mr. Kern did not commit any

18   crimes why would it -- why was she being

19   insubordinate when he told her you need to

20   charge him for failing to ID and she didn't

21   think that that was lawful?

22                MS. ZIARKO:  Objection.

23                MR. SPYKER:  Objection.

24          A.    When I first got there -- I can't

25   remember.  But I feel like his interaction with

Page 43

1    him.

2            Q.    So his interaction with him, whose

3    with who?

4            A.    Officer Wolf's interaction

5    with --

6            Q.    With Mr. Kern?

7            A.    -- Kern --

8            Q.    Okay.

9            A.    -- warranted that.

10           Q.    Warranted interference or the

11   obstruction charge?

12           A.    Correct.

13           Q.    And that was -- when you were there

14   he was already in the handcuffs; correct?

15           A.    Correct.

16           Q.    And that was because he declined to

17   identify himself?

18           A.    Correct.

19                 MS. ZIARKO:   Objection.

20           Q.    Let me see, other than the

21   discussion about -- by the way, the discussion

22   about insubordination, that, we don't have any

23   body camera footage; correct?  I've not seen

24   any body camera footage.

25           A.    Correct.  I mean, yes.

1        Q.    Where did that conversation occur?

2        A.    Not sure.  Don't recall.

3        Q.    Do you know, would it have been at

4   the synagogue, the Park Synagogue?

5        A.    It could have been when I turned

6   off my body camera and we were talking there.

7        Q.    Okay.  You don't remember?

8        A.    No, I don't.  It could have been at

9   the synagogue.  It could have been --

10       Q.    Were you at the synagogue for the

11  discussion that followed this incident?

12       A.    Don't remember.

13       Q.    Okay.

14             (Discussion had off the record.)

15       Q.    Were there any other conversations

16  that you've had with anyone on the department

17  to include -- and I want to be clear.  It does

18  not include any conversations that you've had

19  with your outside counsel, I'm not asking about

20  that, I'm not entitled to know about it.

21  Anyone on the department that you've had

22  related to the Mr. Kern incident since the

23  incident that you recall?

24       A.    Like since the video went viral?

25       Q.    Sure.

1      A.    Oh, yeah, I mean, there's --

2  everybody had something to say.

3      Q.    What do you mean by everybody had

4  something to say?

5      A.    Like other officers were like, man,

6  she should have never done that, you know, he's

7  a sergeant.  People felt the way I did.  And

8  then other people were like maybe it was too

9  much.  Then other people -- you know, everybody

10  had something to say.

11      Q.    And when you say everybody, you

12  mean everybody on the department had something

13  to say?

14      A.    No, just in general.

15      Q.    Just in general?

16      A.    Yeah.

17      Q.    I want to focus in on any

18  discussions you've had with anyone on the

19  department relative to the Mr. Kern incident.

20      A.    Maybe Lieutenant, at the time,

21  Williams --

22      Q.    Okay.

23      A.    -- we'd talk about it.

24      Q.    What did he tell you?

25      A.    Don't recall.

Page 46

1          Q.    Okay.  Did you have any discussion
2    with either Sergeant Wolf or Officer Lewis
3    about it after the video went viral?
4          A.    Maybe just to hear their
5    complaints.
6          Q.    In what way?
7          A.    Maybe her stating that he was wrong
8    and maybe him stating that she was wrong, or.
9          Q.    They were --
10         A.    I can't --
11         Q.    -- pointing a finger at each other?
12         A.    I can't recall.
13         Q.    Okay.
14         A.    To be honest.  I don't know.  I
15   can't give you like exact conversation that we
16   had in regards to the matter.
17         Q.    You can't tell me when
18   approximately?
19         A.    Huh-uh.
20         Q.    You can't --
21         A.    Too long ago.
22         Q.    -- tell me the substance of it?
23         A.    (Witness nodding negatively.)
24         Q.    Correct?
25         A.    Correct.

Page 47

1        Q.    Okay.  All right.  After you left

2   this incident -- by the way, what -- I think

3   you told me this before, I just want to be

4   clear.  You were just on patrol.  You weren't

5   responding to anything when you first rolled up

6   to the scene; correct?

7        A.    Yes.  I might have been in the flat

8   camera and going over the Kia, that's what he

9   was telling me.

10       Q.    What was that?

11       A.    Going after the Kia, the stolen

12  Kia.

13       Q.    Okay.  You said flat camera?  I'm

14  sorry, you said flat camera?

15       A.    One of our LPRs.  Plate readers.

16       Q.    Okay.  You were out doing a plate

17  reading exercise around the town?

18       A.    No, we have cameras and -- and

19  different plate readers everywhere, so -- that

20  indicate certain things.

21       Q.    Okay.  And there was a stolen

22  vehicle that was being looked for?

23       A.    Correct.

24       Q.    Okay.  Other than that anything

25  that you recall?

Page 48

1          A.    No.

2          Q.    Okay.

3                (Discussion had off the record.)

4          Q.    Are you sure of that or do you

5    think you might have been doing that?

6          A.    I might have been doing that.

7          Q.    Okay.  But you're not sure you were

8    doing that?

9          A.    I know I was not on no call.

10         Q.    Okay.  You knew that you were not

11   on a call.

12         A.    Correct.

13         Q.    Okay.

14               (Discussion had off the record.)

15         Q.    I don't -- oh, I do have another

16   question for you.  You gave a written statement

17   in this matter.

18         A.    Yes.

19         Q.    It's Exhibit 31.  I want to look at

20   that with you.

21                    -  -  -  -  -

22               (Thereupon, Exhibit 31, Officer

23               Joseph Torres' Written Statement,

24               was previously marked for purposes

25               of identification.)

1                    -   -   -   -   -

2              MS. ZIARKO:  I also have a 27

3    maybe?

4              MR. WIEST:  It's also 27.

5              MS. ZIARKO:  Okay.

6        Q.    31.  Let me start with this

7    question:  When did you make this statement?

8        A.    It could have been right after or a

9    couple days later.

10        Q.    It would be fair to say that it was

11    in 2022; correct?

12        A.    Yes.

13        Q.    It may have been on September 22nd?

14    It may have been within a week or two; fair?

15              MS. ZIARKO:  Objection.

16        A.    Yes.

17        Q.    Do you know what caused you to

18    draft this -- draft and sign this statement?

19        A.    Lieutenant Williams.

20        Q.    So Lieutenant --

21        A.    At the time he told me to write a

22    statement in regards to what happened.

23        Q.    Okay.  It wasn't internal affairs,

24    it was Lieutenant Williams that told you to --

25        A.    I'm pretty sure.  I think so.

1        Q.    You think it was Lieutenant

2    Williams?

3        A.    Yeah.

4        Q.    Okay.  Did you then give him the

5    statement?

6        A.    Yes.

7        Q.    Has anybody asked you anything

8    about this statement after you had issued it?

9        A.    No.

10        Q.    Okay.  You would agree that the

11    statement that you gave at Exhibit 31 is

12    probably fresher in your mind or the incident

13    was fresher in your mind then than it is

14    today --

15        A.    Yes.

16        Q.    -- fair?

17              Okay.  All right.  Why did you

18    write that you, quote, carefully removed the

19    handcuffs?

20        A.    Because he was complaining of

21    shoulder injury.

22        Q.    Okay.  And you wanted to make clear

23    that that wasn't anything that you had done?

24        A.    Correct.

25        Q.    Okay.  This indicates that:  I

Page 51

1    responded to the traffic stop and observed

2    Demetrius Kern in handcuffs being escorted to

3    Officer Lewis' cruiser by Sergeant Wolf.

4              That occurs just a couple seconds

5    prior to your body camera being activated;

6    fair?

7        A.    Yes.

8        Q.    Okay.  Do you have any reason to

9    believe that that statement is inaccurate?  In

10   other words -- strike that.

11             You think the statement that you

12   responded to the traffic stop and observed

13   Demetrius Kern in handcuffs being escorted to

14   Officer Lewis' cruiser by Sergeant Wolf, does

15   that accurately reflect what you first saw at

16   the scene when you showed up?

17       A.    It could have because I was

18   watching, you know, as I was driving up.

19       Q.    Okay.

20       A.    I had my eyes on, you know, before

21   I turned around.

22       Q.    Okay.

23             (Discussion had off the record.)

24       Q.    Do you remember anything else?

25       A.    No.

Page 52

1        Q.    Okay.  That's all I've got.

2              MS. ZIARKO:  Tom?  Are you there?

3              MR. SPYKER:  Yeah, I'm here.

4              MS. ZIARKO:  All right.

5              MR. SPYKER:  I've got a couple of

6    questions.

7              EXAMINATION OF OFFICER JOSEPH TORRES

8    BY MR. SPYKER:

9         Q.    Officer Torres, my name's Tom

10   Spyker.  I'm the attorney representing Sergeant

11   Wolf in this lawsuit who's been personally

12   named.  I appreciate you taking the time.  I

13   don't have very many questions for you.

14              You've mentioned you were a Marine;

15   correct?

16        A.    Yes.

17        Q.    So as a Navy guy and having you

18   under oath I've got to ask you this question,

19   you'd agree with me Marine Corps is a

20   department of the Navy; right?

21        A.    Yes.

22        Q.    Okay.  I'm glad we got that out of

23   way early.

24        A.    But we're -- we're the --

25        Q.    The men's department?

1      A.    I guess you could say that.  We're

2  like the -- we're like the Jordan to Nike.

3  Right?

4      Q.    Yeah.  Yeah.  I guess that's fair.

5  I guess that's fair.  The Jordan brand.  Yeah.

6  That's fair -- that's actually good.  I hadn't

7  heard that one before.  I was expecting the

8  men's department.  So I appreciate that.

9           Let me ask you a question:  Are you

10 aware that the lawsuit that Demetrius Kern is

11 bringing is accusing both Officer Lewis and

12 Sergeant Wolf of taking the actions they took

13 on the traffic stop because they were racially

14 bias against black people.  Are you aware of

15 that?

16           MR. WIEST:  Objection.

17     A.    No.

18     Q.    Okay.  Well, I will represent to

19 you that the complaint filed by Mr. Kern in the

20 federal court accuses Officer Lewis and

21 Sergeant Wolf, you know, for lack of better

22 terms, for basing their decisions based on the

23 fact that Mr. Kern was African American.

24           My question to you:  Did you

25 observe anything on the scene that day that

1    would lead you to believe that Sergeant Wolf

2    took any of the actions he took because

3    Mr. Kern was black?

4              MR. WIEST:  Objection.

5         A.    Absolutely not.

6         Q.    Okay.  Same question for Officer

7    Lewis, do you think she took any of the actions

8    there on scene because Mr. Kern was black?

9              MR. WIEST:  Objection.

10        A.    Absolutely not.

11        Q.    How long have you served with

12   Sergeant Wolf?

13        A.    Since I started.

14        Q.    And --

15        A.    Going on almost six years.

16        Q.    Okay.  Have you ever seen Sergeant

17   Wolf take any actions that you think were

18   motivated by racial bias?

19             MR. WIEST:  Objection.

20        A.    Never.

21        Q.    Same question as it pertains to

22   Officer Lewis?

23        A.    Never.

24        Q.    Okay.  Do you think -- you would

25   agree with me that police officers enjoy broad

1    discretion in issuing citations, enforcement

2    action, and police officers may not approach

3    the same situation completely in the same

4    manner; right?

5            MR. WIEST:  Objection.

6        A.    100 percent agree.

7        Q.    And it's okay for officers to

8    disagree about how to approach certain things;

9    is that fair?

10           MR. WIEST:  Objection.

11       A.    Absolutely.

12       Q.    Now that you've had some time to

13   review the body camera and everything, do you

14   think that the actions that Sergeant Wolf took

15   on scene were appropriate for the situation?

16           MR. WIEST:  Objection.

17       A.    Yes.

18       Q.    Okay.  And the same question, do

19   you think the actions Officer Lewis took on

20   scene were appropriate for this situation?

21           MR. WIEST:  Objection.

22       A.    (Pause.)

23       Q.    Understanding your prior testimony

24   about the potential insubordination, aside from

25   that?

Page 56

```
 1         A.    Yes.  I think she did -- I think
 2   she did what she was supposed to do and he did
 3   what he was supposed to do.
 4         Q.    Thank you, sir.  Those are the
 5   questions I have.  I appreciate your time.
 6     FURTHER EXAMINATION OF OFFICER JOSEPH TORRES
 7   BY MR. WIEST:
 8         Q.    Let me ask very, very quickly.  Do
 9   you have any personal knowledge of Officer
10   Wolf's involvement in the Johnson Butler
11   complaint in 2020?
12         A.    (Witness nodding negatively.)
13         MS. ZIARKO:  Objection.
14         A.    No.
15         Q.    Do you have any --
16         MR. SPYKER:  Objection.
17         Q.    Do you have any personal knowledge
18   of Officer -- or Officer Wolf's involvement in
19   Ms. Brigid's complaint in 2021?
20         A.    No.
21         MS. ZIARKO:  Objection.
22         MR. SPYKER:  Objection.
23         Q.    Your answer to Mr. Spyker's
24   questions were just based on what you know;
25   fair?
```

1      A.    Yes.

2      Q.    Is it ever okay or within officer

3  discretion to arrest somebody without probable

4  cause?

5            MR. SPYKER:  Objection.

6      A.    No.

7            MS. ZIARKO:  Objection.

8      A.    No.

9      Q.    That is a requirement that is

10  established by clearly established law; you

11  would agree; correct?

12     A.    100 percent.

13            MR. SPYKER:  Objection.

14     Q.    Okay.  And I think we talked about

15  this, when you showed up to the scene Mr. Kern

16  was already in handcuffs and the arrest

17  decision had been made; correct?

18     A.    Yes.

19     Q.    Okay.  You don't have knowledge of

20  what Sergeant Wolf knew prior to making that

21  arrest then; correct?

22     A.    Correct.

23     Q.    Okay.  Your evaluation was only

24  based on what you saw from the second you

25  showed up to the scene after; fair?

1        A.    Yes.

2              MS. ZIARKO:  Objection.

3        Q.    Nothing further.

4              (Discussion had off the record.)

5        Q.    Oh, wait a minute.

6              MR. SPYKER:  No, too late.  You

7    said nothing further.  I'm joking.

8              (Discussion had off the record.)

9        Q.    Are you -- has Sergeant Wolf ever

10    spoken with you about any treatment he was

11    receiving for anger management or PTSD?

12              MS. ZIARKO:  Objection.

13              MR. SPYKER:  Objection.

14        A.    No, not that I recall.

15        Q.    Are you aware that, prior to a

16    couple seconds ago, that he has those issues?

17              MS. ZIARKO:  Objection.

18              MR. SPYKER:  Objection.

19        A.    No.

20        Q.    Okay.  Nothing further.

21              MS. ZIARKO:  We'll read.

22              MR. SPYKER:  Thank you for your

23    time, sir.

24              THE WITNESS:  Thanks.

25              (Deposition concluded at 12:22 p.m.)

Page 59

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12            Christopher D. Wiest, Esq.-Original

13            Andrea K. Ziarko, Esq.-Copy

14            Thomas N. Spyker, Esq.-Copy

15

16

17

18

19

20

21

22

23

24

25

Page 60

1                    REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                                    SS:

4    County of Cuyahoga.   )

5

6            I, Christine M. Emery, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, OFFICER JOSEPH

10   TORRES, was by me first duly sworn to testify

11   the truth, the whole truth and nothing but the

12   truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19            I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 61

1           I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5           IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 8th day of

8    July, 2024.

9

10

11           <%12026,Signature%>

12

13           _____

14           Christine M. Emery, Notary Public

15           within and for the State of Ohio

16

17    My commission expires January 19, 2029.

18

19

20

21

22

23

24

25