IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

CLEVELAND DIVISION

~~~~~~~~~~~~~~~~~~~~

DEMETRIUS KERN,

        Plaintiff,

       vs.         Case No.  1:23-CV-1327

NAFTALI WOLF,

et al.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~

Deposition of

CAPTAIN ERNEST WILLIAMS

June 21, 2024
9:03 a.m.

Taken at:
Baker, Dublikar, Beck, Wiley & Mathews
400 South Main Street
North Canton, Ohio

Christine M. Emery, Notary Public

1   APPEARANCES:

2

3       On behalf of the Plaintiff:

4           Law Office of Christopher D. Wiest,

5           by

6           CHRISTOPHER D. WIEST, ESQ.

7           25 Town Center Boulevard, Suite 104

8           Crestview Hills, KY  41017

9           513-257-1895

10          chris@cwiestlaw.com

11

12              -and-

13

14          Bruns, Connell, Vollmar &

15          Armstrong, LLC, by

16          THOMAS B. BRUNS, ESQ.

17          4555 Lake Forest Drive, Suite 330

18          Cincinnati, OH  45242

19          513-312-9890

20          tbruns@bcvalaw.com

21

22

23

24

25

1    APPEARANCES, continued.

2

3        On behalf of the Defendants City of

4        Cleveland Heights and Officer Carly

5        Lewis:

6            Baker, Dublikar, Beck, Wiley &

7            Mathews, by

8            ANDREA K. ZIARKO, ESQ.

9            400 South Main Street

10           North Canton, OH  44720

11           330-499-6000

12           andreaz@bakerfirm.com

13

14       On behalf of the Defendant Naftali

15       Wolf:

16           Reminger Co., LPA, by

17   via Zoom:  THOMAS N. SPYKER, ESQ.

18           200 Civic Center Drive, Suite 800

19           Columbus, OH  43215

20           614-232-2420

21           tspyker@reminger.com

22   ALSO PRESENT:

23   via Zoom:  Barlow Reporting &

24           Video Services, LLC

25                ~ ~ ~ ~ ~

1                 TRANSCRIPT INDEX

2

3    APPEARANCES...............................    2

4

5    INDEX OF EXHIBITS ........................    5

6

7    EXAMINATION OF CAPTAIN ERNEST LEE WILLIAMS

8    BY MR. WIEST..............................    6

9    BY MR. SPYKER.............................   45

10   BY MR. WIEST..............................   78

11

12   REPORTER'S CERTIFICATE....................   89

13

14   EXHIBIT CUSTODY

15   EXHIBITS RETAINED BY ATTORNEY WIEST

16

17

18

19

20

21

22

23

24

25

1                      INDEX OF EXHIBITS

2     NUMBER              DESCRIPTION              MARKED

3     Exhibit 3    Evaluation of Sergeant Wolf, .  10
                   Dated 12/12/21
4
      Exhibit 4    New Supervisor Training Form..  14
5
      Exhibit 10   Statements...................  32
6
      Exhibit 11   Officer Carly Lewis Body .....  51
7                  Camera Footage

8     Exhibit 12   Sergeant Wolf's Body Camera ..  66
                   Footage
9
      Exhibit 16   Audio........................  62
10
      Exhibit 21   Obstructing Official .........  80
11                 Business Statute

12    Exhibit 24   Citation, 9/22/22.............  16

13    Exhibit 26   Complaint....................  20

14    Exhibit 28   Report.......................  29

15    Exhibit 29   Report.......................  39

16

17

18

19

20

21

22

23

24

25

1              CAPTAIN ERNEST LEE WILLIAMS, of

2     lawful age, called for examination, as provided

3     by the Federal Rules of Civil Procedure, being

4     by me first duly sworn, as hereinafter

5     certified, deposed and said as follows:

6        EXAMINATION OF CAPTAIN ERNEST LEE WILLIAMS

7     BY MR. WIEST:

8          Q.    Sir, can you state your name for

9     the record?

10         A.    Ernest Lee Williams.

11              MR. WIEST:  We are going to go off

12     the record real quick.

13              (Discussion had off the record.)

14         Q.    Can you just let me know your

15     educational background?  Where did you go to

16     high school?

17         A.    John Adams, Cleveland, Ohio.

18         Q.    Okay.  Any college?

19         A.    Yes.  I have a bachelor's degree

20     from Cleveland State and I have a master's

21     degree from Case Western.

22         Q.    What was your bachelor's in?

23         A.    Social work.

24         Q.    What year was that?

25         A.    '89, I think I graduated.

1       Q.    Okay.

2       A.    '92 for the master's.

3       Q.    And what was your master's in?

4       A.    Social work.

5       Q.    Okay.

6       A.    '92, '93.

7       Q.    Okay.

8       A.    I don't know.

9             MS. ZIARKO:  Isn't that crazy?

10      Q.    Did you get your master's from

11  Cleveland State also?

12      A.    Case Western.

13      Q.    Case Western?  All right.  When did

14  you first start working in the law enforcement

15  field?

16      A.    September 25th, 1995.

17      Q.    And with what department was that?

18      A.    Cleveland Heights.

19      Q.    Have you been with Cleveland

20  Heights since then?

21      A.    Yes, sir.

22      Q.    Okay.  All right.  I note that you

23  are presently a captain with the Cleveland

24  Heights Police Department?

25      A.    Yes, sir.

1          Q.    What year were you promoted to

2     captain?

3          A.    Last year, 2023.

4          Q.    Okay.  Do you have a division that

5     you're in charge of or --

6          A.    Yes, internal affairs.

7          Q.    Okay.

8          A.    It's called bureau of professional

9     standards as well.  Most people would know it

10    by internal affairs.

11         Q.    Okay.  Prior to that what was your

12    position with --

13         A.    Lieutenant officer in charge of

14    shift of platoon.

15         Q.    Which platoon?

16         A.    It was the platoon.

17         Q.    Okay.  Which shift was that -- was

18    that covering?  Was that evenings?  Was it

19    days?

20         A.    We rotate.

21         Q.    Okay.

22         A.    I think at that time we -- one

23    month on days, one month -- shift went from 5 P

24    -- 5 A to 5 P and 5 P to 5 A.  And at that

25    month I think we were 5 P -- I'm pretty sure,

 1    5 P to 5 A.

 2         Q.    You say that about the month, the

 3    Kern incident?

 4         A.    Yes.

 5         Q.    When did you become a lieutenant

 6    with the Cleveland Heights Police Department?

 7         A.    Oh, man, 2011, maybe.

 8         Q.    Okay.

 9         A.    Maybe not.  Maybe 2015, I don't

10    know.  I've been a lieutenant for two years.

11         Q.    And --

12              MS. ZIARKO:  Can you hold on just

13    one second?  I'm just going to click this so

14    it's not in the way here.

15              COURT REPORTER:  Thank you.

16              MS. ZIARKO:  It's telling me that

17    it's recording.

18              MR. WIEST:  Okay.

19              MS. ZIARKO:  Okay.  Thank you.

20         Q.    Were you always, as a lieutenant,

21    in the shift commander role?

22         A.    Yes, sir.

23         Q.    Okay.

24         A.    I think so, yes.

25         Q.    Okay.  I want to fast forward just

1    a little bit.  By the way, did you know

2    Sergeant Naftali Wolf prior to the point in

3    time that you became or that -- or that he was

4    promoted to sergeant?

5         A.    We knew each other --

6         Q.    Okay.

7         A.    -- when he started.

8         Q.    Okay.

9         A.    Yeah.  I can't tell you when he

10   started, but I've known him since he started.

11        Q.    Okay.  At one point, though, he

12   gets promoted and he's at that point your

13   direct -- he reports to you; correct?

14        A.    He got promoted.  I don't know

15   whether he was with someone prior to me, but,

16   yeah, he did report to me at that time.

17        Q.    Okay.  I want to look at an exhibit

18   with you.  This is -- we've already marked

19   these, we've been using the same exhibits.  It

20   looks like somebody has gone through and made a

21   mess of them yesterday.  Sorry, sir.

22                  -  -  -  -  -

23             (Thereupon, Exhibit 3, Evaluation of

24             Sergeant Wolf, Dated 12/12/21, was

25             previously marked for purposes of

1              identification.)

2                   -  -  -  -  -

3         Q.    Okay.  This is part of Exhibit 3.

4    It's about, oh, kind of far back in the

5    exhibit.  It's a December, it looks like --

6         A.    December 12th, 2021.

7         Q.    -- 12th, '21, and this was an

8    evaluation that you filled out for Sergeant

9    Wolf; correct?

10             MR. BRUNS:  Would you identify the

11   number of the exhibit?

12             MR. WIEST:  I did say Exhibit 3.

13             MR. BRUNS:  Okay.  Sorry.

14             MR. WIEST:  Yeah.

15        Q.    Correct?

16        A.    Yes.  This is my -- my writing.

17        Q.    And you indicate in this that

18   Sergeant Wolf was newly promoted supervisor,

19   was learning the duties of an officer in

20   charge?

21        A.    I did say that, yes.

22        Q.    Okay.  Sergeant Wolf will need to

23   spend more time learning the intricacies of the

24   jail?

25        A.    Uh-huh.

1          Q.     More focus on schedules and

2     operations of the station protocols?

3          A.     Uh-huh.

4          Q.     Okay.  I think -- did you have any,

5     other than what's written in this evaluation,

6     but other concerns that you had with Sergeant

7     Wolf when he was promoted in terms of his

8     performance?

9          A.     No, sir.

10               (Discussion had off the record.)

11          Q.     Okay.  Could you go back a little

12     bit, and I don't know if this is available to

13     you, in the same evaluation exhibit.  Hold on.

14     This was what Sergeant Wolf wrote about himself

15     on January 17th, 2021.  Did you have access to

16     this?

17          A.     Was this --

18          Q.     This was an evaluation that was

19     prior to what --

20          A.     No.

21          Q.     -- we just looked at.

22          A.     I would not have access to this.

23     Someone else did this evaluation; correct?

24          Q.     Yes.

25          A.     No, I would not have access to

1    that.

2                    (Discussion had off the record.)

3         Q.    Well, that was Wolf's own signature

4    and his own comments to an evaluation prior to

5    the one that you did.

6         A.    No, I would not have access to

7    this.

8         Q.    Okay.

9                    (Discussion had off the record.)

10         Q.    Do you agree with Sergeant Wolf's

11   statements that he needed to improve criminal

12   investigations and relationships with the

13   public and courtesy?

14         A.    I wouldn't disagree with this.  If

15   this is what he feels he needs, I'm okay with

16   that.

17         Q.    Did the chief of police or anyone

18   at the police department come to you, as

19   Sergeant Wolf's immediate supervisor, and

20   implement any kind of plan or kind of

21   corrective action to help Sergeant Wolf with

22   these deficiencies that he was noting, in terms

23   of criminal investigations and courtesy with

24   the public?

25         A.    I would not be aware of any of

1    that.

2           Q.    Okay.  That did not -- nobody told

3    you that?

4           A.    Nobody told me.

5           Q.    Okay.  All right.  I think we're

6    done with 3.  I'll take that.  Did I give you

7    more than that?

8           A.    No.

9           Q.    Okay.  Oh, I've got it.  Okay.

10                4.

11                  -  -  -  -  -

12                (Thereupon, Exhibit 4, New

13                Supervisor Training Form, was

14                previously marked for purposes of

15                identification.)

16                  -  -  -  -  -

17           Q.    This is new -- is new supervisor

18    training form.  And I believe those are your

19    initials next to OIC trainer initials; is that

20    fair?

21           A.    That is fair, yes.

22           Q.    Okay.  Was there any training for

23    new supervisors in the subject area of

24    constitutional rights?

25           A.    That's a little difficult to say.

1    They -- they are sent to new supervisory

2    training.  So, I mean, again, I took it when I

3    became a new supervisor, but I can't remember

4    what they covered.

5            Q.    Okay.

6            A.    But I would think that that may

7    have been covered in that -- in that -- in that

8    class.

9            Q.    Do you know if it was?

10           A.    I don't know for sure.  I can't

11   remember.

12           Q.    Okay.  Was there anything that you

13   did, in terms of this new supervisor training

14   on the job as you went through it with Sergeant

15   Wolf, that looked at constitutional rights or

16   clearly established rights?

17           A.    No.

18           Q.    Okay.

19           A.    No, none that I can remember.

20           Q.    Anything where you went and sat

21   down with Sergeant Wolf and went over, for

22   instance, the elements of particular crimes?

23           A.    No.

24           Q.    Okay.  All right.  I will take that

25   back.

1             The next exhibit that I want to

2    look at is 24 with you and I'm going to hand it

3    to you here in a minute.

4                       -  -  -  -  -

5             (Thereupon, Exhibit 24, Citation,

6             9/22/22, was previously marked for

7             purposes of identification.)

8                       -  -  -  -  -

9        Q.    This is the citation that Officer

10   Lewis issued to Mr. Kern on September 22nd,

11   2022.  And if you look, you're the deputy

12   clerk, slash, peace officer, that's your

13   signature there under that line; right?

14       A.    Yes, sir.

15       Q.    Can you tell me, from a processing

16   standpoint, how it came to be that your

17   signature was on there?  Did Officer Lewis, for

18   instance, come in and just sign it in your

19   presence or was there a discussion about it

20   beforehand?

21       A.    Not much of a discussion.  Our

22   protocol was that, you know, any tickets that

23   we have to sign, any complaints, you know, we

24   have to clerk it as deputy clerks.  And it goes

25   to the court.  We have to get it in that box so

1   that they have it for the following morning.

2           Now, again, I don't have time to

3   really go into detail and look at body camera

4   or anything to see and establish what's going

5   on here because it has to be in that box.

6           Q.   Okay.

7           A.   Plus, I don't have time, I

8   shouldn't say I don't have time.  But the time

9   -- you know, these officers are still running

10  calls on the road, so I don't have -- I don't

11  -- I don't have their body cams to look at to

12  investigate this at that moment.

13          Q.   No, and I wasn't expecting that you

14  did.  My question was far more simple.  I'm

15  just asking what happened as your signature got

16  on there?  In other words, was there a brief

17  explanation by Lewis, or did she just come in

18  and say, hey, I'm going to go sign this, can

19  you -- can you witness it?  I mean, I'm just

20  trying to figure out what happened.

21          A.   They come in, like I've written a

22  complaint for blah, blah, blah, you know, can

23  you clerk it?

24          Q.   Okay.

25          A.   You know, raise your arm, you swear

1    to it, we clerk it and it goes in the box.

2          Q.    So the clerking process involves

3    the administration of an oath where -- where

4    Officer Lewis swore that what was in this

5    complaint was true?

6          A.    Correct.

7          Q.    Okay.  And then once that happens

8    then you affix your signature indicating that

9    she has sworn in your presence that it's true?

10         A.    Yes, sir.

11         Q.    And then you put in the box?

12         A.    No, they put it in the box.

13         Q.    They put it in the box?

14         A.    Uh-huh.

15         Q.    Okay.  So the only thing that you

16   did with respect to this citation, in 24, was

17   administer an oath to Officer Lewis where she

18   would swear that it was true and then she took

19   it and processed this?

20         A.    Yes, sir.

21         Q.    Okay.

22         A.    And see now you're using the word

23   process.  It's just you drop it in a box.

24         Q.    Right.

25         A.    Not much processing to that, you

1    just drop it in the box.  And they come -- the

2    clerks from upstairs come the following morning

3    and get it.

4           Q.    And pull everything --

5           A.    Yes.

6           Q.    -- that happened overnight --

7           A.    Yes.

8           Q.    -- and then they process it through

9    the municipal court?

10          A.    Yes.

11          Q.    Okay.  I understand.  All right.

12   Do you know what time you administered the oath

13   to Officer Lewis on this particular citation?

14          A.    It's been so long.  The only thing

15   I can say, it was that evening.

16          Q.    Okay.

17          A.    I can't put a time.

18          Q.    Because the incident we know

19   happened around 7 p.m.?

20          A.    Uh-huh.

21          Q.    And later that evening, and we're

22   going to look at it in just a minute, Mr. Kern

23   came in and you took a complaint from him?

24          A.    I did.

25          Q.    Do you know if you had already

Page 20

1    clerked this ticket at the time that the

2    complaint had came in?

3         A.    I do not.

4         Q.    Okay.  It may have been, it may not

5    have, but you don't recall one way or the

6    other?

7         A.    I don't recall one way or the

8    other.

9         Q.    Fair enough.  All right.  Let's

10   look at that complaint.  Exhibit 26, for the

11   record.

12                 -  -  -  -  -

13              (Thereupon, Exhibit 26, Complaint,

14              was previously marked for purposes

15              of identification.)

16                 -  -  -  -  -

17        Q.    Let me start with the basics of

18   Exhibit 26.  It looks like you were the officer

19   in charge that received the complaint.  And it

20   looks like that was at about 11 p.m. on

21   September 22nd, 2022.  Would you agree?

22        A.    Yes, sir.

23        Q.    This complaint was in your

24   handwriting; correct?

25        A.    Yes.

1          Q.    We talked to Sergeant Wolf under

2     oath yesterday.  He indicated that -- that you

3     may have been on a dinner break at the time

4     that the complaint came in.  You're nodding

5     your head.  I take it you recall that?

6          A.    Yes, I do, because I was out and I

7     got called in.  I remember Wolf saying, well, I

8     can't take the complaint because the complaint

9     is against me.  So, yeah, I came in to take the

10    complaint.

11         Q.    Okay.  Did he say anything -- so

12    Sergeant Wolf called you to come in and take

13    the complaint?

14         A.    Yes.

15         Q.    Where were you at the time when he

16    called you?

17         A.    On my way -- I have a house also in

18    Cleveland Heights.  So I was on my way for

19    lunch.

20         Q.    Okay.  So were you -- you were

21    going to eat lunch?

22         A.    Yes.

23         Q.    Okay.  And I take it you didn't get

24    to eat lunch?

25         A.    Well, I ate lunch after.

1        Q.    After?

2        A.    Yes.

3        Q.    Okay.  Did Sergeant Wolf say

4   anything about the incident when he called you

5   in to take the complaint?

6        A.    As I recall he was like there's a

7   guy here at the station making a complaint

8   about me.  Officer in charge always has to take

9   the complaint.  So he can't take it against

10  himself, so I would have to come in and take

11  that complaint.

12       Q.    Okay.  So he was at the station at

13  the time doing OIC duties while you were on --

14       A.    Yeah.

15       Q.    -- your lunch break?

16       A.    Yeah.  Because, yeah, normally I

17  take lunch break at 11.  So he came -- he comes

18  back to relieve me.  So I had left out and I

19  get the call that there's a guy at the station

20  wanting to make a complaint.

21       Q.    Okay.  Did he say anything about

22  the substance of the incident to you?

23       A.    No, this would have been very brief

24  on the phone.

25       Q.    Okay.  And so he says, guy wants to

1    make a complaint against me, I need you to come

2    in and take it?

3         A.    Uh-huh.

4         Q.    And that was the -- everything you

5    recall about that portion of the conversation?

6         A.    Yes, sir.

7         Q.    So you come in.  Where do you take

8    this complaint with Mr. Kern on the evening of

9    the 22nd?

10        A.    There's a -- there's a little

11   cafeteria at the station.

12        Q.    Okay.

13        A.    So we went there and sat down and

14   -- at the table and I wrote this up.

15        Q.    Did you record the interaction with

16   Mr. Kern by way of body camera or otherwise?

17        A.    I can't -- I don't remember.  I

18   don't remember whether I recorded it with my

19   body cam or not.

20        Q.    Okay.  This complaint --

21        A.    Normally I don't.  So I'm going to

22   say probably not.

23        Q.    Okay.

24        A.    I don't normally record complaints

25   with my body cam.

1        Q.    If you look, on the second page,
2   this says:  This written by Lieutenant Williams
3   due to shoulder injury; do you see that?
4        A.    Yes, sir.
5        Q.    Was Mr. Kern in a sling at the
6   time?  Do you remember if his right arm was in
7   a sling?
8        A.    I don't recall.  It could have
9   been, but I don't recall.  It could have been,
10  because I know he was coming from the hospital,
11  so it could have been, but --
12       Q.    Okay.
13       A.    -- I can't remember.
14       Q.    He told you he was coming from the
15  hospital?
16       A.    Yeah, I believe so.
17       Q.    Okay.  And I take it that you were
18  writing down what he was telling you in terms
19  of what's in the Exhibit 26?
20       A.    Yes, sir.
21       Q.    Okay.
22       A.    And I'm trying write it verbatim.
23       Q.    Okay.  And you --
24             (Discussion had off the record.)
25       Q.    And, in any event, it's as close as

Page 25

```
 1    you could do to verbatim as you're taking down
 2    what he says --
 3         A.    Yes.
 4         Q.    -- correct?
 5         A.    Yes.
 6         Q.    And then I think you had him
 7    initial the DK --
 8         A.    Yes.
 9         Q.    -- right?
10         A.    I did.
11         Q.    Because you wanted him to read what
12    you had written down to make sure it was
13    accurate?
14         A.    Yes, sir.
15         Q.    Okay.  Had you -- as Mr. Kern is
16    telling you what's going on, what is his
17    demeanor?
18         A.    He's calm.  He's collected.
19         Q.    Or is he upset?
20         A.    No, he was not upset.
21         Q.    Okay.  He was calm?
22         A.    Yeah.
23         Q.    Okay.  Did you -- what did you do
24    with the complaint, this Exhibit 26, after you
25    had taken it?
```

1          A.     Sent it up to the chief of police.

2          Q.     Okay.

3          A.     When I say sent it up, put it in

4    the box, but someone comes from upstairs,

5    downstairs, we have a box in the officer -- in

6    the office down there, you know, for all the

7    different divisions.  And so, you know, I

8    dropped it in that box that says chief of

9    police.

10         Q.     Okay.  Did you do anything else at

11   that time?

12         A.     No, I don't believe so.  I mean, of

13   course, I'm doing a whole lot of things.  You

14   know, I'm the officer in charge of a shift.

15         Q.     Right.

16         A.     So, you know, there's a whole lot

17   of things going on that I have to be concerned

18   -- concerned with.  But as far as with the

19   complaint, I don't recall doing anything else

20   but taking that complaint, dropping it into the

21   chief's box.

22         Q.     Did you have occasion to speak with

23   either Lewis or Wolf or anyone else that was

24   involved in this incident that evening?

25         A.     See I don't -- I don't think -- I

1    know I spoke with -- with Lewis, because I

2    clerked the complaint.

3        Q.    Right.

4        A.    So I spoke with her.  And I don't

5    recall, I may have had some conversation with

6    -- with Sergeant Wolf, you know, letting him

7    know that there's a complaint against him.

8    But, yeah, complaints have been -- taking

9    complaints, normally I figured it was going to

10   come back to me to investigate, but I'm not 100

11   percent sure.  So, you know, we drop it in that

12   box, you know, and I wait for the chief to give

13   me the directions, whether I'm -- whether I'm

14   the lieutenant that's going to investigate this

15   or someone else.

16           So I would not have done -- I

17   wouldn't have looked at any body cam.  I

18   wouldn't have tried to get any in-depth

19   statements from the officers at that time

20   because, again, we got some other things going

21   on.

22       Q.    Okay.

23       A.    So I wouldn't have actually tried

24   to look into that this night.

25       Q.    Okay.  And that was one of the

1    questions I had.  Torres ended up giving a

2    written statement.  That was not that night.

3    That wasn't any directive you gave him?

4          A.    No.

5          Q.    That was maybe later?

6          A.    I wouldn't have even seen any

7    reports that night, so I wouldn't --

8          Q.    Okay.

9          A.    -- have known -- I don't think I

10   would even have known Torres was on that stop

11   that night.

12         Q.    Okay.

13         A.    Or Wolf.  I wouldn't have known

14   either one of them was actually on that stop.

15         Q.    Okay.  And that was the other

16   question I had was:  Did you -- did you review

17   the police report from this incident that

18   night?

19         A.    No.

20         Q.    So the next day --

21         A.    The next day we would have been

22   off, so I wouldn't have looked at anything.

23   Looking at the report, that's a Thursday, so,

24   you know, we worked that Wednesday, Thursday,

25   we would have been off Friday, Saturday,

1    Sunday, so I wouldn't have seen anything.

2         Q.    Okay.

3              MS. ZIARKO:  Can I just say, wait

4    for a question?

5              THE WITNESS:  All right.

6              MS. ZIARKO:  Thank you.

7         Q.    All right.  So when did you find

8    out that there was more for you to do with

9    respect to the complaint?

10        A.    The chief would have sent it down

11   to me and I would -- I don't recall when he

12   would have sent that down to me to look into

13   it, but he would have sent it to me.

14        Q.    Okay.  If you -- let me hand you

15   what's been marked previously as Exhibit 28.

16                   -  -  -  -  -

17              (Thereupon, Exhibit 28, Report, was

18              previously marked for purposes of

19              identification.)

20                   -  -  -  -  -

21        Q.    And what I'm interested in -- well,

22   we can look at all of it, but there's a written

23   statement that -- that you provided on October

24   1st on the last page of this exhibit.  And

25   that's what I wanted to look at.

Page 30

1                  (Discussion had off the record.)

2         Q.    You're looking at the last page,

3    the one you signed; right?

4         A.    Yeah.

5         Q.    Okay.  Let me start here, did you

6    witness Mr. Kern on the evening of September

7    22nd with an arm injury?  Did you see that?

8         A.    As I said, I don't recall an arm

9    injury.  I mean, he may have had a sling on, I

10   don't -- I don't -- I can't recall it.

11        Q.    I mean, honestly, you wrote out the

12   complaint and it says that it was written

13   because he had an arm injury?

14        A.    But that's something he told me.

15        Q.    Okay.  Was he holding his arm like

16   he was injured; do you remember?

17        A.    I don't remember him holding his

18   arm.

19        Q.    Well, I --

20        A.    He could have, but I don't

21   remember.

22        Q.    Okay.  You don't have a specific

23   recollection one way or the other; correct?

24        A.    No, one way or the other, I don't.

25        Q.    Okay.  All right.  This indicates

1    that -- that you had reviewed the officer

2    statement and officer body cam footage on

3    October 1st, 2022.

4              (Discussion had off the record.)

5         Q.    Is that fair?  If you look at -- it

6    says:  After reviewing officers' -- I'm in the

7    first, second, third paragraph down.  After

8    reviewing officers' statement and officers'

9    body cam footage, I find Kern's complaint

10   sustained?

11        A.    Yes.

12        Q.    Would it be fair for me to draw the

13   conclusion that as of October 1st, 2022, you

14   had reviewed the body cam footage and the

15   officer statement?

16        A.    Yes.  Yes, sir.

17        Q.    What -- what statement had you

18   reviewed as of October 1st, '22, was it the

19   police report?

20        A.    I would have, yes, reviewed the

21   police report at that time.

22        Q.    Okay.  And that's the statement

23   that's being referred to in that paragraph?

24        A.    Yes.

25        Q.    Okay.  And just for identification

Page 32

1    purposes, so that the record is clear, I'm

2    going to hand you what's been marked as Exhibit

3    10.

4                    - - - - -

5              (Thereupon, Exhibit 10, Statements,

6              was previously marked for purposes

7              of identification.)

8                    - - - - -

9         Q.    And there's statements by both Wolf

10   and Lewis that are signed at pages five.  And

11   it looks like right after that there's another

12   narrative by Officer Lewis that follows; do you

13   see that?

14        A.    Yes, sir.

15        Q.    Those are -- that's the statements

16   that -- that you're referring to in this

17   October 1st report?

18        A.    Yes, sir.

19        Q.    Okay.  You say:  At no point did I

20   see him obstruct Officer Lewis' initial traffic

21   stop.

22              The him you are referring to is

23   Mr. Kern?

24        A.    Yes.

25        Q.    Okay.  Is that because when Officer

Page 33

1    Lewis told him in her body camera to stand back

2    he complied?

3          A.    From what I reviewed, yes, he

4    complied.

5          Q.    Okay.  And, in fact, you say:  He

6    followed her directives and waited on the

7    sidewalk as she asked?

8          A.    Yes.

9          Q.    You also drew the conclusion he

10   didn't commit any criminal violations and he

11   should have been allowed to leave on his own

12   free will at this stage of the encounter; do

13   you see that?

14         A.    I do see that.

15         Q.    What's -- when you say this stage

16   of the encounter, you're referring to prior to

17   Sergeant Wolf placing him in handcuffs and

18   under arrest?

19         A.    I'm sorry, I missed the first part

20   of that.

21         Q.    You said he didn't commit any

22   criminal violations and he should have been

23   allowed to leave on his own free will at this

24   stage of the encounter; do you see that?

25         A.    Yes.

1      Q.    The stage of the encounter that

2  you're talking about are the events that

3  occurred prior to Sergeant Wolf placing him

4  under arrest and in handcuffs; correct?

5      A.    Yes.  Yes, sir.

6      Q.    The other thing that you -- by the

7  way, what does a finding of unsubstantiated

8  mean?

9      A.    Meaning that I didn't see any --

10  Mr. Kern had complained that Sergeant Wolf,

11  when he placed him in handcuffs, that he used

12  force.  I didn't see any force being used when

13  he placed him in handcuffs.  That's the part

14  that's unsubstantiated.

15      Q.    Okay.  And by that you mean that

16  you didn't see it on the body camera footage?

17      A.    That's correct.

18      Q.    It doesn't mean necessarily that it

19  didn't occur --

20      A.    Right.

21      Q.    -- it just means you didn't see it?

22      A.    I didn't see it.

23      Q.    Okay.

24            (Discussion had off the record.)

25      Q.    I mean, obviously, the body camera

Page 35

1    footage might not capture all of the events;

2    correct?

3         A.    Correct.

4         Q.    Okay.  All right.  Did you learn in

5    the course of what you had done on October 1st,

6    2022, that Sergeant Wolf had had a follow-on

7    meeting at the Park Synagogue with Officer

8    Lewis following the stop?

9         A.    No, I'm not aware of that.

10        Q.    Okay.  He never told you that he

11   met with her to try and get their story

12   straight?

13        A.    No.

14             MS. ZIARKO:  Objection.

15        Q.    Okay.  Had he ever told you that --

16   by the way, did you speak with either Lewis or

17   Wolf prior to writing this October 1st, 2022,

18   narrative?

19        A.    I -- I don't believe so.  I mean,

20   I've had -- you know, I've got their body cam,

21   I've got their statements.  I don't believe I

22   -- I would have questioned them concerning

23   that.

24        Q.    Okay.

25        A.    And I'm not saying I didn't, but I

1  can't recall it.  I don't believe that I did.

2          Q.    Okay.

3                (Discussion had off the record.)

4          Q.    And if you would have questioned

5  them you probably would have taken notes of

6  that --

7          A.    Yes.

8          Q.    -- correct?

9          A.    Probably I would have had something

10 in mind.

11         Q.    And we've not seen anything in this

12 case that reflects that, which suggests that

13 you probably did not, in fact, interview them;

14 correct?

15         A.    I don't think I did.

16         Q.    They were actually interviewed.

17 Lewis, I think, was interviewed twice by

18 internal affairs over this.  Wolf was

19 interviewed once.  We've got those interactions

20 by way of video.

21               Did you ever have occasion to

22 review the IA interviews?

23         A.    I saw it just yesterday.

24         Q.    Okay.  So prior to yesterday --

25         A.    I had never --

1      Q.     -- that was nothing you --

2      A.     -- seen it --

3      Q.     -- remember seeing?

4      A.     -- no.

5      Q.     Okay.  In terms of the actual

6   Exhibit 28 with these findings, if you look at

7   the front.  Is that -- would that have all been

8   done by the chief, sir, and not you?

9      A.     Where it says rough check at the

10  top?

11     Q.     Yes.

12     A.     That would be the chief.

13     Q.     Okay.

14     A.     And this, again, I saw this

15  yesterday for the first time.

16     Q.     No.  And -- and that's -- yeah, I'm

17  just trying to figure out who did what.  So

18  this -- none of this would have been shared

19  with you --

20     A.     No.

21     Q.     -- or reviewed with you with the

22  chief; correct?

23     A.     No, sir.

24     Q.     I mean, that is correct; right?

25     A.     That's correct.

Page 38

1          Q.    All right.  Did you learn that the

2    chief had sent Sergeant Wolf to a confident and

3    non-escalation course on or about October 22nd,

4    2022?

5          A.    I was aware of it.  I don't know if

6    I was aware of it was that soon.  But, yeah, I

7    did know about it.  I can't -- I'm pretty

8    positive I had -- I wasn't aware of it when it

9    happened.

10          Q.    Okay.

11          A.    So probably by the time I found out

12    about it he would have already taken that

13    class.

14          Q.    Okay.  Did you think that that was

15    the end of the incident, in terms of what the

16    department was going to do with Sergeant Wolf,

17    sending him to the confident and non-escalation

18    class?

19          A.    That's hard for me to say.  I -- I

20    have no involvement with what the chief does,

21    you know, for internal investigations.

22          Q.    Okay.

23          A.    You know, that's his thing.  You

24    know, since I became the captain of the bureau

25    of professional standards, you know, he may ask

1    me what I think.  But prior to that I wouldn't

2    have been a part of that.

3         Q.    So just to understand your

4    testimony, in your current role, because you're

5    involved in internal investigations and, in

6    fact, you are the head of the department that

7    handles those, you have a different role today

8    than you had as a shift commander as a

9    lieutenant?

10         A.    Yes, sir.

11         Q.    Okay.  I want to look at Exhibit 29

12    with you.

13              -  -  -  -  -

14              (Thereupon, Exhibit 29, Report, was

15              previously marked for purposes of

16              identification.)

17              -  -  -  -  -

18         Q.    This is signed by you; correct?

19         A.    Correct.

20         Q.    Do you know when you signed this

21    Exhibit 29?

22         A.    I believe it says October 1st,

23    2022.

24         Q.    Okay.  Do you know if -- and is

25    that one you recall signing, I mean is that --

Page 40

1    by the way, sir, is that date in your

2    handwriting?

3           A.    That date is not in my handwriting.

4           Q.    Okay.  Do you recall doing anything

5    with respect to the Kern incident after October

6    1st of 2022?

7           A.    I don't believe so.  Do you have

8    something in mind, because I don't think so.

9           Q.    Okay.  I mean, were you aware that

10   ultimately in February and March there was

11   additional disciplinary action taken against

12   Sergeant Wolf relevant to the Kern matter?  It

13   was '23, yeah, February or March of '23.

14          A.    I don't think so.  But, again, and

15   when I say I don't think so, because, you know,

16   again, this is the department.  Unofficially

17   you hear some things, but officially I don't

18   believe that I was involved in anything after I

19   wrote this.

20          Q.    Okay.  Sergeant Wolf got some -- a

21   suspension with some time off.  Would you have

22   been informed of that?

23          A.    No, I was not aware of that.

24          Q.    Okay.  When did you take over as

25   the captain that was in charge of the internal

1    affairs bureau?

2         A.    February 6th, 2023.

3         Q.    That might be why you didn't hear

4    of that if it happened after that; fair?

5         A.    Yes.

6         Q.    Because as the shift supervisor if

7    one of your people were out on a disciplinary

8    suspension you would have to be told for

9    scheduling purposes; correct?

10        A.    Yes, sir.

11        Q.    Okay.  Would you be told in advance

12   ever of disciplinary action for scheduling

13   purposes?  In other words, if the chief was,

14   you know, possibly was going to be suspending

15   somebody would you be told to make sure there

16   was coverage?

17        A.    Yes, we would be told.  I don't

18   think -- you know, again, you know, the

19   department is kind of small.  I don't recall

20   anybody getting suspended, you know, where I

21   was told.  But, yeah, I would think that --

22   yeah, yeah, we would be told for scheduling

23   purposes.

24        Q.    Do you know how far in advance you

25   would be told?

```
 1          A.    I -- I do not.  Like I said, I
 2   don't recall anybody being suspended.
 3          Q.    Okay.  Ever?
 4          A.    Not on my shift.
 5          Q.    Okay.  Not ever -- when you were a
 6   shift supervisor do you recall anybody being
 7   suspended?
 8          A.    No, I don't.
 9          Q.    Okay.  Suspensions are something
10   that was rare within the Cleveland Heights
11   Police Department?
12          A.    They were rare, yes.
13          Q.    Okay.  All right.  Do you recall
14   ever any training by the Cleveland Heights
15   prosecutor on obstruction charges?
16          A.    I do.
17          Q.    Do you know when that was?
18          A.    I can't -- I can't remember, but,
19   yes, we did that have that training.
20          Q.    What was the nature of that
21   training?
22          A.    Something to do with the, you know,
23   the officers were -- were charging people with
24   obstruction of official business and I believe
25   she said because they, you know, just because
```

1    they fail to ID themselves it's not really

2    official -- obstruction of official business.

3           Q.    Okay.

4           A.    I believe is the essence of that.

5    Now, I'm not a road officer anymore, so I don't

6    pay attention to a whole lot of that stuff

7    unless I have some direct involvement with it,

8    but I believe that was the essence of it.

9           Q.    Do you know if that was prior to

10   the Kern incident?

11          A.    I do not.

12          Q.    Was there training that occurred

13   after the Kern incident?

14          A.    We always have in-service training,

15   so I can't recall when we had it.

16          Q.    Okay.

17                (Discussion had off the record.)

18          Q.    Yeah, was there any training that

19   you recall specifically as an outgrowth of the

20   Kern incident?

21          A.    No, sir.

22          Q.    In other words, because of it?

23          A.    No, sir.

24          Q.    Okay.  Were you ever told by the

25   chief that Sergeant Wolf had been undergoing

1    treatment for anger management and PTSD and

2    required additional supervision?

3            MS. ZIARKO:  Objection.

4            You can testify.

5        A.    No, sir, I have no -- no knowledge

6    of that.

7        Q.    Okay.  Would that have been

8    something that you would have recalled if he

9    would have told you that?

10       A.    Oh, yeah.

11       Q.    Okay.  And so because you don't

12   recall it, it didn't happen; fair?

13       A.    He didn't tell me.

14       Q.    Okay.  All right.  I hate to bring

15   you down for 39 minutes of a deposition, but I

16   don't have any other questions for you.

17           MS. ZIARKO:  Okay.  Thank you.

18           MR. WIEST:  Wait.  Tom, I want to

19   make sure we're good.

20           Tom, you don't have any --

21           MR. SPYKER:  I am going -- I am

22   going to have some questions.  I didn't expect

23   you to finish that early.  Can we take a five

24   minute break and then I'm going to have some

25   questions?

1          MR. WIEST:  Yeah.

2          MR. SPYKER:  All right.  Thanks.

3          (Short recess had.)

4     EXAMINATION OF CAPTAIN ERNEST LEE WILLIAMS

5  BY MR. SPYKER:

6          Q.    Good morning, Captain.  My name is

7  Tom Spyker.  I'm attending remotely from

8  Columbus.  I drove up there yesterday and I

9  just didn't want the four hour round trip

10  today.

11          A.    I understand that.

12          Q.    So I appreciate you being here.  I

13  hope to get you out of here quickly.  I don't

14  have too many questions.

15              I think as your attorney explained,

16  I represent Sergeant Wolf, who has been named

17  in this lawsuit.  I have a few follow-up

18  questions for you.

19              Was it your understanding that part

20  of Mr. Kern's complaint was that he was being

21  treated the way that he was on this traffic

22  stop because he was African American?

23          A.    I never heard that.

24          Q.    Okay.

25          A.    He never said that to me.

Page 46

1          Q.    Okay.  Fair enough.  In your review

2    of Officer Lewis' body worn camera and Sergeant

3    -- Sergeant Wolf's body worn camera, did you

4    see anything that would make you think that

5    Officer Lewis was treating Mr. Kern differently

6    because he was black?

7                MR. WIEST:  Objection.

8          A.    No, sir.

9          Q.    Did you see anything that made you

10   think Sergeant Wolf was treating Mr. Kern

11   differently because he was black?

12               MR. WIEST:  Objection.

13         A.    No, sir.

14         Q.    In your experience in supervising

15   Officer Lewis have you ever noticed any action

16   she's taken to make you think that she has a

17   racial bias towards black people?

18               MR. WIEST:  Objection.

19         A.    No, sir.

20         Q.    Okay.  Same question as it pertains

21   to Sergeant Wolf.  In your time supervising and

22   interacting with him, have you ever seen

23   anything that would make you think that

24   Sergeant Wolf has a racial bias towards black

25   people?

1              MR. WIEST:  Objection.

2         A.    No, sir.

3         Q.    When's the last time you reviewed

4    the body worn camera of Officer Lewis?

5         A.    Yesterday.

6         Q.    Okay.  Same thing for Sergeant

7    Wolf, I'm assuming?

8         A.    Yes, sir.

9         Q.    Okay.  Did you notice anything in

10   your review yesterday that would have changed

11   your opinion about your findings back in 2022

12   as to Mr. Kern's complaint?

13        A.    No, sir.

14        Q.    Okay.  What's your understanding of

15   what an obstruction charge consists of?  What

16   -- what do you need to charge obstruction?

17             MR. WIEST:  Objection.

18        A.    It would have to be something --

19   some type interference with some type of police

20   action, a legitimate police action that I'm

21   trying to perform.

22        Q.    Okay.  Would you agree with me that

23   a traffic stop is a legitimate police action;

24   correct?

25        A.    Yes, sir.

Page 48

1          Q.    Does an obstruction charge, as you

2     understand it, deal with the magnitude of

3     obstructions -- that was actually kind a bad

4     question, let me rephrase it a little bit.

5               How large of an obstruction does it

6     have to be to an official duty before you can

7     charge him?

8          A.    I would like to see some type of

9     direct action on the part of someone.

10         Q.    Okay.  That's what you -- you would

11    like to see; right?

12         A.    Yes, sir.

13         Q.    Okay.  But you would agree with me

14    that obstruction, the way -- the way the

15    statute is written, all it really requires is a

16    deliberate action that takes me away from

17    police duties that I'm currently engaged in;

18    correct?

19               MR. WIEST:  Objection.  Calls for

20    an improper legal conclusion.  Misstates the

21    Sixth Circuit clearly established law.

22               You can answer.

23         A.    I have some issues with the way you

24    stated that.

25         Q.    Okay.  What are your issues?  What

1    are your issues with the way that I've stated

2    it?

3          A.    As I said, you know, obstruction

4    can be something small, but doesn't -- doesn't

5    necessarily mean that I'm going to bring a

6    charge for obstruction.  Now, you can obstruct,

7    it doesn't necessarily mean that I'm going to

8    bring that charge.

9                Or, put another way, you know, I've

10   been, you know, I've been -- I've been an

11   officer for 29 years.  You know, I'm down on

12   the ground wrestling with someone because they

13   refuse to -- to give me their hands or they

14   push me or they kick me, does not necessarily

15   mean I'm going to bring an assault charge

16   against them because, my opinion, this is part

17   of the job.  People are going to fight with

18   you, they are going to resist.  It doesn't

19   necessarily mean I'm going to bring a resisting

20   charge against them.

21         Q.   Fair enough, sir.  And I appreciate

22   that distinction.

23              So you -- you would agree with me

24   that officers generally have discretion and

25   whether or not they are going to charge certain

1    things that might technically meet the probable

2    cause of a crime --

3        A.    Yes, sir.

4        Q.    -- is that a fair statement?

5        A.    That's a fair statement.

6        Q.    Okay.  And two officers might

7    handle a situation completely differently.

8    Like you're describing, you're down on the

9    ground with a suspect, he's kicking, he's

10   fighting, you might not necessarily charge him

11   with assault because it's part of the job, but

12   that doesn't necessarily mean you don't have

13   the probable cause to bring that charge if you

14   had wanted to; right?

15       A.    That is absolutely correct.

16       Q.    Okay.  In the scenario you just

17   described, in fact, it sounds to me like you

18   would absolutely have probable cause to bring

19   an assault charge; right?

20       A.    Yes.  Yes, sir.

21       Q.    But it's ultimately your discretion

22   to decide whether or not to do that; fair?

23       A.    That is correct.

24       Q.    And so the examples we were

25   discussing with obstruction, when I said, you

1    know, it could be something relatively small,

2    and I think your response to me was maybe you

3    have an issue with that, that more falls within

4    the discretion of the officer charging it and

5    not whether or not probable cause exists; is

6    that a fair statement?

7           A.    Yes.

8                 MR. WIEST:  Objection.

9           A.    That is a fair statement.

10          Q.    Okay.  I'm going to publish --

11                MR. SPYKER:  And Chris, Tom, if you

12   could tell me what you guys -- I'll just use

13   the exhibit numbers that you have, what you

14   have Carly Lewis' body camera marked as?

15                MR. WIEST:  Exhibit 11.

16          Q.    Okay.  I'm going -- I'm going to

17   publish Exhibit 11.  I'm going to go through a

18   little bit of the body camera footage with you

19   and talk about it, sir.

20                (Discussion had off the record.)

21                MS. ZIARKO:  He's going to ask you

22   some questions.

23                     -  -  -  -  -

24                (Thereupon, Exhibit 11, Officer

25                Carly Lewis Body Camera Footage, was

1                previously marked for purposes of

2                identification.)

3                    -  -  -  -  -

4     Q.    All right.  Do you see the video

5  with my screen sharing?

6                MR. WIEST:  No.

7                MS. ZIARKO:  We did for a second

8  and then now it's just --

9                (Discussion had off the record.)

10                (Whereupon video was played.)

11     Q.    I paused it about 17 seconds into

12  the video.  You would agree with me that

13  Officer Lewis, in conducting this traffic stop,

14  was engaged in it for law enforcement purposes;

15  is that fair?

16     A.    Yes, sir.

17     Q.    Okay.  You can kind of see her

18  reflection in what I'll say is the subject's

19  vehicle and she's looking behind her over her

20  shoulder; do you see that?

21     A.    Yes, sir.

22     Q.    Okay.  In your training and

23  experience as a police officer where would your

24  attention be focused when you're conducting a

25  traffic stop and approaching a subject for the

1  first time?

2       A.    On that driver.

3       Q.    Okay.  Is Officer Lewis' attention

4  currently focused on the driver?

5       A.    Not from what I can see.

6       Q.    Okay.  Do you have any idea why

7  Officer Lewis' attention is not focused on this

8  driver the way that it should be?

9       A.    I would think because of the second

10  car that -- that's involved in this incident.

11      Q.    Okay.  And by the second car that's

12  involved in this incident, you are aware, from

13  the totality of your review of all the body

14  cameras, that at this point in Officer Lewis'

15  interaction with the subject, Mr. Kern has

16  pulled and stopped his vehicle behind Officer

17  Lewis' cruiser; is that fair?

18           MR. WIEST:  Objection.

19      A.    That is fair.

20      Q.    Okay.  And so because of that

21  Officer Lewis' attention is taken from her

22  legitimate law enforcement purpose, the traffic

23  stop, and she is focusing back on offi -- or on

24  Mr. Kern; correct?

25           MR. WIEST:  Objection.

Page 54

```
1        A.    Yes, that is correct.

2        Q.    Okay.  So at this point there has

3   been a -- and reasonable minds can characterize

4   it as small or potentially minor, but the

5   execution of her legitimate law enforcement

6   purpose at this very point, 17 seconds into her

7   body worn camera, she's not going to focus on

8   her legitimate law enforcement purpose anymore

9   because of the actions of Mr. Kern; is that

10  fair?

11             MR. WIEST:  Objection.  Calls for

12  speculation.  Misstates the law.

13             You can answer.

14       A.    Yeah, I guess that's somewhat fair.

15       Q.    All right.

16       A.    I mean, considering, you know, I'm

17  guessing she's -- she's dealing with -- with

18  Mr. Kern, but I don't know that for sure

19  because I don't know what she's actually

20  looking at.  It could be something else.  But

21  I'm -- I'm guessing it's Mr. Kern.

22       Q.    Okay.  Well, let's keep watching

23  for a minute.

24             (Wherefore video was played.)

25       Q.    Did you hear Officer Lewis'
```

1    transmission to dispatch about the car that is

2    parked behind her?

3         A.    I did.

4         Q.    Okay.  Now, at least at this point

5    in the video, we're stopped 33 seconds in, at

6    least from her radio transmission appeared

7    clear that her initial focus when she looking

8    over her shoulder was related to Mr. Kern

9    pulling in behind her; is that --

10                MR. WIEST:  Objection.

11        Q.    -- fair?

12        A.    I would say, yeah, that's probably

13   what she was -- her attention was -- was pulled

14   to.

15        Q.    All right.  Let's watch a little

16   more.

17                (Whereupon video was played.)

18        Q.    I'm going to stop it at 41 seconds

19   and she asks the subject if he knows the person

20   behind her.  Let me ask you this:  Is that a

21   reasonable question for Officer Lewis to ask

22   this subject?

23                MR. WIEST:  Objection.

24        A.    Yes.

25        Q.    Okay.  And why do you think that's

1    a reasonable question to ask?

2         A.    Because it could be a friend of

3    his.  I would be worried somewhat about my

4    safety, you know, if it's a friend of his and,

5    you know, they might not be -- take too kindly

6    to me stopping him on a traffic stop.

7         Q.    Right.  Right.  And in your

8    experience as a police officer, sir, have you

9    ever had the occasion where, you know, you've

10   pulled over a car and two cars were traveling

11   together, you might pull over the first one

12   and, you know, the car behind stops because

13   they don't know what to do because they are

14   following the first car?

15        A.    Yes, sir.

16        Q.    Is that a situation that's happened

17   to you?

18        A.    Yes.

19        Q.    All right.  And I'll represent to

20   you, sir, that I was a -- I was a cop for ten

21   years before I was an attorney.  That situation

22   has happened to me, too.  It's kind of a weird

23   dynamic where two cars may be traveling

24   somewhere together, you pull over the first

25   one, the second car doesn't know what to do.  I

Page 57

1    wouldn't say it's an everyday situation, but

2    that's not an uncommon scenario that a law

3    enforcement officer may encounter; correct?

4               MR. WIEST:   Objection.

5        A.    Correct.

6        Q.    Okay.  Now, Mr. Kern has testified

7    under oath that he believed that this question

8    was racist and that it would not be asked by a

9    cop if individuals involved were white.  Do you

10   see anything racist about Officer Lewis'

11   inquiry of the subject as to whether or not she

12   knew or, I'm sorry, whether or not the subject

13   knew Mr. Kern because Mr. Kern had pulled in

14   behind?

15       A.    I do not see anything racist.

16       Q.    Thank you, sir.  Let's keep going a

17   little bit.

18               (Whereupon video was played.)

19       Q.    Okay.  You agree with me that at

20   this point Officer Lewis' traffic stop on the

21   subject vehicle is not yet completed; was that

22   fair?

23       A.    That's fair.

24       Q.    Okay.  And, in fact, the occupant

25   of the subject vehicle has informed Officer

1    Lewis that he is lawfully carrying a firearm

2    which was in his center console.  You saw that

3    portion of the video?

4         A.    I did.

5         Q.    Okay.  And the subject appears

6    completely compliant, but is it fair to say

7    that as a -- as a police officer once you know

8    that there's a weapon present at a traffic stop

9    you have to have a little bit of increased

10   diligence and attention on the vehicle even if

11   the subject appears compliant?

12             MR. WIEST:  Objection.

13        A.    That is fair to say.

14        Q.    Okay.  At this point in the traffic

15   stop do you know if dispatch has returned to

16   Officer Lewis information on the DL check,

17   whether or not the subject is wanted, has any

18   outstanding warrants, anything of that nature,

19   are you aware?

20        A.    I'm not aware, but I don't think

21   she -- they -- they got back to her yet

22   concerning that.

23        Q.    Right.  Right.  And so at this

24   point in the video, we stopped at 1:53, let's

25   assume Mr. Kern is not here.  He did not stop

1    behind Officer Lewis.  As a police officer with

2    vast experience, a police supervisor, if you

3    were training this traffic stop, where should

4    Officer Lewis be positioned waiting to learn

5    whether or not the subject has any wants or

6    warrants knowing that there's a weapon in the

7    vehicle?

8              MR. WIEST:  Objection.

9         A.    The question is where should she

10   be?

11        Q.    Yeah.  Where should she be ideally?

12   Let's assume Mr. Kern is not there.

13             MR. WIEST:  Objection.

14        A.    In her vehicle.

15        Q.    Okay.  Where should her attention

16   be focused?

17        A.    On that car.

18        Q.    Okay.  Where is her attention

19   currently focused as we are paused at 1:53 in

20   the body worn camera of her encounter?

21        A.    It looks like on Mr. Kern.

22             (Whereupon video was played.)

23        Q.    All right.  I stopped at 2:33.

24   We've now heard some interaction between

25   Officer Lewis and Mr. Kern.  Did you happen to

Page 60

1    pick it up -- pick up what dispatch was saying

2    over the radio while Officer Lewis and Mr. Kern

3    were speaking?

4         A.    I did not.

5         Q.    Okay.  Do you think Officer Lewis

6    in the moment would have picked up what

7    dispatch was saying while she was engaged with

8    Mr. Kern?

9              MR. WIEST:  Objection.  Calls for

10   speculation.  Lack of personal knowledge.

11             The witness can answer.

12        A.    Probably.  Because she probably

13   would have shifted focus if they had of said

14   something that was -- that would have caught

15   her attention.

16        Q.    Okay.  And you didn't -- you didn't

17   see her shift focus in that manner; correct?

18        A.    I didn't.

19        Q.    Okay.

20             (Whereupon video was played.)

21        Q.    I stopped at 3:07.  Did you observe

22   Officer Lewis radio in and, you know, say, hey,

23   the vehicle did come back, clean, good?

24        A.    Yes.

25        Q.    Okay.  At this point, assuming, and

Page 61

1    we know because of the totality of -- of

2    reviewing everything that the subject does come

3    back clear, good, and he is released with a

4    warning, meaning, the traffic stopped subject

5    vehicle.

6                Would you agree with me that

7    Mr. Kern stopping behind Officer Lewis' vehicle

8    and this interaction has delayed the traffic

9    stop?

10               MR. WIEST:  Objection.

11        A.    Yes.

12        Q.    Okay.  And you would expect that if

13   this interaction had not been happening Officer

14   Lewis would have either already cleared the

15   traffic stop or had at least been back at the

16   subject's window returning him his information

17   and either deciding to cite him for the expired

18   plate or give him a warning; fair?

19        A.    Yes, sir.

20        Q.    All right.  So we'll keep watching.

21               (Whereupon video was played.)

22        Q.    All right.  I'm actually going to

23   stop here.  I'm going to transition to Sergeant

24   Wolf's body cam.  Because we just saw -- I'm

25   paused at 3:27.  We saw a second police officer

Page 62

1    on scene.  That's Sergeant Wolf; right?

2         A.    Yes, sir.

3         Q.    All right.  So let's -- let's stop

4    the share for a minute.  Actually, before we do

5    that, I'm going to introduce the -- it's an

6    audio, so it's just the radio traffic, which we

7    -- we've heard some of in Officer Lewis' body

8    camera, but I want to -- I want to bring this

9    up.

10                    -   -   -   -   -

11              (Thereupon, Exhibit 16, Audio, was

12              previously marked for purposes of

13              identification.)

14                    -   -   -   -   -

15              (Whereupon audio was played.)

16         Q.    I don't know why that is.

17              Can you hear that?

18         A.    Yes.

19         Q.    Okay.  I'm going to start it over.

20              (Whereupon audio was played.)

21         Q.    Did you hear Officer Lewis say I'll

22    give you the plate to the other vehicle that's

23    out with the confrontation?

24         A.    Yes.

25         Q.    Okay.  And prior to that, at the

1   beginning of the recording, did you hear her

2   say to dispatch, send me another unit, their --

3   vehicle doesn't know how to yield to lights and

4   sirens?  You heard that entire interaction?

5          A.    I did.

6          Q.    Okay.  My question to you, and I

7   know we know a lot about this incident now, and

8   you know, we -- the benefit of 20/20 hindsight,

9   we can look at all of it in totality.  But I'd

10  like to -- like you'd to put yourself in the

11  shoes of an officer on the road that day

12  hearing that radio traffic, not knowing

13  anything else, what would you as a back-up

14  officer believe is going on just hearing that

15  radio traffic in the moment?

16          MR. WIEST:  Objection.

17          A.    I would think that this officer was

18  in need of some backup ASAP because of the way

19  it came out.

20          Q.    Okay.  You would think that it's a

21  -- it's a fairly high priority situation; is

22  that fair?

23          A.    That's fair.

24          Q.    Okay.  If you were on the road

25  engaged in other, let's say, law enforcement

Page 64

1    duties, you would probably break away from

2    those to go to Officer Lewis; is that fair?

3                MR. WIEST:  Objection.

4        A.    That's fair.

5        Q.    All right.  It doesn't sound, at

6    least over the radio, like she is dealing with

7    two separate compliant subjects; is that fair?

8        A.    That's fair.

9                MR. WIEST:  Objection.

10       Q.    You would agree with me -- you

11   would agree with me that when providing backup

12   to an officer that is requesting assistance

13   such as this, you'd have to rely on the radio

14   traffic you hear because that's the only

15   information you have going into the situation;

16   is that fair?

17               MR. WIEST:  Objection.

18       A.    Absolutely, that's fair.

19       Q.    While I'm getting Sergeant Wolf's

20   video loaded up here, my assistant is taking a

21   minute, let me ask you some other questions.

22               Generally speaking how long did you

23   work in a supervisory role over Sergeant Wolf,

24   including when he was an officer?  So how long

25   did you approximately have an opportunity to

Page 65

1   supervise Wolf?

2        A.    I believe Sergeant Wolf came to me

3   soon after he made sergeant.  And so,

4   therefore, probably I supervised him from the

5   time he made sergeant until I got promoted to

6   captain.

7        Q.    Okay.

8        A.    As far as whether that's years, it

9   may have been two, but I'm not good with --

10  with time like that.

11       Q.    Generally speaking, do you think

12  Sergeant Wolf is a good cop?

13            MR. WIEST:  Objection.

14       A.    Yeah, he's okay.

15       Q.    He's okay?

16       A.    Yeah, he's okay.

17       Q.    Okay.  If you were in a traffic

18  stop where you needed backup and Sergeant Wolf

19  was the one to show up would that give you a

20  level of comfort or a level of discomfort?

21            MR. WIEST:  Objection.

22            MS. ZIARKO:  Objection.

23       A.    Somewhat of comfort.

24       Q.    Okay.  In other words, you know --

25  well, never mind.  I will leave that alone.

Page 66

1    I'm going to pull up Sergeant Wolf's body

2    camera.

3              MS. ZIARKO:  Hey, Tom, is the radio

4    traffic audio, was that an exhibit?

5              MR. WIEST:  It is.  It has been

6    previously marked, hold on, as exhibit.

7              MR. SPYKER:  13; is that right?

8              MR. WIEST:  No.  Exhibit 16.

9              MS. ZIARKO:  Thank you.

10             MR. SPYKER:  I was close.

11                  -  -  -  -  -

12             (Thereupon, Exhibit 12, Sergeant

13             Wolf's Body Camera Footage, was

14             previously marked for purposes of

15             identification.)

16                  -  -  -  -  -

17        Q.    All right.  So do you see the video

18    we have up now?

19        A.    Yes, sir.

20        Q.    And I'll represent to you this is

21    Sergeant Wolf's body camera, which has been

22    previously marked as --

23             MR. SPYKER:  Do you guys have that?

24             MR. WIEST:  12.

25        Q.    -- 12.

1          (Whereupon video was played.)

2          Q.    All right.  So I have paused it

3     here at 38 seconds into Sergeant Wolf's body

4     camera.

5               Sir, is it fair to say that at this

6     point what Sergeant Wolf knows about the

7     situation is what he has heard over the radio

8     and what he can visually observe walking up to

9     Officer Lewis interacting with Mr. Kern?

10              MR. WIEST:  Objection.

11         A.    I'm sorry, could you repeat that?

12         Q.    Sure.  Sure.  So you had previously

13    -- we previously talked about radio/audio and

14    how a backup unit has to rely on that, it's the

15    only information they really get going into a

16    scene.  So at this point, 38 seconds into

17    Officer Wolf's body camera, we know that he has

18    just pulled up to the scene; correct?

19         A.    Yes.

20         Q.    Okay.  We know he has heard the

21    radio traffic because he responded that he was

22    backing up Officer Lewis; right?

23         A.    Yes.

24         Q.    Okay.  And all the -- the only

25    other additional information he has upon

Page 68

1    arriving on the scene is seeing Officer Lewis

2    behind her cruiser interacting with Mr. Kern as

3    he approaches; is that fair?

4                 MR. WIEST:  Objection.

5         A.    Yes, sir.

6         Q.    Okay.

7                 (Whereupon video was played.)

8         Q.    I've paused at 50 seconds.  So far

9    we've not heard Sergeant Wolf say anything; is

10   that fair?

11        A.    I don't believe I have.

12        Q.    Okay.  He -- he appeared at least

13   to just be observing and assessing kind of what

14   is occurring; is that fair?

15                MR. WIEST:  Objection.

16        A.    I don't know what he's doing, but I

17   have not heard him.  I mean, he could be

18   observing.  He could be in his car doing

19   something else.  I don't know.

20        Q.    Well, we know he's not in his car,

21   right, because he's standing on the sidewalk?

22        A.    Yeah, right, that's true.  From his

23   body cam, yeah, he is standing out there.

24        Q.    Okay.

25                (Whereupon video was played.)

Page 69

1          Q.    Okay.  I paused it at 1:09.  And we

2    now hear Sergeant Wolf says some things.  And

3    he's admitted he doesn't exactly know what's

4    going on outside of what he's heard on the

5    radio traffic; is that fair?

6              MR. WIEST:  Objection.

7    Mischaracterizes the video.  Mischaracterizes

8    the evidence.

9              You can answer.

10         A.    Yes.

11             MS. ZIARKO:  I'll instruct him to

12   answer or not.

13             Go ahead.  You can answer.

14         A.    Yes.

15             MR. WIEST:  Yeah, sorry.

16             MS. ZIARKO:  That's okay.

17             (Whereupon video was played.)

18         Q.    And we just heard Sergeant Wolf say

19   let her finish her business; right?  Did you

20   hear that?

21         A.    I did hear that.

22         Q.    Okay.  And is it -- well, you know,

23   you -- you had to review this for the purposes

24   of Mr. Kern's citizen complaint; fair?

25         A.    Fair.

1        Q.    Okay.  And is it, from your

2    perspective as a reviewing officer, do you

3    interpret, when Sergeant Wolf said, let her

4    finish her business, meaning, let her finish

5    the traffic stop that is currently in

6    progress --

7              MR. WIEST:  Objection.

8        Q.    -- is that a fair interpretation or

9    is that how you took it, rather?

10             MR. WIEST:  Objection.

11       A.    Yes, that's how I took it.

12             (Whereupon video was played.)

13       Q.    Is it appropriate at this stage of

14   the encounter for Officer Lewis to ask Mr. Kern

15   for his name?

16             MR. WIEST:  Objection.

17       A.    Yes.

18       Q.    Okay.  She has legal authority to

19   ask him for his name, you would agree with me?

20       A.    Yes.

21             MR. WIEST:  Objection.

22       Q.    Does Mr. Kern have a duty to

23   provide Officer Lewis with identifying

24   information based on what you've observed thus

25   fair in the interaction?

1          MR. WIEST:  Objection.

2      A.    In my opinion, yes.

3          (Whereupon video was played.)

4      Q.    Do you agree or disagree with

5  Sergeant Wolf's statement there that he could

6  charge Kern with interfering with a traffic

7  stop based on what we know from the

8  interactions that we've observed here up to

9  1:31 in Sergeant Wolf's body worn camera?

10          MR. WIEST:  Objection.

11      A.    I would say I agree with it, but

12  it's kind of weak, but, yeah, I agree with it.

13      Q.    Okay.  He has a probable cause for

14  that charge; is that fair?

15      A.    Yes.

16          MR. WIEST:  Objection.

17      Q.    Okay.

18          (Whereupon video was played.)

19      Q.    Okay.  We saw Mr. Kern ask Sergeant

20  Wolf for his reasonable articulable suspicion;

21  is that fair?  You heard that; right?

22      A.    I heard that.

23      Q.    Okay.  And Sergeant Wolf attempts

24  to explain that before being interrupted by

25  Mr. Kern; did you also hear that?

1      A.    Yes.

2            MR. WIEST:  Objection.

3      Q.    And you believe that that's

4   something we should do, right, if a citizen

5   asks them, you know, for their reasonable

6   articulable suspicion or their probable cause

7   and their -- the opportunity is safe enough for

8   that information to be conveyed and explained,

9   you would expect your police officers to

10  provide that information to a citizen; right?

11     A.    I would.

12     Q.    Okay.  And it appears here that

13  Sergeant -- that's exactly what Sergeant Wolf

14  was trying to do, provide his reasonable

15  articulable suspicion as he allowed Lewis to go

16  back and finish the now delayed traffic stop;

17  is that fair?

18           MR. WIEST:  Objection.

19     A.    That is fair.

20           (Whereupon video was played.)

21     Q.    Okay.  I paused it again at 1:58.

22  Would you agree with me that Mr. Kern is

23  becoming increasingly agitated as this

24  interaction goes on?

25           MR. WIEST:  Objection.

1          A.    Agitated, I don't know if I'd use

2    that word.  He seems a little mouthy, but I

3    don't know.  Because he's cursing, I don't know

4    that he's agitated.  I mean, he's upset, but --

5          Q.    Sure.  Sure.

6          A.    -- agitated is kind of strong.

7          Q.    So you would agree with me, though,

8    that Sergeant Wolf attempts to explain his

9    reasonable articulable suspicion for a second

10   time and is interrupted by Mr. Kern again; did

11   you hear that?

12         A.    I did.

13         Q.    Okay.  And Mr. Kern raises his

14   voice at least a little bit; right?

15         A.    Okay.  I would say so.

16         Q.    Do you agree?

17         A.    Yeah.

18         Q.    Okay.  Mr. Kern starts cussing a

19   little bit; right?

20         A.    Yes.

21         Q.    Okay.

22               (Whereupon video was played.)

23         Q.    I'm actually going to go back ten

24   seconds.

25               (Whereupon video was played.)

Page 74

1          Q.    All right.  I paused there.  Do you

2    hear Sergeant Wolf say I don't want to arrest

3    you?

4          A.    Yes, I heard that.

5          Q.    Okay.  And then the argument and

6    the cross-talk continues then after that; fair?

7          A.    Yes.

8                (Whereupon video was played.)

9          Q.    Okay.  Sergeant Wolf says we have

10   to ID you.  Do you agree with that statement?

11               MR. WIEST:  Objection.

12         A.    We should ID him.  I don't know if

13   we have to at that point.

14         Q.    Okay.  Your -- I think you said you

15   had 29 years experience as a police officer; is

16   that fair?  Am I remembering that right?

17         A.    Yes.

18         Q.    Okay.  If you were in this

19   situation and you were the backup officer, you

20   are Sergeant Wolf, would you allow this

21   incident to conclude and Mr. Kern to travel

22   about his way without identifying who he is --

23               MR. WIEST:  Objection.

24         Q.    -- based on what has happened up to

25   this point and the body worn camera?

1          MR. WIEST:  Objection.

2       A.    Yes, I would have.  I would have

3   allowed him to leave.

4       Q.    Without identifying him?

5       A.    Yes, I would have.

6       Q.    Okay.  But you would also agree

7   with me that it is reasonable for a police

8   officer, maybe who has different experience,

9   different tendencies than you, to identify

10  Mr. Kern before allowing him to leave, that's

11  also a reasonable option; right?

12          MR. WIEST:  Objection.

13      A.    Yes.

14      Q.    That's one of those things that

15  maybe falls within that discretionary,

16  different cops handle things differently, but

17  both scenarios can be right; fair?

18      A.    Yes.

19          MR. WIEST:  Objection.

20          (Whereupon video was played.)

21      Q.    Okay.  Now, Mr. Kern has repeatedly

22  said that Officer Lewis almost ran him off the

23  road.  Did you hear Sergeant Wolf offer to take

24  a report on that complaint just now?

25      A.    I did.

1          Q.    Okay.  Now, you would agree with me

2     that offi -- if Sergeant Wolf is going to take

3     a report on Kern's complaint, that Officer

4     Lewis almost ran her (sic) off the road, he

5     certainly needs Mr. Kern's identification for

6     that; fair?

7                MR. WIEST:  Objection.

8          A.    Fair.

9          Q.    Okay.  He can't take that report

10    without identifying Mr. Kern; fair?

11         A.    You can still take a report without

12    identifying him.  You've got the vehicle there,

13    so you've got a plate, so you do have some

14    information.  So that report can still be taken

15    without identifying him.

16         Q.    Okay.  And in auto accident

17    situation or a near auto accident situation you

18    have to identify the parties involved, right,

19    you have to identify both drivers; fair?

20                MR. WIEST:  Objection to form.

21         A.    You should identify both parties.

22    In some instances there may not be -- if

23    someone is taken to the hospital, for example,

24    or if someone flees that -- that scene it might

25    be almost impossible.  I've had -- I've had

Page 77

1    cases where people have gotten out of those

2    cars and walked away.

3         Q.    Sure.  Of course, but -- and I

4    appreciate those examples, but none of those

5    examples you said were in this situation that

6    we're dealing with here; fair?

7         A.    Right.

8         Q.    And you would agree with me that,

9    you know, I can get behind the wheel and drive

10   your car and if the police run the plate that's

11   going to come back to you, not me, the driver;

12   right?

13        A.    Right.

14        Q.    Okay.  So as police officers we

15   cannot rely on running a license plate to

16   identify the driver of a vehicle; is that a

17   fair statement?

18             MR. WIEST:  Objection.

19        A.    That is a fair statement.

20             (Whereupon video was played.)

21        Q.    Okay.  And did you happen to hear

22   who dispatch said the Tesla came back to?

23        A.    Brandy Wilson.

24        Q.    Right.  And we know that Brandy

25   Wilson was not driving that Tesla; right?

1        A.    Correct.

2        Q.    Okay.  So although we may have

3    information on who owns the car, without

4    Mr. Kern IDing himself, providing either his

5    name or some form of documentary license, we

6    still at this point, meaning, I say we, but I

7    mean, we, the police officers on scene do not

8    know who they are interacting with at this

9    point; right?

10       A.    Correct.

11       Q.    Okay.  Those are the questions I

12   have about the video.  Thank you, sir.

13             And those are all the questions I

14   have.  I appreciate your time.

15             MR. WIEST:  I've got some

16   follow-up.  I want to make sure -- you're good?

17             MS. ZIARKO:  Yes.

18             MR. WIEST:  Okay.

19             MS. ZIARKO:  Thanks.

20    FURTHER EXAMINATION OF CAPTAIN ERNEST WILLIAMS

21   BY MR. WIEST:

22       Q.    Did you, in the course of watching

23   any of those videos, ever witness Mr. Kern be

24   given warnings from the police against

25   interfering with the traffic stop of

1    Mr. Goodman, who was the vehicle in front and

2    Mr. Kern not comply with directives that were

3    given him by the police?

4            A.    I believe Officer Lewis said he was

5    interfering and I believe Sergeant Wolf at some

6    point said he was interfering, too.

7                    (Discussion had off the record.)

8            Q.    So that wasn't my question.

9            A.    Okay.

10           Q.    My question isn't whether or not

11   they were claiming he was interfering.  My

12   question is whether they gave Mr. Kern, at any

13   point in time, warnings against inferring with

14   the Goodman traffic stop and Mr. Kern not

15   complying --

16           A.    Okay.

17           Q.    -- with directives?

18           A.    I don't believe I saw that on that.

19           Q.    And, in fact, when Officer Lewis

20   said, one second, stand back, Mr. Kern did

21   that; right?

22           A.    Yes, sir.

23           Q.    You witnessed that; correct?

24           A.    Yes, sir.

25           Q.    I'm going to hand you Exhibit 21.

1                    - - - - -

2               (Thereupon, Exhibit 21, Obstructing

3               Official Business Statute, was

4               previously marked for purposes of

5               identification.)

6                    - - - - -

7        Q.    This is the interfering statute.

8   I'm sorry, this is the obstructing official

9   business statute.  And the ordinance and the

10  statute, they are the same thing.

11             One of the things that the statute

12  requires is that someone be without privilege

13  to do what they're doing; do you see that?

14       A.    I do.

15       Q.    Did you hear in the initial radio

16  stop when Officer Lewis calls for backup that

17  one of the things she said was that Mr. Kern

18  was filming?  Did you hear that?

19       A.    I did hear that, yes.

20       Q.    Filming is a First Amendment

21  protected activity when it comes to law

22  enforcement activities; correct?

23       A.    Correct.

24       Q.    It's actually in your police manual

25  that citizens have the right to do that;

1    correct?

2         A.    I believe so.

3         Q.    The claim, in part, that Mr. Kern

4    was obstructing was his failure to give his

5    identity; correct?  That's what Lewis and Wolf

6    were claiming --

7         A.    Yes, sir.

8         Q.    -- correct?

9               And, by the way, Captain,

10   complaining about police is also a First

11   Amendment protected activity; correct?

12        A.    Yes.

13        Q.    Okay.

14        A.    Yeah.

15        Q.    That's also in your manual;

16   correct?

17        A.    Yes.

18        Q.    Was it ever the case that anything

19   Mr. Kern did made it impossible for police to

20   question Mr. Goodman and/or complete the

21   traffic stop?

22              MS. ZIARKO:  Objection.

23              MR. SPYKER:  Objection.  Misstates

24   the clearly established law.  All those things

25   you said last time.

1        MR. WIEST:  Yeah, the difference

2   here is I'm reading from the Sixth Circuit case

3   and I'm asking him about it, so.

4        Q.    But go ahead.

5        MR. SPYKER:  Same objection.

6        MR. WIEST:  Yeah.

7        A.    I don't think Goodman did anything

8   to, you know, to stop them from doing a job,

9   no.

10       Q.    Well, not Goodman.  Did Mr. Kern --

11       A.    I'm sorry, no.

12       Q.    -- ever do anything --

13       A.    No.

14       Q.    -- that made it impossible --

15       A.    No.

16       Q.    -- for them to complete the stop?

17       A.    No, sir.

18       Q.    Okay.

19       A.    I didn't see any.

20       Q.    Was the manner or context of

21   anything Mr. Kern did, did it actually prevent

22   Lewis from completing the traffic stop with

23   Mr. Goodman?

24       A.    Prevent?  No.

25       Q.    Okay.  If you see there in the

Page 83

 1    ordinance, and the statute's the same thing,

 2    there has to be an intention -- by the way,

 3    Mr. Kern makes the -- let me back up.  Strike

 4    that.

 5              Mr. Kern makes the statement that

 6    Lewis almost ran him off the road.  He makes

 7    that statement several times in the course of

 8    the video; correct?

 9         A.    Yes, sir.

10         Q.    Do you have any evidence to believe

11    that that statement was not true?

12         A.    No.

13         Q.    Okay.

14              (Discussion had off the record.)

15         Q.    Do you have any evidence that

16    clearly demonstrates that Mr. Kern ever had the

17    intention or purpose to prevent, obstruct or

18    delay Lewis in the performance of her duties,

19    specifically the traffic stop?

20              MR. SPYKER:  Objection.

21              MS. ZIARKO:  Objection.

22         A.    Intention?  Probably not.

23         Q.    Okay.  You'll agree with me that

24    the statute says that to be charged with

25    obstruction somebody has to have, quote, the

Page 84

1    purpose to prevent, obstruct or delay the

2    performance by a public official of an

3    authorized act within his official capacity;

4    correct?

5              MS. ZIARKO:  Objection.

6              MR. SPYKER:  Objection.

7         A.    Yeah, that's what it says.

8         Q.    Okay.  You made the statement in

9    response to one of the questions by the other

10   counsel that you thought Mr. Kern could be

11   charged with interfering with a traffic stop?

12        A.    Yes.

13        Q.    What charge is that?

14        A.    I don't have the ordinance book in

15   front of me, but hindering a traffic stop.  It

16   might say something to that effect.

17        Q.    Okay.  Do you know?

18        A.    I -- I don't know.  No.  I

19   haven't -- in my capacity I haven't written a

20   ticket in quite some time, so.

21        Q.    Okay.

22        A.    Impeding a traffic stop or

23   something to the -- the ordinance might say

24   something to that effect.

25        Q.    You're not looking at any specific

```
 1    -- you would agree, by the way, that to charge

 2    someone with something you would have to look

 3    at the elements and make sure all of the

 4    elements of the crime is met; correct?

 5          A.    That is correct.

 6          Q.    And without knowing what those

 7    elements are with this interfering with a

 8    traffic stop, you can't say with definity that

 9    Mr. Kern could, in fact, be charged with that;

10    right?

11               MS. ZIARKO:  Objection.

12               MR. SPYKER:  Objection.

13          A.    I can say that we have a lot of

14    ordinances and I can probably find one that

15    would fit this instance.

16          Q.    Okay.  I tell you what, if you got

17    a phone I'm going to allow you to do that.

18               MS. ZIARKO:  No.

19               MR. WIEST:  I just want to know --

20               MS. ZIARKO:  No.

21               MR. WIEST:  I'm entitled, okay, I'm

22    entitled to know, if he's got a charge that he

23    thinks was comitted, I want to know what it is

24    and I'm going to give him the time to look it

25    up if he needs it.  We can take a break and
```

Page 86

1    allow him to do that.

2              MS. ZIARKO:  I'm going to object to

3    this.

4              MR. SPYKER:  I will join in that

5    objection.  I mean, it's not --

6              MR. WIEST:  You opened the door to

7    it and I'm going to close the door to it.

8         A.   I don't have --

9              MS. ZIARKO:  Okay.

10        A.   -- nothing at the top of my head.

11        Q.   Okay.  Thank you.

12             (Discussion had off the record.)

13        Q.   All right.  You indicated in

14   response to taking a report that you would need

15   to know Mr. Kern's name.  Do you remember that

16   testimony?

17        A.   Yes, I said that.  Yes.

18        Q.   You have completed reports where

19   you don't know someone's name; correct?

20        A.   Yes.

21        Q.   And it was possible here, maybe not

22   ideal, but possible to complete a report if

23   Sergeant Wolf wanted to by simply indicating

24   that Mr. Kern would not identify himself;

25   correct?

 1        A.     Yes.

 2        Q.     The advice that I think you

 3   indicated that the prosecutor gave in training

 4   was that failure to identify would not meet an

 5   obstruction charge; correct?

 6             MS. ZIARKO:  Objection.

 7             MR. SPYKER:  Objection.

 8        A.     Yes, I said that.

 9        Q.     Okay.  That's all I've got.

10             MS. ZIARKO:  Tom, do you have

11   anything else?

12             MR. SPYKER:  I have nothing else.

13             MS. ZIARKO:  I don't have anything.

14             COURT REPORTER:  Would you like him

15   to read?

16             MS. ZIARKO:  Yes, please.

17        (Deposition concluded at 10:30 a.m.)

18

19

20

21

22

23

24

25

Page 88

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                  TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12                 Christopher D. Wiest, Esq.-Original

13                 Andrea K. Ziarko, Esq.-Copy

14                 Thomas N. Spyker, Esq.-Copy

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2    The State of Ohio,   )

3                                   SS:

4    County of Cuyahoga.  )

5

6            I, Christine M. Emery, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, CAPTAIN ERNEST

10   LEE WILLIAMS, was by me first duly sworn to

11   testify the truth, the whole truth and nothing

12   but the truth in the cause aforesaid; that the

13   testimony then given by the above-referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above-referenced witness.

19            I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 90

1           I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5           IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 8th day of

8    July, 2024.

9

10

11

12              <%12026,Signature%>

13         _____

14         Christine M. Emery, Notary Public

15         within and for the State of Ohio

16

17   My commission expires January 19, 2029.

18

19

20

21

22

23

24

25