## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO – Cleveland Division

| | | | |
|---|---|---|---|
| **DEMETRIUS KERN** | : | **Case No.** | **1:23-cv-1327** |
| **Plaintiff** | : | | |
| **v.** | : | | |
| **NAFTALI WOLF, et. al.** | : | | |
| **Defendants** | : | | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT – *ORAL ARGUMENT IS REQUESTED*

Plaintiff, through Counsel, provides this combined Opposition to Defendants' Motions for Summary Judgment (Doc. 61; Doc. 63). Defendants repeatedly cite "facts" that are wholly unsupported by the record, also argue the factual record in the light most favorable to them, and then repeatedly misapply applicable law. None of this is allowed under FRCP 56, and Defendants' Motions should be denied. Instead, Defendants' Motions are nothing more than an homage to former NKVD chief, Lavrenti "Show me the man and I'll show you the crime" Beria.

Respectfully submitted,

/s/ Christopher Wiest_____          /s/Thomas B. Bruns_____
Christopher Wiest (Ohio 0077931)             Thomas B. Bruns (Ohio 0051212)
Chris Wiest, Atty at Law, PLLC               Bruns, Connell, Vollmar, & Armstrong
50 E. Rivercenter Blvd., Ste. 1280           4555 Lake Forrest Dr., Suite 330
Covington, KY 41011                          Cincinnati, OH 45242
513/257-1895 (v)                             513-312-9890 (v)
859/495-0803 (f)                             tbruns@bcvalaw.com
chris@cwiestlaw.com
**Attorneys for Plaintiff**

### CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing Memoranda upon all counsel of record, this 6 day of December, 2024, via filing same with the Court's CM/ECF system.

/s/Christopher Wiest

### TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................................................ii

TABLE OF AUTHORITIES.................................................................................................iv

Statement of the issues to be decided........................................................................viii

Summary of the Argument............................................................................................viii

MEMORANDUM IN OPPOSITION OF MOTION.........................................................1

I.      STANDARD OF REVIEW…………………………………………....………1

II.     FACTS (in the light most favorable to Plaintiff)……………………………......1

      A.  Background on Officer Carly Lewis and her initial interaction with Mr. Kern prior to Naftali Wolf's arrival on scene on September 22, 2022..............1

      B.  Body camera footage of events occurring after Sgt. Wolf's arrival  and background regarding Sgt Wolf........................................................................7

      C.  Additional Testimony and post-arrest occurrences...........................................16

III.    LAW AND ARGUMENT.................................................................................20

      A.  The FRCP 56(d) Declaration of Mr. Wiest....................................................20

      B.  Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment claims against Sgt. Wolf and Ofcr. Lewis..................................21

           1.  Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment detention claim.....................................21

           2.  Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment false arrest claim...............................................22

                 a)  The collective knowledge doctrine provides no refuge for Sgt. Wolf.................................................................................................26

                 b)  Ofcr. Lewis is liable for false arrest under a failure to intervene theory.....................................................................................28

           3.  Sgt. Wolf is not entitled to summary judgment on Plaintiff's Fourth Amendment excessive force claim........................................28

      C.  Defendants are not entitled to summary judgment on Mr. Kern's First Amendment retaliation claims against Sgt. Wolf and Ofcr. Lewis.................31

      D.  Defendants Wolf and Lewis are not entitled to Qualified Immunity..............34

      E.  The City is liable under *Monell* for the federal constitutional violations.......35

**F.** **Plaintiff is entitled to partial summary judgment on his state law assault and battery claim against Sgt. Wolf**............................................................................**44**

**G.** **Plaintiff is entitled to partial summary judgment on his state law civil unlawful imprisonment and false arrest claims against Sgt. Wolf and Ofcr. Lewis**..............................................................................................**45**

**H.** **Plaintiff is entitled to partial summary judgment on his state law malicious prosecution claim against Wolf and Lewis**............................................**45**

**I.** **There is no immunity for Sgt. Wolf or Ofcr. Lewis under state law immunity due to the fact that their actions were made with malicious purpose, in bad faith, or in a wanton or reckless manner**............................................**46**

**J.** **The City is not entitled to immunity for the negligence claim against it under R.C. 2744.02(B)**...........................................................................**48**

**IV.** **CONCLUSION**.....................................................................................**50**

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)...............................................................33

*Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994)................................................................31

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)..........................................................36

*Adkins v. Bd. of Educ. of Magoffin County, Ky.*, 982 F.2d 952 (6th Cir.1993).........................35, 36

*Agnew v. Porter*, 23 Ohio St. 2d 18, 260 N.E.2d 830 (Ohio 1970)...........................................5, 25

*Akima v. Peca*, 85 F.4th 416 (6th Cir. 2023)..................................................................23

*Anders v. Cuevas*, 984 F.3d 1166 (6th Cir. 2021)...............................................................34

*Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 2012-Ohio-5711,
   983 N.E.2d 266 (Ohio 2012)..............................................................................47, 50

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986).......................................................21

*Anderson v. Holmes*, 2021 U.S. Dist. LEXIS 102401 (MIED 2021)...............................................33

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986).......................................................21

*Arnett v. Myers*, 281 F.3d 552 (6th Cir. 2002)................................................................32

*Arrington-Bey v. City of Bedford Heights,* 858 F.3d 988 (6th Cir. 2017).....................................35

*Baker v. City of Hamilton*, 471 F.3d 601 (6th Cir. 2006)......................................................31

*Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004)...................................................21

*Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006)..........................................................23, 32

*Baynes v. Cleland*, 799 F.3d, 600 (6th Cir. 2015)............................................................30

*Bey v. Falk*, 946 F.3d 304 (6th Cir. 2019)...................................................................26

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998)................................................................32

*Brinkman v. Drolesbaugh*, 97 Ohio St. 171, 119 N.E. 451 (1918).................................................45

*Buddenberg v. Weisdack*, 939 F.3d 732 (6th Cir. 2019).........................................................34

*Bunkley v. City of Detroit*, 902 F.3d 552 (6th Cir. 2018).....................................................28

*Burr v. Perkins*, No. 2:04-cv-786, 2006 U.S. Dist. LEXIS 52442 (S.D. Ohio July 31, 2006).........24

*Carpenter v. City of Cincinnati*, 2003 U.S. Dist. LEXIS 7105 (S.D. OH. Apr. 17, 2003).............40

*Caruso v. State*, 136 Ohio App.3d 616, 737 N.E.2d 563 (10th Dist. App. 2000).............................46

*Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020)..........................................................33

*City of Canton v. Harris*, 489 U.S. 378 (1989)...............................................................40

*City of Houston v. Hill*, 482 U.S. 451 (1987)................................................................24

iv

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)...........................................................38

*Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781 (Ohio 2003)............49

*Collett v. Hamilton Cty, Ohio*, 2019 U.S. Dist. LEXIS 2644 (SDOH 2019)...................................50

*Connick v. Myers*, 461 U.S. 138 (1983).............................................................................32

*Criss v. Springfield Township*, 56 Ohio St.3d 82, 564 N.E.2d 440 (1990).............................46

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807 (6th Cir. 2007)...................33

*Crawford v. Geiger (Crawford II)*, 131 F. Supp. 3d 703 (N.D. Ohio 2015)...................................32

*Delaware v. Prouse*, 440 U.S. 648 (1979)........................................................................22

*Dye v. Office of the Racing Comm'n*, 702 F.3d 286 (6th Cir. 2012)...................................34

*Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017)......................................32, 33

*Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008)......................................28, 33

*Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995)......................................33

*Fritz v. Charter Twp. of Comstock*, 592 F.3d 718 (6th Cir. 2010)...................................31

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)......................................21

*Gable v. Lewis*, 201 F.3d 769 (6th Cir. 2000)...................................................32

*Gambrel v. Knox Cty.*, 25 F.4th 391 (6th Cir. 2021)...............................................31

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011)....................................................32

*Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015)...................................23

*Graham v. Connor*, 490 U.S. 386 (1989)......................................................28, 30

*Greene v. Barber*, 310 F.3d 889 (6th Cir. 2002)................................................32

*Harasyn v. Normandy Metals, Inc.*, 49 Ohio St.3d 17, 551 N.E.2d 962 (1990)...........................44

*Hart v. Hillsdale Cty.*, 973 F.3d 627 (6th Cir. 2020)..........................................26

*Holmes v. City of Massillon*, 78 F.3d 1041 (6th Cir. 1996)...................................31

*Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010)...................................32

*Hope v. Pelzer*, 536 U.S. 730 (2002)............................................................35

*Hughey v. Easlick*, 3 F.4th 283 (6th Cir. 2021)...............................................30, 31

*Humphrey v. Mabry*, 482 F.3d 840 (6th Cir. 2007)................................................26

*In re Sofamor Danek Group, Inc.*, 123 F.3d 394 (6th Cir. 1997)......................................1

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580 (6th Cir. 2008)...................................32

*Jones v. City of Elyria*, 947 F.3d 905 (6th Cir. 2020)......................................24, 25

*Kaylor v. Rankin*, 356 F. Supp. 2d 839 (OHND 2005)...............................................44

*Kearns v. Meigs Cnty. Emergency Med. Servs.*,
    2017-Ohio-1354, 88 N.E.3d 438 (4th Dist. App. 2017)...........................................................50

*Kent v. Oakland County*, 810 F.3d 384 (6th Cir. 2016)...................................................35

*Knox v. Hetrick*, 2009-Ohio-1359, 2009 Ohio App. LEXIS 1141 (8th Dist. 2009).................44, 47

*Kostrzewa v. City of Troy*, 247 F.3d 633 (6th Cir. 2001)...................................................30

*Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017)...............................................................1

*Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241 (6th Cir. 1990)...........................................38, 39

*Love v. Port Clinton*, 37 Ohio St.3d 98, 524 N.E.2d 166 (1988).....................................44

*Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006).............................................30

*McCurdy v. Montgomery County*, 240 F.3d 512 (6th Cir. 2001).........................23, 32, 33

*McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988).......................................................31

*McRae v. Icon Entertainment Group, Inc.*,
    10th Dist. Franklin No. 08AP-820, 2009-Ohio-5119..................................................44

*Melanowski v. Judy*, 102 Ohio St. 153, 131 N.E. 360 (Ohio 1921)...................................45, 46, 47

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008)...................................34

*Miller v. Sanilac County*, 606 F.3d 240 (6th Cir. 2010).................................................31

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)..........................................viii, 35, 36, 43

*Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394 (6th Cir. 2009)............................31

*Nieves v. Bartlett*, 587 U.S. 391 (2021).........................................................................34

*Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020)............................23

*Patrizi v. Huff*, 690 F.3d 459 (6th Cir. 2012).............................................................24, 25

*Pearson v. Callahan*, 555 U.S. 223 (2009)....................................................................34

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).....................................................36

*Phelps v. Coy*, 286 F.3d 295 (6th Cir. 2002)..............................................................28, 31

*Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509 (6th Cir. 2006)...........................31

*Pullin v. City of Canton*, 133 F. Supp. 2d 1045 (N.D. Ohio 2001)..................................24

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005).................................45

*Reed v. Campbell County*, 80 F.4th 734 (6th Cir. 2023)...............................................31

*Rogers v. Barbera*, 170 Ohio St. 241, 164 N.E.2d 162 (Ohio 1960)................................45

*Rudd v. City of Norton Shores*, 977 F.3d (6th Cir. 2020)...........................................33, 34

*Saucier v. Katz*, 533 U.S. 194 (2001)...........................................................................34

*Scott v. Harris*, 550 U.S. 372 (2007)............................................................................1

*Semple v. Hope*, 15 Ohio St. 3d 372, 474 N.E.2d 314 (Ohio 1984)............................5, 25

*Shalkhauser v. City of Medina*,
    148 Ohio App. 3d 41, 2002-Ohio-222, 772 N.E.2d 129 (9th Dist. 2002)....................49

*Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681 (6th Cir. 2006)...........................31

*Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555 (6th Cir. 2004).......................34

*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000).......................................33

*Smith v. John Deere*, 83 Ohio App.3d 398, 614 N.E.2d 1148 (1993)............................44

*Taylor v. City of Cleveland*, 2012-Ohio-3369 (8th Dist. 2012)...................................50

*Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76 (6th Cir. 1995)...................................22

*Taylor v. Riojas*, 141 S. Ct. 52 (2020)..................................................................35

*Teramano v. Teramano*, 6 Ohio St. 2d 117, 216 N.E.2d 375 (Ohio 1966).................46, 47

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999).........................................31, 33, 34

*Trussell v. General Motors Corp.*, 53 Ohio St.3d 142, 559 N.E.2d 732 (1990)..............45

*Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017).......................................33

*Turner v. Scott*, 119 F.3d 425 (6th Cir. 1997)....................................................28, 33

*United States v. Hardnett*, 804 F.2d 353 (6th Cir. 1986).........................................22

*United States v. Hill*, 195 F.3d 258 (6th Cir. 1999)...............................................22

*United States v. Lyons*, 687 F.3d 754 (6th Cir. 2012)............................................26

*United States v. Sokolow*, 490 U.S. 1 (1989).....................................................22

*Wagner v. Heavlin*, 136 Ohio App.3d 719, 737 N.E.2d 989 (7th Dist.2000)..................49

*Webb v. United States*, 789 F.3d 647 (6th Cir. 2015).............................................22

*Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015)...............................................26

*Williams v. Maurer*, 9 F.4th 416 (6th Cir. 2021)...................................................31

*Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999).....................................................1

*Wilson v. Layne*, 526 U.S. 603 (1999)..............................................................35

*Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020)......................................*passim*

## Statutes

42 U.S.C. § 1983.......................................................................................35

R.C. 2744.01(A).......................................................................................49

R.C. 2744.02(B).......................................................................................48

R.C. 2744.03......................................................................................................viii, 46

R.C. 2921.31................................................................................................................23

R.C. 4511.39(A) ...................................................................................................6, 26, 48

R.C. 4511.45(B)........................................................................................................5, 25

**Rules**

FRCP 56.........................................................................................................20, 21, 29

**Other Authorities**

1 Restatement of the Law 2d, Torts, Section 8A, at 15 (1965)...........44

22 Am. Jur. False Imprisonment § 2-3............................................................................45

**<u>Statement of the issues to be decided</u>:**

> (1) Whether Defendants are entitled to summary judgment on the Plaintiff's claims against
> them?

**<u>Summary of the argument</u>:**

Defendants are not entitled to summary judgment on Plaintiff's claims, particularly when viewing the facts in the light most favorable to him and drawing reasonable inferences in his favor. As demonstrated in this memoranda, Defendant, Naftali Wolf, and Defendant, Carli Lewis, violated clearly established law when taking unconstitutional and illegal action against Plaintiff, Demetrius Kern, thus they have no qualified immunity to his lawsuit.  And, in light of the uncontradicted evidence of failure to train, Defendant, City of Cleveland Heights, is liable under *Monell*.  Finally, Defendant Wolf and Defendant Lewis are liable to Plaintiff Kern on the state law claims asserted against them, including because they lose immunity under R.C. 2744.03 for their actions taken with "malicious purpose, in bad faith, or in a wanton or reckless manner" all in contravention of R.C. 2744.03.

## MEMORANDUM IN SUPPORT OF MOTION

We incorporate in full Plaintiff's Motion for Partial Summary Judgment.  (Doc. 62).

## I.    STANDARD OF REVIEW

In considering a motion for summary judgment, courts view the factual evidence in favor of the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).  Also, courts do not credit any testimony that is "blatantly contradicted" by video testimony. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Rather, courts view "the facts in the light depicted by the video tape." *Id.* at 380-381. However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).  Finally, courts do not accept as true "legal conclusions or unwarranted factual inferences." *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (internal quotation omitted).

## II.    FACTS (in the light most favorable to the Plaintiff)

This case arises out of an interaction between the Plaintiff, Demetrius Kern ("Mr. Kern") and primarily two City of Cleveland Heights ("City") Police Officers, Carly Lewis ("Ofcr. Lewis") and Naftali Wolf ("Sgt. Wolf"), on September 22, 2022, most of which was captured on video.  (Ver. Compl., Doc. 1 at ¶¶ 3, 9-61).

### A.  Background on Ofcr. Lewis and her initial interaction with Mr. Kern prior to Sgt. Wolf's arrival on scene on September 22, 2022

Ofcr. Lewis joined the City's Police Department ("CHPD") on June 3, 2018.  (Depo. Lewis, Doc. 52, at 23).  Although she was provided with CHPD's procedure manual, she was never trained on it (*Id.* at 24), and she was never trained, at any time, on clearly established rights, including those at issue in this case.  (*Id.* at 27, 35, 44-47, 72-73, 82).  While in field

1

training with CHPD, Ofcr. Lewis struggled with putting in the information necessary for a criminal complaint.  (*Id.* at 53, 56; Exhibit 9, Doc. 51-11).  She also had difficulty with deciding when to activate lights and sirens.  (*Id.* at 54).

In 2019 in her first formal evaluation, Ofcr. Lewis stated she had a "hope" to learn and understand more policy and procedure, as well as learn city and state laws.  (*Id.* at 61, 67).  But, CHPD did nothing to follow up on these requests for training.  (*Id.* at 61-62).  She recalls receiving no training on obstruction charges prior to September 22, 2022.  (*Id.* at 63, 72).  Despite her lack of training, she did know that in order to determine probable cause for an offense an officer had to know all of the elements of the offense, and there had to be evidence supporting all of those elements.  (*Id.* at 76-78).

Also despite her lack of training, Ofcr. Lewis admitted she has to perform her duties consistent with the U.S. Constitution, that she does not have to comply with an order that is in conflict with federal, state or local law, and that if the legality of an order is in doubt, she has to confer with an authority higher than the supervisor giving the order.  (*Id.* at 84-85).  However, CHPD never clarified whether she or other officers could or would be disciplined for violating the U.S. Constitution.  (*Id.* at 90).  Ofcr. Lewis also admitted that CHPD policy no. 423 required her body worn camera be activated in any enforcement or investigative contact (*Id.* at 102-103), and that it is impossible to record all of such contact without activating the camera prior to activating her lights and sirens, as activating lights and sirens is part of her enforcement activity. (*Id.* at 106-107).

Ofcr. Lewis was sued in 2020 or 2021 for an accident while driving her police vehicle, and the central dispute in that case was whether she had activated her lights and sirens before the accident occurred.  (*Id.* at 74-75).

2

On September 22, 2022, Ofcr. Lewis was on patrol in the area of Noble Road and Mayfield Road when she saw a silver Infiniti that generally matched a description of a vehicle used by a suspect in a domestic violence incident from the day before.  (*Id.* at 115).  She had no knowledge of the suspect involved and she had not read the incident report.  (*Id.* at 116-117).  The silver Infiniti was driven by Larelle Goodman ("Mr. Goodman"), and Ofcr. Lewis ran the license plate and discovered that it came back with an expired license plate sticker, which gave her probable cause to stop the silver Infiniti.  (*Id.* at 117).

Mayfield Road has five lanes, two lanes running in each direction and a middle turn lane. (*Id.* at 118).  Ofcr. Lewis was in the left lane, while the silver Infiniti and Mr. Kern (driving a white Tesla) were in the right curb lane.  (*Id.* at 119-120).

Mr. Kern's testimony was that Ofcr. Lewis' lights and sirens were not on when she cut in, at a 30-to-50-degree angle, from the left lane to the right lane, cut him off and almost caused an accident.  (Depo. Kern, Doc. 54, at 40-41, 134-138).  As a consequence, Mr. Kern had to lock up the brakes and he skidded to a stop, but not before Ofcr. Lewis came "very close" to hitting him.  (*Id.* at 136-137).  And, Ofcr. Lewis did not activate her lights and sirens until after she was fully in front of him.  *(Id*. at 137-138).  Ultimately, Ofcr. Lewis apologized to Mr. Kern for almost causing an accident.  (*Id.* at 134, 138).

For her part, Ofcr. Lewis gave a statement to Internal Affairs approximately a week after the incident which, in her deposition, she admitted was truthful.  In fact, she testified she would make no changes to her statements to Internal Affairs.  (Depo. Lewis, Doc. 52, at 196, 202-203). Exhibit 17 is her statement to Internal Affairs in which she stated that her vehicle actually was in between the two lanes when Mr. Goodman slammed on his brakes (Exhibit 17 at 08:47:45, timestamps reflecting those on the body worn cameras), that she then shouted for Mr. Goodman

3

to move forward, which he did, so that she could get behind him (*Id.* at 08:47:55), that he followed all of her directives (*id.* at 08:48:15), and that she apologized to Mr. Kern for the way the traffic stop went down because the "placement was bad," and the "timing was bad" (*Id.* at 08:48:51).  Ofcr. Lewis reiterated most of this in her deposition when she testified that Mr. Goodman hit his brakes right away in an "abrupt" manner (*Id.* at 124-125), and that as a result of Mr. Goodman slamming on his brakes, Ofcr. Lewis slammed on her brakes, forcing Mr. Kern to slam on his brakes.  (*Id.* at 125).  Ofcr. Lewis also admitted that as she cut over, her vehicle was "very close" to Mr. Kern's vehicle, and she admitted that there almost was a collision as a result, but Mr. Kern was able to stop before any accident occurred.  (*Id.* at 126, 131).

Significantly, Ofcr. Lewis admitted <u>she did not activate her turn signal when changing lanes</u>.  (Depo. Lewis, Doc. 52, at 119-120).  Ofcr. Lewis also admitted that, for a failure to yield to lights and sirens charge, there must be sufficient time for other drivers to appreciate the fact that lights and sirens are on, and then react to that.  (*Id.* at 128).  However, Ofcr. Lewis admitted she could not say how long Mr. Kern had to react (*id.* at 128) and could not say how much time he had to stop.  (*Id.* at 130).  She also admitted Mr. Kern stopped without any accident occurring. (*Id.* at 131).  Significantly, Ofcr. Lewis testified she did not even see Mr. Kern's vehicle as she made the lane change, because she was focused on Mr. Goodman's vehicle.  (*Id.* at 130).  Consequently, she could not say whether the almost-collision occurred during the lane change, or afterwards, because she did not see Mr. Kern's vehicle.  (*Id.* at 131-132).

After the vehicles were stopped, video recorded the interaction.  Filed conventionally is cell phone video taken by Mr. Kern, Kern_1119-20220922_185844.mp4,[1] that records him saying to Ofcr. Lewis, as she approaches Mr. Goodman's vehicle, "I want your badge number,

---

[1] Both of the .mp4 videos were authenticated with the declaration of Mr. Kern.  (Doc. 62-1).

you almost ran me off the road."  (*Id.*).  Mr. Kern wanted Ofcr. Lewis' badge number and name

in order to file a complaint about her reckless driving because she almost ran him off the road.

(Depo. Kern, Doc.54 at 41, 43).  In response, Ofcr. Lewis told Mr. Kern to wait, so he did.  (*Id.*).

Ofcr. Lewis admitted this in her testimony and also admitted that Mr. Kern complied with her

request to wait.  (Depo. Lewis, Doc. 52, at 134-135).

      Ofcr. Lewis' body worn camera picks up at 18:58:44, as she is in her vehicle about to

exit. (Lewis BWC, Exhibit 11, Doc. 59, filed conventionally).[2]  At 18:58:49 she exits and we can

hear her say "one second" in response to Mr. Kern as she continues to proceed to Mr.

Goodman's vehicle.  (*Id.*).  Ofcr. Lewis' testimony about this initial interaction was that she

understood Mr. Kern asked for her name and badge number so he could make a formal

complaint against her.  (Depo. Lewis, Doc. 52, at 141-142).  She also testified she knew citizens

have the right to record police in the performance of their duties.  (*Id.* at 110-111).  In light of her

admitted knowledge, and only seconds after being informed that Mr. Kern wants her name and

badge number, at 18:58:59 to 18:59:11, and while at the side of Mr. Goodman's car, Ofcr. Lewis

begins retaliating[3] against Mr. Kern by reporting to dispatch "81 radio, standby, it's going to be

---

[2] All timestamps of body worn camera footage refer to the timestamps within the footage.  We point out
that not all cameras pick up the entirety of the events.  And, it appears, there is a two second difference
between Sgt. Wolf's body worn camera footage and Ofcr. Lewis' body worn camera footage.  For the
body worn camera footage, we cite for each exhibit whose camera footage is cited, the first time it is
cited, the Exhibit number and the timestamp, and then the exhibit and the timestamp for subsequent
citations.

[3] Ofcr. Lewis drew an erroneous legal conclusion (which the Court should not credit) that Mr. Kern
somehow failed to yield to lights and sirens.  (Depo. Lewis, Doc. 52, at 127).  The Ohio Supreme Court
holds that a failure to yield violation can only be sustained where the driver who is accused of not
yielding should "in the exercise of ordinary care, have heard the siren or seen the flashing lights."  *Semple
v. Hope*, 15 Ohio St. 3d 372, 474 N.E.2d 314 (Ohio 1984).  Further, R.C. 4511.45(B) also provides that
"this section does not relieve the driver of an emergency vehicle from the duty to drive with due regard
for the safety of all persons and property upon the highway," and the driver of an emergency vehicle
loses preferential status and the right of way, if another violation of law is committed. *Agnew v. Porter*, 23
Ohio St. 2d 18, 24, 260 N.E.2d 830 (Ohio 1970).  Here, and without question, Ofcr. Lewis committed a

on Mayfield, across from the first access road, send me another unit because another party does

not know how to yield to lights and sirens, sitting here recording me, saying I almost ran him off

the road."  (*Id.*).[4]  Sgt.Wolf then can be heard stating "en route."  (*Id.*)

After calling in to dispatch, Ofcr. Lewis then interacts with Mr. Goodman, asking if he is

okay, introduces herself, tells him that the reason for the stop was that his plates were expired

"which isn't a big deal", and then asks if Mr. Goodman knows "that guy" behind her.  (Exhibit

11 at 18:59:14).  Mr. Goodman responds that he was trying to hurry up and move over, and Ofcr.

Lewis tells him "you are good."  (*Id.* at 18:59:25).  She then asks Mr. Goodman for his driver's

license and if he has it with him.  (*Id.* at 18:59:35).  Mr. Goodman explains that he bought the car

from his dad, and has his title in his glovebox.  (*Id.* at 18:59:46).  He asks to retrieve the title to

show her, she asks if he has any weapons, and Mr. Goodman explains that he is armed and is

licensed to carry.  (*Id.* at 18:59:56).  She asks if he has a firearm, and he explains it is in the

center console.  (*Id.* at 18:59:58Mr).  Goodman then reaches into the glovebox and hands her the

title.  (*Id.* at 19:00:15).  She then calls in Mr. Goodman's plate to dispatch.  (*Id.* at 19:00:20).

In the meantime, Mr. Kern, as directed, had been standing back, on the sidewalk, and

away from Ofcr. Lewis, for more than a minute.  (*Id.*; Kern_1120-20220922_185903.mp4, filed

conventionally).  Ofcr. Lewis admitted that Mr. Kern did not prevent her from talking to Mr.

Goodman, but claims he somehow "delayed it," despite the fact Mr. Kern complied with her

directive to stand back, and complied with all other directives that she gave him.  (Depo. Lewis,

---

violation of R.C. 4511.39(A) when she failed to use a turn signal while changing lanes, thus losing any
privileged status.

[4] This can also be heard via the radio traffic recordings, Exhibit 16, though, as Lewis testified, all radio
traffic was cut and pasted together, and thus the radio traffic does not reflect large time gaps between
calls.  (Depo. Lewis, Doc. 52, at 206-207).

Doc. 52, at 140-141).  And Ofcr. Lewis admitted she had the scene under control prior to backup arriving.  (*Id.* at 145).

Ofcr. Lewis then approached Mr. Kern and apologized to him.  (Exhibit 11 at 19:00:37). She claimed that she had her lights and sirens on, but Mr. Kern responded that he did not hear anything.  (*Id.* at 19:00:48).  Mr. Kern then stated that he wasn't going to argue with her.  (*Id.* at 19:01:22).  He also tells Ofcr. Lewis that if you do something wrong, just say I'm sorry.  (*Id.* at 19:01:33).  At 19:01:35 of her body camera, Sgt. Wolf arrives.  (*Id.*).

## B.  Body camera footage of events occurring after Sgt. Wolf's arrival  and background regarding Sgt Wolf

Sgt. Wolf joined CHPD in 2012.  (Depo. Wolf, Doc. 60-1 at 87).  Prior to that, he was a deputy for the Village of Bratenahl where he was counseled for being rude to citizens, but could not remember how many times.  (*Id.* at 81, 85, 86).  Sgt. Wolf testified he had some training on constitutional rights at the police academy in 2003-2004, but he could not recall any specifics of that training.  (*Id.* at 87).  He also had no recollection of such training during his field training when he was hired by CPHD.  (*Id.* at 88-89).  Despite this admission, his testimony was that most people in CPHD do not know the law better than him, specifically with respect to obstruction charges.  (*Id.* at 57-58).  From his field training with CPHD, Sgt. Wolf remembers being trained on obstruction charges that if someone doesn't identify themselves in connection with any legal traffic stop, then to charge them with obstruction.  (*Id.* at 97).  He testified this was the practice of CHPD.  *Id.* at 97-98.

Sgt. Wolf knew long before September 22, 2022, that he could not charge obstruction for simply failing to identify, but rather there had to be reasonable articulable suspicion someone committed a crime in order to demand identification.  (*Id.* at 98).  In 2021 he tried to get clarification from the city prosecutor about when to charge obstruction for failing to identify, but

she told him to figure it out, so he read the statute on obstruction.  (*Id.* at 99-100).  Prior to September 22, 2022, he claimed he knew the elements of an obstruction charge.  (*Id.* at 100). And he admitted he knew it was a clearly established right to refuse to identify oneself if there was no probable cause some other crime had been committed.  (*Id.* at 106-107).

Sgt. Wolf admitted he knew he had to have probable cause, requiring evidence on every element of the charge, before making an arrest, and he knew that this was a clearly established right.  (*Id.* at 95-96, 105).  He admitted he had to know all facts supporting an arrest at the moment he made the arrest.  (*Id.* at 113).  He admitted he knew that no use of force, including handcuffing, could be used to effect an illegal arrest.  (*Id.* at 105-106).  He also admitted he knew it was a clearly established right to complain about law enforcement, and he could not retaliate against someone for doing so.  (*Id.* at 106).  Sgt. Wolf also admitted that if a person committed no crime, he had no authority to detain the person just because the person wanted to be detained. (*Id.* at 270).

Sgt. Wolf was promoted to sergeant by CHPD on June 28, 2021.  (*Id.* at 143).  His supervisor training did not include anything on constitutional rights.  *Id.* at 144-145.  He admitted that in 2021 while he was still an officer with CHPD, he had an interaction with a black female witness at the scene of a robbery arrest where he told her he would mail her a ticket for obstructing.  (*Id.* at 152-156).  He testified he was not aware that this conduct resulted in a complaint against him by the witness, that same year, and a sustained finding of misconduct.  (*Id.* at 146-151, Exhibit 9, Doc. 51-9).  In summary, the incident documented that a black woman voiced concern about excessive force by CHPD officers at the scene of an arrest of a black male robbery suspect, and Sgt. Wolf retaliated by threatening to charge her with obstruction.  (*Id.*). And that followed another incident in 2020 which resulted in a sustained finding of misconduct

8

against then Ofcr. Wolf as a consequence of his interactions with yet another black female citizen.  (Exhibit 8, Doc. 51-8).

<u>Body camera footage after Sgt. Wolf arrives on scene</u>

Sgt Wolf's body worn camera footage begins at 19:01:00 (of his camera).  (Wolf BWC, Exhibit 12, at 19:01:00).  At approximately 19:01:53 he walks up to Mr. Kern and immediately falsely accuses Mr. Kern by stating "well you don't pull up behind an officer on a traffic stop." (*Id.* at 19:01:53).  Mr. Kern responds: "you don't even know what's going on," to which Sgt. Wolf replies "you're right, I don't."  (*Id.*).  Mr. Kern then states "so why are you saying that?" (*Id.*).  And Sgt. Wolf replies: "because I am here and what you are doing right now is against the law." (*Id.* at 19:01:58).  Mr. Kern then responds "she almost ran me off the road."  (*Id.*).  Sgt. Wolf replies: "then you should have pulled over for lights and sirens, she said on the radio that you didn't yield and it's on dash cam I'm assuming."  (*Id.* at 19:02:05).  Mr. Kern tells Sgt. Wolf he is wrong, saying "that's the disconnect man."  (*Id.* at 19:02:05).  Sgt. Wolf then says "I'll tell you what, let her finish her stop, then we can sit down and talk like adults."  (*Id.* at 19:02:07). Ofcr. Lewis then responds, "we're good, I'm going to let him go."  (*Id.* at 19:02:09).

Instead of letting him go, and in furtherance of retaliating against Mr. Kern for making an issue of her reckless driving, Ofcr. Lewis asks Mr. Kern for his last name.  (*Id.* at 19:02:11; Exhibit 11 at 19:02:13).  Mr. Kern asks why she needs his last name.  (Exhibit 12 at 19:02:11). Ofcr. Lewis responds that she is "asking who I am talking to," and says "you asked me my last name."  (*Id.* at 19.02.13).  Sgt. Wolf then states: "well now you are going to be under arrest, what you are doing is illegal, I can charge you with interfering with a traffic stop."  (*Id.* at 19:02:22; Exhibit 11 at 19:02:24).

Ofcr. Lewis again asks Mr. Kern for his last name, to which Mr. Kern responds "Why?" (*Id.*).  Ofcr. Lewis responds: "because I am conducting business with you now."  (*Id.* at 19:02.29).  Mr. Kern then asks: "Am I being detained, or am I free to go?" to which Sgt. Wolf responds: "If you want to be."  (Exhibit 12 at 19:02:26; Exhibit 11 at 19:02.29).  Mr. Kern then states "that's not how this works, what is your RAS, what is your reasonable articulable suspicion of my crime?"  (Exhibit 12 at 19:02:35).  Sgt. Wolf then states: "I will explain it to you.  Doing what you are doing right now…"  (*Id.*).  Mr. Kern then states "No, she almost ran me off the road."  (*Id.* at 19:02:40).

Sgt. Wolf responds: "Again, you didn't yield to lights and sirens."  (*Id.*).  Mr. Kern then states "she was next to me and stopped and almost ran me off the fucking road, what are you talking about."  (*Id.* at 19:02.47).  Sgt. Wolf responds: "Okay, listen to me, you asked my reasonable articulable suspicion, its probable cause."  (*Id.* at 19:02:50).  Mr. Kern responds: "I'm not under arrest, if you arrest me you are violating my rights."  (*Id.* at 19:02:52).  Sgt. Wolf responds: "I don't want to arrest you, we have to id you."  (*Id.* at 19:02:54).  Mr. Kern responds: "you are violating my rights, is that what you want to do?"  (*Id.* at 19:02:55).  Sgt. Wolf responds: "we have to id you."  (*Id.* at 19:02:56).  Mr. Kern responds: "No you don't," and Sgt. Wolf repeats "yes we do."  (*Id.* at 19:02:57).  Mr. Kern then states that "OK, I'm going to videotape this," and Sgt. Wolf responds "OK, we have you on camera too."  (*Id.* at 19:03:00).  Mr. Kern then states "I'm going to call, they can come get my car, you are violating my rights."  (*Id.* at 19:03:02).  And Sgt. Wolf responds "who is getting what car?"  *Id.* at 19:03:03.

Sgt. Wolf then makes a radio call and states there is a male who is obstructing by purportedly failing to identify himself.  (*Id.* at 19:03:06-10).  Mr. Kern then states again  "No I'm

not, she almost ran me off the road." (*Id.*).  Sgt. Wolf responds, "so I'll take a report on it, but you need to id." (*Id.* at 19:03:12).

Meanwhile, at 19:02:35 of her body worn camera footage, Ofcr. Lewis walks back to Mr. Goodman, finishes her stop of him, and releases him at 19:03:06 of her body worn camera. (Exhibit 11 at 19:02:35-19:03:06).  Ofcr. Lewis testified that, at that point, all business involving Mr. Goodman was concluded.  (Depo. Lewis, Doc. 52, at 143-144).

Mr. Kern then responds to Sgt. Wolf's statement about "taking a report on it" by stating "No, I'm dealing with her [Ofcr. Lewis]."  (Exhibit 12 at 19:03:15).  In response, Ofcr. Lewis states to Mr. Kern "talk to me." (*Id.*).  Mr. Kern then states to Sgt. Wolf "what the hell is wrong with you man." (*Id.* at 19:03:16).  Sgt. Wolf then steps back and calls in the license plate number on Mr. Kern's vehicle.  (*Id.* at 19:03:16 to 19:03:43).

Ofcr. Lewis continues to interact with Mr. Kern and again asks him to identify himself so that she can let her dispatcher know who she is "dealing with".  (Exhibit 11 at 19:03:54; Exhibit 12 at 19:03:52).  Ofcr. Lewis then states **"if you don't identify yourself, that is obstruction."** (Exhibit 11 at 19:03:54).  Mr. Kern (accurately) states "obstruction is a secondary crime, what crime did I commit?" (*Id.* at 19:04:00; Exhibit 12 at 19:04:02).  Ofcr. Lewis (accurately) responds: "**there is no crime, but I want to identify you**." (Exhibit 11 at 19:04:01; Exhibit 12 19:04:03).

Mr. Kern then (accurately) states "so, if there is no crime, I don't need to identify." (Exhibit 11 at 19:04:04; Exhibit 12 19:04:07).  Sgt. Wolf raises his voice and says "no look man, I'm sorry, I'm going to have to arrest you if you don't identify yourself."  (Exhibit 11 at 19:04:11; Exhibit 12 19:04:13).  Mr. Kern responds that "she just said there is no crime." (Exhibit 11 at 19:04:13; Exhibit 12 19:04:13).  Sgt. Wolf responds "[i]t is a crime, obstructing is

a crime." (*Id.).*  Mr. Kern responds "what crime?"  (Id.).  And Sgt. Wolf responds "you have to legally identify yourself to us."  (Exhibit 11 at 19:04:17; Exhibit 12 19:04:17).  Mr. Kern responds "she almost ran me off the road."  (*Id.).*

Sgt. Wolf then responds: "well, I still have to identify you."  (Exhibit 11 at 19:04:20; Exhibit 12 19:04:20).  Mr. Kern responds "no you don't," and Sgt. Wolf replies "yes I do."  (*Id.,* at 19:04:22).  Mr. Kern then states "Okay, well I'm going to call someone to get my car then you can arrest me."  (*Id.* at 19:04:24).  Sgt. Wolf then states "okay, turn around, put your hands behind your back."  (*Id.* at 19:04:25).  Mr. Kern states "I didn't do anything," and Sgt. Wolf responds "OK, turn around put your hands behind your back."  (*Id.* at 19:04:27).

Ofcr. Lewis then states to Mr. Kern "listen, all you have to do is [unintelligible]." (Exhibit 11 at 19:04:30).  And Mr. Kern states "I don't have my id with me."  (*Id.).*  Sgt. Wolf responds: "so just give me your name and your date of birth, that's all we ask for."  (Exhibit 12 at 19:04:33).  Ofcr. Lewis asks what his "soc" is.  (Exhibit 11 at 19:04:30).  Mr. Kern states "for what?"  (Exhibit 11 at 19:04:34).  Sgt. Wolf then puts Mr. Kern in handcuffs and arrests him. (Exhibit 12 at 19:04:33; Exhibit 11 at 19:04:33).  As he did so, Sgt. Wolf states "look, I'm not doing this, I'm not doing this."  (Exhibit 12 at 19:04:37).  Ofcr. Lewis then states to Mr. Kern "because I need to let my dispatcher know, it's not a big deal."  (Exhibit 11 at 19:04:38).  Mr. Kern responds "but you almost ran me off the road."  (*Id.* at 19:04:38).  Ofcr. Lewis responds "we just had an adult conversation" (*Id.* at 19:04:42), and then says "just give me your social so we can let you go."  (*Id.* at 19:04:47).  Mr. Kern then provides his social security number.  (*Id.).* Sgt. Wolf then responds "it doesn't matter, you're in handcuffs so I have to."  (*Id.* at 19:04:50; Exhibit 12 at 19:04:52).

As Sgt. Wolf was exerting significant force upon Mr. Kern while handcuffing him, Mr. Kern asks "you going to break my wrists?" (Exhibit 11 at 19:04:53). Mr. Kern testified that Sgt. Wolf was twisting on him while he was in handcuffs. (Depo. Kern, Doc. 54 at 45). Sgt. Wolf then states "stop resisting," and Mr. Kern responds "I am not resisting." (Exhibit 11 at 19:04:57). Ofcr. Lewis' testimony was that Mr. Kern was not resisting in any way. (Depo. Lewis, Doc. 52 at 148-149). Despite what he said on camera, Sgt. Wolf also testified that Mr. Kern was not resisting. (Depo. Wolf, Doc. 61-1 at 289). Mr. Kern again reiterates that Ofcr. Lewis "almost ran me off the road." (Exhibit 11 at 19:05:04). To which Sgt. Wolf responds "okay, we're dealing with it, but you can't just stop in the middle of someone's traffic stop." (*Id.* at 19:05:07). Mr. Kern again states "I didn't stop on her traffic stop, I pulled over because I almost hit this pole." (*Id.,* at 19:05:10).

Sgt. Wolf then pulls out Mr. Kern's wallet. (*Id.* at 19:05:15). Mr. Kern is asked his last name by Ofcr. Lewis and he provides it. (*Id.* at 19:05:17). Mr. Kern then turns to Ofcr. Lewis and says "you know what happened, why are you letting him do this?" (*Id.* at 19:05:21). Ofcr. Lewis' response is: "Listen, he's a sergeant." (Id. at 19:05:22). Mr. Kern then says "he is violating my rights." (*Id.).* And Ofcr. Lewis says: "he is not, you didn't identify yourself." (*Id.* at 19:05:25). Sgt. Wolf then tells Mr. Kern to have a seat, Mr. Kern reiterates that his rights are being violated, and Sgt. Wolf states Mr. Kern somehow interfered with a traffic stop. (*Id.* at 19:05:29-19:05:31). Mr. Kern asks how he interfered, and Sgt. Wolf responds that he could have pulled up, waited and called, to which Mr. Kern responds that he did wait when Ofcr. Lewis told him to wait. (*Id.* at 19:05:37). Sgt. Wolf then states that Mr. Kern was out talking to her. (*Id.* at 19:05:38). Mr. Kern is now sitting in the back seat of the police car, but Sgt. Wolf again says to

13

"have a seat", and then says "[d]ude, have a seat, I'm not putting up with your bullshit, okay, have a seat." (*Id.* at 19:05:48).

Sgt. Wolf, who was irate and angry, then slammed the door on Mr. Kern and it struck his shoulder. (*Id.*; Depo. Kern, Doc. 54 at 45). Mr. Kern's shoulder popped as a consequence of the force Sgt. Wolf used on him. (*Id.* at 50, 53, 103). This injury was either from Sgt. Wolf cranking on his arm once he was in handcuffs, or from slamming the door on him. (*Id.* at 103-104). Mr. Kern had extreme pain (*Id.* at 50), and he asked for an ambulance at the scene, but when told that Defendants would tow his car, he drove himself to the hospital. (*Id.* at 47, 106). As a consequence of this excessive force, which was used once Mr. Kern was in handcuffs, Mr. Kern has had to have surgery, followed by extensive physical therapy, and has suffered a permanent mobility loss as a consequence. (*Id.* at 111-116).[5]

Sgt. Wolf and Ofcr. Lewis then has a conversation in which Sgt. Wolf asks if Mr. Kern's license is valid, Ofcr. Lewis responds she does not know, and only then does Ofcr. Lewis explain to Sgt. Wolf, for the first time, what happened. (*Id.* at 19:06:00-19:06:19). Sgt. Wolf suggests citing Mr. Kern for failing to yield, but Ofcr. Lewis makes clear that she doesn't need to give him a ticket for that. (*Id.* at 19:06:19-19:06:44). Ofcr. Lewis then states she is good with letting Mr. Kern go, but Sgt. Wolf says "we can't, he's in handcuffs." (*Id.*). Sgt. Wolf then reiterates that Mr. Kern obstructed by refusing to identify himself, and he was not going to sit and argue with someone "for an hour" and Mr. Kern could come to court. (*Id.* at 19:06:59). Sgt. Wolf then orders Ofcr. Lewis to charge Mr. Kern with obstruction for failing to identify himself. (*Id.* at 19:07:01).

---

[5] Mr. Wiest has submitted a FRCP 56(d) declaration, herewith, on the issues of causation of the shoulder injury because the parties have agreed to bifurcate certain issues, including expert practice, which will establish that causation. Also submitted herewith were certain medical records of Mr. Kern documenting the injuries. (Supp. Decl. Kern, at Exhibit).

Ofcr. Lewis then interacts again with Mr. Kern when she opens the door and Mr. Kern tells Ofcr. Lewis that she knows he did not obstruct, but she responds that Sgt. Wolf is the boss. (*Id.* at 19:07:21).  Mr. Kern states that he followed all of Ofcr. Lewis' directives and she acknowledges that he did so.  (*Id.* at 19:08:10).  Then, Ofcr. Lewis again tells Sgt. Wolf that she is fine not charging Mr. Kern, but Sgt. Wolf responds that "when in police work do we allow people not to identify themselves on a legal stop."  (*Id.* at 19:08:33).

At this point CHPD officer Webster shows up and discusses with Sgt. Wolf what happened, and Sgt. Wolf responds that Mr. Kern "refused to identify himself, that guy is in the back of that car now."  (Exhibit 12 at 19:09:09).  Sgt. Wolf then admits that, with respect to the initial stop and interaction, **he doesn't know what happened**.  (Id. at 19:09:13).  Later, at 19:13:44-19:13:53, Sgt. Wolf again states he doesn't know what happened with the stop, but Ofcr. Lewis tried to identify Mr. Kern, Mr. Kern refused, and then Sgt. Wolf was **"doing this."** (*Id.).*

Ofcr. Lewis then apologizes again to Mr. Kern, tells him everything is on body worn camera, reiterates that Sgt. Wolf told her to charge Mr. Kern, and that the City has a good prosecutor and he will get a court date and they will work through this.  (Exhibit 11 at 19:09:12-19:10:43).  She reiterates that she is doing what she was told.  (*Id.* at 19:11:15).  Mr. Kern complains about his arm being injured.  (*Id.* at 19:11:49).  Ofcr. Lewis then asks Sgt. Wolf for the charge.  (*Id.* at 19:12:11).  And Mr. Kern again complains about his shoulder, with Ofcr. Lewis admitting that she didn't see what Sgt. Wolf did to Mr. Kern.  (*Id.* at 19:13:16).  Mr. Kern then indicates to Ofcr. Lewis that he stood back, which Ofcr. Lewis acknowledges, and he asks how he was interfering with her stop, to which Lewis responds: "that's not what he's [Wolf's] saying."  (*Id.* at 19:14:13).  Ofcr. Lewis again asks Sgt. Wolf what verbiage to put on the

citation, and asks him if it's "when asked to identify himself he refused," to which Sgt. Wolf responds "yeah."  (*Id.* at 19:16:45-19:17:16).  Sgt. Wolf then asks Ofcr. Lewis again "just for my own…" [what happened] and she responds.  (*Id.* at 19:17:18-19:18:47).  Mr. Kern is cited, then released at 19:24:18.

### C. Additional Testimony and post-arrest occurrences

Sgt. Wolf admitted he has no personal knowledge that Mr. Kern failed to yield to lights and sirens.  (Depo. Wolf, Doc. 60-1, at 125, 187, 188, 189).  And he never asked Ofcr. Lewis or otherwise explored the basis for any such allegation.  (*Id.).*  Ofcr. Lewis did not want to charge Mr. Kern with obstruction, but Sgt. Wolf ordered her to do so.  (*Id.* at 126-127).  He gave her the order because it "took it out of her hands."  (*Id.* at 128).  And when Mr. Kern asked at the scene why he was being charged, Sgt. Wolf truthfully answered (i.e.: for failing to identify himself).  (*Id.* at 128).  Further, every reason Sgt. Wolf had to charge Mr. Kern is on body worn camera.  (*Id.* at 129).  And, while he knew he could not prohibit a member of the public from recording law enforcement in the performance of their duties, when Sgt. Wolf arrived on scene, that is what Mr. Kern was doing.  (*Id.* at 130-131).  Sgt. Wolf also admitted that Mr. Kern was saying that Ofcr. Lewis had cut him off and almost caused an accident, and that was why Mr. Kern had stopped.  (*Id.* at 132-133).

Sgt. Wolf testified that he knew he needed to do a thorough investigation of all the facts prior to arresting someone.  (*Id.* at 140).  Here, Sgt. Wolf admitted he had no personal knowledge that Mr. Kern had the intent to purposely obstruct or delay Ofcr. Lewis' traffic stop, and Sgt. Wolf never obtained evidence of Mr. Kern's purpose.  (*Id.* at 169, 170, 177).  Sgt. Wolf's sole basis for the obstruction charge was him showing up, seeing Mr. Goodman's vehicle stopped, and seeing Ofcr. Lewis and Mr. Kern "arguing" about whether her lights and sirens were

activated.  (*Id*. at 173-175).  The gist of it was that Ofcr. Lewis was not dealing with her suspect, Mr. Goodman.  (*Id*. at 175).  However, Sgt. Wolf admitted he has no evidence that Ofcr. Lewis wasn't just standing there discussing with Mr. Kern of her own free will.  (*Id*. at 177-178).  Sgt. Wolf also admitted he never asked this question of Ofcr. Lewis.  (*Id*. at 179).  And, Sgt. Wolf admitted he had no basis to dispute that Mr. Kern previously had been on the sidewalk waiting and following Ofcr. Lewis' instructions.  (*Id.).*

Ultimately, Sgt. Wolf admitted he had no basis to dispute Ofcr. Lewis' statement at the scene, prior to his arrest of Mr. Kern, that Mr. Kern committed no crimes.  (*Id*. at 189-190).  Sgt. Wolf also testified he was truthful with Internal Affairs, and he admitted telling Internal Affairs that he heard Ofcr. Lewis state at the scene that Mr. Kern committed no crimes, **but he nevertheless demanded that Mr. Kern identify himself**.  (*Id*. at 29, 197-198).  And Sgt. Wolf admitted he told Internal Affairs that the only crime he thought Mr. Kern committed was obstructing for failing to identify himself.  (*Id*. at 200).  He also had no basis to dispute Ofcr. Lewis' statement to Internal Affairs that Mr. Kern was not interfering with her traffic stop.  (*Id*. at 201-202).  And he admitted that he "jumped the gun" in arresting Mr. Kern.  (*Id*. at 221-222).

Ofcr. Lewis testified that although an obstruction charge requires proof of an intent or purpose to prevent, obstruct, or delay the performance of an official act, she had no idea what Mr. Kern's purpose was here.  (Depo. Lewis, Doc. 52, at 188).  And, other than the truthful statements of Mr. Kern indicating that Ofcr. Lewis ran him off the road and he wanted her badge number and name, he took no act to hamper or impede her investigation.  (*Id*. at 187).  In fact, Mr. Kern followed her directives at all times, and he waited for her to finish with Mr. Goodman, as she instructed.  (*Id*. at 214-215).  As far as any sort of delay or obstruction, she thinks that taking her eyes off Mr. Goodman's vehicle for a second to tell Mr. Kern "one second" delayed

17

her interaction with Mr. Goodman "for a second," even though she never slowed her momentum while approaching Mr. Goodman's vehicle.  (*Id.* at 214).

Ofcr. Lewis also testified that prior to arresting Mr. Kern, Sgt. Wolf never asked her "what happened," and Ofcr. Lewis never told Sgt. Wolf not to arrest Mr. Kern.  (*Id.* at 227).  In writing out the citation, Ofcr. Lewis knew that body worn cameras did not lie, and she knew a court would review it, and the charge could be thrown out.  (*Id.* at 232).  She also testified she thought **Mr. Kern's frustrations were justified**.  (*Id.* at 235).  She admitted that Mr. Kern was never stopped for a traffic violation.  (*Id.* at 246).  In fact, she testified that while she did not agree with the decision to arrest or charge Mr. Kern, and while she could have called the shift lieutenant, she did not do so; but she had enough time to intervene **but chose not to**.  (*Id.* at 151-154).  Finally, she did not disagree with the decision to dismiss the charge against Mr. Kern.  (*Id.* at 255*).

<u>The efforts to cover up the misconduct</u>

After the false arrest of Mr. Kern, Sgt. Wolf met Ofcr. Lewis in the parking lot of the nearby Park Synagogue.  (Depo. Wolf, Doc. 60-1 at 37-38, 41).  One reasonable inference to draw is that this was for the purpose of generating a narrative in police reports that was inconsistent with what occurred – a cover up.  In fact, Sgt. Wolf could not state why he did not have his conversation, that he had with Ofcr. Lewis at the Park Synagogue, with her at the scene.  (*Id.* at 44, 45).  And neither Sgt. Wolf nor Ofcr. Lewis turned on their body worn camera for this conversation, but both were aware Mr. Kern, while at the scene, threatened a lawsuit.  (*Id.* at 45-46).  Afterwards, Sgt. Wolf again spoke with Ofcr. Lewis at the station about the incident, but he testified he could not remember what was said.  (*Id.* at 49-50).  The inference, *of course*, is that this was an additional effort to concoct an after-the-fact justification for the unjustified arrest.

18

In his deposition, Sgt. Wolf, in yet another attempt to cover up his misconduct, suggested that Mr. Kern could have been charged with impeding the flow of traffic because of his car being stopped where it was, but he admitted he did not know if Ofcr. Lewis directed Mr. Kern to move his vehicle or had permission from Ofcr. Lewis to have his car where it was.  (*Id*. at 182, 183, 185).  And he admitted he had no evidence that Mr. Kern's vehicle impeded traffic, especially in light of the fact that Ofcr. Lewis' vehicle was there and traffic had to flow around it regardless of the presence of Mr. Kern's car.  (*Id*. at 182-185).[6]  At his deposition, Sgt. Wolf also suggested that Mr. Kern violated R.C. 4511.70 (opening door into traffic), but admitted he had no evidence as to whether it was reasonably safe for Mr. Kern to open his door when he did so after he stopped his car to avoid an accident with Ofcr. Lewis' vehicle.  (*Id*. at 186).

Ultimately, Sgt. Wolf admitted he had no basis to dispute Ofcr. Lewis' statement at the scene, prior to his arrest of Mr. Kern, that Mr. Kern committed no crimes.  (*Id*. at 189-190).  Sgt. Wolf told Internal Affairs that he heard Ofcr. Lewis state at the scene that Mr. Kern committed no crimes, but he nevertheless demanded Mr. Kern identify himself.  (*Id*. at 197-198).  And he told Internal Affairs that the only crime he thought Mr. Kern committed was obstructing for failing to identify himself.  (*Id*. at 200).  He also had no basis to dispute Ofcr. Lewis' statement to Internal Affairs that Mr. Kern was not interfering with her traffic stop.  (*Id*. at 201-202).

Sgt. Wolf was not alone in his attempt to cover up Defendants' misconduct.  Ofcr. Lewis' claim, that taking her eyes off Mr. Goodman's vehicle for a second to tell Mr. Kern "one second" delayed her interaction with Mr. Goodman for a second, can be viewed in the same light – an

---

[6] "Persons may not be punished for speaking boisterous, rude or insulting words, even with the intent to annoy another, unless the words by their very utterance inflict injury or are likely to provoke the average person to an immediate retaliatory breach of the peace." *Cincinnati v. Karlan*, 39 Ohio St. 2d 107, 314 N.E.2d 162, paragraph one of the syllabus (Ohio 1974).  And that applies to statements at the scene of a traffic stop.  *State v. Planchak*, 1997 Ohio App. LEXIS 3493 (1st Dist. App. 1997).

effort to manufacture probable cause that did not exist, and should be viewed in the same way. (Depo. Lewis, Doc. 52 at 214). This is particularly true where Ofcr. Lewis admits she never slowed her approach to Mr. Goodman's vehicle when she said "one second" to Mr. Kern. (*Id.* at 214). And Ofcr. Lewis testified that she did not meet or speak with Sgt. Wolf prior to preparing her report five hours later. (*Id.* at 166-167). However, she told Internal Affairs that she did speak with Sgt. Wolf, including that Sgt. Wolf had related to her that he had seen Mr. Kern at the hospital, and that Sgt. Wolf said he was not completing a use of force report, all raising the reasonable inference that Ofcr. Lewis was lying about her own role in the cover up. (Exhibit 17, Doc. 59 at 6:51-7:55). And Internal Affairs documented that Ofcr. Lewis told them that Sgt. Wolf was following her around the station after the incident trying to tell her that Mr. Kern could have been charged with other crimes. (Exhibit 33, Doc. 51-23). Sgt. Wolf denies this ever occurred and testified someone, either Internal Affairs or Ofcr. Lewis, is lying about him. (Depo Wolf, Doc. 60-1 at 53, 54, 56). Of course, this is another reasonable inference about a cover up.

## III.   LAW AND ARGUMENT

Defendants are not entitled to summary judgment on any of their claims.

### A.   <u>The FRCP 56(d) Declaration of Mr. Wiest</u>

As the Court is aware, and as Mr. Wiest's declaration makes clear, the Court bifurcated discovery practice, particularly with respect to experts. (Doc. 45). Mr. Wiest's declaration makes clear that Mr. Kern will be presenting expert testimony on causation of a serious shoulder injury including a rotator cuff tear from the unlawful use of force and arrest by Sgt. Wolf, to include damages and permanent shoulder limitations, by way of expert physician and medical testimony. (Decl. Wiest). In the same vein, discovery was bifurcated on Sgt. Wolf's mental health treatment for PTSD and anger management, and Mr. Kern believes that these records,

discovery of which Defendants have obstructed, will reveal that Sgt. Wolf's anger management, at least in part, stems from his anger in dealing with minorities. *Id.* Because such expert practice and the anger management treatment issue have been bifurcated (Doc. 45), and to the extent that any of this is necessary to resolve the Defendants' motions, adjudication should be continued pursuant to FRCP 56(d).

The purpose behind Rule 56(d) is to ensure that plaintiffs receive "'a full opportunity to conduct discovery' to be able to successfully defeat a motion for summary judgment." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (*quoting Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 25 (1986)). "A party invoking [the] protections [of Rule 56(d)] must do so in good faith by affirmatively demonstrating . . . how postponement of a ruling on the motion will enable him . . . to rebut the movant's showing of the absence of a genuine issue of fact." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014). Moreover, "[a] . . . motion requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *E.M.A. Nationwide, Inc.*, 767 F.3d at 623 n.7. Here, these issues have been bifurcated and, as such, it is not an issue of whether the discovery occurs, but when. And given the proffer above, the Court should either assume that Mr. Kern has established the evidence set forth in the proffer above in adjudicating the pending motions, or delay adjudication of the pending dispositive motions to the extent necessary for such expert practice and discovery of Sgt. Wolf's anger management treatment.

**B.** **Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment claims against Sgt. Wolf and Ofcr. Lewis**

**1.** **Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment detention claim**

Ofcr. Lewis and Sgt. Wolf unlawfully detained Mr. Kern in violation of the Fourth Amendment when Mr. Kern asked if he was being detained or was free to go, including by Ofcr. Lewis failing to respond to his inquiry as to whether he was free to go (and Sgt. Wolf stating "if you want to be" in response to whether Mr. Kern was being detained). *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986); *United States v. Hill*, 195 F.3d 258, 267 (6th Cir. 1999). Defendants admit their actions that violated the foregoing clearly established law.

### 2. Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment false arrest claim

Both Sgt. Wolf and Ofcr. Lewis were involved in making the arrest, because even though Sgt. Wolf placed Mr. Kern in handcuffs, Ofcr. Lewis verbally took the position along with Sgt. Wolf that Mr. Kern was guilty of obstruction merely by not identifying himself (Exhibit 11, Lewis BWC at 5:33). Ofcr. Lewis and Sgt. Wolf kept Mr. Kern detained for more than 15 minutes in her police cruiser, including when Ofcr. Lewis opened the door to speak with him and then closed it again to ensure he was kept in custody. (Exhibit 11, BWC video). That is more than sufficient to hold <u>both</u> of them individually liable for the false arrest. *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 80-81 (6th Cir. 1995) (plaintiff must allege facts showing that the defendant participated, condoned, encouraged, or knowingly acquiesced in alleged misconduct to establish liability); *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) ("Within the meaning of the first element, 'the term 'participated' should be construed within the context of tort causation principles. Its meaning is akin to 'aided.' To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision...").

A warrantless arrest is only reasonable under the Fourth Amendment where there is probable cause to believe that the suspect committed a criminal offense. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 279 (6th Cir. 2020); *Akima v. Peca*, 85 F.4th 416, 422–23 (6th Cir. 2023). An officer has probable cause for an arrest if the "facts and circumstances within the officer's knowledge" would lead a reasonable officer to believe that the suspect "has committed, is committing, or is about to commit an offense." *Goodwin v. City of Painesville*, 781 F.3d 314, 333 (6th Cir. 2015) (citation omitted). In assessing probable cause, courts look to the "totality of the circumstances" confronted by the officer at the time of the arrest. *Akima*, 85 F.4th at 423 (citation omitted). Because probable cause is an objective standard, courts require "concrete" and "articulable facts" from which an officer can reasonably infer criminal conduct. *McCurdy v. Montgomery County*, 240 F.3d 512, 517, 519 (6th Cir. 2001), abrogated on other grounds by *Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006). Courts do not consider the events that occurred after the arrest or the officer's subjective intent. *United States v. Haynes*, 301 F.3d 669, 678 (6th Cir. 2002).

Clearly established law left no doubt that merely refusing to identify is plainly insufficient to satisfy the crime of obstruction, and Ofcr. Lewis and Sgt. Wolf otherwise lacked probable cause for an obstruction[7] charge (just as Mr. Kern's photographing and speaking/arguing with the officers was clearly protected conduct), particularly where the evidence is clear that Mr. Kern complied with the directives of Ofcr. Lewis to stand back until she was ready to speak with him, and he did so for several minutes. *Wright v. City of Euclid*, 962 F.3d 852, 873 (6th Cir. 2020) ("there must be some substantial stoppage of the officer's progress"

---

[7] R.C. 2921.31 provides "(A) No person, **without privilege to do so** and **with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity**, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."

and "statute also requires an affirmative act that interrupts police business; '[a] person may not be convicted of the offense simply by doing nothing,'" and "[w]ith respect to the element of 'purpose to obstruct,' '[a] person acts purposely when it is his specific intention to cause a certain result.'"); *Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir. 2020) ("refusing to comply with an officer's request is not enough"); *Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012)[8] (advising someone not to identify themselves in response to an officer's request is not sufficient, nor are actions that do not actually prevent an officer from completing their duties, and complying with officer demands to step back did not establish a violation, further, "[w]here a defendant's conduct is limited to truthful speech, one cannot reasonably infer intent to obstruct official business unless the circumstantial evidence clearly demonstrates intent," and "such circumstantial evidence is lacking where an individual's conduct was 'limited to arguing with the police officers,'" *id.*).

Sgt. Wolf and Ofcr. Lewis both testified that the charge of obstructing official business requires a purpose to prevent, obstruct, or delay the performance of an official act.  (Depo. Lewis Doc. 52 at 188; Depo Wolf, Doc. 60-1 at 21-23, 100; Doc. 51-14 ordinance and statute).  They also both admitted they had no evidence Mr. Kern intended to obstruct or delay, and no evidence of any purpose he had that would meet the statutory requirements of obstruction.  (Depo. Wolf, Doc. 60-1 at 169, 170, 177; Depo. Lewis, Doc. 52 at 188).  In fact, Ofcr. Lewis testified that Mr.

---

[8] *Patrizi* cited favorably two district court decisions, *Pullin v. City of Canton*, 133 F. Supp. 2d 1045, 1052 (N.D. Ohio 2001) (upholding denial of summary judgment on qualified immunity grounds where Pullin approached the traffic stop only to offer assistance to the individual involved and began to leave the scene when instructed to do so by the police); and *Burr v. Perkins*, No. 2:04-cv-786, 2006 U.S. Dist. LEXIS 52442, 2006 WL 2165701, at *6 (S.D. Ohio July 31, 2006) (unpublished opinion) (concluding that under clearly established law Burr's interruption of the police investigation did not amount to obstruction where Burr approached only to help facilitate the conversation and backed away when instructed to do so by the police).

Kern followed her directives and waited for her to finish with Mr. Goodman.  (Depo. Lewis, Doc. 52 at 214-215).

Lack of intent aside, and other than what he said verbally, namely asking for Ofcr. Lewis' name and badge number, Mr. Kern did no act to hamper or impede Ofcr. Lewis' investigation.  (Depo. Lewis, Doc. 52 at 187).  Rather, Ofcr. Lewis thinks/speculates (after the fact), that taking her eyes off Mr. Goodman's vehicle for a second to tell Mr. Kern "one second" delayed her interaction with Mr. Goodman for a second, even though she never slowed her momentum to Mr. Goodman's vehicle.  (*Id.* at 214).  Even accepting the alleged one second delay that Defendants cling to, stemming from Mr. Kern's request for Ofcr. Lewis' name and badge number, clearly fails to meet the requirement in *Wright*, 962 F.3d 852, 873 that there be "substantial" stoppage of police business.  Simply put, and even construing this evidence in a light most favorable to Defendants, it falls short under the standards the Sixth Circuit has articulated in *Wright*, 962 F.3d 852, 873; *Jones*, 947 F.3d 905, 915; and *Patrizi*, 690 F.3d 459, 464.

And, the *post-hoc* suggestion that Mr. Kern allegedly failed to yield to lights and sirens does not change this legal conclusion.  Sgt. Wolf was not a witness to any of those purported events, and he was disabused of his unsupported assumption by Ofcr. Lewis' statement that Mr. Kern had committed no crime.  (Exhibit 11 at 19:04:01; Exhibit 12 19:04:03).  And, as reflected above, there was no failure to yield violation. [9]  Ofcr. Lewis' statement to dispatch about failing

---

[9] Ofcr. Lewis stated an erroneous legal conclusion (which the Court should not credit) when she called in her stop of Mr. Goodman and stated that Mr. Kern somehow failed to yield to lights and siren.  (Depo. Lewis, Doc. 52, at 127).  The Ohio Supreme Court has explained that a failure to yield violation can only be sustained where the driver who is accused of not yielding should "in the exercise of ordinary care, have heard the siren or seen the flashing lights." *Semple v. Hope*, 15 Ohio St. 3d 372, 474 N.E.2d 314 (Ohio 1984).  Further, R.C. 4511.45(B) also provides that "this section does not relieve the driver of an emergency vehicle from the duty to drive with due regard for the safety of all persons and property upon the highway," and the driver of an emergency vehicle loses preferential status and the right of way, if another violation of law is committed. *Agnew v. Porter*, 23 Ohio St. 2d 18, 24, 260 N.E.2d 830 (Ohio

to yield was a bare legal conclusion, thus rendering any prior report unreliable for probable cause purposes. *Wesley v. Campbell*, 779 F.3d 421, 432 (6th Cir. 2015) (inconsistent statements rendered report unreliable for probable cause purposes); *Hart v. Hillsdale Cty.*, 973 F.3d 627, 643 (6th Cir. 2020) (probable cause cannot rely upon unreliable report or information).

a.  The collective knowledge doctrine provides no refuge for Sgt. Wolf

Sgt. Wolf argues that the collective knowledge doctrine provides him refuge.  Yet this doctrine necessarily asks "(1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007).  Therefore, in order for it to apply, "(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *United States v. Lyons*, 687 F.3d 754, 767 (6th Cir. 2012).  And the doctrine does not apply where, as here, there is "a likelihood, or even a strong suspicion," that the initial source of the information is wrong. *Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019).

Fatally for Sgt. Wolf, he admitted that he had no basis to dispute Ofcr. Lewis' statement at the scene, before Sgt. Wolf arrested Mr. Kern, that Mr. Kern committed no crimes.  (Depo. Wolf, Doc. 60-1 at 189-190).  Sgt. Wolf told Internal Affairs that the only crime he thought Mr. Kern committed was obstructing for failing to identify himself.  Id. at 200.  He also had no basis to dispute Ofcr. Lewis' statement to Internal Affairs that Mr. Kern was not interfering with her traffic stop.  (Id. at 201-202).  And he admits that he "jumped the gun" in arresting Mr. Kern.

---

1970).  Ofcr. Lewis committed a violation of R.C. 4511.39(A) when she failed to activate her turn signal to make the lane change, thus losing any privileged status.

(Id. at 221-222).  Consequently, no reasonable officer, having been informed by the original source of information that the subject in fact committed no crime – repeatedly in fact – prior to the arrest, would proceed with an arrest – and certainly not without conducting some additional investigation.  Indeed, that statement, that Mr. Kern committed no crime, was the last thing Sgt. Wolf heard from Ofcr. Lewis prior to arresting Mr. Kern for failing to identify.  (Exhibit 11 at 19:04:01; Exhibit 12 19:04:03).  This conclusion is consistent with the earlier evidence that, upon his arrival at the scene, and after Sgt. Wolf suggested Mr. Kern violated the law against failing to yield to lights and sirens, Ofcr. Lewis stated she wanted to let Mr. Kern go.  (Exhibit 12 at 19:02:09).

Sgt. Wolf and Ofcr. Lewis admitted they had no evidence of Mr. Kern's intentions, and no evidence of any purpose he had that would meet the statutory requirements of obstruction. (Depo. Wolf, Doc. 60-1, at 169, 170, 177; Depo. Lewis, Doc. 52, at 188).  And other than what he said verbally, namely asking for Ofcr. Lewis' name and badge number, Mr. Kern did no act to hamper or impede her investigation.  Depo. Lewis, Doc. 52 at 187.  Rather, Ofcr. Lewis thinks/speculates (after the fact), that perhaps taking her eyes off Mr. Goodman's vehicle for a second to tell Mr. Kern "one second" delayed her interaction with Mr. Goodman for a second. (Id. at 214).  And the alleged one second delay Defendants now cling to from Mr. Kern's request for Ofcr. Lewis' name and badge number runs afoul of the requirement in Wright, 962 F.3d 852, 873 that there be "substantial" stoppage of police business.

Ofcr. Lewis and Sgt. Wolf both testified that the charge of obstruction of official business requires a purpose to prevent, obstruct, or delay the performance of an official act, and Ofcr. Lewis had no idea what Mr. Kern's purpose was.  (Depo. Lewis, Doc. 52, at 188; Doc. 51-14, ordinance and statute).  And, Ofcr. Lewis admitted that Mr. Kern followed her directives and

waited for her to finish with Mr. Goodman. Id. at 214-215. Simply put, neither Ofcr. Lewis nor Sgt. Wolf had objective evidence establishing the intent element for an obstruction charge, thus the collective knowledge doctrine provides no refuge for Sgt. Wolf.

           b.  Ofcr. Lewis is liable for false arrest under a failure to intervene theory

Ofcr. Lewis also is liable for both the illegal detention violation and Sgt. Wolf's illegal arrest under a failure to intervene theory. *Bunkley*, 902 F.3d 552 (6th Cir. 2018); *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008). The elements of a failure to intervene claim are (1) the officer observed or had reason to know that the constitutional violation was occurring, and (2) the officer had both the opportunity and the means to prevent the harm from occurring. *Floyd*, 518 F.3d 398, 406 (*quoting Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Here, Ofcr. Lewis testified that while she did not agree with the decision to arrest or charge Mr. Kern, and while she could have called the shift lieutenant, she did not do so. In other words, she had enough time to intervene, but chose not to do so. (Depo. Lewis, Doc. 52 at 151-154). *Bunkley* involved the same factual scenario and that court made clear, "[it] matters not whether the individual violating the constitutional rights of a citizen is a fellow officer or a superior." 902 F.3d. at 565. Mr. Kern is entitled to summary judgment on his § 1983 Fourth Amendment detention and false arrest claims against Ofcr. Lewis under a failure to intervene theory.

### 3.  Sgt. Wolf is not entitled to summary judgment on Plaintiff's Fourth Amendment excessive force claim

The Fourth Amendment guarantees the right to be free from excessive force to persons who are stopped, arrested, or held in custody by an arresting officer. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002).

As Mr. Kern is placed in handcuffs, Sgt. Wolf exerted significant force upon Mr. Kern, with Mr. Kern explaining "you going to break my wrists?"  (Exhibit 11 at 19:04:53).  And Mr. Kern testified that Sgt. Wolf was twisting on him while he was in handcuffs.  (Depo. Kern, Doc. 54 at 45).  Then, in an effort to cover up his excessive use of force, Sgt. Wolf states "stop resisting," and Mr. Kern responds "I am not resisting."  (Exhibit 11 at 19:04:57).  Ofcr. Lewis' testimony was that Mr. Kern was not resisting in any way.  (Depo. Lewis, Doc. 52 at 148-149).  Sgt. Wolf also testified that Mr. Kern was not resisting in any way.  (Depo. Wolf, Doc. 61-1 at 289).

After walking Mr. Kern to Ofcr. Lewis' police cruiser, Sgt. Wolf, who was irate and angry, then slammed the door on Mr. Kern and it struck his shoulder.  (*Id.*; Depo. Kern, Doc. 54 at 45).  Mr. Kern's shoulder popped as a consequence of the force Sgt. Wolf used on him.  (*Id.* at 50, 53, 103).  Mr. Kern had extreme pain.  (*Id.* at 50).  He likened it as in the ballpark with a previous quadricep tear.  (*Id.* at 51-52).  Mr. Kern asked for an ambulance at the scene, but when told that Defendants would tow his car, he drove himself to the hospital.  (*Id.* at 47, 106).  As a consequence of this excessive force, Mr. Kern was diagnosed with rotator cuff syndrome (consistent with a tear), had to have surgery, followed by extensive physical therapy, and suffers from a permanent mobility loss as a consequence.  (*Id.* at 101-102, 108-109, 111-116).[10]

And, Mr. Kern has provided an expert declaration on this excessive force issue, with the testimony establishing beyond doubt that the force employed here was excessive from a police practices perspective.  (Decl. Knight, attached hereto).

---

[10] Mr. Wiest has submitted a FRCP 56(d) declaration, herewith, on the issues of causation of the shoulder injury because the parties have agreed to bifurcate certain issues, including expert practice, which will establish that causation.  Also submitted herewith were certain medical records of Mr. Kern documenting the injuries (which were inquired about in Mr. Kern's deposition but were not identified as an exhibit) – we have redacted the personal identifying information (i.e. date of birth and social security number).  (Supp. Decl. Kern, at Exhibit).

When reviewing Fourth Amendment excessive-force claims, courts invoke an objective-reasonableness standard, *see Graham*, 490 U.S. at 388, which is a fact-specific, totality-of-the-circumstances inquiry, *see Baynes v. Cleland*, 799 F.3d, 600, 607 (6th Cir. 2015). To determine whether an arresting officer acted reasonably, we consider a non-exhaustive set of three factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (*quoting Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)); *see also Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006) (*quoting Graham*, 490 U.S. at 396).

The Sixth Circuit has addressed nearly identical circumstances in *Hughey v. Easlick*, 3 F.4th 283, 291 (6th Cir. 2021). There, the Sixth Circuit observed that "none of the three non-exhaustive general-framework factors justified Easlick's allegedly yanking Hughey's arm or Easlick's purported refusal to remove the handcuffs after Hughey complained of shoulder pain." *Id.* As with Mr. Kern here, "Hughey's minor crimes were far from severe, she posed no immediate threat to Easlick, and she resisted arrest in no way." *Id.* And, as in *Easlick*, Mr. Kern "testified that [Wolf] tore [his] rotator cuff as he yanked [his] arm and that [he] complained [numerous] times that [his] arm hurt." *Id.* As in *Easlick*, "an excessive use of force claim may be established through evidence of severe injury or physical contact, [but we have] not required that this must be the case." *Id.*

Mr. Kern's "assertion that [Wolf] vigorously yanked [his] arm is 'gratuitous violence' under our precedent." *Id.* "We have decided that a police officer's slapping a handcuffed plaintiff in the face constituted '[g]ratuitous violence' 'notwithstanding the relatively minimal use of force applied and the absence of any resulting injury.'" *Id.* "Surely a shoulder-yank that

tears a rotator cuff is more unwarranted than a face-slap that 'antagoniz[es] or humiliat[es] the suspect' without resulting in physical injury." *Id.*

This gratuitous violence resulting in a shoulder injury requiring rotator cuff surgery and physical therapy is a textbook Fourth Amendment excessive force violation. *Gambrel v. Knox Cty.*, 25 F.4th 391, 402 (6th Cir. 2021) (*quoting Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006)); *see Reed v. Campbell County*, 80 F.4th 734, 750 (6th Cir. 2023); *Williams v. Maurer*, 9 F.4th 416, 438-39 (6th Cir. 2021); *Miller v. Sanilac County*, 606 F.3d 240, 252-54 (6th Cir. 2010); *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 404-05, 407 (6th Cir. 2009); *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006); *Baker v. City of Hamilton*, 471 F.3d 601, 607-08 (6th Cir. 2006); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002); *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988).  As in *Easlick*, Sgt. Wolf is not entitled to summary judgment. 3 F.4th 283, 291.

### C. Defendants are not entitled to summary judgment on Mr. Kern's First Amendment retaliation claims against Sgt. Wolf and Ofcr. Lewis

A First Amendment retaliation claim has three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (emphasis added).  When it comes to adverse actions, where, as here, we deal with a citizen and not with a prisoner or a public employee, the adverse action need not be great. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010).

Unquestionably, Mr. Kern engaged in protected First Amendment activities, which both Defendants were aware of, and ranging from Mr. Kern asking for Ofcr. Lewis' badge number and name upon initial contact, (Kern_1119-20220922_185844.mp4, filed conventionally),[11] to repeatedly telling Sgt. Wolf (and Ofcr. Lewis) they were violating his rights, (Exhibit 12, 19:02:52 to 19:05:48), to recording with his phone the interaction with Ofcr. Lewis, and later Sgt. Wolf. (Exhibit 11 at 18:58:59 to 18:59:11(Lewis initial radio call to dispatch mentioning the recording), Exhibit 12 at 19:03:00; Depo. Wolf, Doc. 60-1 at 130-131), to filing, threatening to file, or attempting to file a complaint against a police officer. *See generally Connick v. Myers*, 461 U.S. 138, 148, (1983) (Speech that "bring[s] to light actual or potential wrongdoing or breach of public trust" is speech that addresses a matter of public concern, as is speech that "seek[s] to inform the public that [the government] [is] not discharging its governmental responsibilities."); *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008); *Gable v. Lewis*, 201 F.3d 769 (6th Cir. 2000); *Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010); *Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002); And, Mr. Kern's protests to Ofcr. Lewis and Sgt. Wolf about his rights being violated also is clearly established First Amendment activity. *City of Houston v. Hill*, 482 U.S. 451, 461-463 (1987); *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998); *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001); *Barnes v. Wright*, 449 F.3d 709, 718 (6th Cir. 2006); *Greene v. Barber*, 310 F.3d 889, 895-96 (6th Cir. 2002); *Arnett*, 281 F.3d 552, 560; . So is the right to record police. *Crawford v. Geiger (Crawford II)*, 131 F. Supp. 3d 703, 715 (N.D. Ohio 2015) (establishing that the right to record would be clearly established going forward); *see, also, Glik v. Cunniffe*, 655 F.3d 78 (1st Cir.

---

[11] Ofcr. Lewis testified that she understood Mr. Kern was upset about the initial interaction and wanted to make a report/complaint. (Depo. Lewis, Doc. 52 at 141-142). And body camera footage reveals Sgt. Wolf's acknowledgment that Mr. Kern wanted to make a complaint about that interaction. (Exhibit 12 at 19:03:12).

2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017);  *Turner v. Lieutenant Driver*, 848 F.3d 678, 687-90 (5th Cir. 2017);  *ACLU v. Alvarez*, 679 F.3d 583, 606 (7th Cir. 2012); *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000);  *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

Moreover, detaining, arresting, threatening to arrest, and charging someone is sufficient adverse action to meet the second prong of *Blatter*, 175 F.3d 378, 394. *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822-823 (6th Cir. 2007) (explaining that detention is not de minimis and would meet the adverse action prong, as would arrest); *McCurdy v. Montgomery County*, 240 F.3d 512, 520 (6th Cir. 2001) (impliedly acknowledging an arrest without probable cause constitutes adverse action of sufficient consequence); *Anderson v. Holmes*, 2021 U.S. Dist. LEXIS 102401 (MIED 2021) (failure to identify case First Amendment retaliation); *Rudd v. City of Norton Shores*, 977 F.3d 503 (6th Cir. 2020) (threatening to arrest sufficiently adverse).

And as explained in III.B.2. above (p.22), Ofcr. Lewis and Sgt. Wolf personally were involved in taking these adverse actions with full knowledge of Mr. Kern's protected activity, to include Ofcr. Lewis reporting in her initial call to dispatch that Mr. Kern was video recording her, both Defendants demanding identification from Mr. Kern under threat of (false) arrest, and Ofcr. Lewis' supporting Sgt. Wolf's activities despite acknowledging Mr. Kern had committed "no crime".  As noted, Ofcr. Lewis is liable for her failure to intervene where she had reason to know that the constitutional violation was occurring, she had both the opportunity and the means to prevent the harm from occurring, and yet she chose not to intervene. *Floyd*, 518 F.3d 398, 406 (*quoting Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

With respect to causation, detaining, arresting, and charging Mr. Kern, all without probable cause (see Section III.B.1. and 2., *supra*), is significant evidence demonstrating causation and First Amendment retaliation. *Nieves v. Bartlett*, 587 U.S. 391, 401-402 (2021). Regardless, sufficiently close temporal proximity between protected activity and adverse action, by itself, establishes the requisite causation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (two months sufficient).  In fact, evidence of up to a four-month gap between the protected speech and the initial adverse action, without more, is sufficient evidence of causation.  *Id.*; *Anders v. Cuevas*, 984 F.3d 1166, 1177-1178 (6th Cir. 2021) (four months sufficient); *Rudd*, 977 F.3d 503, 515 (eight days sufficient); *Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019) (four days sufficient); *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (concluding that a lapse of three months is a sufficient to show causal connection).  Here, the retaliation and adverse actions were immediate.  These undisputed facts are more than sufficient for all three elements of the First Amendment retaliation claim.  *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999).

### D.  Defendants Wolf and Lewis are not entitled to qualified immunity

There is a two-step sequence for resolving a government official's claim to qualified immunity.  First, the court must analyze whether the facts a plaintiff has alleged in his/her complaint make out a violation of a constitutional right, and second, the court must decide whether the right at issue was "clearly established" at the time of the defendant's misconduct. *Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

A plaintiff overcomes qualified immunity by citing to "cases of controlling authority in their jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority

such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Kent v. Oakland County*, 810 F.3d 384, 395 (6th Cir. 2016). That said, "officials can still be on notice that their conduct violates established law even in novel factual circumstances" if "the state of the law . . . gave [the government officials] fair warning that their alleged [conduct] . . . was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Moreover, even without citation to a particular case, plaintiffs can overcome qualified immunity if the facts are "particularly egregious." *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020). Here, and as reflected in Sections III.B. and III.C., Sgt. Wolf and Ofcr. Lewis violated rights that were clearly established by published Sixth Circuit case law and/or a consensus of other circuit case law. That, in turn, divests them both of any defense of qualified immunity.

### E. The City is liable under *Monell* for the federal constitutional violations

The City is not entitled to summary judgment on Mr. Kern's *Monell* claims. A municipality is a "person" under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality may become liable under a §1983 claim if the alleged federal violation occurred because of a municipal policy or custom, *Monell*, 436 U.S. 658, 694, and for harms caused by employees for whom the municipality has failed to provide adequate training, *see Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017).

A city may be sued for having caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Adkins v. Bd. of Educ. of Magoffin County, Ky.*, 982 F.2d 952, 957 (6th Cir.1993). Since such bodies can act only through natural persons, the critical question is whether the person

committing the act did so pursuant to official policy. *Id.*  A formally adopted policy is not required; established usage or custom may be sufficient. *Id.*

To demonstrate *Monell* liability, a Plaintiff must (1) identify the policy or custom that injured him; (2) connect the policy to the city or county; and (3) show that his particular injury was incurred due to execution of that policy or custom. *Id.*  There are four methods of proving an unlawful policy or custom: (1) showing an illegal official policy or legislative enactment; (2) demonstrating that an official with final decision-making authority ratified illegal actions; (3) showing a policy of inadequate training or supervision; or (4) demonstrating a custom of tolerance of or acquiescence to federal rights violations. *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020).

"[A] city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written." *Id.* at 830; *see Monell*, 436 U.S. at 691 ("Congress included customs and usages [in § 1983] . . . . Although not authorized by written law, such practices . . . could well be so permanent and well settled as to constitute   a 'custom or usage' with the force of law." (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970))). When proceeding under the first theory of *Monell* liability, a plaintiff must show that there were "formal rules or understandings—often but not always committed to writing—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).

Here, the record establishes that in order to sustain a charge of obstruction merely for failure to identify, the defendant must have committed, is committing, or is about to commit a crime, or witnessed a violent felony offense.  (Depo. Joseph Torres, Doc. 56, at 29).  But "for so

long... [i]f you failed to identify it's obstruction." (*Id*.).  Until Pam Roessner was in charge of the City's prosecutor's office, the City would arrest individuals for mere failure to identify, regardless of whether the person committed a separate crime.  (*Id*.).  Even with the policy having changed, the custom remains unchanged at the City.  Captain Ernest Williams, the City's Internal Affairs investigator, upon reviewing the footage of the Kern incident, testified under oath that he still believes Mr. Kern's mere failure to identify was sufficient to justify an arrest for obstruction. (Depo. Ernest Williams, Doc. 58, at 72).  However, and even when given the opportunity to do as much research as he wanted, Captain Williams still *to this day* could not cite to any specific law that Mr. Kern violated, other than Captain Williams' incorrect interpretation of obstruction for the mere failure to identify.  (*Id*., at 84-87).  In fact, this admission came after Chief Williams boasted and said "we have a lot of ordinances and I can probably find one that would fit this instance." (*Id.* at 84).  The record here demonstrates a policy and practice of illegal arrests for obstruction within the City.

It is unknown whether the prior practice of arresting individuals for obstruction, as a result of their mere failure to identify, regardless of whether one committed a separate crime or witnessed a violent felony, ever stopped as of September 22, 2022.  (Depo. Joseph Torres, Doc. 56, at 32).  It also is unknown whether the follow-up training regarding failure to identify and obstruction took place before or after the Kern incident.  (*Id*., at 42-43).  Either way, though, this training was a failure as the view that "failure to identify is obstruction of official business" still runs rampant at CHPD.  (*Id.*, at 32-33).  At the very least, a factual question remains as to whether CHPD's custom of arresting individuals for mere failure to identify, regardless of whether the person committed a separate crime, remained the custom of CHPD when Sgt. Wolf did exactly that to Mr. Kern.

Under this jurisprudence, the actions of a single official also can create liability for the local government where that official has "final policymaking authority." *Id.* "[W]hether an official has such final authority is a question of state law." *Id.* (*citing City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). And, a plaintiff also can establish municipal liability by showing that the municipality ratified the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247-48 (6th Cir. 1990). As the Sixth Circuit explained in *Wright*:

> Wright points us to Chief Meyer's lack of investigation and discipline in the other high-profile use-of-force cases involving Euclid police officers, but those instances occurred after Wright's encounter with Flagg and Williams and cannot show that Meyer's failure to investigate and punish the officers involved in those uses of force led in any way to Wright's injuries. However, Murowsky testified that he had never heard of a use of force incident by a Euclid officer that seemed inappropriate to him. That too moves the needle so that a reasonable jury could decide that use of excessive force is ratified by the department. A reasonable jury could likewise find that Meyer and Murowsky's seeming failure to ever meaningfully investigate excessive force complaints rises to the level of a ratification of use of force by a policymaker. *Wright*, 962 F.3d 852, 880.

Here, Sgt. Wolf testified that, even though he had sustained findings of misconduct, including with respect to false/inappropriate obstruction charges involving minorities, he never was disciplined, or even counseled, before the September, 2022 incident with Mr. Kern. (Depo. Wolf, Doc. 60-1, at 65, 70, 146-161). Specifically, Sgt. Wolf engaged in previous incidents resulting in allegations of racial bias, but the City not only failed to discipline Sgt. Wolf or so much as offer post-incident training for his (mis)handling of the situations, but the City promoted him to sergeant approximately one month after one such incident. (Depo. Britton as 30(b)(6) witness, Doc. 55, at 90-94). That incident involved a situation in which then-officer Wolf, along with several other CHPD officers, were "observed ... on top of a black man" by a black female bystander. (*Id.*, at 95). The witness was threatened with obstruction after she stopped to ask if the man was okay: a prior incident of First Amendment retaliation by Sgt. Wolf. (*Id.*). No

subsequent training was given to then-officer Wolf for having escalated a police interaction involving a black suspect, whether it was training regarding use of force, obstruction of justice, or any other policies that could have prevented this woman's complaint.  (*Id*., at 93-93, 96).  Simply put, no action was taken against then-officer Wolf for his actions, and he was not given any training in response to this earlier incident as any such training would have been documented.  (*Id*., at 94-95, 97).  Certainly the City failed to meaningfully investigate and punish allegations of misconduct, but promoted Sgt. Wolf instead. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247-48 (6th Cir. 1990).

Ofcr. Lewis likewise had previous issues in terms of her failure to use lights and sirens. (Depo. Britton as 30(b)(6) witness, Doc. 55 at 98).  Ofcr. Lewis' previous failure to use lights and sirens resulted in a state lawsuit against her and the City when she was involved in a collision at a red light, in which the plaintiff testified – under oath – that Ofcr. Lewis did not have her lights and sirens on.  (*Id*., at 102).  Despite this serious issue surrounding Ofcr. Lewis' use of the City's police vehicles (and other issues concerning criminal complaints and investigations), the City never provided Ofcr. Lewis with any follow-up training, despite its awareness of this issue, thus ratifying Ofcr. Lewis' failure to use lights and sirens while on police duty in this incident.  (*Id*., at 99, 101, 102-0).

As for the Kern incident, the City plainly ratified the actions of Ofcr. Lewis, including the arrest she effectuated despite acknowledging that Mr. Kern committed no crime.  (*Id*., at 118-19).  The City's own 30(b)(6) witness testified that Ofcr. Lewis's actions were entirely consistent with City policy.  (*Id*., at 115-16).  The City condoned Ofcr. Lewis' illegal arrest of Mr. Kern despite the fact that the City agreed with the prosecutors' determination that there was not enough evidence to sustain the charges against Mr. Kern.  (*Id*., at 113).  And other than the

belated anger management training Sgt. Wolf was ordered to take, there was no follow-up training from the department after the Kern incident.  (*Id*., at 114).

Inadequate training also was present before the Kern incident.  A "municipality may be liable for inadequately training its employees where 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In such a case, ***the failure to train its employees itself amounts to an unconstitutional policy***." *Carpenter v. City of Cincinnati*, 2003 U.S. Dist. LEXIS 7105, at *33 (S.D. OH. Apr. 17, 2003), *quoting City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Matters related to stops and arrests are areas in which the need for training is so obvious that the inadequacy of such training can be an unconstitutional policy.  (*Id*., at *33-35).  Testimony that the officers were not trained on such issues "[a]t the very least ... raises an issue as to whether the City failed to train its officers...." *Id*., at *35.

Here, the record establishes that the City keeps record of officer training.  (Depo. Britton as 30(b)(6) witness, Doc. 55 at 27).  The police chief is responsible for training that must comply with federal, state, and local requirements, but CHPD's chief admits he does not know what these requirements are.  (*Id.*, at 42).  And, there is no written formal training plan for CHPD.  (*Id*., at 43).  There is no record of any training lists of particular officers.  (*Id.*, at 43-44).  And while there are daily training bulletins, the record is absent of any documentation of completion of this training.  (*Id.*, at 48).

There also is no documentation of officers receiving training on constitutional requirements, and the City's 30(b)(6) witness was unable to speak to any specific training on

40

those requirements, clearly established rights, the First Amendment, use of force, illegal arrests, reasonable suspicion, or how to intervene when constitutional violations occur. (*Id*., at 28-31). And while certain First Amendment rights and retaliation is covered in the policy manual, there is no training on the matter. (*Id*., at 31-32). There is no training beyond the fact there are policies and procedures on the right not to be arrested without probable cause. (*Id*., at 32-33). Nor is there any documentation of training on the requirements before one can be arrested for obstruction. (*Id*.).

It was longstanding policy to arrest suspects for obstruction based on their mere failure to identify, but that changed late in the day (maybe after the Kern incident) based on Pam Roessner's, a City prosecutor, directing the halt to the practice. (Depo. Joseph Torres, Doc. 56, at 29). But with this new directive, where all the elements of obstruction or failure to identify had to be met before a suspect was arrested, no witness was able to definitively affirm that they received any follow up training on failure to identify and/or obstruction *before* the Kern incident. (Depo. Nathan Webster, Doc. 57 at 15-16); (Depo Ernest Williams, Doc. 58 at 15, 42); (Depo. Britton as 30(b)(6) witness, Doc.55 at 32-33).

Ofcr. Lewis joined the CHPD on June 3, 2018. (Depo. Lewis, Doc. 52, at 23). Although she was provided with the CHPD's procedure manual, she was never trained on it. (*Id.* at 24). She also was never trained, at any time, on clearly established rights, including those at issue in this case. (*Id.* at 27, 35, 44-47, 72-73, 82). While with CHPD, her field training documented that she struggled with putting in the information necessary for a criminal complaint. (*Id.* at 53, 56; Exhibit 9, Doc. 51-11). Also documented was her difficulty with deciding when to activate lights and sirens. (*Id.* at 54). In 2019 in her first formal evaluation, Ofcr. Lewis stated she had a "hope" to learn and understand more policy and procedure, as well as learn city and state laws.

41

(*Id.* at 61, 67).  But, CHPD did nothing to follow up on these requests for training.  (*Id.* at 61-62).

Ofcr. Lewis recalls receiving no training on obstruction charges prior to September 22, 2022.

(*Id.* at 63, 72).  Ofcr. Lewis admits she had to perform her duties consistent with the U.S.

Constitution, that she need not comply with an order that is in conflict with federal, state or local

law, and that if the legality of an order is in doubt, she had to confer with an authority higher

than the supervisor giving the order.  (*Id.* at 84-85).  However, CHPD never clarified whether she

or other officers could or would be disciplined for violating the U.S. Constitution.  (*Id.* at 90).

Sgt. Wolf joined CHPD in 2012.  (Depo. Wolf, Doc. 60-1 at 87).  Prior to that, he was a

deputy for the Village of Bratenahl where he was counseled for being rude (but could not state

how many times).  (*Id.* at 81, 85, 86).  He testified he had some training on constitutional rights

at the police academy in 2003-2004, but could not recall any specifics of that training.  (*Id.* at

87).  He also had no recollection of such training during field training.  (*Id.* at 88-89).  Despite

this, his testimony was that most people in the department do not know the law better than him,

specifically with respect to obstruction charges.  (*Id.* at 57-58).  He remembers being trained in

field training on obstruction charges that if someone doesn't identify themselves in connection

with any legal traffic stop, then to charge them with obstruction (*Id.* at 97), and this was the

practice of CHPD.  (*Id.* at 97-98).

In 2021, Sgt. Wolf tried to get clarification from the City prosecutor about when to

charge obstruction for failing to identify, but she told him to figure it out, so he read the statute.

(*Id.* at 99-100).  Sgt. Wolf was promoted to sergeant on June 28, 2021.  (*Id.* at 143).  His

supervisor training did not include any training on constitutional rights.  (*Id.* at 144-145).

Sgt. Wolf admitted that he previously had an interaction with a black female witness at

the scene of a robbery arrest where he stated he would mail her a ticket "for obstructing".  (*Id.* at

42

152-161). He was not aware that this resulted in a complaint in 2020, and a sustained finding against him of misconduct for this incident. (*Id.* at 146-151, Exhibit 8, Doc. 51-8). And a similar incident occurred in 2021. (Doc. 21-9). Yet, Sgt. Wolf received no counseling or feedback as a consequence of these incidents, even though the complaints were sustained. (*Id.* at 160-161).

Add to all of that the Mr. Kern's expert's testimony and opinions reflecting the failure to train by the City. (Decl. Knight, attached hereto). The failure to train elements clearly are met here, as neither Sgt. Wolf nor Ofcr. Lewis were adequately trained on obstruction charges, failure to yield charges, the Fourth Amendment, the First Amendment, traffic stops, or any other enforcement practice that led to the false arrest and illegal detention of Mr. Kern.

The City had policies and customs that gave rise to the violations by Sgt. Wolf and Ofcr. Lewis as set forth herein, including the following: (i) there was a pattern and practice of arresting people for failure to identify without an underlying crime; (ii) the City previously sustained complaints related to Sgt. Wolf for aggressive and inappropriate arrests and interactions, including with respect to obstruction charges, but then did nothing to counsel or train him (or even tell him); (iii) the City promoted Sgt. Wolf despite knowing he had a problem violating the law and United States' Constitution; (iv) the City and its Police Chief had knowledge that Sgt. Wolf had anger management and PTSD issues, leading to citizen complaints (that were sustained), including as a result of Sgt. Wolf's interactions with minorities, but failed to address those issues prior to the September, 2022 interaction with Mr. Kern; (iv) the City's own Internal Affairs Captain – the person who is supposed to be policing the department and investigating police misconduct – testified to his and CHPD's practice of going through the code of ordinances to try and make up a crime after-the-fact. In other words, the unconstitutional rot is from top to

43

bottom. What happened to Mr. Kern in this case was not a singular incident of lawlessness, but rather was a known problem with CPHD. At a minimum, genuine issues of material fact preclude summary judgment on the *Monell* claims.

### F. Plaintiff is entitled to partial summary judgment on his state law assault and battery claim against Sgt. Wolf

"A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. Port Clinton*, 37 Ohio St.3d 98, 99, 524 N.E.2d 166 (1988). "A defendant possesses the requisite level of intent to commit a battery if he "'desires to cause [the] consequences of his act, or … believes that the consequences are substantially certain to result from it.'" *McRae v. Icon Entertainment Group, Inc.*, 10th Dist. Franklin No. 08AP-820, 2009-Ohio-5119, ¶ 8, *citing Harasyn v. Normandy Metals, Inc.*, 49 Ohio St.3d 173, 175, 551 N.E.2d 962 (1990), *quoting* 1 Restatement of the Law 2d, Torts, Section 8A, at 15 (1965). An assault is defined as "the willful threat to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact; the threat or attempt must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching." *Knox v. Hetrick*, 2009-Ohio-1359, 2009 Ohio App. LEXIS 1141 (8th Dist. 2009), *quoting Smith v. John Deere*, 83 Ohio App.3d 398, 406, 614 N.E.2d 1148 (1993). Furthermore, "[a]n essential element of … assault is that the actor knew with substantial certainty that his or her act would bring about harmful or offensive contact." *Id.*

Where officers act without lawful authority in arresting someone, they commit an assault and battery. *Kaylor v. Rankin*, 356 F. Supp. 2d 839, 854 (OHND 2005), *citing Love v. City of Port Clinton*, 37 Ohio St.3d 98, 99, 524 N.E.2d 166 (1988) (officer who subdued and handcuffed the plaintiff committed intentional acts which, unless privileged, constituted a battery). For the

reasons stated in the facts section and in Section III.B., Sgt. Wolf is liable for civil assault and battery.

### G. Plaintiff is entitled to partial summary judgment on his state law civil unlawful imprisonment and false arrest claims against Sgt. Wolf and Ofcr. Lewis

The Ohio Supreme Court has noted that "false arrest and false imprisonment as causes of action are indistinguishable." *Rogers v. Barbera*, 170 Ohio St. 241, 164 N.E.2d 162, 164 (Ohio 1960) (*quoting* 22 Am. Jur. False Imprisonment § 2-3).  The court stated that "the essence of the tort consists in depriving the plaintiff of his liberty without lawful justification; and the good intention of the defendant does not excuse, nor does his evil intention create, the tort." *Id.*  To prevail on a claim for false arrest/imprisonment, the plaintiff must demonstrate: "(1) the intentional detention of the person and (2) the unlawfulness of the detention." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315 (6th Cir. 2005).  An arrest without a probable cause is unlawful. *Id.*  Malice is not an element of, and good faith is not a defense to, a claim of a false imprisonment/arrest. *Rankin*, 356 F. Supp. 2d 839, 855, *citing Brinkman v. Drolesbaugh*, 97 Ohio St. 171, 119 N.E. 451 (1918)

As in *Rankin*, the tort is established here through the intentional detention of Mr. Kern by Sgt. Wolf and Ofcr. Lewis, without probable cause, including for the reasons above and those stated in the facts section and in Sections III.B.1 and III.B.2.

### H. Plaintiff is entitled to partial summary judgment on his state law malicious prosecution claim against Sgt. Wolf and Ofcr. Lewis

To sustain a claim of malicious prosecution, a plaintiff must prove: "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Trussell v. General Motors Corp.*, 53 Ohio St.3d 142, 144, 559 N.E.2d 732 (1990).  In *Melanowski v. Judy*, 102 Ohio St. 153, 155, 131 N.E. 360 (Ohio

1921), the Ohio Supreme Court held that "in an action for malicious prosecution, the want of probable cause is the gist of the action. If such be proven, the legal inference may be drawn that the proceedings were actuated by malice." *Id.*, paragraph one of the syllabus.  Furthermore, for the purposes of malicious prosecution, malice is defined as "an improper purpose, or any purpose other than the legitimate interest of bringing an offender to justice." *Criss v. Springfield Township*, 56 Ohio St.3d 82, 85, 564 N.E.2d 440 (1990).

As discussed in Sections III.B.1 and III.B.2., there was no probable cause.  And, the prosecution terminated in Mr. Kern's favor.  See Exhibit 25, Doc. 51-16.  That leaves malice, which not only can be inferred through the lack of probable cause, *Melanowski*, 102 Ohio St. 153, but also is established through Sgt. Wolf's admission he has no basis to doubt Ofcr. Lewis' statement that Mr. Kern committed no crime, Ofcr. Lewis' admission that Mr. Kern committed no crime and her admission to Mr. Kern that body camera captured everything and the prosecutor was good, and through the *post hoc* efforts by Sgt. Wolf, even continuing into his deposition testimony, to try to invent other crimes Mr. Kern could have been charged with.  Also, the discussion in III.C. about First Amendment retaliation, which establishes an improper purpose.  All of the above establishes an improper purpose, which is malice.

### I.  There is no immunity for Sgt. Wolf or Ofcr. Lewis under state law immunity due to the fact that their actions were made with malicious purpose, in bad faith, or in a wanton or reckless manner

R.C. 2744.03 provides for immunity for police officers unless they took actions with a "malicious purpose, in bad faith, or in a wanton or reckless manner."  Malicious purpose is defined as "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 136 Ohio App.3d 616, 620-21, 737 N.E.2d 563 (10th Dist. App. 2000); *Teramano v. Teramano*, 6

46

Ohio St. 2d 117, 118, 216 N.E.2d 375 (Ohio 1966). "Bad faith has been defined as the opposite of good faith, generally implying or involving actual or constructive fraud or a design to mislead or deceive another." *Id.* And "reckless" is defined as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388, 2012-Ohio-5711, 983 N.E.2d 266, 273 (Ohio 2012).

Here, and construing the facts in the light most favorable to Mr. Kern, the record establishes at least recklessness, and likely malice, including, without limitation: (i) Sgt. Wolf and Ofcr. Lewis' invention of charges to cover up an illegal arrest without probable cause; (ii) an arrest perpetrated by Sgt. Wolf out of anger (and perhaps racial animus), after Mr. Kern declined to comply with an illegal demand to identify himself (which ultimately resulted in significant injury); (iii) Sgt. Wolf and Ofcr. Lewis conferring about releasing him immediately thereafter but Sgt. Wolf saying that he could not because Mr. Kern already was in handcuffs (and the reasonable inference is that Sgt. Wolf knew the arrest and his actions were illegal but it was additional effort to cover up); (iv) Ofcr. Lewis' acknowledgement in her police vehicle that the City prosecutor would drop the charges, thus demonstrating her knowledge that everything she and Sgt. Wolf were doing was illegal; and (v) the significant efforts by Sgt. Wolf and Ofcr. Lewis to engage in after the fact excuse-making (extending to their absurd testimony and argument in their pleadings about a "one second" delay, without any evidence of intent, being obstruction), all of which started at the scene of the incident and included an effort to fabricate evidence when they immediately met up to discuss things in the parking lot of a synagogue rather than proceed to the station.

All of that is sufficient to establish malice and/or recklessness.  *See discussion, infra*, at pp. 17-19; *Knox v. Hetrick*, 2009-Ohio-1359 (8th Dist. App. 2009).  In fact, malice may be inferred from proof of lack of probable cause. *Melanowski v. Judy*, 102 Ohio St. 153, 155, 131 N.E. 360 (1921).  All of those malice factors are present here, including as discussed above and in the fact section and in Sections III.B. and III.C., which we incorporate by reference.

### J.  The City is not entitled to immunity for the negligence claim against it under R.C. 2744.02(B).

Mr. Kern's testimony was that Ofcr. Lewis' lights and sirens were not on, she cut him off, and then she stopped suddenly, all of which almost caused an accident.  (Depo. Kern, Doc. 54 at 40-41).  She was in the left lane, he was in the right lane and he was going the speed limit.  (*Id.* at 134-135).  He had to slam on the brakes such that his brakes were on the floor, he was already in the curb lane and could not pull over further, and he thinks his vehicle skidded.  (*Id.* at 136-137).  And, her lights and sirens was not activated until she was fully in front of him.  *Id.* at 137-138.

Ofcr. Lewis admitted she did not activate her turn signal.  (*Id.* at 119-120).  Mr. Goodman hit his brakes right away in an "abrupt" manner.  (*Id.* at 124-125).  As a result of Mr. Goodman slamming on his brakes, Ofcr. Lewis slammed on her brakes, forcing Mr. Kern to slam on his brakes.  (*Id.* at 125).  Ofcr. Lewis admitted that as she cut over, her vehicle was "very close" to Mr. Kern's vehicle, and she admitted that there almost was a collision as a result.  (*Id.* at 126).  Without question, Ofcr. Lewis committed a violation of R.C. 4511.39(A), and is negligent *per se*, when she failed to use a turn signal while changing lanes.

R.C. 2744.02(B) is clear that "a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary

function, as follows: (1) Except as otherwise provided in this division, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority."  The fact that Lewis negligently operated her motor vehicle, cutting off Mr. Kern, causing him to slam on his brakes, set off, and was the proximate cause for, the entire chain of events.

Defendants argue that Ofcr. Lewis was on an "emergency call."  (Doc. 61 at pp. 26-30); *see, also*, Ohio Rev. Code Ann. 2744.01(A).  The problem with that argument is that Defendants rely upon crediting Ofcr. Lewis' testimony, and not Mr. Kern's testimony, who testified the lights and sirens were not activated when Ofcr. Lewis changed lanes and cut him off without operation of a turn signal.  But beyond that factual problem, the law is equally unsupportable.

An "'emergency call' involves a situation to which a response by a peace officer is required by the officer's professional obligation." *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781 (Ohio 2003).  To determine whether an emergency call exists in a pursuit scenario, a court must consider "'all the attendant facts and circumstances leading up to or giving rise to the pursuit, including the operation of the fleeing motorist's vehicle during the pursuit.'" (Emphasis omitted.) *Shalkhauser v. City of Medina*, 148 Ohio App. 3d 41, 2002-Ohio-222, 772 N.E.2d 129 (9th Dist. 2002) at ¶ 24, *quoting Wagner v. Heavlin*, 136 Ohio App.3d 719, 729, 737 N.E.2d 989 (7th Dist.2000).  Here, there was no motorist fleeing at the time that Ofcr. Lewis illegally changed lanes without a turn signal and cut Mr. Kern off.  There was no pursuit either, if Mr. Kern's testimony is credited that lights and sirens were not activated until after the illegal lane change occurred.  And, if we credit Mr. Kern's testimony and all reasonable inferences from it, and partially credit Ofcr. Lewis' own testimony that she did not activate lights

49

and sirens until she had received the expired license plate identification that gave her the basis for the stop, that also did not occur until after she had made the illegal lane change.

Moreover, Ofcr. Lewis' failure to activate her lights and sirens prior to committing the traffic violation gives rise to the wanton exception. *Kearns v. Meigs Cnty. Emergency Med. Servs.*, 2017-Ohio-1354, 88 N.E.3d 438 (4th Dist. App. 2017) (finding genuine issue of fact on wantonness where responder did not activate lights and sirens and committed traffic infraction causing injury); *Anderson v. City of Massillon*, 2014-Ohio-2516 (5th Dist. App. 2014) (same); *Taylor v. City of Cleveland*, 2012-Ohio-3369 (8th Dist. 2012) (same).

In short, there is a genuine issue of fact on this score, and the City Defendant is not entitled to summary judgment. *Collett v. Hamilton Cty, Ohio*, 2019 U.S. Dist. LEXIS 2644 at *61-*62 (SDOH 2019).

## IV.    CONCLUSION

Defendants' Motions for Summary Judgment should be denied.

Respectfully submitted,

/s/ Christopher Wiest_____          /s/Thomas B. Bruns_____
Christopher Wiest (Ohio 0077931)          Thomas B. Bruns (Ohio 0051212)
Chris Wiest, Atty at Law, PLLC            Bruns, Connell, Vollmar, Armstrong
50 E. Rivercenter Blvd., Ste. 1280        4555 Lake Forrest Dr., Suite 330
Covington, KY 41011                       Cincinnati, OH 45242
513/257-1895 (v)                          513-312-9890 (v)
859/495-0803 (f)                          tbruns@bcvalaw.com
chris@cwiestlaw.com
**Attorneys for Plaintiff**

## <u>CERTIFICATE AS TO PAGE LIMITATIONS</u>

I certify that this memoranda is within the page limits, as extended by order of the court, permitted by L.R. 7.1(f).

/s/Christopher Wiest