**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEMETRIUS KERN, | ) | CASE NO. 1:23-cv-1327 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| v. | ) | |
| | ) | |
| NAFTALI WOLF, *et al.*, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendants. | ) | **ORDER** |
| | ) | |

Before the Court are three motions: (i) Defendant Carly Lewis and the City of Cleveland Heights's ("Cleveland Heights") motion for summary judgment (ECF No. 61); (ii) Plaintiff Demetrius Kern's motion for partial summary judgment (ECF No. 62); and (iii) Defendant Naftali Wolf's motion for summary judgment (ECF No. 63). The parties have filed their respective briefs in opposition, (ECF Nos. 66–68), and replies in support, (ECF Nos. 70–72). For the reasons discussed below, Plaintiff's motion for summary judgment is **DENIED**, Lewis and Cleveland Height's motion for summary judgment is **GRANTED**, and Wolf's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

I.      FACTUAL BACKGROUND

        A.      **Initiation of the Traffic Stop and Near Accident**

On September 22, 2022, around 7:00 p.m., Defendant Carly Lewis, a Cleveland Heights police officer, was driving her police-issued, marked cruiser on Mayfield Road in Cleveland Heights when she saw a 2011 silver Infiniti that matched the description of a vehicle used by a suspect in a felony domestic incident which occurred the day before. (ECF No. 52, PageID #776–78). Lewis ran the license plate through LEADS and found that it had an expired license plate sticker. (*Id.* at PageID #778–79). To pull over the driver of the Infiniti, Lewis transitioned

1

from the left westbound lane to the right westbound lane behind the Infiniti; but she did not activate her turn signal. (*Id.* at PageID #780–81).

When making this transition, Lewis pulled in front of Plaintiff, who was driving a white Tesla and had been traveling in the westbound right lane at least one car length behind the silver Infiniti. (*Id.* at PageID #780–83, 786–87). Shortly after Lewis pulled behind the silver Infiniti, the driver of that vehicle stopped abruptly.[1] (*Id.* at PageID #780, 785–86). This caused Lewis to stop abruptly, which also caused Plaintiff to stop abruptly, and almost resulted in a collision between the two vehicles. (*Id.* at PageID #782–83, 786–87).

**B.      Beginning of the Interaction between Plaintiff and Officer Defendants**

After the three vehicles had stopped (Lewis's cruiser behind the Infiniti and Plaintiff behind Lewis), Lewis and Plaintiff both exited their vehicles; Plaintiff walked towards Lewis and said, "I want your badge number, you almost ran me off the road." (*Id.* at PageID #795–96, 835–37; ECF No. 59, Ex. Kern_1119_20220922-185844 ("1st Cell Video")). Lewis instructed Plaintiff to wait, stating "one second," and Plaintiff complied with her request—stepping to the side, waiting on the sidewalk behind Lewis's cruiser, and videotaping her. (ECF No. 52, PageID #795–96; ECF No. 59, Ex. 11, at 00:00-00:06; 1st Cell Video; ECF No. 59, Kern_1120-20220922_185903 ("2nd Cell Video"), at 00:00-00:27). Lewis approached the silver Infiniti and called for backup when she arrived at the driver's side door, looking back towards Plaintiff and stating, "81 radio, standby, it's going to be on Mayfield, across from the first access road, send me another unit because

---

[1] The parties dispute whether Lewis activated her lights and sirens before pulling over the Infiniti. Lewis testifies that she initiated the stop by activating her lights and sirens. (ECF No. 52, PageID #780, 782, 786). Plaintiff testifies that Lewis did not activate her lights and sirens when she cut him off. (ECF No. 54, PageID #1299–300). There is no video or other evidence to corroborate whether and when the lights and sirens were initiated before the near accident. It stands to reason, though, that Lewis, at some point, initiated some emergency signal because the Infiniti was prompted to stop.

another party does not know how to yield to lights and sirens, sitting here recording me, saying I almost ran him off the road." (ECF No. 52, PageID #796; ECF No. 59, Ex. 11, at 00:14-00:30).

Lewis proceeded with her traffic stop investigation; she spoke with the driver of the silver Infiniti and learned that: (i) his name was Larelle Goodman, who was not the subject of the prior felony domestic violence incident; (ii) he had just purchased the vehicle and was still transferring the title to his name; and (iii) he was licensed to carry and had a gun in the vehicle. (ECF No. 59, Ex. 11, at 00:30-01:32).  Lewis stepped away from Mr. Goodman, called in the license plate of the Infiniti, and walked back towards her cruiser. (*Id.* at 01:33-01:48; 2nd Cell Video, at 00:16-00:26). Lewis then approached Plaintiff, who was waiting on the sidewalk and began stating that she had run him off the road, and she apologized to him. (ECF No. 59, Ex. 11, at 01:49-01:56; 2nd Cell Video, at 00:27-00:36).  Lewis and Plaintiff begin arguing with: (i) Lewis apologizing for the situation but maintaining that she had initiated her lights and sirens, Mr. Goodman had abruptly stopped, which was the reason for the near collision, and she was not wrong; and (ii) Plaintiff maintaining that he did not hear a siren, Lewis was wrong, and she should just apologize. (ECF No. 59, Ex. 11, at 01:56-03:03; 2nd Cell Video, at 00:37-01:15).

Meanwhile, Defendant Naftali Wolf, a Cleveland Heights police officer, arrived at the scene in response to Lewis's call for back up, and observed the argument between Plaintiff and Lewis. (ECF No. 60-1, PageID #1943–44, 1993; ECF No. 59, Ex. 12, at 00:00-00:30).  When Wolf  walked up to Plaintiff and Lewis, Lewis explained why she had called for backup and then walked a short distance away to call in Plaintiff's license plate. (ECF No. 59, Ex. 11, at 03:03-03:26).  When Lewis stepped away, Wolf stated, in response to Plaintiff's comment about calling for backup, that "you don't pull up behind an officer on a traffic stop." (ECF No. 59, Ex. 12, at 00:52-00:58).  Wolf and Plaintiff kept talking to each other, with Wolf stating that what Plaintiff

3

was doing was illegal and he had failed to yield to Lewis's lights and sirens and Plaintiff stating that there was a disconnect.  (*Id.* at 00:59-01:12).

Lewis reapproached Plaintiff, stated that she planned to let him go, but asked for his name. (*Id.* at 01:15-01:18; ECF No. 59, Ex. 11, at 03:23-03:28).  Plaintiff asked why she wanted his last name, Lewis responded that she was asking who she was talking to, and Plaintiff had also asked who he was talking to.  (ECF No. 59, Ex. 11, at 03:29-03:33).  Wolf then stated, "well now you are going to be under arrest, because what you are doing is illegal, what you are doing is illegal, I can charge you with interfering with a traffic stop."  (ECF No. 59, Ex. 11, at 03:34-03:40; ECF No. 59, Ex. 12, at 01:23-01:30).  Lewis asked for Plaintiff's last name again, Plaintiff asked why, and she stated, "because I am conducting business with you now."  (ECF No. 59, Ex. 11, at 03:34-03:45).  After Plaintiff declined to provide his last name, asking what the officers' reasonable articulable suspicion of his crime was, Lewis stepped away towards the silver Infiniti, stating that she planned to get rid of Mr. Goodman.  (*Id.* at 03:46-03:55).  Lewis arrived at the silver Infiniti and informed Mr. Goodman that: (i) she was letting him go; (ii) the plates were expired and he could not drive under the former owner's plates; (iii) she would not be writing him a ticket for the violations; and (iv) she was going to deal with Plaintiff, whom she described as "really irritated."  (*Id.* at 04:03-04:23).

### C.    Escalation of Argument between Plaintiff and Officer Defendants

While Lewis was talking with Mr. Goodman, Plaintiff and Wolf continued to argue as to whether the officers had reasonable articulable suspicion, whether Plaintiff had failed to yield, and whether Plaintiff had to provide identification.  (ECF No. 59, Ex. 12, at 01:43-02:10).  Wolf radioed for back-up assistance stating that he had a male who was obstructing and failing to identify himself.  (*Id.* at 02:11-02:16).  Wolf then stated he would take a report on Plaintiff's

complaint of being run off the road but he would need Plaintiff's identification.  (*Id.* at 02:17-02:20).

At this point, Lewis was walking back from releasing Mr. Goodwin; she approached Plaintiff, told him to talk to her, and explained that she had called for backup because she was dealing with more than one person during the traffic stop with an unknown man getting out of a car and walking towards her.  (ECF No. 59, Ex. 11, at 04:45-05:05).  She then asks Plaintiff to identify himself so she can let dispatch know who she is "out with" and states, "if you don't identify yourself, that is obstruction."  (*Id.* at 05:06-05:14).  Plaintiff refused to identify himself, asked what crime he committed, and Lewis responded, "there is no crime, but I want to identify you," after which Plaintiff began to walk away from Lewis.  (*Id.* at 5:07-05:25).

### D.      Plaintiff's Arrest

Wolf stated that: (i) he would have to arrest Plaintiff if he did not identify himself; (ii) Plaintiff had committed the crime of obstruction; and (iii) Plaintiff had to legally identify himself.  (*Id.* at 05:26-05:40; ECF No. 59, Ex. 12, at 03:13-03:22).  Plaintiff responded that Lewis had almost run him off the road, after which Wolf and Plaintiff continued to argue about whether Plaintiff had to identify himself.  (ECF No. 59, Ex. 12, at 03:23-03:31).  Wolf proceeded to arrest Plaintiff, directing him to place his hands behind his back, securing his hands behind his back with handcuffs, and stating he would be issuing a ticket for obstruction.  (*Id.* at 03:32-03:54; ECF No. 59, Ex. 11, at 05:45-06:00).  Plaintiff provided his social security number to Lewis in response to her request, he turned his head back towards Wolf and asked if he is going to break his wrists, after which Wolf adjusts the handcuffs.  (ECF No. 59, Ex. 12, at 03:55-04:10; *id.*, Ex. 11, at 06:01-06:19).

5

While Plaintiff continued to state that Lewis had almost run him off the road and he was not interrupting her traffic stop, Wolf explained that Plaintiff could not just "stop in the middle of someone's traffic stop" and he was being issued a ticket for interfering with a traffic stop. (ECF No. 59, Ex. 12, at 04:11-04:38; *id.*, Ex. 11, at 06:22-6:30).  Wolf walked Plaintiff to Lewis's cruiser, instructed Plaintiff to sit in the backseat, Plaintiff sits down, and Wolf closeed the cruiser door after Plaintiff brought his legs and head inside the vehicle. (ECF No. 59, Ex. 12, at 04:39-04:59; *id.*, Ex. 11, at 06:43-07:09).

### E.      Issuing the Citation/Ticket

Wolf and Lewis then have a conversation where she explains why the traffic stop was initiated, describes how an accident almost occurred, and states that she had her lights and sirens on when she initiated the stop. (ECF No. 59, Ex. 12, at 05:00-05:29; *id.*, Ex. 11, at 07:10-07:40). Wolf stated that Plaintiff could be cited for failure to yield but Lewis responded that she felt she did not need to give him a ticket for that. (ECF No. 59, Ex. 12, at 05:30-05:51; *id.*, Ex. 11, at 07:41-08:02).  Although Lewis said that she was good with letting Plaintiff go, Wolf stated that Plaintiff had committed obstruction and instructed Lewis to issue Plaintiff a ticket for "obstructing - failure to identify himself." (ECF No. 59, Ex. 12, at 05:52-6:09; *id.*, Ex. 11, at 08:03-08:18). After talking briefly with Plaintiff, Lewis walked back to Wolf and stated she was fine with not charging Plaintiff, Wolf insisted on charges, and she stated she would write a ticket for obstruction. (ECF No. 59, Ex. 11, at 09:42-10:03).   Lewis ultimately issued a citation to Plaintiff for Obstructing Official Business pursuant to Cleveland Heights Ordinance No. 525.07. (ECF No. 59, Ex. 11 at 10:00-18:11; Ex. 24, ECF No. 51-15, PageID #552).

When writing the citation, Lewis asked Wolf what she should "put down for the verbiage," she explained the situation (initiation of the traffic stop, near accident, her telling Plaintiff to step

6

back and his compliance, etc.), and Wolf stated that Plaintiff was ultimately obstructing.  (ECF No. 59, Ex. 11 at 18:26-20:07).  Lewis finished writing the ticket, gave it to Kern, and then released him. (*Id.* at 24:24-25:53).

### E.  Shoulder Injury – Complaint and Officer Actions

While Lewis was writing the ticket, with Plaintiff in the back seat of her cruiser, Plaintiff remarked that he might need an ambulance and stated his arm had popped out.  (ECF No. 59, Ex. 11, at 13:03-13:08).  Lewis immediately called for an ambulance to come to the scene and relayed Plaintiff's remark about his arm.  (*Id.* at 13:09-13:19).  Officer Joe Torres, who had responded after Wolf called for assistance, asked Plaintiff about his arm, Plaintiff complained about pain in his right shoulder being bad, Plaintiff asked for the cuffs to be taken off, Torres took the handcuffs off Plaintiff and re-applied them in front of his body. (ECF No. 59, Ex. 13, at 04:05-05:33; ECF No. 56, PageID #1672–77; ECF No. 51-21).  Plaintiff advised Torres that he had no prior injuries to his right shoulder.  (ECF No. 59, Ex. 13, at 04:53-04:58).  Paramedics arrived at the scene, but Plaintiff declined medical treatment and elected to drive himself to Metro Hospital for treatment.  (*Id.* at 07:00-12:30; *id.* Ex. 11, at 24:00-27:30; ECF No. 51-21).

## II.  PROCEDURAL BACKGROUND

On July 7, 2023, Plaintiff filed a verified complaint against Cleveland Heights, Lewis, and Wolf.  (ECF No. 1).  Plaintiff generally alleges that Wolf arrested and detained Plaintiff for obstructing official business without probable cause, Lewis had an opportunity to intervene but failed to do so, and Cleveland Heights was aware of prior incidents involving Lewis and Wolf and the instant constitutional violations were the result of official policy, unofficial custom, or deliberate indifference to train and supervise police officers.  (*Id.* at PageID #3–10).  Plaintiff asserts seven causes of action: (i) Violation of the Fourth Amendment, against Defendants

7

(Count I); (ii) Violation of the First Amendment, against Defendants (Count II); (iii) Civil Assault and Battery, against Wolf (Count III); (iv) Civil Unlawful Imprisonment, against Wolf and Lewis (Count IV); (v) Civil False Arrest, against Wolf and Lewis (Count V); (vi) Malicious Criminal Prosecution, against Wolf and Lewis (Count VI); and (vii) City Liability – Ohio Rev. Code § 2744.02, against Cleveland Heights (Count VII).  (*Id.* at PageID #10–19).

On October 31, 2024, Lewis and Cleveland Heights moved for summary judgment seeking dismissal of all claims asserted against them.  (ECF No. 61).  The same day, Plaintiff filed a motion for partial summary judgment seeking judgment in his favor on the claims against Wolf and Lewis (liability only), (ECF No. 62), and Wolf filed a motion for summary judgment on all claims asserted against him, (ECF No. 63).  The parties filed their respective briefs in opposition, (ECF Nos. 66–68), and their reply briefs in support, (ECF Nos. 70–72).

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  The Rule states that the court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if it is "based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 487 (6th Cir. 2006).  A fact is material if "its resolution might affect the outcome of the suit under the governing substantive law."  *Id*.  The moving party bears the burden of showing that no genuine issues of material fact exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The court views the facts and draws all reasonable inferences in favor of the non-moving party.  *Pittman v. Experian Info. Solutions, Inc*., 901 F.3d 619, 628 (6th Cir. 2018).  Once the moving party satisfies its burden, the burden shifts to the non-moving party to produce evidence that

demonstrates that there is a genuine dispute of a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)).

The standard for evaluating motions for summary judgment does not change when cross-motions for summary judgment have been filed. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The Sixth Circuit has explained:

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.

*Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## IV.     DISCUSSION

### A.     Fourth Amendment Claims – Count I

Section 1983 confers a private right of action upon individuals to enforce rights secured by the Constitution and the laws of the United States. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff "must establish . . . (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that he was subjected to or caused to be subjected to this deprivation by a person acting under the color of state law." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). In Count I, Plaintiff asserts a cause of action based on violations of the Fourth Amendment. Specifically, he asserts his Fourth Amendment right against unreasonable seizure was violated when: (i) Wolf and Lewis illegally detained him without reasonable suspicion; (ii) Wolf and Lewis arrested him without probable cause; and (iii) Wolf arrested him using excessive force. (ECF No. 1, PageID #10–11, ¶¶ 64–67). Plaintiff also asserts that Cleveland Heights is liable for these

Fourth Amendment violations under *Monell*,[2] and Lewis is liable for Wolf's use of excessive force claim based on a failure to intervene.  (*Id.* at PageID #11–12, ¶¶ 68, 71).

The Court will first address the Fourth Amendment claims against Wolf and Lewis based on unlawful detention and false arrest, before addressing the claims based on excessive force.  The Court will then address the *Monell* claims against Cleveland Heights.

### 1.    Unlawful Detention and False Arrest

Wolf and Lewis argue that they are entitled to summary judgment in their favor on Plaintiff's claims for unlawful detention and false arrest because there was probable cause to detain and arrest Plaintiff for obstructing official business and they are otherwise entitled to qualified immunity.  By contrast, Plaintiff argues that he is entitled to summary judgment because there was no probable cause and neither Wolf nor Lewis is entitled to qualified immunity.[3]

The Fourth Amendment guarantees the right "to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  Arrests are  considered "reasonable" when a police officer had "probable cause to believe that a criminal offense has been or is being committed."  *Graves v. Mahoning Cnty.*, 821 F.3d 772, 776 (6th Cir. 2016) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)) (internal quotation marks omitted).  Conversely, "[i]t is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment."  *Ingram v. City of Columbus*, 185 F.3d 579, 592–93 (6th Cir. 1999).

---

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).
[3] The Court will analyze the unlawful detention and false arrests claims together because a determination as to whether there was probable cause to arrest Plaintiff and whether the false arrest claim can survive summary judgment, will necessarily resolve the same issues as to the unlawful detention claim (*i.e.*, if there is probable cause or qualified immunity for the false arrest claim, the same goes for unlawful detention claim).

Probable cause to arrest must be based on "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979)); *see also United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998) ("The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty."). Such probability is tested against "all facts and circumstances *within an officer's knowledge at the time of an arrest*." *Crockett*, 316 F.3d at 580 (citing *Est. of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999) (emphasis in original)). "Probable cause is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018) (cleaned up). Probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *United States v. McClain*, 444 F.3d 556, 562 (6th Cir.2005)); *see also United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

The doctrine of qualified immunity shields government officials from civil liability in the performance of their duties so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Qualified immunity is not merely a defense to liability; the doctrine provides immunity from suit altogether. *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019). This form of immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and protects "all but the plainly incompetent or those who

11

knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotations omitted).

Courts engage in a two-step inquiry to determine whether a defendant is entitled to qualified immunity. "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 247 (6th Cir. 2010)).

Since qualified immunity presumptively protects a public official conducting his official duties, the plaintiff bears the burden of showing that it does not apply to a defendant's conduct. *Id.* (citing *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)); *see Mays v. City of Dayton*, 134 F.3d 809, 813 (6th Cir. 1998) ("While acting in his role of law enforcement officer, [the officer defendant] presumptively receives immunity for acts committed in the course of his duties."). To do this, "the plaintiff must show a substantial correspondence between the conduct in question and prior law allegedly establishing the defendant's actions were clearly prohibited." *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241 (6th Cir. 1996).

To resolve whether any party is entitled to summary judgment, the Court must first determine if there was probable cause to detain and arrest Plaintiff for obstructing official business in violation of Ohio Rev. Code § 2921.31 (*i.e.*, was there a constitutional violation of Plaintiff's Fourth Amendment rights). If there was probable cause, the inquiry would end there; the claims would fail as a matter of law and Wolf and Lewis would be entitled to qualified immunity.

Ohio's obstructing-official-business statute provides:

> No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or

12

> impedes a public official in the performance of the public official's lawful duties.

Ohio Rev. Code § 2921.31(A). "Ohio courts have interpreted this statute to criminalize only affirmative acts, not the failure to act." *State v. Certain*, No. 07CA3003, 2009-Ohio-148, 180 Ohio App. 3d 457, 905 N.E.2d 1259, 1264 (Ohio Ct. App. 2009) (collecting cases) (finding that a defendant obstructed official business when he fled from police). Thus, to convict an individual for obstructing official business in Ohio, law enforcement must observe: (1) an affirmative act; (2) done with the purpose to prevent, obstruct, or delay the officer; (3) without privilege to do so; (4) that actually hampers or impedes the officer; (5) while the officer is acting in his official capacity. *State v. Henry*, 2018-Ohio-1128, 110 N.E.3d 103, 116 (Ohio Ct. App. 2018) (citing *State v. Dice*, 2005-Ohio-2505, ¶ 19 (Ohio Ct. App. 2005)); *see also Osberry v. Slusher*, 750 F. App'x 385, 393 (6th Cir. 2018) (citing Ohio Rev. Code § 2921.31). "Ohio courts have emphasized the importance of the first element, the requirement that the defendant commit an affirmative act." *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016).

An obstructive act must actually delay law enforcement's performance of her official duties; the delay caused by an affirmative act must be more than "de minimis." *State v. Coffman*, 2024-Ohio-1182, ¶ 29 (Ohio Ct. App. 2024). Similarly, there must be a causal relationship between the defendant's affirmative act and the officer's delayed performance of her duties. *Id.*

Wolf and Lewis argue that a reasonable officer on the scene could have determined there was probable cause to believe Plaintiff obstructed official business in violation of Ohio Rev. Code § 2921.31 based on Plaintiff pulling up behind Lewis while she was conducting a traffic stop, engaging in hostile and abusive speech, and failing to identify himself. (*See* ECF No. 61, PageID #2170–73; ECF No. 63, PageID #2235–40). Plaintiff maintains that there is no probable cause because there was no evidence of the intent to obstruct official business, he took no action that

13

hampered or impeded Lewis's traffic stop (other than asking for her name and badge number), and he complied with Lewis's directives to wait.[4]  (ECF No. 62, PageID #2213–15).

Having reviewed the record evidence, the Court finds that Wolf and Lewis did not have probable cause to believe that Plaintiff had committed an affirmative act with the purpose to prevent, obstruct, or delay the performance of a public official.  It is undisputed that Plaintiff exited his vehicle and approached Lewis on the side of the road after she had initiated the traffic stop of Mr. Goodman and was exiting her own vehicle.  After Plaintiff asked for her badge number and stated she had run him off the road, she instructed him to wait "one second" and Plaintiff complied, stepping to the sidewalk and waiting behind Lewis's vehicle.  Plaintiff began talking with Lewis only after she had stepped away from Mr. Goodman, approached Plaintiff, and began talking with Plaintiff.  It was at this point that Plaintiff and Lewis began arguing about the near accident.  Wolf then arrived on the scene to witness this argument.  He did not witness the entire encounter.  Wolf joined the argument; this is when Lewis first asked for identification and Plaintiff refused.  The argument escalated between Plaintiff and Wolf while Lewis left to release Mr. Goodman; then Wolf arrested Plaintiff for obstructing official business.

Wolf and Lewis argue that Plaintiff initially approaching Lewis and "yelling" at her and then his subsequent arguing with Lewis constituted probable cause for obstructing official business

---

[4] Plaintiff impliedly argues that he is entitled to summary judgment because Wolf and Lewis "admitted" that they had no evidence of Plaintiff's intentions.  The Court finds Plaintiff's argument overstated.  Obstructing official business is a specific intent offense that requires a person to acted with the "specific intention to cause a certain result." *State v. McCoy*, 2008-Ohio-5648, ¶ 13 (Ohio Ct. App. 2008) (quoting Ohio Rev. Code § 2901.22(A)).  "Because no one can know the mind of another, a defendant's intent is 'not discernible through objective proof.'" *Id.* ¶ 14 (quoting *State v. Huffman*, 131 Ohio St. 27, 1 N.E.2d 313, paragraph four of the syllabus (1936)).  As a result, "[t]he intent to obstruct, delay, or prevent a public official from carrying out his or her duties may be inferred from [a party's] actions." *State v. Lee*, 2019-Ohio-3904, ¶ 20 (Ohio Ct. App. 2019); *State v. Partee*, 2018-Ohio-3878, ¶ 26 (Ohio Ct. App. 2018) ("Purposely obstructing official business is determined from the manner in which it is done, the means used, and all other facts and circumstances introduced into evidence." (citations and internal quotation marks omitted)).  In their respective depositions, Wolf and Lewis solely admitted that they lacked actual knowledge of Plaintiff's intentions/purpose.  This is not an admission that they did not make inferences as to Plaintiff's intention from his actions and the circumstances of the case.

because it took her focus away from and delayed the traffic stop of Mr. Goodman.  The Court disagrees.  Wolf and Lewis cite several cases for the proposition that there is probable cause to arrest a bystander to a traffic stop for obstruction when the bystander interrupts or interferes with a traffic stop through disruptive behavior.  (ECF No. 61, PageID #2172; ECF No. 63, PageID #2240).  But these cases are easily distinguishable.  As noted by Lewis, the Supreme Court, in *Colten v. Kentucky*, declined to set aside a conviction for disorderly conduct[5] after determining that: (i) a bystander was not engaged in protected conduct when he engaged in conduct that appeared to have no other purpose than to cause inconvenience and annoyance; and (ii) the State had "a legitimate interest in enforcing its traffic laws and its officers were entitled to enforce them free from possible interference or interruption from bystander[.]"  407 U.S. 104, 109–10, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972).  In that case, the bystander "made some effort to enter into a conversation" between the police and the person who was subject to a traffic stop, and he was also asked by police officers to leave the scene at least five times.  *Id.* at 106–07.  Here, Plaintiff did not insert himself directly into the traffic stop and he was never asked to leave the scene once, let alone five times.  While Plaintiff did initially approach Lewis, and this may have momentarily distracted her and caused her some unease, he immediately complied with her instructions.  Only after Lewis approached Plaintiff and started talking did Plaintiff start arguing with Lewis.

Wolf cites *Leonard v. Pryne*, No. 1:07-cv-283, 2008 U.S. Dist. LEXIS 122110, at *21–22 (S.D. Ohio June 24, 2008), and *State v. Fort*, 2003-Ohio-1075, ¶¶ 25–29 (Ohio Ct. App. 2003), as examples when Ohio courts have determined there was obstruction of official business when an

---

[5] The statute at issue, Ky. Rev. Stat. § 437.016 (1)(f) (Supp. 1968), stated, in relevant part: "(1) A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: . . . (f) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . ."

individual approached officers during a traffic stop, yelled at officers, and impeded the stop.  (ECF No. 63, PageID #2240).  But in *Leonard*, the bystander approached and interacted with the subject of a traffic stop, re-approached the officers while the subject was being handcuffed, continued to make physical advances and verbal threats to the police officer, and ignored at least two warnings by officers to back up and not interfere.  2008 U.S. Dist. LEXIS, at *6–7.  In *Fort*, the bystander interrupted officers three separate times, was instructed to continue on his way, still persisted in questioning the officers, and then refused to leave when asked by an officer.  2003-Ohio-1075, ¶ 28.  These cases all involve instances where a bystander continually inserted themselves into a traffic stop and ignored repeated instructions to leave/stop interrupting.  Circumstances that are not present in this case.

Wolf and Lewis contend that Plaintiff's "hostile and abusive speech" was a sufficient affirmative act to sustain a charge of obstructing official business under Ohio law.  (ECF No. 61, PageID #2171; *see* ECF No. 63, PageID #2237–38).  Reviewing Ohio court decisions, the Sixth Circuit has noted that "hostile or abusive speech" can sustain a charge of obstructing official business.  *Lyons v. City of Xenia*, 417 F.3d 565, 574 (6th Cir. 2005) (citing *State v. Stayton*, 126 Ohio App. 3d 158, 709 N.E.2d 1224, 1227 (Ohio Ct. App. 1998); *State v. Overholt*, No. 2905-M, 1999 Ohio App. LEXIS 3788, at *9 (Ohio Ct. App. Aug. 18, 1999)).  But the Court notes that the cases cited by the *Lyons* court involved repeated instances of ignoring instructions by police officers to leave or refrain from interfering with official business.  *See Stayton*, 709 N.E.2d at 1225–28; *Overholt*, 1999 Ohio App. LEXIS 3788, at *9 ("Defendant's refusal to leave the scene when requested and his interference with the officers' attempts to complete an arrest, coupled with his *repeated*, prolonged, and profane outbursts, are sufficient to constitute acts within the meaning of R.C. 2921.31(A)." (emphasis added)).

Moreover, the Court's review of Ohio caselaw reveals that combative speech has supported a finding of probable cause for obstructing official business when an individual *persistently* disrupted police officers during their investigations and did so after *multiple* warnings. *See, e.g.,* *State v. Herron*, 2011-Ohio-127, ¶¶ 2, 59–63 (Ohio Ct. App. 2011) (arrestee persistently screamed and yelled obscenities at a police officer from mere feet away and was told at least five times to leave the scene); *State v. Wellman*, 2007-Ohio 2953, 173 Ohio App. 3d 494, 879 N.E.2d 215, 217–18 (Ohio App. Ct. 2007) (arrestee repeatedly interrupted an ongoing conversation between police and another individual in a belligerent manner, identified himself as an owner of the nightclub police observed liquor permit violations, and refused to provide identification and walked away despite multiple warnings to stop); *City of Warren v. Lucas*, No. 99-T-0019, 2000 Ohio App. LEXIS 2146, at *2–4 (Ohio Ct. App. May 19, 2000) (arrestee repeatedly interrupted questioning of another individual, became so "loud and belligerent" that the subject of questioning would have been unable to answer, was repeatedly instructed by officers to calm down, received a final warning, and stuck a finger in an officer's chest and began yelling); *City of N. Ridgeville v. Reichbaum*, 112 Ohio App. 3d 79, 677 N.E.2d 1245, 1248–49 (Ohio Ct. App. 1996) (arrestee repeatedly refused to follow directions, repeatedly answered questions posed to a police witness, and shouted to prevent completion of the interview).

Upon review of the facts, Plaintiff was not acting physically aggressive towards either Wolf or Lewis, he complied with Lewis's request to stand back and wait while she conducted the traffic stop of Mr. Goodman, and Plaintiff did not take up any further discussion until after Lewis reapproached him. Wolf and Lewis never instructed Plaintiff to leave or to take any other action with relation to interrupting the stop of Mr. Goodman. There was no affirmative act that would sufficiently demonstrate that Plaintiff's intention was to prevent, obstruct, or delay the traffic stop

17

of Mr. Goodman.  Accordingly, the Court finds that neither Wolf nor Lewis had probable cause to arrest Plaintiff for obstructing official business.

That said, this is not the end of the inquiry.  The Court must now determine whether clearly established law demonstrates that Wolf and Lewis lacked probable cause to arrest Plaintiff for obstructing official business.  The Court finds that it does not.

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft*, 563 U.S. at 741.  In that vein, police officers are entitled to qualified immunity if they "reasonably but mistakenly" believed that there was probable cause for an arrest.  *See Wesby*, 583 U.S. at 65 ("Even assuming the officers lacked actual probable cause . . . the officers are entitled to qualified immunity because they *reasonably but mistakenly* concluded that probable cause was present." (cleaned up) (emphasis added)); *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) (holding that officials who "reasonably but mistakenly" conclude that probable cause is present are entitled to qualified immunity); *see also Dolbin v. Miller*, 786 F. App'x 52, 56–57 (6th Cir. 2019) (clarifying that "whether [the police officers] actually had probable cause" is irrelevant to the qualified immunity inquiry, as the analysis turns on whether the police officers "had the reasonable but mistaken belief that they had probable cause").  In other words, Wolf and Lewis are entitled to qualified immunity if the contours of what constitute sufficient probable cause for obstructing official business were not sufficiently clear, such that Wolf and Lewis could have reasonably believed that there was probable cause to arrest Plaintiff for obstruction on September 22, 2022.

18

The Court finds that caselaw at the time of the incident does not demonstrate a robust consensus, nor does it clearly establish, that Wolf and Lewis were unreasonable to believe that probable cause existed to arrest Plaintiff for obstructing official business.  The Sixth Circuit has commented that Ohio caselaw has provided "less-than-precise contours" regarding Ohio's affirmative-act requirement under Ohio Rev. Code § 2921.31.  *See Lyons*, 417 F.3d at 575; *Phillips v. Blair*, 786 F. App'x 519, 528 (6th Cir. 2019).  As explained by the panel in *Phillips*:

> Cases from this circuit and Ohio courts supply few clear lessons about whether Officer Blair violated clearly established law by arresting Phillips for obstruction under these specific factual circumstances.  *See Harlow*, 457 U.S. at 818.  In *Lyons*, for example, we granted qualified immunity because a woman's cursing and screaming at an officer would  have allowed a reasonable officer to conclude that she committed affirmative acts interfering with police business. 417 F.3d at 574–75.  Although the woman did not physically resist, or even threaten to do so, her "overall pattern of behavior [was] one of resistance" and her "hostility and unwillingness to cooperate in physical and verbal ways" sufficed as an affirmative act.  *Id.* at 574.  In *Patrizi*, on the other hand, we affirmed the denial of qualified immunity as unsupported by probable cause when the arrestee "did not in any way exhibit aggressive, boisterous, or unduly disruptive conduct."  690 F.3d at 465–66.  Significantly, though, the arrestee also "did not ignore instructions."  *Id.*  And in *Wellman*, the Ohio Court of Appeals found an arrestee who "actively prevented [officers] from talking to [a suspect] . . . by being belligerent and argumentative" committed affirmative acts supporting the obstruction offense.  879 N.E.2d at 218–19.

786 F. App'x at 527–28 (alterations in original).

A district court in the Northern District of Ohio made a similar conclusion:

> A review of Ohio case law at the time of the occurrence reveals that the interpretation of the affirmative act requirement with respect to verbal conduct is varied.  For example, some courts found that an individual may be convicted if their "purposeful loud, boisterous, and uncooperative conduct" makes it "more difficult" for law enforcement to gain control of a situation.  *State v. Florence*, 2014-Ohio-2337, 2014 WL 2526069, at *3 (Ohio Ct. App. 12th Dist. 2014). Similarly, other courts have found that if "loud and boisterous speech" makes it impossible to investigate a complaint, this can constitute an affirmative act.  *City of Warren v. Lucas*, 2000 Ohio App. LEXIS 2146, 2000 WL 655446, *2-3 (Ohio Ct. App. 11th Dist 2000). The Sixth Circuit, in interpreting Ohio law, has found that a reasonable officer could find an affirmative act where an individual engages in "profanity-laced yelling and finger pointing," "disruptive" speech, and refuses to provide

information.  *Lyons*, 417 F.3d at 574-575. On the other hand, other courts have found that an individual's "loud and boisterous speech" to a police officer was not an "act" under the statute.  *State v. Smith*, 108 Ohio App. 3d 663, 671 N.E.2d 594, 596-598 (Ohio Ct. App. 4th Dist 1996).  *See also Stayton*, 126 Ohio App.3d at 164 ("a citizen's verbal assault on a police officer does not, standing alone, constitute criminal conduct.").

*Dudas v. Engel*, No. 1:19 CV 2565, 2021 U.S. Dist. LEXIS 94753, at *32–33 (N.D. Ohio May 17, 2021).  The *Dudas* court found that, although there was not probable cause for obstruction of official business, a reasonable officer would not have known that there was a lack of probable cause given the lack of clearly established law.  *See id.* at *33–34.

The Court adopts the analysis and approach of the above courts and similarly finds that the contours of the "affirmative act" requirement for obstructing official business under Ohio law are unclear.  As another example, the Court notes that some courts have held there was sufficient probable cause for obstructing official business where a bystander/third-party to a police investigation was persistently loud and argumentative with officers and questioned their authority, which forced the officers to interact and deal with that party.  *See, e.g.*, *State v. Brown*, 2025-Ohio-1391, ¶ 23–24 (Ohio Ct. App. 2025); *Halasah v. City of Kirtland*, 574 F. App'x 624, 630–31 (6th Cir. 2014).  Plaintiff has been unable to identify any cases that substantially correspond to the circumstances of this case, such that Wolf and Lewis would have clearly understood their actions were prohibited.  *See Hughes*, 93 F.3d at 241.  As discussed above, "[g]iven its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in the precise situation encountered."  *Beck v. Hamblen Cnty.*, 969 F.3d 592, 599 (6th Cir. 2020) (citation and internal quotation marks omitted).  "So 'a body of relevant case law' addressing similar facts 'is usually necessary' to show a violation of a clearly established rule in the probable-cause context."  *Id.* (quoting *Wesby*, 583 U.S. at 64).

Plaintiff fails to cite to any cases where a bystander approached an investigation/traffic stop, initially spoke to an officer in an angry tone (whether justified or reasonable), and then engaged in a heated discussion with police officers while the traffic stop was still in process, while also refusing to identify themselves (whether they had the right to deny such a request or not). Plaintiff cites *Jones v. City of Elyria*, 947 F.3d 905 (6th Cir. 2020), *Patrizi v. Huff*, 690 F.3d 459 (6th Cir. 2012), *Pullin v. City of Canton*, 133 F. Supp. 2d 1045 (N.D. Ohio 2001), and *Burr v. Perkins*, No. 2:04-cv-786, 2006 U.S. Dist. LEXIS 52442 (S.D. Ohio July 31, 2006). (ECF No. 62, PageID #2214 & n.11). But these cases do not involve an angry initial encounter with officers or continued heated discussions during an active traffic stop involving a suspected outstanding warrant for a felony. *See Jones*, 947 F.3d at 910–11, 915 (holding no probable cause for obstructing official business when the plaintiff, at most, refused to submit to a pat down—with no argument or drawn out interaction with officers); *Patrizi*, 690 F.3d at 465 (involving a plaintiff asking an officer "questions in a calm and measured manner" who "did not continuously interrupt so that the officer could not speak to the subjects of his investigations"); *Pullen*, 133 F. Supp. 2d at 1052 (involving a plaintiff who provided evidence that "she had come upon the scene only to see if she should contact" the investigation subject's family and she began to leave as soon as she was asked to by officers); *Burr*, 2006 U.S. Dist. LEXIS 52442, at *14–19 (denying qualified immunity when there was an issue of material fact as to whether the plaintiff simply interrupted the questioning of a suspect and then immediately attempted to back up).

Accordingly, the Court finds that a reasonable officer would not have known that they lacked probable cause to arrest Plaintiff for obstructing official business. The Court finds that Wolf and Lewis operated under the reasonable but mistaken belief that there was probable cause. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

21

law." *Ashcroft*, 563 U.S. at 743. There is insufficient evidence to demonstrate that either Wolf or Lewis was plainly incompetent or knowingly violated Plaintiff's Fourth Amendment right to be free from arrest without probable cause. Thus, Wolf and Lewis are entitled to qualified immunity as to Plaintiff's claims of unlawful detainment and false arrest under Count I. The Court **GRANTS** summary judgment in favor of Wolf and Lewis as to Plaintiff's claims for unlawful detainment and false arrest under Count I.

> 2.      *Excessive Force*

In Count I, Plaintiff alleges that Wolf violated the Fourth Amendment by using excessive force to arrest Plaintiff, and Lewis is also liable for that use of force because she failed to intervene. (ECF No. 1, PageID #11, ¶¶ 67–68). The complaint alleges that Wolf "injured Plaintiff's shoulder when he pulled Plaintiff's arm behind his back" and used excessive force when handcuffing Plaintiff. (*Id.* at PageID #6–7, ¶¶ 41–42).

The Fourth Amendment guarantees the right of individuals to be free from excessive force during an arrest. *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). While the Supreme Court has long recognized that a police officer's right to make an arrest includes a companion right to use some force to effect it, an officer's use of force must be objectively reasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396 (quoting *Scott v. United States*, 436 U.S. 128, 137–39, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). This inquiry accounts for the tense, uncertain, and rapidly evolving circumstances in which police officers are often forced to make split-second judgments about the appropriate amount of force to use. *Graham*, 490 U.S. at 396–97. To determine whether an officer's use of force was objectively

22

reasonable, courts should "pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" S*olomon v. Auburn Hills Police Dep't,* 389 F.3d 167, 174 (6th Cir. 2004) (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). Courts evaluate reasonableness from the perspective of an objective officer on the scene. *Dunigan v. Noble*, 390 F.3d 489, 493 (6th Cir. 2004); *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (providing that courts, when making the objectiveness determination, should consider the "facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight").

The Sixth Circuit has also adopted a "segmented analysis" approach to analyzing whether an officer's specific actions within an encounter were unreasonable. *See Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996); *Greathouse v. Couch*, 433 F. App'x 370, 372 (6th Cir. 2011); *see Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (segmenting whether it was reasonable for the officer to (1) draw his gun; and (2) not return his gun to his holster); *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001) (analyzing separately whether officers violated the knock-and-announce rule and whether officers used deadly force against the plaintiff). This segmented approach applies "even to encounters lasting very short periods of time." *Greathouse*, 433 F. App'x at 372.

Plaintiff's opposition focuses on the following actions to support his claim of excessive force: (i) Wolf grabbing and twisting his arm while handcuffing Plaintiff; (ii) the placement/tightness of the handcuffs; and (iii) Wolf slamming the car door onto his right shoulder. (*See* ECF No. 68, PageID #2312, 2327–29). The Court will separate these separate actions into different segments and address them in turn.

23

a.	Grabbing and Twisting of Plaintiff's Arm

Plaintiff argues that Wolf "exerted significant force" upon him when he was placed in handcuffs, citing his statement to Wolf "you going to break my wrists?" and his deposition testimony that Wolf was "twisting" on him.  (ECF No. 68, PageID #2327 (citing ECF No. 59, Ex. 11, at 06:09-06:11; ECF No. 54, PageID #1304)).  Lewis and Wolf both argue that the video evidence demonstrates that Plaintiff was handcuffed in an appropriate manner, there was no force used during the handcuffing, there was no struggle, and Plaintiff never complained of shoulder pain while being placed in the handcuffs.  (ECF No. 61, PageID #2177; ECF No. 63, PageID #2242–43).  They also point out that Wolf immediately loosened Plaintiff's handcuffs when he complained and there is no evidence of "gratuitous violence."  (ECF No. 61, PageID #2398; ECF No. 72, PageID #2431).

Having reviewed the record evidence, the Court finds that Wolf did not use unreasonable force on Plaintiff's arm when he initially handcuffed Plaintiff.  Even when someone is passively resisting arrest, which Plaintiff was arguably doing, an officer is still entitled to use some force to carry out the arrest, so long as that force is not "gratuitous."  *See Chaney-Snell v. Young*, 98 F.4th 699, 715 (6th Cir. 2024) (collecting cases); *Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). *Gambrel v. Knox Cnty.*, 25 F.4th 391, 402 (6th Cir. 2022).  Under Sixth Circuit precedent, an officer is permitted to grab a person's arm to effectuate an arrest. *See Collazo v. Otsego Cnty.*, No. 1:23-cv-11849, 2025 LX 303688, at *32 (E.D. Mich. Sep. 8, 2025) (collecting cases).  The question here is whether Wolf used excessive or gratuitous force in grabbing Plaintiff's arms and placing them behind his back.

24

Plaintiff describes Wolf's actions in grabbing his arm and initially applying the handcuffs as "cranking,' "twisting," and "yanking." (ECF No. 68, PageID #2312, 2327–28). But the video evidence contradicts Plaintiff's characterization. The footage clearly shows that Wolf grabs Plaintiff's arms and places them behind his back with little to minimal force or resistance, and there is no indication that Wolf "vigorously yanked" or violently twisted Plaintiff's arms in any manner. (ECF No. 59, Ex. 11, at 06:02-6:21; *id.* Ex. 12, at 03:32-04:59). The video evidence demonstrates that hardly any force was used, let alone a gratuitous amount. Around when Plaintiff asks, "you going to break my wrists?" Wolf responds by loosening the handcuffs and Plaintiff keeps twisting around to argue with Wolf while the handcuffs are being secured. (ECF No. 59, Ex. 11, at 05:45-07:09; *id.* Ex. 12, at 3:53-04:18). During this encounter, there is no evidence of yanking or twisting and Plaintiff does not complain about shoulder pain or inform the officers that he is being hurt or injured.

To establish excessive force, Plaintiff puts forward a sworn declaration from Jennifer Knight, an attorney who was formerly in law enforcement, to establish excessive force. (ECF No. 68, PageID #2327, (citing ECF No. 68-2)). The Court finds the evidence unavailing. First, to the extent Ms. Knight states her conclusion that Wolf used unreasonable and excessive force while arresting Plaintiff, this is a legal conclusion that is properly excluded under Sixth Circuit precedent. *See Hubbard v. Gross*, 199 F. App'x 433, 442–43 (6th Cir. 2006) ("Because testimony about whether the officers used reasonable force is a legal conclusion and may confuse the trier of fact, the district court is within its sound discretion to exclude it."); *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006) (holding that the district court did not err in ignoring an expert's legal conclusions on objective reasonableness); *Norman v. City of Lorain*, No. 1:04 CV 913, 2006 U.S. Dist. LEXIS 97840, at *6–8 (N.D. Ohio Nov. 27, 2006) (excluding expert

25

testimony that expressed legal conclusions on whether an officer's use of force was necessary or unreasonable while handcuffing a plaintiff); *United States v. Hanshaw*, No. 1:14-cr-120, 2015 LX 82330, at \*16–18 (S.D. Ohio Sep. 9, 2015) (same).  Second, in the context of grabbing Plaintiff's arms, Ms. Knight's declaration fails to provide much insight into whether the pulling of the arm was excessive (mainly focusing on issues with handcuffing a person of Plaintiff's build behind his back and with single cuffs).

Regardless, based on the video evidence, the Court rejects Ms. Knight's speculation as to whether Wolf used unreasonable force in pulling Plaintiff's arm behind his back.  Considering the uncontroverted video evidence, the Court finds that Wolf did not use excessive force when grabbing and placing Plaintiff's arms behind his back to initially handcuff him.  There is no genuine issue of material fact as to this allegation.

b.        The Tightness and Placement of the Handcuffs

The Sixth Circuit has "articulated a three-part test for ascertaining whether 'unduly tight or excessively forceful handcuffing' constitutes excessive force." *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021) (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).  "At the summary-judgment stage, a plaintiff must create a genuine dispute of material fact that '(1) [they] complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced "some physical injury" resulting from the handcuffing.'" *Id.* (quoting *Morrison*, 585 F.3d at 401) (alteration in original).

Plaintiff cannot sustain a claim for excessive force related to the placement and tightness of the handcuffs.  There is no genuine dispute of material fact that when Plaintiff complained about the handcuffs and his shoulder, the officers did not ignore his complaints, and they immediately took actions to alleviate Plaintiff's discomfort.  As discussed in the previous section, when Plaintiff

26

commented about his "wrist being broken," Wolf immediately loosened the handcuffs.  Plaintiff made no further comments of pain or discomfort to Wolf.  When Plaintiff was in the back seat of Lewis's police cruiser, for the first time he made remarks concerning his having suffered a possible injury, stating that he might need an ambulance and his arm had "popped out."  (ECF No. 59, Ex. 11, at 13:03-13:08).  Lewis immediately called for an ambulance and relayed Plaintiff's statements about his arm.  (*Id.* at 13:09-13:19).  Shortly thereafter, Officer Torres asked Plaintiff about his arm and took the handcuffs off and re-applied them in front of Plaintiff's body in response to Plaintiff's statement about the pain in his right shoulder.  (ECF No. 59, Ex. 13, at 04:05-05:33; ECF No. 56, PageID #1672–77; ECF No. 51-21).

Ms. Knight opines that Wolf should have cuffed Plaintiff using two pairs of handcuffs or in the front based on Plaintiff's large size and inflexibility because that would be consistent with Ohio Peace Officer Training Academy training, as well as national and state police practice standards.  (ECF No. 68-2, PageID #2372–73).  This does not create an issue of material fact as to whether Wolf used excessive or gratuitous force.  There is no evidence that significant force was used: the video of the encounter demonstrates that minimal force was used, and that officers reacted to Plaintiff's complaints of pain in a timely manner.  Moreover, even if the Court accepted that Wolf deviated from standard practice by failing to cuff Plaintiff in the front or using two handcuffs, Wolf would ultimately be entitled to qualified immunity.  Plaintiff has not identified any caselaw establishing that the failure to cuff a larger or inflexible individual[6] using two handcuffs or in the front is excessive force in violation of the Fourth Amendment.

Nor has the Court found any such cases.  Caselaw establishes that there is a triable issue of fact concerning excessive force when an officer refused to handcuff an individual in the front after

---

[6] There is also little to no evidence provided to establish that Wolf knew or should have known that Plaintiff qualified as a larger or inflexible individual who should be handcuffed only in the front or with two handcuffs.

27

the officer was aware, or had reason to know, of an injury, deformity, or medical condition that would be exacerbated by cuffing the individual behind the back (with that awareness established either through the pleas of the plaintiff or an obvious, noticeable condition).  *See, e.g.*, *Crooks v. Hamilton Cnty., Ohio*, 458 F. App'x 548, 549–50 (6th Cir. 2012) (holding that there was a triable issue of fact on excessive force when the defendant officer handcuffed the plaintiff behind the back despite the plaintiff posing no threat and her having "asked to be handcuffed in front instead of behind the back because of her medical condition"); *Walton v. City of Southfield*, 995 F.2d 1331, 1334, 1341–42 (6th Cir. 1993) (affirming the denial of qualified immunity when the defendant officer handcuffed the plaintiff behind the back despite her pleas of an injured shoulder); *Ferguson v. Hall*, 33 F. Supp. 2d 608, 612–13 (E.D. Mich. Jan. 28, 1999) (denying qualified immunity when the defendant officer forcefully handcuffed the plaintiff behind his back despite the plaintiff showing the officer his "deformed" arm and asking to be handcuffed in the front of his body); *see also Littrell v. Franklin*, 388 F.3d 578, 581, 585 (8th Cir. 2004) (finding an issue of triable fact when a plaintiff reported extreme pain in her arm, which had been broken by the officer during the arrest, and the defendant officer continued to handcuff her and force her into the car); *Howard v. Dickerson*, 34 F.3d 978, 979 (10th Cir. 1994) (finding a viable claim for deliberate indifference to medical needs when the plaintiff was wearing a neck brace, told the officer that she had recently undergone surgery, and asked for handcuffing in front to prevent injury).

These circumstances are absent from this case.  Plaintiff did not inform Wolf or Lewis that he had any injury or medical condition, and there was no obvious injury or deformity that would have made it obvious to the officers handcuffing Plaintiff behind his back would clearly be excessive force.  Caselaw regarding the use of excessive force against handcuffed individuals provides a "throughline" that there is a Fourth Amendment violation when officers use "violent

28

force" against such individuals. *See Franke v. Janes*, No. 25-5105, 2026 LX 35333, at \*25–26 (6th Cir. Mar. 2, 2026). Once again, there is no evidence of such violent force. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Wolf used excessive force when handcuffing Plaintiff behind his back. The evidence before the Court clearly establishes that he did not.

c.      The Door Being Closed on the Shoulder

Notably, Plaintiff's complaint and his motion for summary judgment make no mention or allegation of Wolf slamming the car door on Plaintiff's shoulder. The first mention is in Plaintiff's opposition, where he cites his own deposition in which he states that Wolf slammed the door on him and it collided with his right shoulder. (ECF No. 68, PageID #2312 (citing ECF No. 54, PageID #1362–63)). The video evidence shows that Wolf places Plaintiff in the backseat of Lewis's vehicle, instructs him to go all the way in when Plaintiff's legs and head are outside the door frame, and then closes the door once Plaintiff has moved his legs inside the door frame and he appears to be completely inside the vehicle. (ECF No. 59, Ex. 11, at 07:03-07:10); *id.* Ex. 12, at 04:54-04:59). While Wolf uses some force to close the door, it can hardly be characterized as "slamming" or using gratuitous force. Moreover, nothing in the footage indicates that Plaintiff's right shoulder had not cleared the door frame or that Wolf had closed the door with the intention of striking Plaintiff. In fact, Wolf's actions in telling Plaintiff to get all the way into the car indicate that he had no such intention.

Plaintiff testifying that the door hit his shoulder, and Plaintiff's shoulder ultimately suffering an injury after the encounter with the officers, does not address whether the force used by Wolf to close the door was unreasonable. Simply put, there is no evidence that Wolf exercised more force than necessary to close the door and secure Plaintiff in the back of Lewis's vehicle; as

29

such, there is insufficient evidence for a jury to conclude that Wolf applied unreasonable and excessive force when closing the door. Accordingly, Wolf is **GRANTED** summary judgment on Plaintiff's excessive force claim in Count I. Because this claim against Wolf fails as a matter of law, and Plaintiff asserts a related claim against Lewis based on the theory of failure to intervene, Lewis is also **GRANTED** summary judgment as to the excessive force claim in Count I.

### 3. *Monell Liability*

The complaint alleges that Cleveland Heights is liable under *Monell* based on: (i) officials with final decision-making authority ratifying the alleged illegal actions; (ii) inadequate training or supervision; and (iii) a custom of tolerance or acquiescence of federal rights violations. (ECF No. 1, PageID #12, ¶ 71). Cleveland Heights first argues that Plaintiff's *Monell* claims fail as a matter of law because there was no underlying constitutional harm. (ECF No. 61, PageID #2178). To be liable under *Monell*, a plaintiff must prove that a municipality had a "policy or custom" that caused a violation of his rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). To establish such a policy or custom, a plaintiff may demonstrate any of the following: (1) the existence of an illegal policy; (2) an official with final decision-making authority ratified illegal actions; (3) a policy of improper training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Id.* Here, Plaintiff argues for *Monell* liability under the second, third, and fourth prongs.

Importantly, "there can be no liability under *Monell* without an underlying constitutional violation." *Martinez v. Wayne Cnty., Michigan*, 142 F.4th 828, 844 (6th Cir. 2025). A municipality's conduct must be the "moving force or direct causal link in the constitutional deprivation." *Id.* at 843–44 (cleaned up). More specifically, the Sixth Circuit clarified that:

> . . . when the complaint alleges municipal liability based on a policy of inaction or
> a failure to train, "[t]he absence of a clearly established right spells the end of

> th[e] *Monell* claim." That's because a policy of inaction relies on the municipality's deliberate indifference. And 'a municipality cannot deliberately shirk a constitutional duty unless that duty is clear.' Likewise, a failure to train theory requires it be obvious (i.e., clearly established) that the conduct violates a constitutional right. So both theories rely on a clearly established constitutional violation.

*Id.* at 844 (citations omitted) (alteration in original).  Because the Court has granted the individual defendants qualified immunity, in part, because there was no violation of a clearly established right, Plaintiff's *Monell* claims against Cleveland Heights fail as a matter of law.  Thus, the Court **GRANTS** Cleveland Heights summary judgment in its favor on the claims asserted against it in Count I.

### B.  First Amendment Retaliation Claim – Count II

In Count II, Plaintiff alleges that Wolf and Lewis violated his First Amendment rights because he was engaging in protected speech and they retaliated against him for that protected speech by detaining, arresting, and charging him without probable cause.  (ECF No. 1, PageID #12–13, ¶¶ 74–78).  He further alleges that Lewis is liable under a failure to intervene theory and Cleveland Heights is liable under *Monell*.  (*Id.* at PageID #13–14, ¶¶ 79, 82).

"To succeed on a First Amendment claim of retaliation, a plaintiff must establish three elements: (1) he engaged in the protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the protected conduct." *Harris v. Sowers*, No. 22-4060, 2024 U.S. App. LEXIS 2772, at *6 (6th Cir. Feb. 6, 2024) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).  Under current Sixth Circuit precedent, a First Amendment retaliatory arrest claim fails upon a showing of probable cause.  *See Hartman v. Thompson*, 931 F.3d 471, 484–85 (6th Cir. 2019) (citing *Nieves v. Bartlett*, 587 U.S. 391, 397–98, 402, 139 S. Ct. 1715, 204 L. Ed. 2d 1 (2019)); *see also Germany v. Watkins*, No. 23-1812, 2024

31

U.S. App. LEXIS 11281, at *10 (6th Cir. May 8, 2024) ("The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." (quoting *Nieves*, 587 U.S. at 402) (quotation marks omitted)).  "The Supreme Court has recognized a 'narrow qualification' to this rule 'for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so.'" *DeCastro v. Wagner*, No. 23-3808, 2024 U.S. App. LEXIS 15425, at *10 (6th Cir. June 25, 2024) (quoting *Nieves*, 587 U.S. at 406).

Plaintiff argues that he is entitled to summary judgment on his First Amendment retaliation claims against Wolf and Lewis because the undisputed facts sufficiently establish all three elements: (i) protected conduct (telling the officers they were violating his rights, recording the interaction with his phone, and threatening to file a complaint); (ii) adverse action (detaining, arresting, threatening to arrest, and charging Plaintiff); and (iii) causation (lack of probable cause and temporal proximity).  (ECF No. 62, PageID #2218–21).  Defendants first argue that Plaintiff's First Amendment claims fail as a matter of law because there was probable cause to arrest Plaintiff for obstructing official business, which is not protected conduct under the First Amendment.  (ECF No. 61, PageID #2175–76; ECF No. 63, PageID #2243–45).  As discussed above, there was no probable cause to arrest Plaintiff for obstructing official business; thus, the Court will turn to Defendants' alternative arguments.

Alternatively, Wolf and Lewis both argue that they are entitled to qualified immunity on Plaintiff's First Amendment retaliation claims.  (ECF No. 61, PageID #2166–68; ECF No. 63, PageID #2245–46, 2250–51).  As discussed above, Wolf and Lewis are entitled to qualified immunity because of their reasonable but mistaken belief that there was probable cause to arrest Plaintiff for obstructing official business.  Thus, Wolf and Lewis are **GRANTED** summary judgment in their favor as to Count II.  For the reasons discussed above, because the individual

32

defendants are entitled to qualified immunity, Plaintiff cannot sustain his claim against Cleveland Heights based on *Monell* liability.  Thus, Cleveland Heights is **GRANTED** summary judgment in its favor as to Count II.

### C.       State Law Claims (Counts III through VI)

#### 1.       *Ohio Statutory Immunity – Ohio Rev Code § 2744.03*

With respect to Plaintiff's state-law claims against the individual defendants, Lewis and Wolf argue that they are entitled to statutory immunity pursuant to Ohio Rev. Code § 2744.03(A)(6).  (ECF No. 61, PageID #2184–85; ECF No. 63, PageID #2251–54).  Under Ohio law, officers enjoy immunity from tort liability unless their acts or omission were: (i) "manifestly outside the scope of the employee's employment or official responsibilities"; or (ii) "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code §§ 2744.03(A)(6)(a)–(b).  Ohio statutory immunity does not rise or fall with a grant or denial of qualified immunity because it is a separate and distinct concept of immunity from federal qualified immunity; importantly, it does not require any analysis of whether a defendant violated clearly established law.  *Redrick v. City of Akron*, No. 21-3027, 2021 U.S. App. LEXIS 33892, at *17–19 (6th Cir. Nov. 15, 2021); *Abdur-Rahim v. City of Columbus*, 825 F. App'x 284, 288 (6th Cir. 2020); *see also Wilson v. Gregory*, 3 F.4th 844, 860–61 (6th Cir. 2021) ("[I]n this case, our federal qualified immunity analysis turns on the 'clearly established' prong.  As a result, 'the availability of both federal qualified immunity and state law immunity' does not entirely 'depend[] on the correctness of the district court's finding of the existence of the very same questions of fact'

33

because Ohio statutory immunity does not turn on whether a particular right was clearly established." (citations omitted)(alteration in original)).

The parties do not dispute that Wolf's and Lewis's actions were within the scope of their official responsibilities. The parties contest whether there is sufficient evidence to demonstrate that Wolf and Lewis acted with malicious purpose, in bad faith, or in a wanton or reckless manner. (ECF No. 62, PageID #2224–25; ECF No. 68, PageID #2344–46). The Court will address whether either Lewis or Wolf are entitled to Ohio statutory immunity separately.

a.      Defendant Lewis

Ohio courts define wanton misconduct as the "failure to exercise any care whatsoever." *Fabrey v. McDonald Vill. Police Dep't.*, 1994-Ohio-368, 70 Ohio St. 3d 351, 639 N.E.2d 31, 35 (Ohio 1994). Conduct recklessly disregards the safety of others "if such risk is substantially greater than that which is necessary to make his conduct negligent." *Id.* "[I]n the context of R.C. 2744.03(A)(6)(b), recklessness is a perverse disregard of a known risk." *O'Toole v. Denihan*, 2008-Ohio-2574, 118 Ohio St. 3d 374, 889 N.E.2d 505, 517 (Ohio 2008). As such, both wanton and reckless misconduct require that the actor must be conscious/aware that his or her conduct will most likely result in injury. *See Anderson v. Massillon*, 2012-Ohio-5711, 134 Ohio St. 3d. 380, 983 N.E.2d 266, 273 (Ohio 2012).

Ohio defines "malicious purpose" as "the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct that is unlawful or unjustified." *Caruso v. State*, 136 Ohio App. 3d 616, 737 N.E.2d 563, 567 (Ohio Ct. App. 2000). "Ohio law defines bad faith, as relevant to § 2744.03(A)(6)(b), as a 'dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another.'" *Frenchko v. Monroe*, 160 F.4th 784,

34

805 (6th Cir. 2025) (quoting *Rural Bldg. of Cincinnati, LLC v. Mercer*, 2017-Ohio-7226, 96 N.E.3d 882, 888 (Ohio Ct. App. 2017)).

Plaintiff's arguments seemingly focus on establishing that Wolf's and Lewis's conduct was sufficient to establish either malice or recklessness.  (ECF No. 68, PageID #2345; ECF No. 71, PageID #2424–25).  Lewis argues in her motion for summary judgment that "there are simply no facts in the record which rise to the level of a consciousness or indifference on the part of Lewis that her conduct would 'in all likelihood' result in injury to Kern."  (ECF No. 61, PageID #2185).  Lewis's opposition and reply solely argue that she is entitled to statutory immunity because there was probable cause to arrest Plaintiff for obstructing official business.  (ECF No. 67, PageID #2289; ECF No. 71, PageID #2402–03).  As discussed above, the Court has found a lack of probable cause.  Plaintiff argues that "malice may be inferred from proof of lack of probable cause." (ECF No. 68, PageID #2346).  While a lack of probable cause allows one to draw the legal inference of malicious purpose in the context of claims for malicious prosecution under Ohio law, *see Wright v. City of Euclid*, 962 F.3d 852, 879 (6th Cir. 2020) (citing *Melanowski v. Judy*, 102 Ohio St. 153, 131 N.E. 360, 361, 19 Ohio L. Rep. 6 (Ohio 1921)), this inference must still be supported by sufficient facts to create an issue of material fact.  In this instance, the Court finds there are insufficient facts to establish that Lewis acted maliciously or recklessly with relation to the arrest of Plaintiff.

While the Court determined that there was no probable cause, it also found that Officer Lewis could have reasonably but mistakenly concluded that there was probable cause.  In this case, the lack of probable cause is not enough, by itself, to preclude statutory immunity.  Showing sufficient recklessness and malice to preclude statutory immunity under § 2744.03 presents a high bar and standard.  *See Fabrey v. McDonald Vill. Police Dep't*, 70 Ohio St.3d 351, 356, 1994 Ohio

35

368, 639 N.E.2d 31 (Ohio 1994); *Rankin v. Cuyahoga Cnty. Dep't of Child. & Family Servs.*, 2008-Ohio-2567, 118 Ohio St. 3d 392, 889 N.E.2d 521, 527 (Ohio 2008).  The question the Court must ask itself is "whether, based on the evidence in the record, reasonable minds could conclude that any of the officers acted 'with malicious purpose, in bad faith, or in a wanton or reckless manner' so as to preclude immunity." *Argabrite v. Neer*, 2016-Ohio-8374, 149 Ohio St. 3d 349, 75 N.E.3d 161, 166 (Ohio 2016) (quoting Ohio Rev. Code § 2744.03(A)(6)(b)).  The exception to immunity under § 2744.03(A)(6)(b) employs "rigorous standards that will in most circumstances be difficult to establish[.]" *Id.*

Plaintiff has cited no evidence from which a reasonable juror could conclude that Lewis acted with ill will, enmity, intentional wrongdoing, ulterior motive, a complete failure to exercise any care, or the conscious disregard or indifference to a known or obvious harm.  Plaintiff's opposition points to Lewis and Wolf inventing charges, Lewis acknowledging that the prosecutor would drop the charges, and Lewis and Wolf engaging in "after the fact excuse-making," including meeting up at a parking lot immediately after the arrest incident.  (ECF No. 68, PageID #2345).  But the record evidence belies Plaintiff's assertions as to Lewis.  First, there is no evidence that Lewis was attempting to invent charges against Plaintiff.  In fact, the record demonstrates that Lewis: (i) was resistant to arresting Plaintiff, pushing back on arresting him for failure to yield and obstructing official business; (ii) continually apologized and was empathetic towards Plaintiff;  and (iii) was following the instructions of her superior officer (Wolf) in writing the citation for Plaintiff for obstructing official business.  Second, Lewis did not acknowledge that the prosecutor would drop the charges.  In response to Wolf challenging the legality of his arrest, Lewis disagreed and stated why he was being arrested.  Wolf kept insisting it was illegal, and Lewis simply stated that the prosecutor was "really good" and "would work through it."  (ECF No. 59, Ex. 11, at

36

10:22-12:08).  It is pure speculation to view this statement as Lewis admitting that the arrest was illegal.

Finally, nothing in the record demonstrates that Lewis took any efforts after the arrest to fabricate excuses.  While there is evidence that Lewis and Wolf met at the parking lot of the Park Synagogue after the arrest, (ECF No. 60-1, PageID #1856–57, 1860), there is no evidence as to what was discussed and Lewis's testimony and statements about the incident at the time and after remained consistent.  There is no other evidence presented, other than speculation, that Lewis *knew* there was no probable cause to arrest Plaintiff for obstructing official business and then she later fabricated excuses for probable cause to cover her malicious intent or reckless behavior.  In light of the record, the Court finds that no reasonable juror could conclude that Lewis acted with malicious intent, in bad faith, or in a wanton or reckless manner.  Lewis is therefore entitled to statutory immunity under Ohio Rev Code. § 2744.03(A)(6).  Accordingly, the Court **GRANTS** Lewis summary judgment in her favor on the state-law claims asserted against her in Counts IV, V, and VI.

b.      Defendant Wolf

For Wolf, Plaintiff points to the following evidence to demonstrate that Wolf acted with recklessness or malice:

> (i) Sgt. Wolf and Ofcr. Lewis' invention of charges to cover up an illegal arrest without probable cause; (ii) an arrest perpetrated by Sgt. Wolf out of anger (and perhaps racial animus), after Mr. Kern declined to comply with an illegal demand to identify himself (which ultimately resulted in significant injury); (iii) Sgt. Wolf and Ofcr. Lewis conferring about releasing him immediately thereafter but Sgt. Wolf saying that he could not because Mr. Kern already was in handcuffs (and the reasonable inference is that Sgt. Wolf knew the arrest and his actions were illegal but it was additional effort to cover up); . . . and (v) the significant efforts by Sgt. Wolf and Ofcr. Lewis to engage in after the fact excuse-making (extending to their absurd testimony and argument in their pleadings about a "one second" delay, without any evidence of intent, being obstruction), all of which started at the scene of the incident and included an effort to fabricate evidence when they immediately

37

met up to discuss things in the parking lot of a synagogue rather than proceed to the station.

(ECF No. 68, PageID #2345).  Wolf's opposition argues that the fact Plaintiff committed obstruction of official business negates any argument of malice or bad faith and Plaintiff cannot demonstrate "Wolf acted with malicious purpose, bad faith, or wanton or reckless behavior in detaining and arresting Plaintiff." (ECF No. 66, PageID #2279).  Because the Court already found a lack of probable cause, Wolf's first argument falls short.  Thus, the Court must determine if there is an issue of material fact as to whether Wolf acted maliciously or recklessly in arresting Plaintiff.

As discussed in the prior section, there is no evidence as to what was discussed between Wolf and Lewis in the Park Synagogue parking lot immediately after the incident.  But unlike with Lewis, there is additional evidence suggesting that Wolf was attempting to offer post-hoc rationalizations for the arrest, with Wolf reportedly following Lewis around the station to explain why he arrested Plaintiff.  (ECF No. 51-23, PageID #574).  In contrast with Lewis, who stated she was willing to release Plaintiff without charges, Wolf insisted on charging Plaintiff while stating, in part, that Plaintiff cannot be released because he was already in handcuffs, Plaintiff obstructed by refusing to identify himself, and he was not going to argue with someone for an "hour" about the matter.  (ECF No. 59, Ex. 11, at 07:41-10:03).

In his deposition, Wolf admits that in an interview with internal affairs, he stated that he "jumped the gun" in arresting Plaintiff because he did not de-escalate the situation or determine all the facts before the arrest.  (ECF No. 60-1, PageID #2040–41).  A detective assigned to internally investigate the incident with Plaintiff found that Wolf: (i) stated that he did not know the totality of circumstances of Lewis's encounter with Plaintiff; (ii) stated that he assumed interference with the traffic stop and did not ask Lewis what was going on; and (iii) "was not truthful about his conversations with Officer Lewis, and the A-Platoon supervisors."  (ECF

No. 51-23, PageID #574).  The record is replete with admissions by Wolf that he acted without first investigating the situation or attempting to de-escalate.  Wolf was also disciplined by the Cleveland Heights Police Department as a result of his actions during Plaintiff's arrest for violations of seven different policies.  (ECF No. 51-25).  Wolf also has prior incidents of being disciplined for failing to thoroughly investigate crimes, including one incident involving Wolf threatening an obstruction charge.  (ECF No. 60-1, PageID #1965–1970; ECF Nos. 51-8, 51-9; ECF No. 55, PageID #1551–55).

The Ohio Supreme Court has held that whether an officer acted maliciously or recklessly with relation to immunity under § 2744.03 is generally a question for the jury to decide. *Schoenfield v. Navarre*, 2005-Ohio-6407, 164 Ohio App. 3d 571, 843 N.E.2d 234, 239 (Ohio Ct. App. 2005) (citing *Fabrey*, 70 Ohio St. 3d at 356); *Stevenson v. Prettyman*, 2011-Ohio-718, 193 Ohio App. 3d 234, 951 N.E.2d 794, 801 (Ohio Ct. App. 2011).  Given the above evidence, and when viewed in the light most favorable to Plaintiff, the Court finds a reasonable juror could conclude that Wolf acted with a perverse disregard to a known risk of violating Plaintiff's rights.  Thus, there is an issue of material fact as to whether Wolf acted maliciously or in a reckless manner when he arrested Plaintiff for obstruction of official business.  Accordingly, the Court **DENIES** Wolf's request to dismiss the state-law claims against him on the basis of statutory immunity under Ohio Rev. Code § 2744.

### 2. *Count III – Assault and Battery*

In Count III, Plaintiff alleges that Wolf is liable for assault and battery under Ohio law because he placed Plaintiff in apprehension of contact, grabbed Plaintiff and twisted his arm behind his back, and did so without privilege and using excessive force.  (ECF No. 1, PageID #15–16, ¶¶ 85–90).  Plaintiff argues that he is entitled to summary judgment on these claims because Wolf

acted without lawful authority when he arrested Plaintiff.  (ECF No. 62, PageID #2222–23; ECF No. 68, PageID #2342–43).  Wolf counters that he is entitled to summary judgment in his favor on Count III because he is entitled to Ohio statutory immunity.  (ECF No. 63, PageID #2251–54; ECF No. 66, PageID #2278–79).  Because the Court has found that there is a jury question as to whether Wolf acted with malice, in bad faith, or in a wanton or reckless manner, which would resolve the issue of statutory immunity, the Court cannot grant summary judgment in favor of Plaintiff or in favor of Wolf on the basis of statutory immunity.

Wolf separately argues that Plaintiff's claims fail as a matter of law, even if he is not entitled to statutory immunity, because there was probable cause to arrest Plaintiff, the only force used was placing Plaintiff in handcuffs, and the use of handcuffs alone is not excessive force. (ECF No. 63, PageID #2255).  To sustain a claim for assault and battery under Ohio law, a plaintiff must demonstrate: "(1) that the officers acted with an intent to cause harmful or offensive contact and (2) that such contact occurred (that's battery) or that he *thought* that such contact would occur (that's assault)."  *Howse v. Hodous*, 953 F.3d 402, 410 (6th Cir. 2020) (citing *Love v. City of Port Clinton*, 37 Ohio St. 3d 98, 524 N.E.2d 166, 167 (Ohio 1988); *Smith v. John Deere Co.*, 83 Ohio App. 3d 398, 614 N.E.2d 1148, 1154 (Ohio Ct. App. 1993)) (emphasis in original).  The Ohio Supreme Court has held that a police officer "subduing" and "handcuffing" a person constitute "acts of intentional contact which, unless privileged, constitute a battery."  *Love*, 37 Ohio St. 3d at 99.  Police officers are privileged to make *lawful* arrests, and therefore lose such privilege when arresting a person without probable cause.  *See Alley v. Bettencourt*, 134 Ohio App. 3d 303, 313, 730 N.E.2d 1067 (1999); *Williams v. Crosby*, 43 F. Supp. 3d 794, 806 (N.D. Ohio 2014) ("Because the Complaint adequately alleges [an arrest] without probable cause, the uses (or threatened uses) of force that underlie the assault and battery claims were not privileged[.]"); *Walsh v. Erie Cnty.*

40

*Dep't of Job & Family Servs.*, 240 F. Supp. 2d 731, 765 (N.D. Ohio 2003) ("An unlawful arrest would involve an unlawful touching."). The privilege to commit battery to effectuate a lawful arrest is also negated by the use of excessive force. *Alley*, 134 Ohio App. 3d at 313.

Because the Court has found that Wolf arrested Plaintiff without probable cause, the arrest was not lawful and Wolf's actions in handcuffing Plaintiff were not privileged. Thus, whether Wolf used excessive force is irrelevant and whether either side prevails on this claim will be based on the resolution of whether Wolf is entitled to statutory immunity at trial. Accordingly, the Court **DENIES** Plaintiff's and Wolf's requests for summary judgment as to Count III.

3.      *Counts IV and V – False Imprisonment and Arrest*

In Counts IV and V, Plaintiff alleges that Wolf intentionally and unlawfully detained and then arrested Plaintiff. (ECF No. 1, PageID #16–17, ¶¶ 91–101). Under Ohio law, the torts of false arrest and false imprisonment are indistinguishable causes of action. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315 (6th Cir. 2005) (citing *Rogers v. Barbera*, 170 Ohio St. 241, 164 N.E.2d 162, 164 (Ohio 1960)). "To prevail on a claim for false arrest/imprisonment, the plaintiff must demonstrate: '(1) the intentional detention of the person and (2) the unlawfulness of the detention.'" *Id.* (quoting *Hodges v. Meijer, Inc.*, 129 Ohio App. 3d 318, 717 N.E.2d 806, 809 (Ohio Ct. App. 1998)). "In false arrest, the action is based upon 'some asserted legal authority to enforce the law (such as that possessed by a police officer), whereas the tort of false imprisonment is reserved for those situations in which detention is purely a matter between private persons.'" *Ruble v. Escola*, 898 F. Supp. 2d 956, 983 (N.D. Ohio 2012) (quoting *Norwell v. Cincinnati*, 133 Ohio App. 3d 790, 729 N.E. 2d 1223 (Ohio Ct. App. 1999)); *see also Kareva v. United States*, 9 F. Supp. 3d 838, 845 (S.D. Ohio 2014) (determining that claims of false imprisonment cannot be asserted against government actors). The Court will therefore treat

41

Plaintiff's claims against Wolf for unlawful/false imprisonment and false arrest as a single claim for false arrest.  *See Ruble*, 898 F. Supp. 2d at 983.

Plaintiff argues that he is entitled to summary judgment on these claims because his arrest was without probable cause (unlawful) and Wolf is not entitled to statutory immunity.  (ECF No. 62, PageID #2223–25).  Wolf counters that he is entitled to summary judgment because there was probable cause for Plaintiff's arrest and he is also entitled to statutory immunity. (ECF No. 63, PageID #2251–56).  The Court cannot grant either party summary judgment on Counts IV and V because, as discussed above, there was no probable cause to arrest Plaintiff but there is a jury question as to whether Wolf acted with malice, bad faith, or recklessly such that he is not entitled to statutory immunity.  As a result, the Court **DENIES** Plaintiff's and Wolf's requests for summary judgment as to Count IV and V.

### 4.        *Count VI – Malicious Criminal Prosecution*

In Count VI, Plaintiff alleges that Defendant Wolf is liable for malicious criminal prosecution under Ohio law.  (ECF No. 1, PageID #17–18, ¶¶ 102–09).  "The elements of the tort of malicious criminal prosecution under Ohio law are '(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused.'"  *Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016) (quoting *Trussell v. Gen. Motors Corp.*, 53 Ohio St. 3d 142, 559 N.E.2d 732, 736 (Ohio 1990)).  The parties do not dispute that the prosecution was terminated in favor of Plaintiff—with evidence that the charges against Plaintiff were dismissed on October 3, 2022.  (ECF No. 51-16).  Wolf and Plaintiff instead dispute whether the first two elements of the offense are satisfied (malice and lack of probable cause).

Defendants argues that Plaintiff's malicious criminal prosecution claim fails on the merits because there was probable cause to charge Plaintiff with obstructing official business.  (ECF

42

No. 61, PageID #2183–84; ECF No. 63, PageID #2256–57; ECF No. 66, PageID #2279–80; ECF No. 67, PageID #2289; ECF No. 70, PageID #2402–03; ECF No. 72, PageID #2434).  By contrast, Plaintiff argues that he is entitled to summary judgment, in part, because there was no probable cause to charge him for obstructing official business.  (ECF No. 62, PageID #2224; ECF No. 68, PageID #2343; ECF No. 71, PageID #2423–24).

As with the prior state-law claims, the Court cannot grant either party summary judgment because there was no probable cause but the jury question remains as to whether Wolf is entitled to statutory immunity.  Accordingly, the Court **DENIES** Plaintiff's and Wolf's requests for summary judgment as to Count VI.

### G.      Count VII – Civil Liability (Ohio Rev. Code § 2744.02)

In Count VII, Plaintiff alleges that Cleveland Heights is liable under Ohio Rev. Code § 2744.02 for Plaintiff's injuries because Lewis negligently operated her motor vehicle, she was not responding to an emergency, and "[t]he entirety of the events, including the injuries to Plaintiff, stemmed from that negligent vehicle operation." (ECF No. 1, PageID #18–19, ¶¶ 110–13).  Under Ohio law, municipalities are generally afforded immunity from tort liability for injuries caused by an employee's acts or omissions in connection with a governmental function or proprietary function.  Ohio Rev. Code § 2744.02(A)(1); *Colbert v. City of Cleveland*, 2003-Ohio-3319, 99 Ohio St. 3d 215, 790 N.E.2d 781, 783 (Ohio 2003); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007).  However, municipalities "are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees upon the public roads when the employees are engaged within the scope of their employment and authority." Ohio Rev. Code § 2744(B)(1).  That said, the statute provides that a municipality "may establish a defense to liability for the negligent operation of a motor vehicle by an employee if the vehicle was being

43

operated by a police officer while 'responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct.'" *Digiorgio v. City of Cleveland*, 2011-Ohio-5878, ¶ 36 (Ohio Ct. App. 2011) (quoting Ohio Rev. Code § 274402.(B)(1)(a)) (alteration adopted).

Cleveland Heights first argues that it is immune from Plaintiff's claims under Ohio Rev. Code § 2744 because the exception for liability under § 2744.02(B)(1) is limited only to negligence related to driving a motor vehicle and not so expansive to include conduct related to the arrest of an individual (even when precipitated by a traffic stop). (ECF No. 61, PageID #2185–86). Plaintiff does not directly address this argument but contends that Lewis's negligently operated her motor vehicle by cutting off Plaintiff and almost causing an accident, and this "set off, and was the proximate cause for, the entire chain of events." (ECF No. 68, PageID #2346–47). The Court agrees with Cleveland Heights, the exception for liability under § 2744.02(B)(1) does not apply to the circumstances of this case. First, the Court agrees that the exception for liability under § 2744.02(B)(1) was strictly intended to encompass only injuries directly caused by and related to a government employee's negligent operation of a motor vehicle (*e.g.*, damages and injuries to a person or property caused by a collision or other accident relating to negligent vehicle operation).

Second, the alleged injuries in this case were not proximately caused by Lewis's alleged negligent operation of her motor vehicle. Under Ohio law, "[l]iability in negligence is dependent upon the existence of a proximate cause relationship between breach of duty and injury suffered. . . . Causation requires a factual nexus between the breach and injury (i.e., actual cause) and a significant degree of connectedness that justifies imposing liability (i.e., proximate cause)." *Darling v. Tribute Contracting & Consultants, LLC*, 2025-Ohio-4624, 273 N.E.3d 311, 327 (Ohio Ct. App. 2025) (internal quotation marks and citations omitted). Proximate causation

requires there to be "some reasonable connection" between a defendant's wrongful act and a plaintiff's injury. *See Queen City Terminals, Inc., v. General Am. Transp. Corp.*, 1995-Ohio-285, 73 Ohio St. 3d 609, 653 N.E.2d 661, 670 (Ohio 1995).  More specifically, "[t]he rule of proximate cause 'requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.'" *Jeffers v. Olexo*, 43 Ohio St. 3d 140, 539 N.E.2d 614, 617 (Ohio 1989) (quoting *Ross v. Nutt*, 177 Ohio St. 113, 203 N.E.2d 118, 120 (Ohio 1964)) (cleaned up).  Thus, "[a] party's negligence is a proximate cause of an injury if the injury is a natural and foreseeable result of the party's act or failure to act." *Wheeler v. Estes Express Lines*, 53 F. Supp. 3d 1032, 1040 (N.D. Ohio 2014) (citing *Brott Mardis & Co. v. Camp*, 2001-Ohio-4349, 147 Ohio App. 3d 71, 75, 768 N.E.2d 1191 (Ohio Ct. App. 2001)); *see also Mussivand v. David*, 45 Ohio St. 3d 314, 321, 544 N.E.2d 265, 272 (Ohio 1989) ("[I]n order to establish proximate cause, foreseeability must be found.").

Plaintiff argues that Lewis "cut him off" without activating her turn signal, Mr. Goodman hit his brakes abruptly, this caused Lewis to slam on her brakes, which in turn caused Plaintiff to slam on his brakes and almost resulted in a collision.  (*Id.* at PageID #2346).  Even if it were determined that this conduct by Lewis was negligent, it was not the proximate cause of Plaintiff's injuries related to his arrest.  Plaintiff has not alleged, nor does the record establish, that he suffered any injuries or damages directly related to his having to slam on his brakes to avoid a collision with Lewis's vehicle.  Plaintiff being arrested for obstructing official business and him suffering injuries from being handcuffed and placed in the back of a police cruiser were not the natural and foreseeable consequences of Lewis "cutting off" Plaintiff and slamming on her brakes in response

45

to Mr. Goodman abruptly stopping.  A reasonably prudent person would not anticipate or expect the subsequent interaction between officers and Plaintiff, as well as the arrest of Plaintiff.  Thus, Cleveland Heights is entitled to immunity against Plaintiff's Count VII claim because the exception for liability under § 2744.02(B)(1) is not applicable.  Accordingly, the Court **GRANTS** summary judgment in Cleveland Height's favor as to Count VII.

## V.      CONCLUSION

For the foregoing reasons, The Court **DENIES** Plaintiff's motion for partial summary judgment (ECF No. 62).  The Court **GRANTS** Lewis and Cleveland Heights's motion for summary judgment (ECF No. 61).  Summary Judgment is entered in Lewis's and Cleveland Heights's favor on all claims asserted against them in the complaint.  The Court **GRANTS IN PART AND DENIES IN PART** Wolf's motion for summary judgment (ECF No. 63).  Summary Judgment is entered in Wolf's favor on all claims asserted him in Counts I and II.  Counts III, IV, V, and VI remain pending against Wolf, and are the sole remaining claims in this action.

**IT IS SO ORDERED.**

Date: March 30, 2026

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**